# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **TOSHIBA INTERNATIONAL CORPORATION,** | § | |
| | § | |
| | § | |
| **PLAINTIFF,** | § | |
| **v.** | § | |
| | § | |
| | § | **No. 4:19-cv-04274** |
| **SUDHAKAR KALAGA,** | § | |
| **an individual, VIJAYAGOWRI** | § | |
| **"JAYA" KALAGA, an individual,** | § | |
| **KIT CONSTRUCTION SERVICES,** | § | |
| **INC., KIT PROFESSIONALS, INC.,** | § | |
| **SKBP VENTURES, LLC,** | § | |
| **SVSRK ENTERPRISES, LLC,** | § | **JURY TRIAL DEMANDED** |
| **RUDOLPH CULP, as independent** | § | |
| **administrator of the ESTATE** | § | |
| **OF PABLO D'AGOSTINO,** | § | |
| **PD RENTALS, LLC,** | § | |
| **JANUARY 22 1992, LLC,** | § | |
| **VINOD VEMPARALA, an individual,** | § | |
| **V2V SOLUTIONS, LLC,** | § | |
| **CHETAN VYAS, an individual,** | § | |
| **ABRAHAM JOSEPH, an individual,** | § | |
| **and ONEPOINT, INC.,** | § | |
| | § | |
| **DEFENDANTS.** | § | |

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

CONCISE SUMMARY ............................................................................................iv

I.    TIC Faces Irreparable Harm from the Kalaga Defendants' Dissipation of
      Funds from the Bank Accounts, Disposition of Real Estate, and Sale of
      Luxury Assets. ...........................................................................................4

      A.    Further Dissipation of the Kalagas' Personal and Corporate Bank
            Accounts Will Irreparably Harm TIC ...................................................5

            1.    From 2013 to 2019, Kalaga Deposited $83 Million Paid by
                  TIC into KIT Construction's Bank of America Accounts
                  Ending in -3327 and -9169. ......................................................5

            2.    Since September 2019, the Kalagas Have Rapidly
                  Dissipated Cash............................................................................6

            3.    $1.75 Million Paid to Rusty Hardin by KIT Construction ........8

            4.    $1.5 Million Wired to KIT Professionals Used to Pay
                  "Employee Bonuses," the Kalagas Personally, Kalaga
                  Family Taxes, and Profit-Sharing Plan......................................9

            5.    The Kalagas Have Lavishly Spent the Proceeds of the
                  Fraud on Themselves, Charged to a KIT Construction
                  Credit Card. ..............................................................................12

      B.    Potential Dissipation of Real Estate will Irreparably Harm TIC. .......13

      C.    The Dissipation of Luxury Assets Purchased with the Proceeds
            of the Fraud will Irreparably Harm TIC..............................................15

II.   TIC Has a Substantial Likelihood of Success on the Merits Because
      There is No Genuine Dispute that Defendants Engaged in a Bribery
      and Bid-Rigging Fraud Scheme, and that Sudhakar Kalaga Refused
      to Testify About It. .........................................................................................23

      A.    There is No Genuine Dispute that Sudhakar Kalaga, Jaya Kalaga,
            KIT Construction, and KIT Professionals Paid at least $5.5 Million
            in Cash Bribes to Pablo D'Agostino from 2011 to 2019. ...................23

B.    There is No Genuine Dispute that Sudhakar Kalaga, Jaya Kalaga, SKBP Ventures, LLC, and SVSRK Enterprises, LLC Bribed Pablo D'Agostino By Giving Him at Least 18 Properties Worth Almost $4 million.................................................................31

C.    There is No Genuine Dispute that Sudhakar and Jaya Kalaga Bought Luxury Goods and 100 Ounce Silver Bars for Pablo D'Agostino......35

D.    There is No Genuine Dispute that Sudhakar Kalaga, Jaya Kalaga, KIT Professionals, and KIT Construction Rigged Bids and Submitted Fake Bids with Vinod Vemparala and Pablo D'Agostino. ................................................................38

E.    There is No Genuine Dispute that KIT and Kalaga Marked Up the Cost of the TIC Projects by Between 50% to Over 300%. .....44

III.   There is Overwhelming Evidence in the Record Supporting Each of TIC's Causes of Action to Establish a Substantial Likelihood of Success. ..47

A.    Civil RICO: 18 U.S.C. § 1962(c) ........................................48

1.    RICO Person .........................................................48

2.    A Pattern of Racketeering Activity: Mail and Wire Fraud and Commercial Bribery as Predicate Acts...................49

3.    Enterprise Connected to Racketeering Activity ......................62

4.    Causation ................................................................65

B.    Breach of Fiduciary Duty ....................................................66

C.    Knowing Participation in Breach of Fiduciary Duty .........................67

D.    Constructive Trust ...........................................................71

IV.   TIC's Threatened Injury Outweighs Any Threatened Harm........................75

V.   Granting TIC's Preliminary Injunction Will Not Disserve the Public Interest ...........................................................................77

VI.   No Additional Bond Should Be Required .....................................78

VII.  CONCLUSION.....................................................................79

## CONCISE SUMMARY

The primary purpose of this motion for a preliminary injunction is for the Court to preserve the last $5 million remaining in the Kalaga Defendants' personal and corporate bank accounts after they spent, transferred, or hid away over $3 million since September 2019, when they first became aware that Toshiba International Corporation ("TIC") had discovered their fraud. The $5 million that is left represents just a small fraction of the $109 million bid-rigging and bribery fraud they committed against TIC. TIC's motion for a preliminary injunction against the Kalaga Defendants presents the Court with the following four issues:

- **Irreparable Harm.** Bank records show that over the last five months, the Kalaga Defendants have been dissipating their bank accounts to further victimize TIC and impair its ability to recover what little is left of the funds that the Kalaga Defendants stole. For example, KIT Construction's bank account has dropped 97% from $3.85 million to approximately $131,000. Even as this Court considered TIC's request for a TRO in December 2019, the Kalagas were actively draining the accounts and making lavish payments for their family members. There is no genuine dispute that these funds are traceable to the fraud. Between 2013 and 2019, KIT Construction deposited approximately $83 million in check payments from TIC in its Bank of America accounts ending in -3327 and -9169. The bank records show that TIC was KIT Construction's only customer. From these bank accounts, the proceeds of the fraud were sent to other bank accounts, including approximately $13 million to KIT Professionals and another $11.8 million to the Kalagas' personal bank accounts.

  Bank records show that since September 2019, when Kalaga became aware of the federal criminal investigation, the Kalaga Defendants have been methodically draining their corporate bank accounts to pay for the personal expenses of their adult children, their parents, and themselves to place the funds out of the reach of TIC in the event of a judgment.

For example, from September 1, 2019, to the present, Sudhakar Kalaga purportedly paid over $1.8 million to the IRS in round dollar amounts for Rohit and Sharat Kalaga, his adult children in college; for Srihari Kalaga, his father; for Deekshitulu Lanka, Jaya's father, and for themselves.  The Kalagas have also continued to allow their children to charge personal expenses, such as college tuition and parking expenses, to the KIT corporate credit cards.  There was also a transfer of $627,559 from KIT Professionals to a Deutsche Bank account.  There was a transfer of $1.75 million to the bank account of Rusty Hardin from KIT Construction, presumably to fund the criminal defense of Sudhakar Kalaga using funds that are the proceeds of fraud.  There are also apparent transfers to offshore accounts, including transfers to accounts located in India.  In light of these transfers and others described below, the Court should freeze the Kalaga Defendants' bank accounts, investment accounts, physical assets, and real estate to prevent further dissipation and irreparable harm to TIC.

- **Likelihood of Success on the Merits – Bribes.**  KIT Construction's Bank of America records and Pablo D'Agostino's income tax returns show over $5.5 million in bribery checks for so-called "Business Development" paid to Pablo D'Agostino's personal company, January 22 1992, LLC, and to his ex-wife, Melissa D'Agostino.  The checks were signed by both Sudhakar and Jaya Kalaga.  In addition, property transfer records show approximately $4 million in real estate transferred from Sudhakar Kalaga to D'Agostino, with eight recorded before D'Agostino's suicide and ten more notarized and ready to be recorded at the time of his suicide.  Kalaga also sent D'Agostino over $100,000 in shipments of 100-ounce silver bars, among other luxury gifts, including cars and watches.

- **Likelihood of Success on the Merits – Fake Bids.**  The e-mail records between Vinod Vemparala and Sudhakar Kalaga show that Kalaga was preparing bids in the name of Vemparala's company, V2V Solutions, LLC, as well as a non-existent company called Sermeg Industrial, Inc.  In addition, Vemparala admitted to coordinating with Kalaga to submit bids to TIC at prices higher than KIT Construction's prices and admitted that Kalaga would also create additional V2V and Sermeg bids without Vemparala's involvement.  This occurred nearly 70 times.  Vemparala was paid at least $230,000 by Sudhakar Kalaga for his involvement in this fraud.  This evidence of fake bids submitted by Kalaga and Vemparala, and at least $10 million in bribe payments to D'Agostino, is sufficient to establish TIC's likelihood of success on the merits against the Kalaga

Defendants in its civil RICO, breach of fiduciary duty, knowing participation in breach of fiduciary duty, and constructive trust claims.

- **Adverse Inference.** During his deposition, Sudhakar Kalaga refused to answer all questions about the substance of TIC's claims against him, invoking his Fifth Amendment right against self-incrimination. Kalaga has also refused to produce text messages between himself and D'Agostino, citing an act-of-production privilege rooted in the Fifth Amendment right against self-incrimination. TIC is entitled to an adverse inference against Kalaga and his companies based on Kalaga's refusal to answer relevant questions about his submission of fake bids to TIC and payment of bribes to D'Agostino.

The bank records TIC obtained through the Court-ordered expedited discovery process show that the Kalagas are doing everything they can do to hide funds from this Court and deny TIC its equitable remedy and a meaningful financial recovery from the massive fraud they committed. Accordingly, TIC respectfully requests that the Court set an expedited briefing and hearing schedule so that TIC may present its evidence supporting a preliminary injunction to the Court.

TIC seeks a preliminary injunction to:

- Freeze all corporate and personal bank accounts and investment accounts, both domestic and offshore, of the Kalaga Defendants, including the KIT Professionals savings account containing $3.7 million — the last account remaining with any significant balance;

- Freeze all real estate acquired by the Kalaga Defendants since their participation in the fraud began in 2009; and

- Freeze all personal assets acquired by the Kalaga Defendants after their participation in the fraud began in 2009, including cars, artwork, watches, luxury clothing, jewelry, silver bars, gold bars, and safes.

Justice requires nothing less.

## MEMORANDUM OF LAW

Since the TRO hearing in December 2019, TIC sent subpoenas to Bank of America, Chase, Wells Fargo, and Green Bank pursuant to the terms of the Court's Expedited Discovery Order (ECF No. 40).   The information provided by the subpoenaed banks is shocking.   From the moment that the Kalagas became aware that Pablo D'Agostino was terminated and that there was an ongoing federal criminal investigation, KIT Construction's bank accounts have dropped 97%, and Sudhakar Kalaga's personal bank account has dropped 59%.   *See* Declaration of Richard A. Pollack (Ex. 1) at ¶ 27.   Millions of dollars have disappeared in the last five months. The bank records show that the money has been used to fund purely personal expenses of the Kalaga family in an effort to put the funds out of the reach of this lawsuit.   The Kalagas have consolidated what remains in Jaya Kalaga's personal bank account and in the checking and savings accounts of KIT Professionals.   The following chart shows the sharp drop in account balances since September:

| Bank | Account Number | Account Name | Beginning Balance 9/24/2019 | Ending Balance |
|---|---|---|---|---|
| Bank of America | -3327 | KIT Construction - Checking | $ 3,851,296.13 | $ 131,396.69 |
| Wells Fargo | -2053 | KIT Professionals - Checking | $ 535,708.78 | $ 488,319.45 |
| Wells Fargo | -8865 | KIT Professionals - Savings | $ 3,262,305.64 | $ 3,715,326.87 |
| Wells Fargo | -4154 | Sudhakar Kalaga - Checking | $ 85,766.96 | $ 35,589.03 |
| Wells Fargo | -7512 | Jaya S Kalaga - Savings | $ 156,382.10 | $ 475,279.85 |
| | | **Totals** | **$ 7,891,459.61** | **$ 4,845,911.89** |

*See id.*  These accounts had $7.9 million as of September 24, 2019.  The KIT Construction account, which was used solely to receive payments from TIC — its only customer — has been completely emptied by the Kalagas.  As of January 31, 2020, the KIT Construction account that received TIC's payments is down 97% — a decline of over $3.7 million.  Overall, the accounts have lost $3.045 million.  There is a risk of further dissipation occurring over the next few months absent an injunction.

Over the course of the fraud from 2013 to 2019, the Kalagas made regular transfers from a KIT Construction bank account to the KIT Professionals checking account totaling nearly $18 million.  *See id.* at ¶ 19.  In addition, during the course of the fraud, TIC directly paid KIT Professionals a total of $11,786,026.  *See id.* at ¶¶ 23-24.  This means that between direct payments from TIC and Kalaga bank transfers from KIT Construction, KIT Professionals received a total of at least $29.5 million of TIC's funds out of the $108.8 million paid by TIC to KIT entities from 2011 to 2019.  *See id.* at ¶ 23.  The KIT Construction transfers to KIT Professionals are as follows:

| KIT Construction Account Sending Transfer | KIT Professionals Account Receiving Transfer | Date | Amount Total |
|---|---|---|---|
| Wells Fargo -3438 | Wells Fargo -2053 | 03/18/13 | $254,790 |
| Wells Fargo -3438 | Wells Fargo -2053 | 09/17/13 | $74,510 |
| Wells Fargo -3438 | Wells Fargo -2053 | 09/17/13 | $204,300 |
| Wells Fargo -3438 | Wells Fargo -2053 | 09/30/13 | $125,000 |
| Wells Fargo -3438 | Wells Fargo -2053 | 09/30/13 | $150,000 |

| | | | |
|---|---|---|---|
| Wells Fargo -3438 | Wells Fargo -2053 | 09/30/13 | $380,260 |
| Wells Fargo -3438 | Wells Fargo -2053 | 04/01/14 | $500,250 |
| Wells Fargo -3438 | Wells Fargo -2053 | 08/01/14 | $375,000 |
| Wells Fargo -3438 | Wells Fargo -2053 | 12/12/14 | $875,000 |
| Wells Fargo -3438 | Wells Fargo -2053 | 12/26/14 | $500,000 |
| Wells Fargo -3438 | Wells Fargo -2053 | 11/02/15 | $750,000 |
| Wells Fargo -3438 | Wells Fargo -2053 | 12/28/15 | $700,000 |
| BoA -3327 | Wells Fargo -2053 | 01/27/16 | $300,000 |
| BoA -3327 | Wells Fargo -2053 | 03/28/16 | $600,000 |
| BoA -3327 | BoA -7660 | 10/24/16 | $250,000 |
| BoA -3327 | BoA -7660 | 11/18/16 | $750,000 |
| BoA -3327 | BoA -7851 | 11/21/16 | $20,000 |
| BoA -3327 | BoA -7903 | 11/21/16 | $20,000 |
| BoA -3327 | BoA -7851 | 12/15/16 | $500,000 |
| BoA -3327 | BoA -7851 | 01/03/17 | $50,000 |
| BoA -3327 | BoA -7851 | 01/03/17 | $100,000 |
| BoA -3327 | Wells Fargo -2053 | 04/04/17 | $127,500 |
| BoA -3327 | Wells Fargo -2053 | 06/22/17 | $750,000 |
| BoA -3327 | BoA -7903 | 10/10/17 | $100,000 |
| BoA -3327 | BoA -7660 | 11/09/17 | $375,000 |
| BoA -3327 | BoA -7851 | 11/13/17 | $300,000 |
| BoA -3327 | Wells Fargo -2053 | 12/22/17 | $900,000 |
| BoA -3327 | Green Bank | 12/22/17 | $1,000,000 |
| Wells Fargo -3438 | Wells Fargo -2053 | 01/12/18 | $154,695 |
| BoA -3327 | Green Bank | 01/19/18 | $2,000,000 |
| BoA -3327 | BoA -7903 | 05/16/18 | $60,000 |
| BoA -3327 | BoA -7851 | 11/28/18 | $700,000 |
| BoA -3327 | BoA -7660 | 04/30/19 | $1,250,000 |
| BoA -3327 | BoA -7660 | 06/06/19 | $1,100,000 |
| BoA -3327 | BoA -7660 | 10/18/19 | $1,500,000 |
| | | **TOTAL** | **$17,796,305** |

Significantly, the last transfer on October 18, 2019, for $1.5 million was the **second-highest** value transfer the Kalagas ever made from KIT Construction to KIT Professionals and was about 3x higher than the average transfer of approximately $500K.  This money was not used for any legitimate business purpose, but instead was used to benefit the Kalagas personally and hide funds from the lawsuit

As a result of this sudden dissipation of funds and the threat of further losses from KIT Professionals' savings account, TIC respectfully requests that the Court issue a preliminary injunction freezing the Kalaga Defendants' bank accounts, properties, and personal assets.  In order to obtain a preliminary injunction, a plaintiff must show: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.  *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  As set forth below, TIC meets these requirements for injunctive relief.

## I.   TIC Faces Irreparable Harm from the Kalaga Defendants' Dissipation of Funds from the Bank Accounts, Disposition of Real Estate, and Sale of Luxury Assets.

TIC faces irreparable harm if this Court does not grant injunctive relief.  A preliminary injunction should issue when necessary to preserve the status quo and "protect a [movant's] remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." *Janvey*, 647 F.3d at 600.  A plaintiff may also seek injunctive relief on an equitable cause of action, such as TIC's request for a constructive trust, regardless of whether a plaintiff also seeks legal remedies.  *See Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835

F.2d 554, 561–62 (5th Cir. 1987) ("[A]n asset freeze by preliminary injunction is an appropriate method to assure the meaningful, final equitable relief sought," where plaintiff sought a constructive trust on funds defendants gained from breach of fiduciary duties, as well as other legal remedies); *see also Animale Group v. Sunny's Perfume, Inc.*, 256 Fed. App'x 707, 708–09 (5th Cir. 2007) (citing cases from numerous circuits to uphold asset-freezing preliminary injunction where both legal and equitable relief was sought).

### A. Further Dissipation of the Kalagas' Personal and Corporate Bank Accounts Will Irreparably Harm TIC

#### 1. From 2013 to 2019, Kalaga Deposited $83 Million Paid by TIC into KIT Construction's Bank of America Accounts Ending in -3327 and -9169.

All the funds in KIT Construction's Bank of America accounts -3327 and -9169 were proceeds of Sudhakar and Jaya Kalaga's bribery and bid-rigging fraud.  The bank records TIC obtained through expedited discovery show that the Kalagas were consistent in depositing TIC's checks to KIT Construction into the Bank of America bank accounts ending in -3327 and -9169.  Between just 2013 and 2019, the accounts ending in -3327 and -9169 show approximately $83 million in deposits of payments from TIC.  Pollack Decl. at ¶ 11.  In fact, 97.9% of KIT Construction's total deposits from 2013 to 2019 came from TIC.  *See id.* at ¶ 12. The accounts show that KIT Construction paid LSI, the subcontractor that did most of the work at TIC, $21.5 million during this same period.  *See id.* at ¶ 13;

Declaration of Jason Snell (December 6, 2019) ("Snell Decl.") (ECF No. 31-6) at ¶ 26, Ex. 8. The accounts also reflect payments to other potential subcontractors on TIC-related projects of (at most) approximately $6 million and an additional $2.2 million in potential TIC related transfers. Pollack Decl. at ¶¶ 13–14. With total payments received from TIC of $82,995,976, and total disbursements of $29,990,295, this reflects an aggregate mark-up of 176.7 percent. *See id.* at ¶ 15.

The $53 million difference between what KIT Construction received and paid out as costs was profit for the Kalaga Defendants, representing the proceeds of the bribery and bid-rigging conspiracy from 2013 to 2019. *See id.* at ¶ 17. The years 2011 to 2012 are not included in this calculation because the bank records only go back seven years. Additional discovery will allow TIC to account for the earlier years; however, an extrapolation of the loss to the missing years and to KIT Professionals, which also received direct payments from TIC, yields a total loss to TIC of at least $69.5 million. With the treble damages permitted under TIC's civil RICO claim, TIC's total damages are at least $208.5 million from the Kalagas' illegal bribery and bid-rigging conspiracy. *See id.* at ¶ 24.

## 2. Since September 2019, the Kalagas Have Rapidly Dissipated Cash.

The Kalagas learned about the criminal investigation against them soon after D'Agostino was terminated on September 24, 2019, and TIC sent a letter requesting a meeting with Sudhakar Kalaga. Rusty Hardin called TIC's legal counsel on

September 26, 2019, the same day bank records reflect his firm received a $100,000 wire transfer from KIT Construction's bank account.  Mr. Hardin followed up with an e-mail on September 27, 2019, stating, "[W]e have been informed that there is a criminal investigation of this matter by federal law enforcement and until that is completed, we will not be allowing our client to be interviewed by you or anyone outside of law enforcement."  *See* Ex. 2.  Therefore, the Kalagas were well-aware, at least as of September 27, that their fraud scheme had been discovered by TIC and federal law enforcement.

In the three months after becoming aware of Pablo D'Agostino's termination and the federal criminal investigation (September 24), the lawsuit (October 30), and TIC's Motion for a Temporary Restraining Order (November 27), the Kalagas drained approximately $3 million from KIT Construction's Bank of America account, leaving virtually nothing.  Pollack Decl. at ¶ 28.  In September, prior to D'Agostino's termination, TIC paid KIT Construction $540,995.65, and the Kalagas deposited the checks into the Bank of America account, bringing the total in the account to $4.1 million.  As of December 31, 2019, there was $131,396 left in the account.  *See id.* at ¶ 27.  Where did the money go?

| Opening Balance | $3,851,296 |
|---|---|
| Disbursements: | |
| Payments to Rusty Hardin (Attorney) | $1,750,000 |
| Transfer to KIT P (*2053) via SVRSK (BOA *7660) – Note 1 | 1,500,000 |
| Payments to credit card | 48,177 |
| Tax Payments (State of Texas Comptroller) | 40,666 |
| Payments to Bob Kakarala (CPA) | 15,500 |

| | |
|---|---:|
| Payment to Rohit Kalaga | 11,470 |
| Payment to Sharat Kalaga | 11,470 |
| Payments to Charity and Other Payments for Benefit of Sudhakar Kalaga | 3,338 |
| Payments to subcontractors or unknown payees | 351,063 |
| **Total** | $3,731,685 |

**Closing Balance**                                                                                  $131,397

Note 1
The following disbursements are traceable to the $1.5 million transfer to KIT P these funds:

- 10/17/2018 – Transfer to Sudhakar Kalaga (Wells *4154)        $500,000
  ultimately used for tax payments on behalf of Sudhakar
  Kalaga and family members.

- 12/19/2019 – Payment to Deutsche Bank for                              627,559
  "All Emp Annual Bonus" via KIT P (Wells *2053)

- 12/30/2019 – Payment to John Hancock for                               189,658
  "2019 Profit Sharing" via KIT P (Wells *2053)

*See id.* at ¶ 28.

### 3.   $1.75 Million Paid to Rusty Hardin by KIT Construction

Nearly half of the money, $1.75 million, went to Rusty Hardin, counsel for the Kalaga Defendants, presumably as his fee for the criminal and civil cases. The wires began two days after D'Agostino's termination and continued monthly as follows:

| | | | |
|---|---|---|---|
| 09/26/2019 | KIT Construction | Rusty Hardin & Associates, LLP | $100,000 |
| 10/21/2019 | KIT Construction | Rusty Hardin & Associates, LLP | $500,000 |
| 11/13/2019 | KIT Construction | Rusty Hardin & Associates, LLP | $50,000 |
| 12/13/2019 | KIT Construction | Rusty Hardin & Associates, LLP | $1,100,000 |
| | | TOTAL | $1,750,000 |

*See id.* at ¶ 18; Ex. 3 .  Assuming these payments are for legal fees, Kalaga has used the proceeds of his fraud against TIC to pay for his personal criminal and civil defense.[1]

### 4. $1.5 Million Wired to KIT Professionals Used to Pay "Employee Bonuses," the Kalagas Personally, Kalaga Family Taxes, and Profit-Sharing Plan.

On October 18, 2019, Kalaga transferred $1.5 million from KIT Construction's bank account to a bank account in the name of SVSRK and then to KIT Professionals' Well Fargo account ending in -2053.  Kalaga used all of those funds to make the following payments:

- $627,559 to Deutsche Bank for purported "Employee Bonuses";

- $189,658 to John Hancock for "Profit Sharing"; and

---

[1] To the extent that these funds went to pay for the Kalagas' attorney's fees, those funds are proceeds directly traceable to the fraud and the Kalagas' counsel is on notice that his fee may be subject to clawback and forfeiture.  *F.T.C. v. Assail, Inc.*, 410 F.3d 256, 265 (5th Cir. 2005) ("when an attorney is objectively on notice that his fees may derive from a pool of frozen assets, he has a duty to make a good faith inquiry into the source of those fees. Failure to make such an inquiry in the face of this duty will result in disgorgement of the funds."); *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010) (concluding that although client's assets were not yet frozen when attorney accepted his fee, attorney received sufficient notice to trigger "a duty to make a good faith inquiry into the source of th[e] fee [ ]." citing *Assail*, 410 F.3d at 265.); *In re Bell & Beckwith*, 838 F.2d 844, 850 (6th Cir.1988) (where circumstances surrounding the payment of attorney's fees proved sufficient to put attorney on notice that client's funds were obtained by fraud, attorney not entitled to bona fide purchaser status and funds may be clawed back);  *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F.Supp. 463, 474 (E.D. Va.1994) (attorney's fees may be "subject to forfeiture, even in the attorney's hands" if funds used to pay fees were derived from criminal activity), *aff'd United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 665 (4th Cir. 1996).

- $500,000 of the total $665,000 in purported payments of Kalaga family taxes after September 2019.

Pollack Decl. at ¶ 28.  First, KIT Construction reported to an insurance company in 2017 that it only has two employees — likely to be Sudhakar and Jaya Kalaga.  *See* Ex. 4 (Colony Insurance General Casualty Application Signed by Sudhakar Kalaga at Question 8).  Second, the $500,000 transferred to Kalaga appears to be purely a way for him to take cash out of the company.  Third, it is unclear what the "Profit Sharing," payment was used for.  Finally, Kalaga purportedly paid the personal taxes of his family members as follows:

| Item Category | Oct-19 | Jan-20 |
|---|---|---|
| IRS USATAXPYMT - DEEKSHITULU LANKA | 20,000.00 | |
| IRS USATAXPYMT - ROHIT KALAGA | 50,000.00 | 50,000.00 |
| IRS USATAXPYMT - SHARAT KALAGA | 50,000.00 | |
| IRS USATAXPYMT - SRIHARI KALAGA | 20,000.00 | 75,000.00 |
| IRS USATAXPYMT - SUDHAKAR & VIJAYAGOWRI | 150,000.00 | 250,000.00 |
| TOTAL | 290,000.00 | 375,000.00 |

Pollack Decl. at ¶ 30.

Rohit and Sharat Kalaga are the adult children of Sudhakar Kalaga.  They appear to be in college because they are charging their college tuition payments to a KIT Construction credit card.  *See* Ex. 5.  Srihari Kalaga appears to be Sudhakar's

father and Deekshitulu Lanka appears to be Jaya Kalaga's father.  Apart from using KIT Construction and KIT Professionals funds to make personal tax payments, another concern is that they could be using the IRS as a cover to hide funds from this lawsuit.  In fact, if the Kalagas overpaid the tax liabilities of their family members, they will eventually get a refund or can apply the payments to future tax liabilities.  Sudhakar Kalaga himself purportedly paid $1.2 million to the IRS in September 2019 for his own personal tax liability and $665,000 in 2019 for the tax liability of KIT Professionals.  Pollack Decl. at ¶ 30.

Although TIC sent a subpoena to Bob Kakarala, the Kalaga family accountant, Mr. Hardin's law firm is now representing Mr. Kakarala in responding to the subpoena, and they have indicated they intend to object to the production of the tax returns.

From the KIT Construction bank account, the Kalagas moved the money around and commingled it with other funds.  From 2013 to 2019, the Kalagas transferred:

- $18 million to KIT Professionals' bank account,

- $19 million to pay the Kalagas and their family members,

- $5.5 million in cash bribe payments to D'Agostino,

- Hundreds of thousands in payments to co-conspirators Chetan Vyas and Vinod Vemparala, and

- Millions of dollars in personal checks, credit card payments, and bank cash withdrawals.

> **5. The Kalagas Have Lavishly Spent the Proceeds of the Fraud on Themselves, Charged to a KIT Construction Credit Card.**

In the short period between hiring counsel and TIC filing its Complaint, the Kalagas used KIT credit cards to, among other things, travel to India, buy $1,699 worth of electronics, cover $714.45 in country club expenses for multiple months, and spend $5,969.68 on goods from Amazon.com. *See* Exs. 5–15.  After TIC filed its Complaint on October 30, 2019, the Kalagas continued spending the proceeds of the fraud using credit cards linked to KIT Professionals and KIT Construction.  For example, Sudhakar Kalaga's KIT credit card spending reveals a November 2019 trip to Las Vegas to stay at the Bellagio Hotel.  *See* Ex. 6.  The same statement shows a $470.44 purchase at "Five Star Liquor" in Las Vegas and a $315.00 expenditure at the TAO Asian Bistro and Nightclub.  *See id.*  On January 6, 2020, a KIT credit card was used to make a $5,766.65 tuition payment to the University of Texas, presumably for one of Kalaga's adult children.  *See* Ex. 16.  That same credit card has been used to pay at least $4,553.76 in parking fees at the University of Texas in the few months after TIC filed its Complaint.  *See* Exs. 17–20.

### B. Potential Dissipation of Real Estate will Irreparably Harm TIC.

This Court has granted injunctive relief where funds from an illegal scheme were taken to purchase real property. *See O'Kane v. Sembritzky*, No. 4:18-cv-02728, 2019 U.S. Dist. LEXIS 102357 (S.D. Tex. June 19, 2019). In *O'Kane*, plaintiffs alleged that defendants used fraudulently obtained money to buy a luxury condo. *Id.* at *1–2. The court there granted a preliminary injunction to prevent defendants from transferring the real property. Preliminary Injunction Order at 3; *O'Kane*, 2019 U.S. Dist. LEXIS 102357, ECF No. 11. In granting an order on additional injunctive relief, this Court in *O'Kane* found substantial harm would occur if plaintiffs were to lose the property as part of their equitable relief. *O'Kane*, 2019 U.S. Dist. LEXIS 102357, at *16–20. This Court noted that the condo was "an identifiable res that [could] be traced back to [the] Plaintiffs' subscription payments and proceeds [to one of the Defendants]." *Id.* at *18.

Except for one property acquired in 1998, all properties owned by the Kalaga Defendants were acquired during the course of the fraud. Beginning in 2013 and continuing until 2018, the Kalaga Defendants purchased 23 different properties. Eight of these properties were transferred to D'Agostino or D'Agostino-owned entities and recorded; Kalaga attempted to transfer ten of these properties in the same manner on November 6, 2018, but failed to record or have D'Agostino sign the deed.

13

The following are properties purchased during the course of the fraud that Kalaga did not transfer:

1. 734 Beckets Crossing Ln., Spring, TX 77373-8100
2. 25527 Goss Spring Ct., Spring TX 77373-2296
3. 22526 Goss Spring Ct., Spring, TX 77373-2295
4. 10 Ellicott Way, Sugar Land, TX 77479-2870
5. 23323 Kobi Park Ct., Spring, TX 77373-8349
6. 47 Wickerdale Pl., The Woodlands, TX 77382-1674
7. 4521 San Felipe St., #1801, Houston, TX 77027-3389
8. 26 Whitekirk Pl., Magnolia, TX 77354-3276
9. 706 Beckets Crossing Ln., Spring, TX 77373-8100
10. 54 Blue Creek Pl., Spring, TX 77382-1779
11. 43 Verbena Bend Pl., Spring, TX 77382-2303
12. 21219 Fire Wind Ct., Spring, TX 77379-8253
13. 1007 Lamson Ct., Spring, TX 77373-8060
14. 22402 Spring Crossing Dr., Spring, TX 77373
15. 23106 Oxbow Trail, Spring, TX 77373-8144.

*See* ECF No. 24, 24-17 (ownership of property by Sudhakar Kalaga and corporate entities).

All of these properties were purchased by Kalaga Defendants during a time where they (or their entities) received over $100 million from TIC.  Additionally, to ensure facilitation of the scheme, the Kalaga Defendants transferred or attempted to transfer over 80% of the 23 properties to D'Agostino or D'Agostino-owned entities, leaving a few for themselves to enjoy.  Not only were these properties likely purchased with TIC's money and to further perpetrate a fraud against TIC, absent an injunction, TIC will have no guarantee that these properties will not be further transferred to a third-party buyer.  Should the properties be further transferred to a

third-party buyer, TIC would have to pursue multiple lawsuits against successive transferees of the properties in order to establish its interest via constructive trust. *See Janvey*, 647 F.3d at 600 ("[A] remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions." (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934))). These 15 properties have a collective tax assessed value of $6,322,150, and the purchase of these properties occurred with funds acquired after the Kalaga Defendants began their fraud against TIC. Injunctive relief is therefore necessary to prevent Plaintiff from being irreparably harmed and to preserve the status quo.

### C. The Dissipation of Luxury Assets Purchased with the Proceeds of the Fraud will Irreparably Harm TIC.

The entire Kalaga family benefitted from the acts of Sudhakar and Jaya Kalaga to defraud TIC. Sharat and Rohit Kalaga, sons of Sudhakar and Jaya Kalaga, both received significant payouts from KIT Construction. As an example, KIT Construction paid a $250,000 check with the memo line "Good luck Sharat!!" to Sharat Kalaga on March 11, 2019:



See Ex. 21.  On June 21 and June 26, 2019, KIT paid $11,740 checks to Sharat and Rohit with the memo line on both checks of "2019 Q2 Payroll."  See id.  Besides enjoying monetary benefits of the fraud, Sharat and Rohit both obtained internships at TIC, in 2015 and 2017 respectively, through D'Agostino's inside influence at the company.  See Am. Compl. ¶ 84.  Before and after their internships, both Rohit and Sharat Kalaga were involved in the operations of the companies, KIT Construction Services and KIT Professionals.  See id.  Both sons continue to use KIT credit cards to cover their expenses while at college, further demonstrating how the Kalaga Defendants commingled their funds.

KIT Construction generally spent the fortune it amassed as a result of the fraud against TIC on lavish expenses.  For example, from 2013 to 2019, Kalaga wrote checks or made credit card purchases from KIT Construction's bank account totaling $454,670 to Karat 22 Jewelers (a/k/a Amrut 75, Inc.) and Zadok Jewelers.  See Ex. 22.  A single Zadok Jewelry purchase on July 15, 2013 was for $85,559.07:

| Card account # | | 9706 | | | |
| --- | --- | --- | --- | --- | --- |
| 07/15/13 | CHECKCARD 0712 ZADOK JEWELERS HOUSTON | | TX 24639233193900016700274 CKCD | | -85,559.07 |

*Id.* at 7.  KIT Construction spent up to $95,000 at a time at Karat 22 Jewelers:



*Id.* at 2.  These purchases were entirely inconsistent with construction-related work, even though Kalaga occasionally had silver bars shipped to KIT's office.  For example, the KIT Construction Bank of America account -3327 was used to purchase $20,740 in silver bars from APMEX on January 7, 2014.  *Id.* at 7.  Kalaga had the order sent via FedEx to KIT Professionals:

> **Order#:** 7607099
> **Order Date:** 2014-01-07
>
> Dear Sudhakar,
>
> This email confirms that we have shipped your order. Here are the shipping details:
>
> **Shipping Method**
> Your package is being shipped by: Fedex
> Tracking number: 591712614200



Ex. 23.

TIC seeks imposition of a preliminary injunction upon assets reasonably traceable to the Kalaga Defendants' fraud, including assets of the Kalaga individuals and their companies. Should the Kalaga Defendants be permitted to continue to dissipate, transfer, or destroy assets, TIC's claim for an equitable remedy, a constructive trust, will be rendered moot, and TIC will be irreparably harmed. *See A.T.N. Indus. v. Gross*, No. 4:14-cv-02473, 2014 U.S. Dist. LEXIS 200662, at *64 (S.D. Tex. Nov. 26, 2014), *aff'd per curiam*, 632 F. App'x 185 (5th Cir. 2015) ("If Defendants dissipate the money [that Plaintiffs asked the Court to place in an equitable trust], Plaintiffs' equitable remedies will be rendered moot." (citing

*Janvey*, 647 F.3d at 601)).  A substantial threat of irreparable injury exists concerning TIC's ability to recover on its claim for relief.

The Fifth Circuit and this Court routinely find substantial and irreparable harm where a plaintiff can provide evidence showing that a defendant is either concealing or dissipating assets or funds it acquired from plaintiff through fraud.  In *Janvey*, the Fifth Circuit affirmed the grant of a preliminary injunction where the district court held that the plaintiff was "entitled to a presumption that [defendants] would dissipate the frozen assets absent a preliminary injunction because the assets were fraudulently transferred as part of a Ponzi scheme."  *See, e.g.*, *Janvey*, 647 F.3d at 600; *see also id.* at 599–601 (Plaintiff "provid[ing] evidence of [the Ponzi scheme] and proof that each individual received proceeds from the fraudulent scheme" was "sufficient to prove the likelihood of each individual removing or dissipating the frozen assets but for the preliminary injunction"); *A.T.N. Indus.*, 2014 U.S. Dist. LEXIS 200662, at *60–66 (finding that a company would be irreparably harmed where a defendant manager engaged in fraudulent transactions with plaintiff's money, and in order to conceal these transactions, defendant registered shell companies he owned to resemble legitimate steel suppliers); *Kalsi Eng'g, Inc.*, 2014 U.S. Dist. LEXIS 190052, at *6–7 (finding irreparable harm where an employee wrongfully took funds "in acts that are the basis of this lawsuit" and subsequently there was a "substantial threat of depletion").

As in *Janvey*, *A.T.N.*, and *Kalsi*, this Court should grant injunctive relief based on the substantial probability that the Kalaga Defendants are likely to render irretrievable their fraudulently obtained-funds.

The threat of dissipation of monetary assets is especially heightened where a defendant has international ties and sophistication in wiring funds to foreign bank accounts. This Court, in granting a preliminary injunction on analogous facts to TIC's case, noted that "[i]n other circumstances, courts routinely cite the international character of the circumstances of a case in imposing restraints on a party." *A.T.N. Indus.*, 2014 U.S. Dist. LEXIS 200662, at *62 (citing *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990)).

Other courts have also found irreparable harm in granting a preliminary injunction where defendants either actually diverted monetary operations to foreign bank accounts during the pendency of the proceedings or evidenced an intent to move funds into offshore accounts. *See Akishev v. Kapustin*, No. 13-cv-07152(NLH)(AMD), 2015 U.S. Dist. LEXIS 187996, at *10–11, 22¬23 (D.N.J. Sept. 21, 2015); *AIM Recycling, Fla., LLC v. Metals USA, Inc.*, No. 18-60292-CIV, 2018 U.S. Dist. LEXIS 159155, at *10–11, 12 (S.D. Fla. Sept. 17, 2018) (finding an adverse inference that defendants had already spent significant amounts of money and intended to "spirit it away abroad" where a defendant pled the Fifth as to questions about defendants' use of the money from the fraud and intention to move

away into offshore accounts).  The Kalaga Defendants make frequent trips between the U.S. and India, and they have wired $771,316 to Indian bank accounts from their U.S. Bank of America accounts, with one of the most recent examples occurring in September 2019:

| WIRE DATE | USD AMOUNT | DEBIT ID NAME | BENEFICIARY BANK NAME | BENEFICIARY BANK NAME LINE234 |
|---|---|---|---|---|
| 06/26/2013 | 170,000.00 | SUDHAKAR KALAGA | AXIS BANK | GROUND FLOOR  WELCOME COURT COMPLEXSECUNDERABAD INDIA |
| 04/16/2014 | 109,299.64 | SUDHAKAR KALAGA | STATE BANK OF HYDERABAD | PLOT NO.21, AUTONAGAR RD., TEH.VIJAVIJAYAWADAANDHRA PRADESH 520008 IN |
| 07/15/2014 | 25,000.00 | KIT CONSTRUCTION SERVICES, INC | ICICI BANK LTD | 6 2 1012 TGV MANSIONS OPP INSTITUTIHYDERABAD, 500004, IN |
| 01/22/2015 | 116,902.29 | SUDHAKAR KALAGA | HDFC BANK LTD | G/4, GROUND FLOOR, 40-1-48/2 BANDARVIJAYAWADAANDHRA PRADESH 520010 IN |
| 01/28/2015 | 41,586.40 | SUDHAKAR KALAGA | STATE BANK OF INDIA | RASHTRAPATHI ROAD OPP ARYA SAMAD BUSECUNDERABAD500003 |
| 06/04/2015 | 32,057.81 | KIT CONSTRUCTION SERVICES, INC | CANARA BANK | HYDERABAD MOZZAMJAHI MARKETHYDERABAD, 500001, IN |
| 01/22/2016 | 30,125.47 | KIT CONSTRUCTION SERVICES, INC | STATE BANK OF INDIA | NEAR CLOCK TOWER,S.D. ROAD,SECUNDERABAD,IN 500003 |
| 06/23/2016 | 76,203.25 | KIT CONSTRUCTION SERVICES, INC | ANDHRA PRADESH MAHESH CO-OP URBAN B | 2-2-57/19, 1ST FLOOR, M.G. ROAD, SEHYDERABAD500003 IN |
| 02/23/2017 | 153,395.41 | KIT CONSTRUCTION SERVICES, INC | AXIS BANK | GROUND FLOOR, WELCOME COURT COMPLEXSECUNDERABAD500017 IN |
| 04/12/2017 | 300.00 | KIT PROFESSIONALS INC | STATE BANK OF HYDERABAD | O.U.CAMPUS,HYDERABADHYDERA BAD HYDERABANIN |
| 01/02/2018 | 4,832.79 | KIT CONSTRUCTION SERVICES, INC | STATE BANK OF INDIA | ARTS COLLEGE PREMISESHYDERABADHYDERABA D URBANIN |
| 09/28/2018 | 1,658.61 | KIT CONSTRUCTION SERVICES, INC | STATE BANK OF INDIA | ARTS COLLEGE PREMISESHYDERABADHYDERABA D URBANIN |
| 09/09/2019 | 9,955.00 | KIT CONSTRUCTION SERVICES, INC | ICICI BANK LIMITED | 1-11-256, STREET NO 1, BEGUMPET, HYHYDERABADIN |

Ex. 3.  The Kalagas "have over the years demonstrated their sophistication and ability in using the wires to transfer large amounts of money internationally and deceptively for their own gain," and the "concern they would do so again absent an

injunction is well-founded and based on past experience." *A.T.N. Indus.*, 2014 U.S. Dist. LEXIS 200662, at *62.

Moreover, since the termination of D'Agostino, the Kalaga Defendants have worked to conceal and dissipate any funds beyond the reach of TIC. This includes draining multiple bank accounts post-September 2019 anywhere from 48% to over 96%, with some of those funds having already disappeared to offshore accounts in India. The closing or draining of bank accounts since TIC has become aware of the fraud constitutes a "real threat of dissipation." *Id.*

Further, as described in detail above, the Kalaga corporate defendants have actively sought to dissipate corporate assets, through the payment of excessive bonuses to employees exorbitantly above the amount of previous years' bonuses paid, and the pre-payment of corporate taxes to place funds beyond the reach of TIC, in the amount of $1.8 million in payments to the IRS and $627,558.67 for purported employee bonuses. Pollack Decl. at ¶ 36. These types of excessive corporate payments following plaintiff's commencement of a lawsuit are precisely the type of injury that courts have found sufficient as irreparable injury to grant a preliminary injunction. *See Jieyi Elecs. Co. v. Case Indus.*, No. 5:14-cv-01996, 2015 U.S. Dist. LEXIS 62173, at *8 (N.D. Ohio May 12, 2015) (finding defendants' payment of excessive salaries, increased travel expenses, and personal credit lines as evidence supporting granting a preliminary injunction freezing defendants' bank

accounts).  The Kalaga Defendants have exhibited business acumen in creating, coordinating, and utilizing various corporate entities to conceal and siphon off proceeds of their fraud, and they are likely to continue doing so absent judicial intervention.

**II.    TIC Has a Substantial Likelihood of Success on the Merits Because There is No Genuine Dispute that Defendants Engaged in a Bribery and Bid-Rigging Fraud Scheme, and that Sudhakar Kalaga Refused to Testify About It.**

To establish a likelihood of success on the merits, a plaintiff's evidence does not need to satisfy a summary judgment standard; the plaintiff need only to present a prima facie case to show a likelihood of success.  *See Janvey*, 647 F.3d at 595–96. However, the evidence gathered to date, as well as Sudhakar Kalaga's refusal to answer questions about the fraud, shows there is no genuine dispute that the Kalaga Defendants engaged in a bribery and bid-rigging scheme to defraud TIC out of $109 million.

**A.    There is No Genuine Dispute that Sudhakar Kalaga, Jaya Kalaga, KIT Construction, and KIT Professionals Paid at least $5.5 Million in Cash Bribes to Pablo D'Agostino from 2011 to 2019.**

There is no genuine dispute that Sudhakar Kalaga and Jaya Kalaga paid at least $5.5 million in cash bribes to Pablo D'Agostino through KIT Construction and KIT Professionals.  These cash payments have been independently confirmed through KIT Construction's own bank statements produced by Bank of America in

response to a subpoena from TIC.   The cash bribes were paid from KIT Construction's Bank of America account ending in -3327.   *See* Exs. 24–25.   KIT Professionals also issued IRS 1099s in 2011 and 2012 for these payments.   *See* ECF No. 30-2 (Declaration of Neil Melms); Ex. 26 (redacted tax documents).

In an effort to conceal the fact that the bribes were for Pablo D'Agostino, the checks issued from 2013 to 2015 were made out to Pablo D'Agostino's then-wife Melissa D'Agostino.   Pablo was married to Melissa D'Agostino from 2003 until they divorced in 2015.   *See* ECF No. 24-7 (Divorce Agreement between Pablo and Melissa D'Agostino).   Some of the bribery checks were signed by Sudhakar and others were signed by Jaya.   Sudhakar and Jaya issued the checks roughly once a month in round dollar amounts ranging from $20,000 to $180,000.   *See* Ex. 24.

Here is an example of a bribery check signed by Sudhakar Kalaga:



Here is an example of a bribery check signed by Jaya Kalaga:



Ex. 24.  The check memos written by Sudhakar and Jaya claim that the checks are for "Business Development in South and Latin America."  In fact, in some months, Sudhakar and Jaya wrote that the check was a "Bonus for Business Development." The check memos are lies.  No business was ever developed in South or Latin America by Melissa D'Agostino.  The only "business" ever "developed" by Pablo D'Agostino or his ex-wife Melissa was from TIC in Houston through a fraudulent bid-rigging scheme targeting TIC.  The bank records show that TIC was KIT Construction's only source of revenue from 2013 to 2019 — approximately $83 million in revenue.  There were no South American clients.  All of TIC's checks to KIT Construction were deposited in the Bank of America accounts ending in -3327 and -9169, and account -3327 was used by Sudhakar and Jaya to pay the bribes to Pablo.

The following table lists the bribery checks issued to Melissa D'Agostino by Sudhakar and Jaya Kalaga from KIT Construction's bank account:

| Check # | Check Memo | Check Date | Check Signatory | Amount ($) |
|---|---|---|---|---|
| 2083 | Business Development in South & Latin America | 01/14/13 | Sudhakar Kalaga | 20,000.00 |
| 2093 | Business Development in South & Latin America | 02/28/13 | Jaya Kalaga | 20,000.00 |
| 2080 | FY 2013 Q1 Bonus for Business Development | 03/04/13 | Sudhakar Kalaga | 50,000.00 |
| 2081 | Business Development in South & Latin America | 04/01/13 | Sudhakar Kalaga | 20,000.00 |
| 2100 | Business Development in South & Latin America | 04/30/13 | Jaya Kalaga | 20,000.00 |
| 2102 | Business Development in South & Latin America | 05/17/13 | Sudhakar Kalaga | 20,000.00 |
| 2103 | FY 2013 Q2 Bonus for Business Development | 05/17/13 | Sudhakar Kalaga | 50,000.00 |
| 2109 | Pass thru Cost for Business Development in South & Latin Am. | 06/12/13 | Sudhakar Kalaga | 57,207.44 |
| 2110 | July 2013 Business Development in South & Latin America | 06/12/13 | Sudhakar Kalaga | 20,000.00 |
| 2111 | August 2013 Business Development in South & Latin America | 06/12/13 | Sudhakar Kalaga | 20,000.00 |
| 2112 | Sept 2013 Business Development in South & Latin America | 06/12/13 | Sudhakar Kalaga | 20,000.00 |
| 2121 | FY 2013 Q3 Bonus for Business Development | 07/16/13 | Sudhakar Kalaga | 50,000.00 |
| 2129 | FY 2013 Bonus for Business Development | 08/13/13 | Sudhakar Kalaga | 100,000.00 |
| 2136 | FY 2013 Bonus for Business Development | 09/27/13 | Sudhakar Kalaga | 150,000.00 |
| 2143 | November 2013 Business Development in South & Latin Am. | 11/05/13 | Jaya Kalaga | 20,000.00 |
| 2147 | December 2013 Business Development in South & Latin Am. | 11/25/13 | Sudhakar Kalaga | 20,000.00 |
| 2148 | 2013 Q4 Bonus for Business Development | 12/19/13 | Sudhakar Kalaga | 63,000.00 |
| 2149 | FY 2013 Business Development in South & Latin America | 12/20/13 | Sudhakar Kalaga | 180,000.00 |
| 2151 | January 2014 Business Development in South & Latin America | 12/31/13 | Sudhakar Kalaga | 20,000.00 |
| 2158 | February Business Development in South & Latin America | 01/28/14 | Sudhakar Kalaga | 20,000.00 |
| 2162 | March 2014Business Development in South & Latin America | 02/25/14 | Jaya Kalaga | 20,000.00 |
| 2161 | Q1 2014 Bonus Business Development in South & Latin America | 03/11/14 | Sudhakar Kalaga | 150,000.00 |
| 2165 | April 2014 Business Development in South & Latin America | 03/19/14 | Sudhakar Kalaga | 35,000.00 |
| 2172 | May-Jun-Jul 2014 Business Development in South & Latin Am. | 04/22/14 | Sudhakar Kalaga | 105,000.00 |
| 2190 | Q2 2014Bonus Business Development in South & Latin America | 06/12/14 | Sudhakar Kalaga | 50,000.00 |
| 2204 | Aug-Sep-Oct 2014 Business Development in South | 07/22/14 | Jaya Kalaga | 105,000.00 |
| 2222 | Nov 2014 Business Development in South & Latin A | 10/01/14 | Sudhakar Kalaga | 35,000.00 |
| 2224 | December 2014 Business Development in South & Latin Am. | 10/01/14 | Sudhakar Kalaga | 70,000.00 |
| 2235 | 2014 Bonus for Business Development in South & L | 12/17/14 | Sudhakar Kalaga | 100,000.00 |
| 2245 | 2015 Jan thru Mar Business Development in South & | 01/05/15 | Sudhakar Kalaga | 105,000.00 |
|  |  |  | **TOTAL** | **1,715,207.44** |

These checks were deposited into the joint bank account held by both Pablo and Melissa D'Agostino.  *See* Ex. 24.

Finally, even though Bank of America's records only go back to 2013, Pablo and Melissa's joint income tax returns provided by their accountant, Neil Melms, show that Melissa reported 1099 income of $240,000 from KIT Professionals in

2011 and $360,000 from KIT Professionals in 2012.  *See* Ex. 26; ECF No. 30-2 (Declaration of Neil Melms).  Prior to 2011, the year KIT Construction was formed and began doing work at TIC, there were no 1099 payments reported to Pablo or Melissa.  *See id.*  Therefore, the total bribe payments paid to Pablo D'Agostino through Melissa D'Agostino by KIT Construction and KIT Professionals is $2,315,207.  *See* Exs. 24, 26.

After Pablo and Melissa divorced in 2015, it is undisputed that KIT Construction began paying Pablo cash bribes directly through his shell company, January 22 1992, LLC.  According to Texas public records, January 22 1992, LLC was incorporated in 2015, and Pablo D'Agostino is the registered agent and sole member of the entity.  *See* Ex. 27.  The purpose of the shell company was to disguise the recipient of the payments.  The Bank of America records show that KIT Construction made these payments to Pablo from 2015 until 2019.  Some of the bribery checks were signed by Sudhakar and others were signed by Jaya.  Sudhakar and Jaya Kalaga issued these checks roughly once a month in round dollar amounts ranging from $50,000 to $265,000.  *See* Ex. 25.

Here is an example of a bribe check to Pablo's company signed by Sudhakar Kalaga:



Here is an example of a bribe check to Pablo's company signed by Jaya Kalaga:



Ex. 25.  The check memos written by Sudhakar and Jaya claim that the checks are for "Business Development."  Once again, the only business Pablo was developing for the Kalagas was the $109 million bid-rigging fraud scheme at TIC.  The total documented amount of bribe payments paid to Pablo by KIT Construction from April 2015 to September 2019 was $3,820,000.  *See* Ex. 25.

The following table lists the bribe checks made out to Pablo's company January 22 1992, LLC by Sudhakar and Jaya from KIT Construction's bank account:

| Check # | Memo | Check Date | Check Signatory | Amount ($) |
|---|---|---|---|---|
| 2308 | Business Development 2015 Apr thru Jun | 04/10/15 | Sudhakar Kalaga | 105,000.00 |
| 2318 | Bonus Business Development 2015 | 05/12/15 | Sudhakar Kalaga | 50,000.00 |
| 2334 | Business Development 2015 Jul thru Aug | 07/09/15 | Sudhakar Kalaga | 105,000.00 |
| 2330 | Bonus Business Development 2015 | 08/12/15 | Sudhakar Kalaga | 75,000.00 |
| 2354 | Additional Business Development 2015 - KCSI - 15 - IN | 09/16/15 | Sudhakar Kalaga | 150,000.00 |
| 2356 | Business Development 2015 Oct thru Dec - KCSI - 15 | 10/01/15 | Sudhakar Kalaga | 105,000.00 |
| 2360 | Bonus Business Development 2015 - KCSI-15-INV# | 11/19/15 | Sudhakar Kalaga | 75,000.00 |
| 2375 | Business Development 2016 Jan thru Mar - KCSI-16 | 01/04/16 | Sudhakar Kalaga | 105,000.00 |
| 2393 | No Memo | 03/14/16 | Sudhakar Kalaga | 155,000.00 |
| 2405 | Bonus Business Development 2016 - KCSI-16-INV# | 04/25/16 | Sudhakar Kalaga | 75,000.00 |
| 2416 | Business Development 2016 Jul thru Sep - KCSI-16- | 05/31/16 | Sudhakar Kalaga | 105,000.00 |
| 2432 | Business Development 2016 Oct thru Dec - KCSI-16 | 08/08/16 | Sudhakar Kalaga | 105,000.00 |
| 2443 | Bonus Business Development 2016 - KCSI-16-IN | 11/09/16 | Sudhakar Kalaga | 100,000.00 |
| 2452 | Bonus Business Development 2017 Jan Thru Mar- KCSI-17 | 01/04/17 | Jaya Kalaga | 105,000.00 |
| 2461 | Business Development 2-17 Apr thru Jun - KCSI-17 | 03/27/17 | Sudhakar Kalaga | 105,000.00 |
| 2479 | Business Development 2017 - Jul thru Sept KCSI-17 | 05/25/17 | Sudhakar Kalaga | 105,000.00 |
| 2508 | 2017 Business Development Oct thru Dec - KCSI-17 | 09/06/17 | Jaya Kalaga | 105,000.00 |
| 2521 | Bonus Business Development for 2017 | 10/25/17 | Sudhakar Kalaga | 100,000.00 |
| 2535 | Business Development for 2018 | 12/18/17 | Sudhakar Kalaga | 265,000.00 |
| 2541 | 2018 Q1 | 01/19/18 | Sudhakar Kalaga | 105,000.00 |
| 2545 | Business Development for 2018 - KCSI - 18-INV # 03 | 01/29/18 | Sudhakar Kalaga | 132,500.00 |
| 2548 | Business Development for 2018 - KCSI - 18-INV # 04 | 02/05/18 | Sudhakar Kalaga | 117,500.00 |
| 2561 | Business Development 2018 Apr thru Jun - KCSI-18- | 03/14/18 | Sudhakar Kalaga | 205,000.00 |
| 2563 | Bonus Business Development for 2018 - KCSI - 18-INV# | 04/03/18 | Sudhakar Kalaga | 100,000.00 |
| 2572 | Business Development 2018 Jul thru Sep - KCSI-18- | 05/16/18 | Sudhakar Kalaga | 185,000.00 |
| 2586 | Business Development 2018 Oct thru Dec - KCSI-18 | 07/26/18 | Sudhakar Kalaga | 105,000.00 |
| 2581 | Business Development 2018 | 10/01/18 | Sudhakar Kalaga | 105,000.00 |
| 2630 | Bonus Business Development 2019 Jan thru Mar - K | 01/03/19 | Sudhakar Kalaga | 105,000.00 |
| 2629 | Business Development 2019 Jan thru Mar - KCSI-19 | 01/04/19 | Sudhakar Kalaga | 250,000.00 |
| 2651 | Business Development 2019 Apr thru Jun - KCSI-19- | 03/21/19 | Sudhakar Kalaga | 105,000.00 |
| 2654 | Business Development 2019 Jul thru Sep - KCSI-19- | 06/04/19 | Sudhakar Kalaga | 105,000.00 |
| 2677 | Business Development 2019 Oct thru Dec - KCSI-19 | 09/03/19 | Sudhakar Kalaga | 105,000.00 |
| | | | **TOTAL** | **3,820,000.00** |

*See* Ex. 25.  Through the Bank of America records and Pablo's tax returns obtained

through discovery, TIC has obtained documentary proof that Defendants Sudhakar

and Jaya Kalaga paid Pablo D'Agostino $6,135,207 in bribes from 2011 to 2019.

Sudhakar has no defense or explanation for these payments. During his

deposition by written questions on January 3, 2020, he **<u>refused</u>** to answer any

questions about the cash bribes he paid to D'Agostino.  As a result, TIC is entitled to an adverse inference against Sudhakar Kalaga, KIT Construction, and KIT Professionals.   Sudhakar was asked the following questions related to these payments:

- 13:19–24:  How much money did KIT Construction and KIT Professionals pay to Melissa D'Agostino and January 22, 1992, LLC?
- 12:21–13:1:  Tell me about all the services that Pablo D'Agostino's ex-wife, Melissa D'Agostino provided to KIT Professionals and KIT Construction.
- 13:2–6:  Did KIT Professionals and KIT Construction issue IRS 1099s in the name of Melissa D'Agostino?
- 13:7–12:  Did KIT Professionals and KIT Construction issue IRS 1099s in the name of Pablo D'Agostino or his company January 22, 1992, LLC?
- 13:13–18:  Please describe in detail anything of value you and your companies ever gave to Pablo D'Agostino, including any gifts, cash, or real estate.
- 10:24–11:5:  Did you give Pablo D'Agostino kickbacks in exchange for him insuring that KIT Professionals and KIT Construction were awarded contracts by Toshiba International Corporation?

*See* Ex. 28.  Sudhakar refused to answer any of these questions, including whether he even knew Pablo D'Agostino, stating, "On the advice of Counsel, I invoke my 5th Amendment privilege against self-incrimination and respectfully decline to answer."  *See generally id.*  Based on his refusal to answer questions directly on point about the bribes he paid to D'Agostino, the Court should make an adverse inference against the Kalaga Defendants.

The Court should also reject any attempt by the Kalagas to provide a defense for these payments unless Sudhakar and Jaya Kalaga testify.  *See, e.g.*, *Hinojosa v.*

*Butler*, 547 F.3d 285, 291–92 (5th Cir. 2008) (finding the district court erred when it failed to draw an adverse inference against the defendant after the defendant refused to answer any questions relevant to the claims against him); *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 431 (S.D. Miss. 2015), *aff'd*, 886 F.3d 507 (5th Cir. 2018) (drawing an adverse inference against the bank after its corporate agent invoked his personal Fifth Amendment privilege in refusing to answer specific questions at his deposition about the bank's participation in the conspiracy); *Gulf Coast Bank & Tr. Co. v. Stinson*, No. 2:11-CV-88-KS-MTP, 2013 WL 30136, at *5 (S.D. Miss. Jan. 2, 2013) (drawing an adverse inference against the defendant for invoking his Fifth Amendment privilege in refusing to respond to a substantial number of questions about the fraud claim against him at his deposition).

**B.    There Is No Genuine Dispute that Sudhakar Kalaga, Jaya Kalaga, SKBP Ventures, LLC, and SVSRK Enterprises, LLC Bribed Pablo D'Agostino By Giving Him at Least 18 Properties Worth Almost $4 million.**

There is no genuine dispute that Sudhakar Kalaga bribed Pablo D'Agostino by deeding to him at least eighteen properties, including single family homes, condominiums, and vacant lots, worth almost $4 million in 2018.  Eight of these properties were recorded by D'Agostino before his suicide (ECF No. 24-3 (first eight properties)) and the other ten were transferred by Kalaga but not recorded by D'Agostino (*See* Ex. 29).  Four transfers occurred on July 27, 2018, and fourteen transfers occurred on December 12, 2018.  *See id.*  The total value of those eight

recorded properties is in excess of $2 million, and no mortgage exists on the properties worth almost $4 million because they were paid for in cash by the Kalagas using the proceeds of the fraud and gifted to D'Agostino. *See* ECF No. 24-3 (Deeds for Properties Owned by D'Agostino and PD Rentals); ECF No. 24-10 (First 8 properties of 2019 County Property Assessments of Properties Owned by D'Agostino and PD Rentals).

Kalaga's lawyer, Joe Enis, sent 14 separate letters to D'Agostino enclosing warranty deeds signed and notarized by Sudhakar Kalaga, on December 12, 2018, on behalf of SKBP transferring the properties to Pablo D'Agostino through Pablo's company PD Rentals. *See* Ex. 29. The bribe properties Kalaga gave to D'Agostino are the following:

| No. | Property Address[2] | Date of Transfer to PD | 2019 Assessed Value (County Assessor's Office) |
|---|---|---|---|
| 1 | 15 Fairlee Ct., Magnolia, TX 77354-3283* | 7/27/2018 | $173,810 |
| 2 | 255 Bloomhill Pl., Magnolia, TX 77354-3278* | 12/12/2018 | $181,250 |
| 3 | 303 Bloomhill Pl., Magnolia, TX 77354-3280* | 12/12/2018 | $184,380 |
| 4 | 331 Bloomhill Pl., Magnolia, TX 77354-3280* | 12/12/2018 | $182,980 |
| 5 | 11705 Grandview Dr., Montgomery, TX 77356-4296* | 7/27/2018 | $63,350 |
| 6 | 2207 Bancroft St #1201, Houston, TX 77027-3729* | 7/27/2018 | $742,036 |
| 7 | 102 Winterport Cir., Spring, TX 77382-1141* | 7/27/2018 | $219,010 |
| 8 | 21026 White Shore Ln., Spring, TX 77379-327*6 | 12/12/2018 | $175,500 |
| 9 | 54 Blue Creek Pl., Spring, TX 77382-1779 | 12/12/2018 | $188,100 |
| 10 | 21219 Fire Wind Ct., Spring, TX 77379-8253 | 12/12/2018 | $193,158 |
| 11 | 22402 Spring Crossing Dr., Spring, TX 77373 | 12/12/2018 | $173,299 |
| 12 | 1007 Lamson Ct., Spring, TX 77373-8060 | 12/12/2018 | $197,000 |
| 13 | 26 Whitekirk Pl., Magnolia, TX 77354-3276 | 12/12/2018 | $204,750 |
| 14 | 43 Verbena Bend Pl., Spring, TX 77382-2303 | 12/12/2018 | $187,220 |
| 15 | 23106 Oxbow Trail, Spring, TX 77373-8144 | 12/12/2018 | $185,000 |
| 16 | 734 Beckets Crossing Ln., Spring, TX 77373-8100 | 12/12/2018 | $185,003 |
| 17 | 22526 Goss Spring Ct., Spring, TX 77373-2295 | 12/12/2018 | $194,365 |
| 18 | 706 Beckets Crossing Ln., Spring, TX 77373-8100 | 12/12/2018 | $186,261 |
| **Total Value of Properties Transferred to PD:** | | | **$3,816,472** |

[2] The properties marked with an asterisk were transferred and recorded.

*See* Exs 29–30; ECF No. 24-3 (Deeds for Properties Owned by D'Agostino and PD Rentals); ECF No. 24-10 (First 8 properties of 2019 County Property Assessments of Properties Owned by D'Agostino and PD Rentals).

Sudhakar has no defense for these bribe property transfers because during his deposition by written questions on January 3, 2020, Sudhakar **refused** to answer any questions about the properties he gave to D'Agostino.  *See* Ex. 28.  In addition, during the TRO hearing in December, Rusty Hardin represented to the Court that Kalaga and D'Agostino had a real estate investment business together and the properties were transferred to D'Agostino so he could have an easier time evicting tenants.  *See* Dec. 9, 2019 Hearing Transcript 70:18–71:21.  Kalaga was asked about this "defense" at his deposition, and he refused to answer the questions.  *See* Ex. 28 at 12:8–20.

During his deposition, Kalaga was asked the following questions about the bribe property transfers:

- 9:2–10:  At the December 9, 2019 hearing, your counsel Rusty Hardin represented to the Court that Mr. D'Agostino and Mr. Kalaga set up a real estate investment company.  What are the names of all the real estate investment companies you set up with Pablo D'Agostino?

- 9:11–16:  Please describe in detail all the properties [your real estate investment companies with Mr. D'Agostino invested in].

- 10:15–23:  Please take a look at paragraph 34, which states, "in the last half of 2018 alone Kalaga transferred eight properties from this company, SKBP Ventures to D'Agostino's company, PD Rentals."  How many properties did SKBP Ventures transfer to Mr. D'Agostino's company, PD Rentals?

- 11:6–14:  At the December 9, 2019 hearing, your counsel Rusty Hardin represented to the Court that you used your cash to buy the eight properties that you transferred to PD Rentals in 2018.  Why did you use your cash to buy the eight properties that you transferred to PD Rentals in 2018?

- 11:15–12:1:  I'm handing you Composite Exhibit 3 containing eight deeds for the transfer of properties from SKBP Ventures LLC to PD Rentals of 2018 . . . For each of the eight deeds please tell me if that is your signature above your name Sudhakar Kalaga?

- 12:2–7:  How much did you or your companies receive in payment from Pablo D'Agostino or PD Rentals in exchange for the transfer of eight properties?

- 12:8–20:  At the December 9, 2019 hearing, your counsel Rusty Hardin represented to the Court that you transferred the eight properties to PD Rentals in 2018 because Pablo D'Agostino was managing the homes for you but he did not have the power to evict anybody because the properties were not in his name.  Did you transfer the eight properties to PD Rentals in 2018 because Pablo D'Agostino was managing the homes for you but he did not have the power to evict anybody because the properties were not in his name?

*See* Ex. 28.  Sudhakar refused to answer any of these questions, stating, "On the advice of Counsel, I invoke my 5th Amendment privilege against self-incrimination and respectfully decline to answer."  *See generally id.*

As a result, TIC is entitled to an adverse inference against Sudhakar and SKBP, and Kalaga should not be permitted to rely on an invented defense that he refuses to testify about.  *See Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 547 (5th Cir. 2012), as revised (Jan. 12, 2012) (holding that a party may not withdraw his Fifth Amendment invocation if the party is trying "abuse, manipulate or gain an unfair strategic advantage over opposing parties."); *see also Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008) (preventing the defendant from

testifying about her husband's murder at summary judgment after she had previously invoked her Fifth Amendment privilege on that subject-matter because "[a] defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial." (citations omitted)).

### C. There is No Genuine Dispute that Sudhakar and Jaya Kalaga Bought Luxury Goods and 100 Ounce Silver Bars for Pablo D'Agostino.

There is no genuine dispute that Sudhakar and Jaya Kalaga provided additional bribes to Pablo D'Agostino that took a number of forms, including:

- purchasing multiple vehicles for him,

- letting him live rent free at the $2 million Arabella condominium owned by Kalaga's company SVSRK,

- gifting him an $85,000 leopard skin as a birthday present,

- gifting him luxury watch accessories such as watch winders for the expensive watches Kalaga gave to him,

- purchasing multiple safes worth nearly $50,000 for D'Agostino, and

- bribing him with 100 ounce bars of silver.

*See* Exs. 23, 31–34; ECF No. 24-4 (Deed for Arabella condominium at 4521 San Felipe Street).

Sudhakar Kalaga also generally acted as D'Agostino's personal shopper. As an example, on March 7, 2012, D'Agostino sent an e-mail to Kalaga asking him to contact his friend at the jewelry store and order Swarovski and Lladro items for him. Kalaga immediately called the store, Karat 22, and arranged for delivery of the items. Kalaga informed D'Agostino on April 4, 2012, that they would be delivered by FedEx the following Monday, and promised to give them to D'Agostino at dinner that day. *See* Ex. 35. Kalaga also ordered merchandise from luxury menswear fashion brand, Ermenegildo Zegna, for D'Agostino (*See* Ex. 36) and household items totaling $14,867 for D'Agostino's personal use from Sur La Table (*See* Ex. 37).

Jaya was also heavily involved in providing bribes to D'Agostino. In addition to signing the bribery checks (*See* Exs. 24–25), e-mails show that Jaya was also involved in the selection of gifts to D'Agostino. For example, Kalaga sent an e-mail to Jaya Kalaga on February 15, 2011, with D'Agostino's comment about a Girrard Perragaux watch they had given to him. Kalaga wrote to Jaya Kalaga, "Looks like he really liked the other one. . . .which we did not get." *See* Ex. 38. Later that year, on November 22, 2011, Kalaga purchased watch winders for D'Agostino for $3,100 and sent an e-mail to co-conspirator Vinod Vemparala showing him the gift he had purchased for D'Agostino. *See* Ex. 33.

Sudhakar has no defense for these bribes to Pablo D'Agostino because during his deposition by written questions on January 3, 2020, Sudhakar **refused** to answer any questions about the gifts he gave to D'Agostino. *See generally* Ex. 28. As a result, TIC is entitled to an adverse inference against Sudhakar. *See GE Capital Commercial Inc. v. Wright & Wright Inc.*, No. CIV.A. 3:09-CV-572-L, 2009 WL 1148235, at *3 (N.D. Tex. Apr. 28, 2009) (drawing adverse inferences against the defendant at the preliminary injunction hearing when the defendant invoked his Fifth Amendment privilege to avoid answering any questions at his deposition about the claims against him). During his deposition, Kalaga was asked the following questions about his gifts to D'Agostino:

- 13:13–18:  Please describe in detail anything of value you and your companies ever gave to Pablo D'Agostino, including any gifts, cash, or real estate.
- 6:18–24:  I am handing you Exhibit 1, a receipt for two safes that you purchased for Pablo D'Agostino totaling over $14,000. Why did you purchase safes for Pablo D'Agostino?

*See id.* Sudhakar refused to answer any of these questions, stating, "On the advice of Counsel, I invoke my 5th Amendment privilege against self-incrimination and respectfully decline to answer." *See generally id.* As a result, the Court should make an adverse inference against Kalaga and find that the gifts were bribes paid to D'Agostino in furtherance of the fraud scheme against TIC.

**D.   There is No Genuine Dispute that Sudhakar Kalaga, Jaya Kalaga, KIT Professionals, and KIT Construction Rigged Bids and Submitted Fake Bids with Vinod Vemparala and Pablo D'Agostino.**

Sudhakar Kalaga, Jaya Kalaga, KIT Professionals, and KIT Construction conspired with Pablo D'Agostino and Vinod Vemparala to submit at least 70 fake bids to TIC from 2010 to 2019.  Vinod Vemparala admitted to this scheme when he agreed to be interviewed by David Frizell and Tom Kiefer, investigators working for TIC's counsel.  *See generally* Declaration of David Frizell (March 23, 2020) ("Frizell Decl.") (attached as Exhibit 39).  Vemparala met Kalaga in college in India and they have remained friends.  *See id.* at ¶ 6.  Vemparala met D'Agostino through Kalaga, and he visited with D'Agostino several times in person over the years.  *See id.* at ¶ 7.  V2V Solutions is a company owned by Vemparala, and it has no presence in Houston, Texas and it has no employees.  *See id.* at ¶¶ 8, 16; Ex. 40.  From 2011 to 2019, acting under the direction of Kalaga, Vemparala created and submitted bids for TIC construction projects under the name of V2V Solutions.  *See id.* at ¶¶ 9–11.  Vemparala's own admissions and e-mails produced by KIT Professionals and KIT Construction show that to coordinate the submission of fake bids, Kalaga provided Vemparala with KIT's bid for a particular TIC project, and Vemparala added a markup for his own expenses and profit and then submitted the bid under V2V Solutions' name.  *See id.* at ¶ 10.  Vemparala would then prepare a second bid under the name of Sermeg.  *See id.* at ¶ 14.  Sermeg was a company Vemparala made up

using his sister Gita Vemparala's address in Georgia, but the company was not registered and it did not actually operate. *See id.* at ¶¶ 14–15. Vemparala prepared and submitted the Sermeg bids personally and affixed his father's signature, V.N. Murthy, by using a handwriting style font on his word processing software. *See id.* at ¶ 15.

Vemparala did not prepare every V2V Solutions and Sermeg bid that was submitted to TIC. Kalaga himself prepared bids using V2V Solutions' name, and he submitted them to TIC personally. *See id.* at ¶ 12. The bids submitted by Vemparala to TIC under the names of V2V Solutions and Sermeg were an integral part of the conspiracy to defraud TIC, because Vemparala ensured that his bids were always higher than those submitted by Kalaga under KIT's name. In this way, Vemparala's role helped ensure that TIC's management would conclude that three companies, KIT, V2V Solutions, and Sermeg, bid on a project and that KIT was the lowest bidder.

Jaya also played a critical role in the conspiracy separate and apart from her husband's. For example, on April 21, 2015, Jaya forwarded to Sudhakar a fake bid from Sermeg for installation of a fire notification system in the amount of $575,500. *See* Ex. 41.

The following is a list of some of the projects that KIT was awarded by TIC in reliance upon the fake bids that Sudhakar, Jaya, Vemparala, and D'Agostino prepared and submitted to TIC:

| Winner | Fake Bidders | Requisition Date | PO# | Amount (USD) |
|--------|--------------|------------------|-----|--------------|
| KIT | Y2Y (V2V) | 3-Nov-2010 | 905413 | 48,000.00 |
| KIT | V2V, OnePoint | 21-Nov-2011 | 906748 | 601,825.00 |
| KIT | SER, Reytec | 2-Jul-2012 | 907379 | 16,250,000.00 |
| KIT | V2V, SER | 9-May-2013 | 908352 | 61,425.00 |
| KIT | V2V | 21-May-2013 | 908402 | 135,500.00 |
| KIT | V2V | 4-Jun-2013 | 908455 | 850,000.00 |
| KIT | V2V | 4-Jun-2013 | 908453 | 450,000.00 |
| KIT | V2V, SER | 6-Jun-2013 | 908454 | 749,500.00 |
| KIT | V2V | 17-Jun-2013 | 908485 | 180,000.00 |
| KIT | V2V | 24-Jun-2013 | 908502 | 68,500.00 |
| KIT | V2V | 27-Jun-2013 | 908519 | 70,000.00 |
| KIT | V2V | 11-Jul-2013 | 908558 | 659,050.00 |
| KIT | V2V | 1-Aug-2013 | 950003 | 40,000.00 |
| KIT | V2V | 12-Aug-2013 | 950051 | 85,550.00 |
| KIT | V2V | 12-Aug-2013 | 950052 | 16,950.00 |
| KIT | V2V | 12-Aug-2013 | 950053 | 12,650.00 |
| KIT | V2V | 19-Aug-2013 | 950090 | 70,000.00 |
| KIT | V2V | 21-Aug-2013 | 950107 | 70,000.00 |
| KIT | V2V | 21-Aug-2013 | 950108 | 60,000.00 |
| KIT | V2V | 27-Aug-2013 | 905127 | 72,500.00 |
| KIT | V2V | 29-Aug-2013 | 950140 | 135,750.00 |
| KIT | V2V | 30-Sep-2013 | 950255 | 38,652.00 |
| KIT | V2V | 1-Oct-2013 | 950279 | 61,350.00 |
| KIT | V2V, OnePoint, A&A | 7-Oct-2013 | 950527 | 550,000.00 |
| KIT | V2V, Construction Masters | 13-Nov-2013 | 950437 | 93,865.00 |
| KIT | V2V | 3-Dec-2013 | 950464 | 80,000.00 |
| KIT | V2V | 3-Dec-2013 | 950465 | 8,000.00 |
| KIT | V2V | 3-Dec-2013 | 950466 | 55,000.00 |
| KIT | Sermeg, SER | 9-Jan-2014 | 950532 | 535,000.00 |
| KIT | V2V, Sermeg | 18-Feb-2014 | 950634 | 275,000.00 |
| KIT | V2V, Sermeg | 18-Feb-2014 | 950635 | 150,000.00 |
| KIT | Sermeg, PIE | 19-Feb-2014 | 950637 | 225,000.00 |

| KIT | Sermeg | 24-Mar-2014 | 950683 | 50,000.00 |
|-----|--------|-------------|--------|-----------|
| KIT | V2V | 25-Mar-2014 | 950684 | 64,500.00 |
| KIT | V2V, Sermeg | 11-Apr-2014 | 950724 | 76,500.00 |
| KIT | V2V, Sermeg | 23-Apr-2014 | 950747 | 76,250.00 |
| KIT | V2V, Sermeg | 9-Jun-2014 | 950833 | 380,000.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950864 | 95,500.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950865 | 58,900.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950866 | 34,850.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950867 | 32,503.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950868 | 28,255.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950869 | 29,375.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950870 | 32,900.00 |
| KIT | V2V, Sermeg | 23-Jun-2014 | 950863 | 98,600.00 |
| KIT | V2V, Sermeg | 30-Jun-2014 | 950880 | 26,789.00 |
| KIT | V2V, Sermeg | 7-Jul-2014 | 950888 | 36,900.00 |
| KIT | V2V, Sermeg | 7-Jul-2014 | 950889 | 16,250.00 |
| KIT | V2V, Sermeg | 29-Jul-2014 | 950937 | 260,000.00 |
| KIT | V2V, Sermeg | 29-Jul-2014 | 950938 | 270,000.00 |
| KIT | V2V, Sermeg | 29-Jul-2014 | 950936 | 376,000.00 |
| KIT | V2V, Sermeg | 29-Jul-2014 | 951036 | 160,000.00 |
| KIT | V2V, Sermeg | 29-Jul-2014 | 950950 | 200,000.00 |
| KIT | V2V, Sermeg | 6-Aug-2014 | 950942 | 168,900.00 |
| KIT | V2V, Sermeg | 18-Aug-2014 | 950964 | 184,000.00 |
| KIT | V2V, Sermeg | 4-Sep-2014 | 950981 | 58,000.00 |
| KIT | V2V, Sermeg | 11-Sep-2014 | 950989 | 55,500.00 |
| KIT | V2V, Sermeg | 5-Dec-2014 | 951118 | 168,720.00 |
| KIT | V2V, OnePoint, A&A Premier, Reytec | 29-Jan-2015 | 951184 | 1,680,000.00 |
| KIT | V2V, Sermeg | 22-Apr-2015 | 951376 | 400,000.00 |
| KIT | V2V, Sermeg | 22-Apr-2015 | 951375 | 250,000.00 |
| KIT | V2V, Sermeg | 22-Apr-2015 | 951377 | 395,000.00 |
| KIT | V2V, Sermeg | 30-Jul-2015 | 951433 | 898,150.00 |
| KIT | V2V, PRV | 28-Oct-2015 | 951505 | 225,500.00 |
| KIT | V2V, Sermeg | 11-Jan-2016 | 951568 | 245,000.00 |
| KIT | V2V, Sermeg | 11-Jan-2016 | 951569 | 440,000.00 |
| KIT | V2V, PRV, KD Benett | 16-Feb-2016 | 7000559 | 1,775,000.00 |
| KIT | PRV, KD Benett, Sermeg | 17-Feb-2016 | 951603 | 749,500.00 |
| KIT | V2V, PRV | 9-Nov-2016 | 7010663 | 404,692.00 |
| KIT | V2V, PRV, Redwood Builders, OnePoint | 20-Apr-2017 | 7018425 | 4,550,825.00 |

| KIT | V2V, PRV | 6-Jun-2018 | 7040067 | 75,000.00 |
| KIT | V2V, PRV | 6-Jun-2018 | 7040069 | 35,000.00 |
| KIT | V2V, PRV | 6-Jun-2018 | 7040070 | 90,000.00 |
| KIT | V2V, OnePoint | 17-Sep-2018 | 7045528 | 32,450.00 |
| KIT | V2V, OnePoint | 17-Sep-2018 | 7045529 | 41,550.00 |
| | | | **TOTAL** | **$38,085,926** |

KIT Construction handsomely rewarded Vemparala for submitting fake bids in the name of V2V Solutions and Sermeg.  For example, on December 18, 2013, KIT Construction issued V2V Solutions a check for $150,000.  *See* Ex. 21.  Again, on December 30, 2014, KIT Construction issued V2V Solutions a check for $80,000. *See id.*  Neither check had an entry line explaining the purposes of the payment, and both were signed by Sudhakar Kalaga.  Below is an example check made out to V2V Solutions:



Sudhakar has no defense for the fake bidding conspiracy with Vemparala and V2V Solutions because Sudhakar **refused** to answer any questions about the fake bids he prepared with Vemparala and D'Agostino.  As a result, TIC is entitled to an

adverse inference against Sudhakar Kalaga.  *See GE Capital Commercial Inc.*, 2009 WL 1148235, at *3.   During his deposition, Kalaga was asked the following questions about his conspiracy with Vinod Vemparala:

- 14:24–15:2:  How do you know Vinod Vemparala?
- 14:12–23:  I am handing you Exhibit 4, an e-mail from you to Pablo D'Agostino dated October 2, 2013 with the subject "V2V" attaching a bid for a motor plant roof study from V2V Solutions for $76,500 . . . Why did you send Pablo D'Agostino a bid from V2V Solutions?
- 15:3–8:  Did you ever prepare or direct someone to prepare a bid in the name of V2V Solutions for a project at Toshiba International Corporation?
- 15:9–14:  How many times did you send Pablo D'Agostino a bid from V2V Solutions for a project at Toshiba International Corporation?
- 15:15–16:5:  I am handing you Composite Exhibit 5, which are emails between you and Vinod Vemparala where you exchanging bid documents with him, and he is awaiting your approval for them to be finalized and sent to Toshiba International Corporation . . . In the email dated February 13, 2016, titled "Bids," Mr. Vemparala writes to you and says, "Mama, check these out carefully and let me know.  I can finalize them today." He attaches a purported bid from V2V and a company called Sermeg [ph] for new groundwater wells for Toshiba.  Explain in detail why Vinod Vemparala asked you to check out carefully the Toshiba groundwater well bids from V2V and Sermeg.

*See* Ex. 28.  Sudhakar refused to answer any of these questions, stating, "On the advice of Counsel, I invoke my 5th Amendment privilege against self-incrimination and respectfully decline to answer."  *See generally id.*  As a result, the Court should make an adverse inference against Kalaga and find that Kalaga, KIT Construction, and KIT Professionals conspired to submit fake bids through V2V Solutions, Sermeg, and Vinod Vemparala.

### E.    There is No Genuine Dispute that KIT and Kalaga Marked Up the Cost of the TIC Projects by Between 50% to Over 300%.

For the hundreds of TIC projects on which KIT Construction bid and was selected to perform the work, KIT Construction did not actually do any construction work itself nor did it have any employees capable of doing so.    Rather, it "completed" projects at TIC by hiring LaGrone Services Limited ("LSI") to work as the general contractor, and in turn, LSI was the entity that would pay the subcontractors who completed tasks that LSI could not complete on its own.    *See generally* Snell Decl. (ECF No. 31-6).  KIT would obtain a price quote from LSI and then mark the price up exorbitantly to invoice TIC, sometimes by more than 400%. KIT's involvement and extreme markup in these construction projects was unnecessary, because LSI could have done all the work itself without KIT.  LSI was paid approximately $24 million by KIT for projects LSI completed at TIC between 2013 and 2019, while KIT was paid more than $95 million by TIC over approximately the same period.  *See* Second Kennon Decl. ¶ 9 (ECF No. 30-1); Snell Decl. ¶ 26, Ex. 8 (ECF Nos. 31-6, 31-6-8).

The below chart includes additional examples of TIC projects from 2015 to 2018 where KIT substantially marked up the price it was charged by LSI, who actually performed the work:

| # | Date | Project | G.C. Price | KIT Price | Price Difference (tax not included) | Mark up |
|---|------|---------|-----------|-----------|-------------------------------------|---------|
| 1 | 1/29/2015 | TMPE office and manufacturing areas build out | $ 1,100,465 | $ 1,680,000 | $ 579,535 | 53% |
| 2 | 3/14/2016 | Fire water storage tank replacement | $ 574,125 | $ 1,775,000 | $ 1,200,875 | 209% |
| 3 | 4/13/2017 | Waste water treatment refurbishment | $ 552,155 | $ 1,095,000 | $ 542,845 | 98% |
| 4 | 4/17/2017 | HEV expansion (Phase II) (Building construction portion only, not including HVAC) | $ 1,232,879 | $ 2,620,478 | $ 1,387,599 | 113% |
| 5 | 5/23/2018 | Fire and water damage remediation and repair | $ 155,500 | $ 405,000 | $ 249,500 | 160% |

*See* Exs. 42–45 (Projects #1, 3–5 KIT Price); ECF No. 24-23 (Project #2 KIT Price); Snell Decl. ¶¶ 20–24, Exs. 3–7 (LSI business records for Projects # 1–5) (ECF Nos. 31-6, 31-6-3–7);

Sudhakar has no defense for the extreme markups KIT Construction and KIT Professionals charged to TIC.  During his deposition, Kalaga **refused** to answer any questions about the markups he was able to charge TIC as a result of the fake bid and bribery scheme.  As a result, TIC is entitled to an adverse inference against Sudhakar and he should not be permitted to rely on an invented defense that he refuses to testify about.  During his deposition, Kalaga was asked the following questions about the subcontractors he used and the markups he charged:

- 16:9–15:  How did you calculate the price and the profit margin included in the KIT Construction proposals provided to Toshiba International Corporation?

- 16:16–21:  Name all the subcontractors you can remember ever using for KIT Construction and KIT Professionals projects at Toshiba International Corporation.

- 16:22–17:3:  What work did KIT Construction perform itself at Toshiba International Corporation that was not performed by a subcontractor hired by KIT Construction?

- 17:4–20:  I am handing you Composite Exhibit 6, which is a series of emails showing that Pablo D'Agostino had asked LSI to relocate a fan, a plastic wall, and a duct . . . The documents show that LSI quoted a price of $6898.11 for the work, including an 8 percent markup.  You then emailed Pablo D'Agostino a separate quote for the plastic wall, the fan, and the duct totaling $19,800.  How do you justify charging Toshiba International Corporation over $12,900 more for the work than what LSI charged KIT Construction?

- 17:21–18:11:  I am handing you composite Exhibit 7, which contains your costs for remediation and repair of the fire and water damage that occurred at Toshiba International Corporation in May 2018 . . .The documents show that LSI charged KIT $155,500 and that KIT charged Toshiba International Corporation $405,000.  What additional work did KIT do in this project to justify the $249,000 difference between what it cost you and what you charged Toshiba?

- 18:12–22:  Please look at paragraph 31 of the complaint, which is Exhibit 2.  This paragraph identifies the difference between what KIT Construction charged Toshiba International Corporation and what LSI charged KIT for various projects from 2015 to 2018.  Please tell me for each project how you account for the difference between KIT's cost and the price charged to Toshiba.

*See* Ex. 28.  Sudhakar refused to answer any of these questions, stating, "On the advice of Counsel, I invoke my 5th Amendment privilege against self-incrimination and respectfully decline to answer."  *See generally id.*  As a result, the Court should make an adverse inference against Kalaga, KIT Construction, and KIT Professionals

46

and find that, as a result of the bribery and bid-rigging fraud, they charged TIC

excessive markups on the work that was done at TIC.

### III. There is Overwhelming Evidence in the Record Supporting Each of TIC's Causes of Action to Establish a Substantial Likelihood of Success.

TIC's Amended Complaint includes highly detailed descriptions of

Defendants' violations of the Racketeer Influenced & Corrupt Organization Act,

18. U.S.C. § 1961 *et seq*. ("RICO") and Texas state law.  TIC's findings from its

ongoing investigation and from expedited discovery granted to prepare for this

Motion demonstrate a substantial likelihood of success on the merits for its claims.

*See Janvey*, 647 F.3d at 595–96; *see also Kalsi Eng'g, Inc. v. Davidson*, No. 4:14-

cv-01405, 2014 U.S. Dist. LEXIS 190052, at *6 n.2, *9–13 (S.D. Tex. Sept. 2, 2014)

(Hittner, J.) (granting plaintiff's preliminary injunction because plaintiff

demonstrated a substantial likelihood of success for at least one claim other than

plaintiff's RICO claim, which was not considered in the opinion).  As shown below,

TIC demonstrates its likelihood of success on its RICO, breach of fiduciary duty,

knowing participation in breach of fiduciary duty, and constructive trust claims.  TIC

submits that the same evidence described below also demonstrates a likelihood of

success on its other state-law claims for relief because they are all based on the same

unlawful conduct.  *See A.T.N. Indus. v. Gross*, No. 4:14-cv-02473, 2014 U.S. Dist.

LEXIS 200662, at *50 (S.D. Tex. Nov. 26, 2014) (finding that a plaintiff need only

show substantial likelihood of success for some claims to obtain a preliminary injunction) (citing *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378 (5th Cir. 2008)).

## A.    Civil RICO: 18 U.S.C. § 1962(c)

To establish a RICO violation, a plaintiff must show: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (citations omitted).  Further, the plaintiff "must show the [RICO] violation was the but-for and proximate cause of injury." *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015) (citation omitted).  Each of these elements is present in this case, and TIC can show that Defendants' RICO violations are the but-for and proximate causes of its injury.

### 1.  RICO Person

First, all Defendants are culpable "persons" within the meaning of RICO because each Defendant is an "individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).  The Fifth Circuit has added that "the RICO person must be one that either poses or has posed a continuous threat of engaging in acts of racketeering." *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995) (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)).  Individuals D'Agostino, and Sudhakar and Jaya Kalaga, as well as Vemparala, unquestionably are individuals capable of holding such an interest in

property.  Their respective corporate entities, the KIT Defendants, SKBP, SVSRK, PD Rentals, January 22 1992, and V2V Solutions were not only *capable* of holding an interest in property, they did in fact hold interests in the very property at issue in the racketeering scheme and continue to retain title to properties and funds obtained through the course of their fraud against TIC.

### 2.  A Pattern of Racketeering Activity: Mail and Wire Fraud and Commercial Bribery as Predicate Acts

Second, Defendants have engaged in a pattern of racketeering activity. "Racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *Abraham*, 480 F.3d at 355 (internal quotation marks omitted) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)) (denying dismissal of RICO claim where similar predicate fraudulent acts presented a future threat of repetition had plaintiffs not filed their lawsuit).  Relatedness is established if the acts have the "same or similar purposes, results, participants, victims, or methods of commission." *H.J. Inc.*, 492 U.S. at 240.  To find "continued criminal activity," there must be "a closed period of repeated conduct . . . [in which] a series of related predicates extend[] over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242–43; *see also Hewlett-Packard Co. v. Byd:sign, Inc.*, No. 6:05-CV-456, 2007 U.S. Dist. LEXIS 5323, at *15–16 (E.D. Tex. Jan. 25, 2007) (finding a two-year period of fraud committed by plaintiff company's employees was "long-term criminal activity").

Qualifying "predicate criminal acts" under RICO include mail fraud (in violation of 18 U.S.C. § 1341) and wire fraud (in violation of 18 U.S.C. § 1343), as well as commercial bribery under Texas penal law.  *See* 18 U.S.C. § 1961(1); Tex. Penal Code § 32.43; *see also Aetna Life Ins. Co. v. Behar*, No. 4:15-cv-00491, 2019 U.S. Dist. LEXIS 150521, at *37–38 (S.D. Tex. Aug. 5, 2019) (denying defendant's motion to dismiss where plaintiff sufficiently alleged RICO claims based on predicate acts of violations of Texas's commercial bribery law, and mail and wire fraud).

### a.   Commercial Bribery

Texas's commercial bribery statute applies to a fiduciary, who, without the consent of the beneficiary, intentionally or knowingly accepts a benefit from another person on the understanding this benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary.  *See* Tex. Penal Code § 32.43.  The statute defines a fiduciary as, among other terms, "an agent or employee."  Tex. Penal Code § 32.43(a)(2)(A).  Both the payor and payee of a bribe can be guilty of commercial bribery if the payor offers the benefit to the employee-fiduciary.  *See Samsung Elecs. Am., Inc. v. Chung*, No. 3:15-CV-4108-D, 2017 U.S. Dist. LEXIS 21700, at *16–17 (N.D. Tex. Feb. 16, 2017) (citing Tex. Penal Code § 32.43(c)).

Here, D'Agostino, Sudhakar and Jaya Kalaga, and the Kalaga corporate Defendants, including KIT, SKBP, and SVSRK, engaged in multiple predicate

criminal acts violating Texas's commercial bribery statute.  According to the statute, D'Agostino was a fiduciary to TIC as its employee.  *See* Second Kennon Decl. ¶¶ 3, 5.  He intentionally and knowingly accepted bribes from the Kalaga Defendants worth millions of dollars in cash, property, and luxury goods that influenced his conduct in relation to TIC.  *See* Exs. 23–25, 29, 31–38.  From the Kalaga Defendants, D'Agostino received over \$10 million in bribes.  *See id.*  These bribes went to D'Agostino personally, as well as to his shell companies, PD Rentals and January 22 1992, LLC and through his then-wife Melissa D'Agostino.  *See* Ex. 24–25.  In exchange, D'Agostino facilitated the submission of fraudulently inflated bids from KIT Defendants to TIC, including fictitious higher bids, and he ensured the KIT Defendants won every project on which they bid.  *See, e.g.*, Exs. 44, 46–49 (bid packages submitted to TIC from KIT, V2V Solutions, and Sermeg), Ex. 50 (e-mails sent to D'Agostino containing bids for review and PowerPoint to award KIT more construction work); ECF Nos. 24-19–25 (bid packages and e-mails to D'Agostino); Second Kennon Decl. ¶¶ 12–14, 17–19, 21, Exs. 1-A–1-J (ECF No. 30-1) (same). He also facilitated the award of unnecessary construction work to the KIT Defendants.  *See, e.g.*, Ex. 51; Am. Compl. ¶¶ 94–103.  Each and every submission to TIC of a fraudulent bid or award of unnecessary construction work by D'Agostino at the expense of TIC in exchange for bribes for D'Agostino violated the Texas commercial bribery statute, constituting a criminal predicate act under RICO.

51

Sudhakar and Jaya Kalaga, and their KIT entities, paid hundreds of bribes to D'Agostino between 2009 and 2019 worth millions of dollars.  As previously extensively detailed, these bribes included silver bars and innumerable luxury goods worth hundreds of thousands of dollars, real estate worth approximately $4 million, and cash bribes worth over $5 million.  *See* Exs. 24–25, 29, 31–32, 34–38; Am. Compl. ¶¶ 104–141.  They paid these bribes to incentivize D'Agostino to continue breaching his fiduciary duty to his employer, TIC, by rigging the bid process and greatly enriching the Kalaga Defendants at TIC's expense.  Each of the Kalagas' and KIT's offers of bribes to D'Agostino, in real property, cash, and goods, violates the Texas commercial bribery statute and constitutes criminal predicate acts under RICO.

Finally, as extensively detailed above, Sudhakar Kalaga was asked numerous questions at his deposition on January 3, 2020 relating to bribes, gifts, and real estate transfers made to D'Agostino, and he refused to answer all questions by invoking his Fifth Amendment privilege.  *See* Sections II.A–C.  As a result, TIC is entitled to an adverse inference against Sudhakar Kalaga that these transactions were bribes that violated the Texas commercial bribery statute.  *See GE Capital Commercial Inc.*, 2009 WL 1148235, at *3.

### b.   Mail and Wire Fraud

In addition to commercial bribery, the Kalaga Defendants committed multiple criminal predicate acts of mail and wire fraud.  *See* § 1341; § 1343; § 1961(1). Under RICO, for a mail or wire fraud to serve as a predicate act, a plaintiff must establish: "(1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by revising, participating in, or abetting the scheme."  *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 746 F. Supp. 2d 819, 841 (S.D. Tex. 2010) (citation omitted) (denying summary judgment on RICO claims where the predicate criminal acts included mail and wire fraud).  Under the first factor, the elements of fraud include (1) a misstatement or omission; (2) of material fact; (3) made with the intent to defraud; (4) on which the plaintiff relied; and (5) which proximately caused the plaintiff's injury.  *See Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 5323, at *12 (citing *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997)).  Federal Rule of Civil Procedure 9(b) requires that fraud claims, including mail and wire fraud as predicates of a RICO claim, plead the "circumstances constituting fraud" with particularity.  *See Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 658 (S.D. Tex. 2016) (quoting Fed. R. Civ. P. 9(b)).  "However, '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'"  *Id.*  The purpose

of such heightened pleading standards is to "provide defendants with fair notice of the plaintiffs' claims." *See Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 5323, at *12 (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

However, courts in this Circuit have routinely found that where the fraudulent conduct extended over a long period of time, "the plaintiff need not allege in detail the facts of each transaction of the fraudulent scheme." *See Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 5323, at *13–14 (citing *United States ex rel. King v. Alcon Laboratories, Inc.*, 232 F.R.D. 568, 570 (N.D. Tex. 2005) ("[I]n cases where the plaintiff is alleging that the fraud occurred over a multi-year period, the plaintiff is not required to allege all facts supporting each and every instance when each defendant engaged in fraud."); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998) (noting that courts have consistently found that where allegations of fraudulent conduct are numerous or take place over an extended period of time, less specificity is required to satisfy the pleading requirements of Rule 9(b)) (citations omitted).  In such instances, the plaintiff need only establish the "who, what, when, where, and how of the alleged fraud." *See, e.g.*, *Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d at 1028 (citations omitted).

Defendants carried out their unlawful scheme by use of the interstate mails and wires, committing the predicate criminal acts of mail and wire fraud.  First, all individual Defendants (the Kalagas, D'Agostino, and Vemparala) on personal e-mail accounts and on behalf of their corporate entities (the KIT Defendants and V2V Solutions) used the interstate wires via e-mail to communicate with each and to transmit fraudulent bids, fraudulent purchase order forms, and other messages designed to execute a scheme to defraud TIC, constituting numerous acts of wire fraud.  *See* Exs. 41, 50–54; ECF Nos. 24-19, 24-20, 24-22; Second Kennon Decl. ¶¶ 16–17 (ECF No. 30-1) (e-mails sending and facilitating submission to TIC of fraudulent and fake bids between Defendants).  TIC described in detail in its Amended Complaint the Defendants' scheme and provided multiple specific examples of e-mails between the Defendants establishing wire fraud (*see generally* ECF No. 90), sufficient to provide Defendants with "fair notice of plaintiff's claims."  *See Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 5323, at *12.

As just one example, in Amended Complaint paragraphs 50–54, TIC described an e-mail exchange in which Vemparala sent a V2V Solutions bid to D'Agostino's e-mail on November 3, 2010 for D'Agostino to submit to TIC, and Vemparala blind-copied Sudhakar Kalaga so that Sudhakar Kalaga's inclusion on the e-mail would not be known to anyone at TIC.  Kalaga then forwarded the bid e-mail he received from Vemparala to Joseph informing him the bid was sent.

55

Joseph responded that the bid should have been hand-delivered without any e-mail, but that it was ultimately fine it was sent via e-mail.  KIT Professionals submitted a lower bid than V2V Solutions' bid and it was awarded the project by TIC.  *See* Ex. 50; Am. Compl. ¶¶ 50–54.  This exchange alone establishes the use of the wires to further the scheme to defraud TIC and rig its bidding process by submitting two fraudulent bids the Defendants intended TIC to rely upon, and it also establishes the Defendants' specific intent to defraud by concealing their coordination of bids from TIC.

Sudhakar Kalaga also personally created fake bids using other companies' names utilizing e-mail, further instances of wire fraud.  As one example, in January 2016, D'Agostino solicited bids for a "lightning protection system" at TIC.  KIT Construction submitted a lump-sum bid of $245,000.   On the same day, V2V Solutions and Sermeg each submitted a lump-sum bid of $375,000 and $295,000, respectively.  Sermeg's bid was "signed" by V.N. Murthy, the father of Vemparala, the owner of V2V Solutions.  *See* Ex. 55; Frizell Decl. at ¶¶ 14–15.  As planned, because KIT appeared to be the lowest bidder, the project was awarded to KIT.  LSI, the general contractor for KIT Construction, charged KIT $49,955.40 to complete all work on this project.  *See* Ex. 56.  KIT's profit on this project was $195,044.60, a 390% markup of its costs.  *See* Exs. 55–56.  This coordination of bids enabling KIT's enlarged profit margin was made possible because Sudhakar Kalaga himself

prepared the Sermeg and V2V Solutions bid to be higher than his KIT bid. On the same day the bids were submitted, Kalaga e-mailed the submitted Sermeg and V2V Solutions bids to Vemparala, with the subject line, "Old proposals resubmitted today with revised dates and numbers." *See* Ex. 53. Kalaga e-mailed these bids to inform Vemparala that they had been submitted to TIC. Vemparala responded to Kalaga via e-mail, "Got it Mama. Thanks. Good luck!!" *See id.* Vemparala himself admitted during a voluntary interview with TIC's investigators that Kalaga prepared bids using V2V Solutions' name and submitted them to TIC personally. *See* Frizell Decl. at ¶ 12. This exchange establishes that Sudhakar Kalaga utilized the interstate wire system to further the conspiracy to defraud TIC with fake bids and demonstrates his fraudulent intent to hide this coordination of bids from TIC.

Similar examples of wire fraud, including examples involving Jaya Kalaga, are described in TIC's Amended Complaint at paragraphs 56, 73, 81, 83, 89, and 103, as well as in exhibits submitted in support of TIC's Motion for a Temporary Restraining Order (ECF No. 24). *See* Exs. 41, 51–52, 54; ECF No. 24-19, Second Kennon Decl. ¶ 16 (ECF No. 30-1) (e-mail sent by Kalaga to D'Agostino's personal e-mail account attaching V2V Solutions bid, which D'Agostino then forwarded to his TIC account); ECF Nos. 24-21–22, Second Kennon Decl. ¶ 17 (ECF No. 30-1) (e-mails sent by Kalaga to D'Agostino's private e-mail attaching KIT Construction bids for D'Agostino to review before D'Agostino sent the bids to his TIC e-mail

account).  Such detailed and specific examples of wire fraud over the extended period from 2010 to 2019 establish a strong likelihood of success on TIC's claims of numerous acts of wire fraud as criminal predicate acts under RICO.

Additionally, the KIT Defendants received fraudulently inflated payments from TIC through the U.S. mail system, constituting mail fraud.  *See* Second Kennon Decl. ¶ 11 (ECF No. 30-1).  Checks sent through the mail containing the proceeds of the fraud "thus contain[] 'the lifeblood of the scheme,'" and the act constitutes mail fraud under § 1341.  *See United States v. Marchan*, 32 F. Supp. 3d 753, 770 (S.D. Tex. 2013) (quoting *United States v. Rico Indus.*, Inc., 854 F.2d 710, 713 (5th Cir. 1988)).  KIT Construction and KIT Professionals received checks from TIC through the U.S. mail for millions of dollars.  *See* Second Kennon Decl. ¶¶ 9–11 (ECF No. 30-1).  D'Agostino directed and caused TIC to make these payments to KIT that would not have been made but for Defendants' fraud and deception.  *See id.* ¶¶ 13–14, 21–23.

TIC's Amended Complaint describes in detail two specific examples in 2013 to 2014 and 2016 to 2017 respectively, in which Sudhakar Kalaga coordinated via e-mail with Vemparala and D'Agostino to submit fraudulently inflated KIT Construction and KIT Professionals bids and fake higher V2V Solutions and Sermeg bids, which resulted in TIC selecting KIT as the winning bidder and paying out the fraudulently-invoiced amount via the U.S. mail.  *See* Ex. 48 (2016–17 example);

Am. Compl. ¶¶ 73, 75; ECF Nos. 24-19, 24-20 (2013–14 example); Second Kennon Decl. ¶¶ 9–11 (ECF No. 30-1).  These two instances alone constitute two acts of mail fraud.  Further, TIC has described approximately 80 examples between 2010 to 2018 in which KIT and V2V Solutions submitted inflated and fake bids designed to defraud TIC to select KIT's bids and pay out KIT's bid via the U.S. mail.  *See* Am. Compl. ¶ 77; Second Kennon Decl. ¶¶ 9–11 (ECF No. 30-1).  TIC's payments on KIT's inflated bids constitute numerous acts of mail fraud.  Again, these detailed and specific examples of mail fraud between 2007 and 2019 surpass Rule 9(b)'s heightened pleading standard and establish a strong likelihood of success on TIC's claims of multiple acts of mail fraud as criminal predicate acts under RICO.

Furthermore, D'Agostino solicited bids via FedEx, constituting further examples of mail fraud.  *See, e.g.*, *Marchan*, 32 F. Supp. 3d 753 (affirming jury verdict of guilty of mail fraud for receiving proceeds of fraud through FedEx).  As just one example, KIT Construction, V2V Solutions, and OnePoint, as well as other fictitious bidders, all submitted bids to D'Agostino via FedEx, which he received on April 17, 2017, for the HEV Expansion (Phase II) project.  *See* Exs. 44, 46–47; Am. Compl. ¶¶ 92 (Project #4), 170.   KIT Construction's bid for this project was fraudulently inflated 113% from what the general contractor, LSI, was charging it for the work.  *See* Snell Decl. ¶ 23, Ex. 6 (ECF 31-6); Am. Compl. ¶ 92, Project #4. The Defendants coordinated for V2V Solutions' and OnePoint's submitted bids to

59

be higher, and KIT Construction was selected by TIC as the winning, "lowest" bidder.   D'Agostino directed and caused TIC to pay KIT Construction their fraudulently obtained $1.39 million.   *See* Second Kennon Decl. ¶¶ 9–11 (ECF No. 30-1).  This is just one example in which the Defendants utilized the interstate mail system through FedEx to engage in mail fraud.

As such, all Defendants have committed multiple predicate criminal acts of commercial bribery, mail fraud, and wire fraud that collectively establish a pattern of racketeering activity that was related in the same participants aiming to achieve the same result, defraud TIC for millions.  Every bribe offered and accepted, every e-mail sent in furtherance of the scheme, and every payment sent through the U.S. mail or bid sent through FedEx was related to the Defendants' coordinated scheme to defraud TIC for millions of dollars.

Finally, as extensively detailed above, Sudhakar Kalaga was asked numerous questions at his deposition on January 3, 2020 relating to his relationship with Vinod Vemparala and his company, V2V Solutions, as well as KIT's method for calculating its bids based on subcontractors price quotes, and e-mails between Defendants exchanging bids, and he refused to answer all questions by invoking his Fifth Amendment privilege.  *See* Sections II.D–E.  As a result, TIC is entitled to an adverse inference that Kalaga, KIT Construction, and KIT Professionals submitted fake bids themselves and conspired to submit fake bids through V2V Solutions,

Sermeg, and Vinod Vemparala using the interstate mail and wires, in violation of sections 1341 and 1343. *See GE Capital Commercial Inc.*, 2009 WL 1148235, at *3.

Defendants' related criminal predicate acts represent a closed period of repeated conduct, amounting to a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5). *See H.J. Inc.*, 492 U.S. at 242 ("A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."). Between at least 2007 and 2019, TIC paid over $100 million in numerous construction contracts to KIT at markups of between 50% to 400% over the Defendants' cost because of the Defendants' criminal acts. *See, e,g,*, Exs. 41, 44, 46, 48, 50–52, 54 (examples of Defendants' criminal acts); *see* ECF Nos. 24-20, 24-23–28 (examples of inflated bids and LSI invoices to KIT Construction on TIC projects); *see generally* Snell Decl. and exhibits (ECF No. 31-6). The duration of the continuous and lucrative bribery and kickback scheme constitutes a substantial and long-term period of criminal activity. Furthermore, based on the nature of the enterprise and predicate acts, had TIC not detected Defendants' scheme, Defendants posed a threat of continued criminal activity extending indefinitely into the future. Am. Compl. ¶¶ 172–73. TIC has therefore sufficiently alleged a prima facie case that Defendants satisfy the second prong of a RICO claim with their pattern of racketeering activity.

### 3. Enterprise Connected to Racketeering Activity

Third, TIC's evidence establishes a prima facie case that Defendants' pattern of racketeering activity connected to "the acquisition, establishment, conduct, or control of an enterprise." *See Abraham*, 480 F.3d at 355. Here, all individual Defendants, together with the corporate Defendants under their control, created an association-in-fact enterprise, separate from the pattern of racketeering, for the common purpose of unlawfully obtaining TIC construction projects and payments from TIC. *See* 18 U.S.C. § 1961(4); *Crowe*, 43 F.3d at 204 ("A RICO enterprise can be either a legal entity or an association-in-fact."). Each individual and corporate entity also had an existence separate from the racketeering activity. Am. Compl. ¶¶ 15–27 (describing the individual and corporate Defendants' identities). Beginning in 2009 for the Kalaga Defendants and Vemparala, and continuing until 2019 when TIC discovered the fraud, each Defendant engaged in a pattern of racketeering activity for the shared purpose of defrauding TIC for their own personal benefit.

Each Defendant had a defined role in operating the enterprise. D'Agostino was responsible for collecting bids from V2V Solutions, Sermeg, KIT, and other non-Defendant companies and making the bidding process appear legitimate to others at TIC. D'Agostino concealed the fraudulent nature of the bidding process from others at TIC to obtain TIC approvals to award work to D'Agostino's preferred

bidder. *See, e.g.*, Ex. 51; ECF Nos. 24-19, 24-21 (e-mails where D'Agostino used his personal account to facilitate transmission of fraudulent bids and use of Kalaga-created PowerPoint to justify unnecessary construction). D'Agostino ensured that TIC issued purchase orders to KIT, as all the Defendants planned, and he ensured that TIC paid out the fraudulently inflated invoices submitted by KIT. *See* Exs.44, 46–49 ; ECF Nos. 24-19–28; Second Kennon Decl. ¶¶ 14, 18, 21–23, Exs. 1-A–1-J (examples representative of hundreds of fraudulent and fictitious bids and TIC Purchase Requisitions submitted by D'Agostino to TIC). D'Agostino also formed and exercised control over entities PD Rentals (ECF No. 24-18 (D'Agostino's ownership of PD Rentals) and January 22 1992 (Ex. 27) to receive the hundreds of bribes and kickbacks from Sudhakar and Jaya Kalaga and entities under their control to compensate him for his actions at TIC.

Sudhakar and Jaya Kalaga controlled Defendants KIT Construction, KIT Professionals, SKBP, and SVSRK. *See* Am. Compl. ¶¶ 17–18; Exs. 57–59; ECF No. 24-5 (Kalaga control of SKBP). The Kalagas were responsible for submitting inflated bids on behalf of KIT via e-mail and for coordinating the submission of fake bids to justify TIC awarding work to KIT. *See* Exs. 44, 46, 49, 51, 54, 55; Frizell Decl. at ¶¶ 10–15; ECF Nos. 24-19–28; Second Kennon Decl. ¶¶ 14, 18, 21–23, Exs. 1-A–1-J (examples representative of hundreds of fraudulent and fictitious bids and TIC Purchase Requisitions submitted by D'Agostino to TIC).

Vinod Vemparala was responsible for submitting fake bids on behalf of his companies, V2V Solutions and Sermeg, to D'Agostino. *See generally* Frizell Decl. These bids were coordinated with KIT's bids to ensure that KIT's bids were lower so that D'Agostino and TIC would select KIT to perform the work. *See* Exs. 44, 46, 50, 55; ECF No. 24-20; Second Kennon Decl. ¶ 18, Exs. 1-A–1-J (ECF No 30-1).

KIT Construction and KIT Professionals were responsible for retaining contractors that would actually perform the work at TIC's facilities, and the KIT companies were used to submit fraudulently inflated bids and pay out bribes to D'Agostino and others. *See, e.g.*, Exs. 21, 24–25, 42–45, 54, 55, 56; ECF Nos. 24-20 (TIC Purchase Requisition with KIT Professional's bid); 24-24–25 (LSI invoice and price quote to KIT Professionals and KIT Construction for TIC projects); 24-26–28 (KIT Construction bids relating to LSI price quote in No. 24-25); Second Kennon Decl. ¶ 18, Exs. 1-A-1-J (ECF No. 30-1); Snell Decl. ¶¶ 16–26, Exs. 1–8 (ECF No. 31-6). SKBP and SVSRK, Kalaga-controlled companies, held properties that Sudhakar Kalaga acquired using the proceeds of the fraud at TIC. *See* Ex. 29; ECF No. 24-3 (deeds for properties held by SKBP and SVSRK that were transferred to PD Rentals). The Kalagas used SKBP and SVSRK to transfer properties to D'Agostino as compensation for facilitating the fraud at TIC. *See id.*

All individual Defendants and corporate entities are culpable persons distinct from the association-in-fact enterprise they formed, with their own role in the

scheme.  The purpose of this association-in-fact enterprise was to defraud TIC of millions of dollars by manipulating and rigging TIC's bidding process for construction projects.

### 4. Causation

Finally, TIC can establish that Defendants' violations of RICO were the but-for and proximate cause of TIC's injury.  Am. Compl. ¶ 177.  But for Defendants' criminal activities, bribery, and manipulation of TIC's procurement and bidding processes for maintenance and construction projects, TIC would not have overpaid by tens of millions for construction work.  Defendants' action in manipulating TIC's bidding process directly resulted in the award of millions of dollars of construction business to KIT.  *See* Second Kennon Decl. ¶¶ 9–14, 21–23 (ECF No. 30-1).  Moreover, TIC was clearly a foreseeable victim, as the entire purpose of Defendants' enterprise was to defraud TIC into paying unnecessary costs for construction projects.  TIC's injuries to its business and property in the form of grossly inflated payments to KIT Defendants are the direct and proximate result of Defendants' pattern of racketeering activity.  *See id.*

Based on the above, TIC has at this preliminary stage of the case demonstrated a substantial likelihood of success on the merits for its RICO claims against all Defendants.

### B.   Breach of Fiduciary Duty

TIC can also establish a substantial likelihood of success on its breach of fiduciary duty claim against D'Agostino.   TIC can meet each of the necessary elements: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *See Navigant Consulting v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. — Dallas 2006, pet. denied)).

A fiduciary relationship existed between TIC and D'Agostino.  A "fiduciary" relationship between employer and employee "'contemplates fair dealing,' and 'refers to integrity and fidelity.'" *See Navigant Consulting*, 508 F.3d at 283.  Further, "Texas courts have held that an employee may owe certain fiduciary duties to his employer when the employee has been placed in a position of peculiar confidence or trust toward the employer." *Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 5323, at *22–23 (citing *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App. — Houston 2003, no pet.)).

Here, D'Agostino had a fiduciary relationship with TIC, his employer. D'Agostino, as an employee, had a duty to TIC to act openly, in good faith, and with integrity.  Further, TIC placed D'Agostino in a position of peculiar confidence and trust that he would, consistent with TIC's purchasing policies, solicit accurate and

competitive bids from contractors to complete necessary construction work at TIC's facilities and not receive "personal benefits from suppliers with regard to corporate procurement." *See* Second Kennon Decl. ¶¶ 5–6, 21 (ECF No. 30-1).  D'Agostino breached his fiduciary duty and abused his position of confidence and trust by engaging in a fraudulent scheme to award over $100 million in construction contracts to KIT at markups significantly over these companies' costs.  *See* Exs. 42– 45, 48, 49; ECF Nos. 24-20, 24-23; Second Kennon Decl. ¶¶ 14, 18, 21–23, Exs. 1-A–1-J (examples representative of hundreds of fraudulent and fictitious bids and TIC Purchase Requisitions submitted by D'Agostino to TIC).  TIC suffered damages each time it awarded a construction project at a grossly inflated markup as a result of D'Agostino's conduct, and its pre-trebled damages as a result of D'Agostino's breach are approximately $69.5 million.  Pollack Decl. at ¶ 24.  D'Agostino engaged in this deceitful manipulation of TIC's bidding process to enrich himself to the detriment of TIC, in bribes worth millions of dollars, in real-estate, luxury cars and apartments, luxury goods, and silver bars.  *See* Exs. 23–25, 29, 31–38; Am. Compl. ¶¶ 104–141.  Therefore, TIC has demonstrated a substantial likelihood of success on the merits for its breach of fiduciary duty claim against D'Agostino.

### C.   Knowing Participation in Breach of Fiduciary Duty

Similarly, TIC can establish that the Sudhakar and Jaya Kalaga and the KIT Defendants knowingly participated in and facilitated D'Agostino's breach of his

fiduciary duty.  To prove such knowing participation, TIC can show that (1) a fiduciary relationship existed between D'Agostino and TIC; (2) these Defendants knew that D'Agostino was in a fiduciary relationship with TIC; and (3) these Defendants were aware that they were participating in the breach of fiduciary relationship by defrauding TIC and bribing its fiduciary, D'Agostino.  *See D'Onofrio v. Vacation Publs., Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (applying Texas law to establish a claim for knowing participation in a breach of fiduciary duty).  Knowledge in the context of knowingly participating in a breach of another's fiduciary duty means the tortfeasor had "actual awareness, at the time of the conduct" that the other party owed a fiduciary duty and that their actions were aiding breach of those duties.  *See Seven Seas Petroleum, Inc. v. Cibc World Mkts. Corp.*, No. H-08-3048, 2013 U.S. Dist. LEXIS 101112, at \*43 (S.D. Tex. July 19, 2013) (citing *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 411 (Tex. App. — Houston [1st Dist.] 2011, review denied)).  "Texas law, follows the general rule, that except for knowledge obtained confidentially, the knowledge of the agent is the knowledge of the principal irrespective of its source or time of acquisition."  *Floyd v. Hefner*, 556 F. Supp. 2d 617, 655 (S.D. Tex. 2008) (citing *Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 S.W.2d 352, 356 (Tex. 1965)).

D'Agostino owed a fiduciary duty to his employer, TIC, because of the peculiar position of confidence he was placed in to solicit and submit accurate bids

for construction work.  *See supra* Section III.B (Breach of Fiduciary Duty).  The Defendants plainly and actually knew that D'Agostino owed such a fiduciary duty to TIC as their association with him submitting bids directly involved his duty to TIC to solicit competitive bids for constructive work.  *See, e.g.*, Exs. 42–45, 48–52; ECF Nos. 24-19, 21, 22 (e-mails from Kalaga to D'Agostino submitting bids), ECF Nos. 24-26–28 (KIT bids addressed to D'Agostino); Second Kennon Decl. ¶ 18, Exs. 1-A–1-J (ECF No. 30-1) (same).  They conspired with D'Agostino to take advantage of the trust that TIC had placed in D'Agostino.  The knowledge of KIT's agents, Sudhakar and Jaya Kalaga, are imputed to their corporate entities, the KIT Defendants.  *See* Am. Compl. ¶¶ 17–18 (both Kalagas were officers of KIT corporations).

Finally, all Defendants were not only aware, but acted with the explicit goal, that their actions would encourage and assist D'Agostino to breach his fiduciary duty to TIC.  Sudhakar and Jaya Kalaga paid extravagant bribes to D'Agostino, such as purchasing him luxury goods and silver bars worth hundreds of thousands of dollars, providing him with luxury cars and luxury apartments rent-free, and transferring to him millions of dollars in real estate through their other corporate entities.  *See* Exs. 23–25, 29, 31–38; ECF No. 24-3 (first eight properties); Am. Compl. ¶¶ 104–141.  They made these exorbitant transfers to D'Agostino so that D'Agostino would continue to submit their companies' fraudulently inflated and fake bids to TIC and

facilitate awarding their companies lucrative construction work, in breach of his duty to TIC.  In addition to acting in their individual capacity, they also acted as agents for KIT Construction and KIT Professionals, which submitted the fraudulent bids (*see, e.g.*, Exs. 42–45, 49, 55; ECF Nos. 24-20, 26–28; Second Kennon Decl. ¶ 18, Exs. 1-A–1-J (ECF No. 30-1)) and which paid D'Agostino cash bribes worth an additional $5 million to encourage continued submission of bids to enrich the companies and the Kalagas at the expense of TIC (*See* Exs. 24–25).  The Kalagas and their KIT entities knew their bids were fraudulent, and they knew that TIC would not select their bids without fake bids from companies designed to make KIT bids appear competitive.  *See, e.g.*, Frizell Decl. at ¶¶ 10, 12, 14; Exs. 41, 50, 52, 55; ECF No. 24-19 (e-mail from Kalaga to D'Agostino with a V2V bid).  The knowledge of the individual Kalagas is imputed to their corporate agents.  These Defendants knowingly participated in D'Agostino's breach of his fiduciary duty to TIC to enrich themselves at the expense of TIC.

Finally, as extensively detailed above, Sudhakar Kalaga was asked numerous questions at his deposition on January 3, 2020 relating to his relationship with D'Agostino and the bribes, gifts, and real estate transfers he made to D'Agostino, and he refused to answer all questions by invoking his Fifth Amendment privilege. *See* Sections II.A–C.  As a result, TIC is entitled to an adverse inference that Sudhakar Kalaga, KIT Professionals, and KIT Construction knowingly participated

in D'Agostino's breach of fiduciary duty with exorbitant bribes to enrich himself at TIC's expense.  *See GE Capital Commercial Inc.*, 2009 WL 1148235, at *3.

### D.    Constructive Trust

TIC can establish it is likely to succeed on its equitable remedy of a constructive trust against the Kalaga Defendants, and this equitable remedy supports imposing a preliminary injunction to protect such a remedy.  A constructive trust is a court-created, equitable remedy intended to redress unjust enrichment.  *See Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974).  The Texas Supreme Court has stated that "[t]he specific instances in which equity impresses a constructive trust are numberless."  *Pope v. Garrett*, 147 Tex. 18, 211 S.W.2d 559, 560 (Tex. 1948).  Generally, though, to obtain a constructive trust, a party must establish "(1) a breach of a special trust or fiduciary relationship or actual or constructive fraud, (2) unjust enrichment of the wrongdoer, and (3) an identifiable res that can be traced back to the original property."  *See Archer v. Anderson*, 556 S.W.3d 228, 245 (Tex. 2018) (citations omitted).  The final tracing requirement on particular property should be "observed with reasonable strictness."  *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 88 (Tex. 2015).  However, where a plaintiff can establish that property was purchased with commingled funds, i.e., funds tracing back to the breach or fraud, as well as funds from other sources, the burden then shifts to the Defendant to establish that the property should not have a constructive

trust imposed upon it.  *See Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 873–74 (Tex. 2017) (citing multiple cases supporting this proposition).

Notably, as a plaintiff is not required to demonstrate it is entitled to summary judgment in order to establish a likelihood of success on its claims, courts have not required a plaintiff to detail every asset upon which he could obtain a constructive trust when granting a preliminary injunction.  *See, e.g.*, *Tisino v. R & R Consulting & Coordinating Group, LLC*, 478 Fed. App'x 183, 186 (5th Cir. 2012) ("Even if the preliminary injunction could have been more precise with respect to the exact assets at issue, such inaccuracy would not require reversal.  Under Texas law, a court is not required to exercise mathematical precision when deciding which assets should be covered by a constructive trust.") (citations omitted) (affirming district court's grant of a preliminary injunction freezing defendants' assets to preserve plaintiff's constructive trust remedy over disputed funds after plaintiff established that defendants had wrongfully acquired a defined amount of money and were actively dissipating and transferring funds); *Tujague v. Adkins*, No. 4:18-CV-631, 2018 U.S. Dist. LEXIS 171394, at *6–7, 11–12 (E.D. Tex. Oct. 4, 2018) (granting a broad asset-freezing preliminary injunction where plaintiff pled RICO and a constructive trust because plaintiff "established with sufficient likelihood for the limited purpose of this [preliminary injunction] order" that defendant defrauded him of a certain amount of money and that money was traceable from plaintiff to defendant and/or

companies defendant controlled); *French v. Fisher*, No. 1:17-CV-248-DAE, 2018 U.S. Dist. LEXIS 232723, at *49 (W. D. Tex. Aug. 27, 2018) (granting a preliminary injunction limiting defendants' access to funds to protect plaintiff's constructive trust remedy without specifically identifying upon which funds the plaintiff could likely obtain a constructive trust).

TIC can prevail on its claim for a constructive trust on the Kalaga Defendants' real property and personal properties of significant value because they were purchased as a result of funds unjustly obtained through breach of fiduciary duty and fraud. First, as established above, D'Agostino breached his fiduciary duty to TIC by accepting bribes and kickbacks from Defendants in exchange for rigging TIC's bid-process and directing TIC to pay millions on inflated bids. *See supra* Section III.B (Breach of Fiduciary Duty). Additionally, Sudhakar and Jaya Kalaga, and their KIT corporate entities knowingly participated in and facilitated this breach of fiduciary duty by paying D'Agostino bribes worth millions of dollars to incentivize him to continue to breach his fiduciary duty to TIC by rigging the bidding process. *See* Exs. 23–25, 29, 31–38. Second, the Kalaga Defendants have plainly received benefits worth millions of dollars from TIC through their fraudulent conduct, and it would be unconscionable to allow them to retain this unjust enrichment. *See* Second Kennon Decl. ¶¶ 9–10 (ECF No. 30-1).

Finally, TIC can reasonably establish that funds, real properties, and valuable personal property acquired after 2009, when the Kalaga Defendants' fraud began, are traceable to the $109 million TIC paid to KIT Construction and KIT Professionals. Pollack Decl. at ¶ 23. TIC currently estimates that nearly $70 million of this $109 million represents TIC's loss. *See id.* at ¶ 24. With this nearly $70 million, the Kalagas paid bribes (*See* Exs. 23–25, 29, 31–38), purchased real estate (including their primary residence), acquired vehicles, paid college tuition, and obtained luxury items such as expensive watches, jewelry, and precious metals. As demonstrated above, the Kalaga Defendants extensively commingled funds and used KIT Construction's bank accounts to fund their other various corporate and personal accounts such that the burden is now on the Kalaga Defendants to show why such properties should not be included in a constructive trust. At this early stage, TIC has established a substantial likelihood of success on its RICO claim, its breach and knowing participation in a breach of fiduciary duty claims, and its equitable remedy of a constructive trust. TIC has a substantial likelihood of success in obtaining a constructive trust over a significant amount of the Kalaga Defendants' assets that they wrongfully obtained from TIC and have subsequently spent and commingled with other funds in multiple personal and corporate bank accounts. TIC is therefore entitled to a preliminary injunction to protect assets likely to be part of its equitable remedy.

## IV.    TIC's Threatened Injury Outweighs Any Threatened Harm

TIC seeks to freeze the funds, property, and real estate that Defendants stole from TIC or acquired with the proceeds from their fraud against TIC.  Maintaining the status quo pending the resolution of TIC's action will not harm Defendants because the assets subject to this motion are traceable to the fraudulent scheme. TIC's requests to freeze all Kalaga bank accounts containing funds that they wrongfully obtained from TIC is not unusual or unreasonable.  *See, e.g.*, *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01479-KOB-HNJ, 2019 U.S. Dist. LEXIS 193454 (N.D. Ala. Nov. 7, 2019) (freezing Defendants' bank accounts in a preliminary injunction relating to RICO claims in part because Defendants purchased "several big-ticket luxury items" after the lawsuit was filed that evidenced irreparable injury for Plaintiff's equitable remedies); *A.T.N. Indus. v. Gross*, No. 4:14-cv-02473, 2014 U.S. Dist. LEXIS 200662, at *64 (S.D. Tex. Nov. 26, 2014) (freezing all funds within the actual or constructive possession or control of all individual and corporate defendants and requiring defendants to file with the Court a schedule identifying the amount and locations of all frozen funds as part of a preliminary injunction granted on RICO claims), *Developers Sur. & Indem. Co. v. Bi-Tech Constr., Inc.*, 979 F. Supp. 2d 1307 (S.D. Fla. 2013) (freezing any funds held in Defendants' identified bank accounts and freezing Defendants assets to preclude them from disposing of assets as part of a preliminary injunction).

Additionally, as mentioned earlier, TIC faces losing its remedy if a preliminary injunction freezing bank accounts does not cover every financial account of the Kalagas, as they are highly adept at setting up and using companies to hide money, and often commingle funds between them. Indiscriminate shifting of money and insufficient segregation of funds between different entities' bank accounts requires the scope of the preliminary injunction to be broad. *See, e.g.*, *Hardie's Fruit & Vegetable Co., LP v. BIMC*, LP, No. 3:18-CV-1454-D, 2018 WL 3302733, at *4 (N.D. Tex. July 5, 2018) (ordering expansion of scope to preliminary injunction to require that contested funds — in addition to other commingled funds — continue to be held in bank account to prevent dissolution of res in dispute); *Sec. & Exch. Comm'n v. Bryant*, No. 4:17-CV-00336, 2017 WL 3492311, at *6 (E.D. Tex. Aug. 15, 2017) ("Receiver has produced sufficient evidence to prove commingling of assets such that segregation between assets used in the Defendants' scheme and those of Wammel Parties' investors cannot be done. Therefore, a preliminary injunction over all of Wammel Parties' assets is appropriate to protect against dissipation of Defendants' assets.").

Moreover, the Court must freeze every Kalaga Defendant bank account, or else a remedy will prove effectively meaningless in reality. The Kalaga Defendants and their financial accounts are all closely linked together, and there is little distinction between corporate spending and personal spending in the accounts. From

what TIC has uncovered from Court-ordered expedited discovery, the Kalagas routinely utilize KIT credit cards to cover a variety of personal expenses that can be hardly justified as "business expenses" (e.g., electronics, country club expenses, goods from Amazon.com, trips to Vegas, expensive liquors, school tuition, parking fees).

Furthermore, KIT Professionals received nearly $18 million in transfers from KIT Construction (*see supra* chart at pages 2-3), proceeds of KIT Construction's fraud against TIC. Where KIT Professionals is being significantly financially supported by KIT Construction and fraudulent proceeds, it is reasonable to also include KIT Professionals' accounts within the scope of the preliminary injunction. Were the Court to grant an asset freeze only on some but not all of the accounts, the Kalagas will simply utilize the unfrozen account/s to continue to dissipate monies unlawfully obtained from TIC.

**V.   Granting TIC's Preliminary Injunction Will Not Disserve the Public Interest**

The public interest will not be disserved in granting TIC's motion. "To the contrary, the requested injunction furthers the public's interest in protecting against fraudulent conduct." *See Tujague v. Adkins*, No. 4:18-CV-631, 2018 U.S. Dist. LEXIS 171394, at *10 (E.D. Tex. Oct. 4, 2018) (citation omitted). Because the public has an interest in preventing fraudulent activity as promulgated by federal statutes as 18 U.S.C. § 1962(c) and (d), 18 U.S.C. § 1341, 18 U.S.C. § 1343, and

under state law such as Texas Penal Code § 32.43, the public interest will not be disserved by granting the requested injunctive relief.

## VI.    No Additional Bond Should Be Required

This Court previously required TIC to post a $1,000 bond as a condition of obtaining a temporary restraining order.  *See* ECF No. 40.  TIC deposited this bond, and the temporary restraining order expired without any enjoined party claiming any harm.  *See* Ex. 60 (bond receipt).  TIC should not be required to provide an additional bond because the injunctive relief will not cause any damages to Defendants, and they would not be "wrongfully enjoined or restrained."  *See* Fed. R. Civ. P. 65(c). The Fifth Circuit has recognized the security requirement to be squarely within the district court's discretion and affirmed injunctions granted without any security.  *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all." (internal quotation marks omitted)); *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 235 (S.D. Tex. 2011) ("The Fifth Circuit has held that courts in this Circuit have the discretion to issue injunctions without security." (citations omitted)).  TIC respectfully submits that the $1,000 bond it has already posted constitutes a reasonable bond for purposes of a preliminary injunction against the Kalaga Defendants.

## VII.   CONCLUSION

For the reasons set forth above, TIC's motion for a preliminary injunction should be granted to preserve the last $5 million remaining in the Kalaga personal and corporate bank accounts, the real estate purchased during the course of the fraud, and the luxury assets the Kalagas purchased for themselves during the fraud.

Respectfully submitted,

Dated:  March 26, 2020

**WHITE & CASE**LLP

By: */s/ Justin Synhorst*
Justin Synhorst
Texas State Bar No. 24095289
S.D. Tex. Bar No. 3099928
justin.synhorst@whitecase.com
609 Main St., Suite 2900
Houston, TX 77002
tel.: (713) 496-9700
fax: (713) 496-9701
*Attorney-in-Charge for Toshiba*
*International Corporation*

OF COUNSEL
Christopher M. Curran (*pro hac vice*)
ccurran@whitecase.com
Samuel J. Sharp (*pro hac vice*)
samuel.sharp@whitecase.com
**WHITE & CASE**LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
tel.: (202) 626-3600
fax: (202) 639-9355

Daniel Fridman (*pro hac vice*)
dfridman@ffslawfirm.com
Fridman Fels & Soto, PLLC
2525 Ponce de Leon Boulevard
Suite 750
Coral Gables, FL 33134
tel.: (305) 569-7720
fax: (786) 627-4145

*Counsel to Toshiba International
Corporation*

## STATEMENT OF CONFERENCE

Counsel for the movant and counsel for Defendants Sudhakar Kalaga, Jaya Kalaga, KIT Professionals, Inc., KIT Construction Services, Inc., SKBP Ventures, LLC, and SVSRK Enterprises, LLC have conferred on numerous occasions about the relief requested in Plaintiff's Motion for a Preliminary Injunction.  Counsel for those Defendants opposes this Motion.

Respectfully submitted,

WHITE & CASE LLP

By: _/s/ Justin Synhorst_
    Justin Synhorst
    justin.synhorst@whitecase.com
    609 Main St., Suite 2900
    Houston, TX 77002
    tel.: (713) 496-9700
    fax: (713) 496-9701

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2020, I caused to be electronically filed the foregoing Plaintiff's Motion for a Preliminary Injunction with the Clerk of the Court using the CM/ECF system, which will send notifications of filings to all counsel of record.

Respectfully submitted,

**WHITE & CASE**LLP

By: */s/ Justin Synhorst*
Justin Synhorst
justin.synhorst@whitecase.com
609 Main St., Suite 2900
Houston, TX 77002
tel.: (713) 496-9700
fax: (713) 496-9701