## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TOSHIBA INTERNATIONAL CORPORATION, | § § § | |
| PLAINTIFF, | § § | |
| v. | § § | |
| | § | No. 4:19-cv-04274 |
| ABRAHAM JOSEPH, an individual, ONEPOINT, INC., RUDOLPH CULP, as independent administrator of the ESTATE OF PABLO D'AGOSTINO, PD RENTALS, LLC, JANUARY 22 1992, LLC, VINOD VEMPARALA, an individual, and V2V SOLUTIONS, LLC, | § § § § § § § § § | JURY TRIAL DEMANDED |
| | § § | |
| DEFENDANTS. | § | |

## PLAINTIFF'S MOTION TO COMPEL DEPOSITION TESTIMONY FROM DEFENDANTS ABRAHAM JOSEPH AND ONEPOINT, INC.

At his deposition on December 16, 2020, Defendant Abraham Joseph, the

President of Defendant OnePoint, Inc., refused to answer questions about several

30(b)(6) topics, including: (1) his December 4, 2019 interview at TIC where he

confessed to paying bribes and creating fake bids, (2) the profit he received from his

fraud, and (3) the reasons why OnePoint produced less than 500 e-mails when

Toshiba International Corporation ("TIC") and the Kalaga Defendants produced thousands of e-mails involving OnePoint.

During his deposition, Joseph did admit to creating over 100 fake bids that he submitted to TIC, and he admitted to paying Pablo D'Agostino hundreds of thousands of dollars, including regularly giving D'Agostino envelopes with thousands of dollars in cash. *See generally* Abraham Joseph Dep. Tr. at 64:21–74:2 (attached as Exhibit A). But Joseph and his counsel resisted TIC's efforts to get additional details about the fraud, and he was unprepared or refused to answer other questions he found uncomfortable. Rather than seeking a protective order in the two months Defendants had to prepare for the deposition, Defendants violated Rule 37(d) of the Federal Rules of Civil Procedure by simply refusing to answer questions relating to topics they did not like. TIC respectfully moves for an order under Rule 37 of the Federal Rules of Civil Procedure to compel deposition testimony by Defendants OnePoint, Inc. ("OnePoint") and Abraham Joseph (collectively, the "Joseph Defendants") and an award of attorney's fees and costs for failure to follow the proper procedure under Rule 37(d) to seek a protective order rather than showing up to the deposition and refusing to answer the 30(b)(6) questions.

## I.     OnePoint Violated Rule 37(d) by Failing to Seek a Protective Order Before the 30(b)(6) Deposition.

Courts in the Fifth Circuit are clear that a party served with a Rule 30(b)(6) deposition notice cannot simply show up and refuse to answer questions on specific

topics. The only way to avoid answering questions is to seek a protective order **before** the deposition takes place. "When a Rule 30(b)(6) deposition notice references multiple topics, the party named in the deposition notice must either move for a protective order regarding each topic or designate a person to testify regarding each topic." *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 142 (E.D. Tex. 2003). Failing to appear and testify as to designated topics for a Rule 30(b)(6) deposition "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2). By failing to seek or obtain a protective order prior to the deposition, OnePoint may face sanctions under Rule 37(d).

On October 20, 2020, TIC noticed the deposition of Defendant OnePoint on a variety of topics pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. *See* TIC's Notice of Rule 30(b)(6) Deposition of Defendant OnePoint, Inc. (hereinafter "the Notice"), attached as Exhibit B. In response, OnePoint designated Abraham Joseph to appear and testify as its sole corporate representative. As a result, counsel agreed that OnePoint's 30(b)(6) deposition and the deposition of Abraham Joseph in his personal capacity would be done together on December 16, 2020.

Nearly two months after TIC noticed its deposition topics—and one week before the deposition—the Joseph Defendants served "objections" on December 9, 2020 (attached as Exhibit C).  On December 15, 2020, counsel met and conferred on the Joseph Defendants' objections but did not reach an agreement on several issues.

In the two months they had to prepare for the deposition, the Joseph Defendants did not file a motion for a protective order, which is the only mechanism under the Federal Rules of Civil Procedure for them to challenge their obligation to provide a witness on a 30(b)(6) topic.  When a 30(b)(6) notice references multiple topics, a party must address each topic by either designating a witness for that topic or moving for a protective order.  *See Ferko*, 218 F.R.D. at 142 (E.D. Tex. 2003) (citing Fed. R. Civ. P 26(c), 30(b)(6), 37(d)).  "Failing to appear and testify as to designated topics for a Rule 30(b)(6) deposition 'is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c).'"  *Talon Transaction Techs., Inc. v. StoneEagle Servs., Inc.*, No. 3:13-cv-902-P, 2014 U.S. Dist. LEXIS 167898, at *4–5 (N.D. Tex. Dec. 4, 2014) (citing Fed. R. Civ. P. 37(d)(2)).  Further, "a pending motion for a protective order only protects a party from designating a witness to appear and testify as to the particular topics addressed in the pending motion."  *Id.* at *5 (citing *Ferko*, 218 F. R. D. at 143 ("To satisfy Rule 37(d)'s requirement of a 'pending motion for a protective order' for each disputed deposition topic, the party

filing a motion for a protective order must state why a motion for a protective order is needed for each disputed deposition topic.")).

If a party does not designate a person to testify at a deposition or move for a protective order, that party has violated Rule 37(d).  Fed. R. Civ. P. 37(d).  District courts remedy Rule 37(d) violations by requiring the violating party to pay the other party's reasonable expenses, including attorney's fees.  Fed. R. Civ. P. 37(d); *see also Fed. Sav. & Loan Ins. Corp. v. Village Creek Joint Venture*, 130 F.R.D. 357, 358 (N.D. Tex. 1989) (noting that "circumstances in which a party has timely failed to designate a Rule 30(b)(6) representative . . . if established warrants the imposition of sanctions under Rule 37").

## II.    The Court Should Order Joseph to Testify About The Admissions from His December 2019 Interview with Joseph.

Topic 12 sought testimony from OnePoint about the interview Abraham Joseph attended at TIC in December 2019 with his counsel where he admitted to TIC that he had created fake bids and had made some payments to TIC's facilities manager, Pablo D'Agostino.  In Paragraph 45 of its Amended Complaint, TIC contends that this interview was the first time TIC learned about Joseph and OnePoint's payments of bribes and bid-rigging:

> 45.  TIC learned of OnePoint's and Abraham Joseph's involvement in [the] fraudulent scheme when Joseph voluntarily agreed to be interviewed at TIC in Houston on December 4, 2019.  He was accompanied by his lawyer.  During the interview, Joseph admitted information contained in allegations 35, 36, 37, 43, 48, and 49.

ECF No. 90.

In their Answer and Affirmative Defenses (ECF No. 227), OnePoint and Joseph admit that the interview occurred, but deny everything else, including the information he admitted to during the interview.   They also raise a statute of limitations defense on Page 29.   In addition, in support of their Motion to Dismiss, the Joseph Defendants actually relied on the substance of the interview:   "On December 4, 2019, TIC's attorneys interviewed Joseph (Am. Comp. at ¶ 45) and Joseph told them that he and OnePoint had nothing to do with KIT or KIT's bidding."   *See* Reply to Mot. to Dismiss at 3 n.2 (ECF No. 173).

During Joseph's deposition, counsel for OnePoint, Mr. Daniels, informed TIC that he would not permit Joseph to answer questions about Joseph's December 2019 interview.

> **Q:   Let's move on to Topic 12.   You recall coming to Toshiba for an interview last year?**
> Mr. Daniels:  You can answer that "yes" or "no."
> A:  Yes, I was there.
> **Q:  You were accompanied by your lawyer Kelly Stephens, right?**
> Mr. Daniels:  You can answer that "yes" or "no."
> A:  Yes.
> **Q:  You came voluntarily, right?**
> Mr. Daniels:  You can answer that "yes" or "no."
> A:  Yes.
> **Q: I'm sorry, Mr. Daniels.  Why are you giving him instructions on how he should answer?**
> Mr. Daniels:  Because we talked about this yesterday, Counsel.  We're not going to let -- I'm not going to let you go reask all the stuff you asked at that interview.  Besides, you've asked it all today already.

Joseph Dep. Tr. at 273:24–274:20.

6

Then, counsel for Joseph Defendants gave the instruction not to answer any further questions about the interview:

> **Q:  Do you recall having a conversation with Kay Peterson towards the end of the interview?**
> A:  I don't know who Kay Peterson is.
> **Q:  She is one of Toshiba's assistant general counsels.  She was present at the meeting.  Do you remember that?**
> A:  You're talking about a conversation outside the room or inside the room?
> **Q:  Outside the room.**
> A:  Outside the room, I spoke to Margaret McKay and one other lady.  I don't know who the other lady was.
> **Q:  Perhaps that was Kay Peterson.**
> A:  I don't know.
> **Q:  What did you tell them?**
> Mr. Daniels:  Don't answer that.
> **Q:  You're instructing him not to answer.**
> Mr. Daniels:  Yes.
> **Q:  Did you tell them that you wanted to make it up to Toshiba?**
> Mr. Daniels:  Don't answer that.
> **Q:  You're instructing him not to answer that.  You're instructing him not to answer?**
> Mr. Daniels:  If I said "don't answer that," I think it's very clear that that's what I'm instructing him.
> **Q:  So is it your position, Mr. Daniels, that you won't allow him to ask – answer any questions about what transpired during the interview.**
> Mr. Daniels:  That's correct.
> **Q:  And you'll instruct him not to answer.**
> Mr. Daniels:  That's correct.
> **Q: All right.  So we'll move on from the topic, but we'll reserve the right to bring this up with the judge.**

*Id.* at 275:18–277:4.

The OnePoint Defendants contend that by allowing Joseph to testify, he would be walking into some kind of "perjury trap," whatever that means.  Their concern is a pretext to justify Joseph's refusal to testify about an uncomfortable subject.  In

7

fact, TIC took the extraordinary step of producing to OnePoint TIC's attorney notes from Joseph's December 2019 interview, attached as Exhibit D.  TIC produced them because TIC's own 30(b)(6) witness who testified about the December 2019 interview relied on those notes to refresh his recollection.  Joseph's counsel had those notes in hand before Joseph's deposition because the court reporter circulated them before the deposition.  The OnePoint Defendants were completely unjustified in instructing Joseph not to answer questions about his interview.

Moreover, Joseph's admissions during that interview are relevant to show that TIC discovered and confirmed the fraud because of that interview.  In addition, Joseph's omissions during that interview including his failure to admit to the sheer volume of fake bids he created and the exorbitant amount of money he gave to D'Agostino bear directly on his credibility.  For these reasons, the Court should compel the testimony and award TIC its attorneys' fees and costs.

### III.    The Court Should Order OnePoint to Testify About its Costs for its Projects and How Much Joseph and OnePoint Profited.

TIC's damages against OnePoint and Joseph are calculated, in part, based on the difference between OnePoint's costs for the projects and the amount OnePoint was able to overcharge TIC because of its bid-rigging and bribery conspiracy.  TIC asked OnePoint to testify about its position on how much specific projects cost, including any overhead, and much profit it made from the project.  TIC also asked for testimony about how much OnePoint and Joseph profited from the fraud.  In

8

addition to its relevance as to TIC's damages, this testimony is relevant to establish motive and intent for the hundreds of thousands of dollars in bribes that Joseph paid to D'Agostino and the amount of trouble he went through to prepare over 100 fake bids.  The Court should compel Joseph to testify about the following topics:

### A. Topic 36: Financial Details for Specific Projects.

<u>Topic 36</u>:  **OnePoint's work, pricing, bidding, and profit margins for the following projects:**

| PO# | OnePoint JOB# | PROJECT DESCRIPTION |
|---|---|---|
| 900757 | 512-07 | Seal/Caulk around Exterior Glass Windows |
| 901178 | 609-07 | Control Plant Expansion Phase 1 |
| 901711 | 762-08 | Control Plant Expansion Phase 2 |
| 901762 | 821-08 | Control Plant Expansion Electrical Upgrades |
| 902826 | 1043-08 | Build retaining wall, steps and sidewalk |
| 902846 | 1044-09 | Build retaining wall, steps and sidewalk |
| 903918 | 1275-09 | PEP Roof Decking Repair |
| 904616 | 1410-10 | Roof replacements Phase 2 |
| 905234 | 1410-10 | Roof replacements Phase 3 |
| 905975 | 1410-10 | Roof replacements Phase 4 |
| 906027 | 1410-10 | Roof replacements Phase 5 |
| 905689 | 1553-10 | HEV Renovation |
| 902548 | 990-08 | Roof Repair to Corporate Residences |
| 902696 | 1021-08 | Upgraded Drainage |
| 902575 | 994-08 | Roof Decking |
| 902766 | 1023-08 | Chain Link Fence |
|  | 4255-18 | Okanella Warehouse Storage Racks |

Despite the fact that he did not move for a protective order prior to the deposition, Joseph was unprepared to provide any testimony about Topic 36:

**Q:  Now, did you go back and try to calculate the costs for the projects in Paragraph 36?**
A:  No, I did not.
**Q:  So you're not able to tell me today what your profit margins were for these projects, right?**
A:  No, I cannot.

Joseph Dep. Tr. at 311:15–20.

Rule 30(b)(6) imposes the obligation on the party to prepare to answer questions about the specified topic:  "The deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006).  "[I]f a certain fact is within the collective knowledge or subjective belief of [the company], [the corporate representative] should be prepared on the issue by [the company]." *Id*. at 434.  "Even if the documents are voluminous and the review of the documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed." *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 454 (M.D. Pa. Jan. 23, 2013) (citations omitted), *amended on other grounds*, *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439 (M.D. Pa. Apr. 8, 2013).

**B.  Topics 38, 48, and 49: OnePoint's financials and revenue.**

**TOPIC 38:  The amount of profit earned by OnePoint on each purchase order issued by TIC and on an annual basis from TIC.**

**TOPICS 48:  In furtherance of TIC's constructive trust claim, provide the total amounts of annual distributions of profit and salary by OnePoint to its shareholders from 2007 to 2019 that includes proceeds of payments made by TIC.**

10

**TOPIC 49**:  **Annual revenue and profit figures for OnePoint from 2007 to 2019.**

The information is relevant to establish TIC's damages as well as Joseph and OnePoint's motive and intent.  For example, if the work from TIC was highly profitable and made up a substantial portion of OnePoint and Joseph's earnings, then that would show that OnePoint and Joseph had a strong motivation to bribe TIC's facilities manager and defraud TIC.  To date, they have refused to provide any financial information that would enable TIC to analyze these facts.

For example, when asked about Topic 38, Joseph noted that he had not attempted to calculate allocations of overhead or otherwise to prepare his answer for 38, which required the amount of profit earned by OnePoint on each purchase order issued by TIC and on an annual basis from TIC:

> **Q:  Altogether, you think your profit margin on TIC projects was about 35 to 40 percent?**
> A:  I really don't know.  I would be speculating at this time.  My best estimate would be around 30 to 55 percent?
> **Q:  30 to 55 percent?**
> A:  Yes.
> **Q:  And that – that would be taking into account what you described earlier as I believe about $39 million worth of work?**
> A:  That's – that is not the not complete profit per se, but I still have to deduct – that will just be the raw profits.  That's not taking into consideration my – my general conditions, my overheads, and all that stuff.
> **Q:  Allocations of – of fixed expenses you're talking about?**
> A:  Yes, correct.  And other expenses.
> **Q:  Did you try to calculate that out to prepare to answer Topic No. 38?**
> A:  No, I did not.

*Id.* at 312:13–313:7.

11

Mr. Joseph was unprepared to provide testimony about these topics, and he was instructed not to answer by his counsel. *See* Joseph Dep. Tr. at 311–313, 318–321. Mr. Daniels, counsel for Joseph, suggested we revisit the topics "offline" to work them out. *Id.* at 319:16–21. When TIC and Joseph Defendants had the meet and confer conference, counsel refused to provide any information at all contrary to his commitments to "give [the information] to you in a way that is just as effective as you asking him about it here. . . ." *Id.* at 320:2–5. The Court should compel the testimony and award TIC its attorneys' fees and costs.

## IV. Joseph Refused to Testify About OnePoint's Document Preservation, Collection, and Production.

TIC is investigating the completeness of OnePoint and Joseph's document collection and production because OnePoint has produced under five hundred e-mails from a relationship with TIC that spanned twelve years. Both TIC and the Kalaga Defendants have produced thousands of OnePoint e-mails that OnePoint did not produce to TIC. As a result, part of the purpose of the 30(b)(6) deposition was to explore the reasons why OnePoint and Joseph are missing hundreds or even thousands of e-mails relating to TIC. TIC is also exploring whether there has been spoliation of evidence by Joseph and OnePoint.

## A. OnePoint and Joseph Have Only Produced 424 E-mails but TIC Knows That There Should be Thousands More.

TIC is aware of thousands of relevant e-mails sent or received by Abraham Joseph and/or OnePoint employees regarding TIC business that the Joseph Defendants have not produced. Below is a chart representing produced e-mails in which a OnePoint domain name is a sender or recipient:

| Year | Produced By | | |
|---|---|---|---|
| | OnePoint | Kalaga Defendants | TIC |
| 2007 | 54 | 0 | 207 |
| 2008 | 171 | 0 | 937 |
| 2009 | 18 | 49 | 226 |
| 2010 | 15 | 67 | 226 |
| 2011 | 5 | 48 | 291 |
| 2012 | 11 | 4 | 174 |
| 2013 | 8 | 3 | 367 |
| 2014 | 2 | 20 | 146 |
| 2015 | 3 | 0 | 92 |
| 2016 | 0 | 0 | 40 |
| 2017 | 0 | 0 | 85 |
| 2018 | 0 | 0 | 105 |
| 2019 | 129 | 0 | 94 |
| 2020 (through March) | 8 | 0 | 0 |
| Grand Total | 424 | 191 | 2,990 |

The chart shows that at least 2,990 relevant e-mails exist involving OnePoint domain names, because TIC itself has produced these 2,990 e-mails. This figure stands in stark contrast to the Joseph Defendants' production of 424 e-mails for a period spanning more than twelve years. Documents produced by the Kalaga Defendants further highlight this deficiency. Within the 191 e-mails produced by the Kalaga Defendants containing a OnePoint domain name, the Joseph Defendants have not produced many of these e-mails, with some of them being key

13

communications between these co-conspirators on their scheme to defraud TIC.  The

Joseph Defendants have either conducted a highly ineffective document collection

and review, or they have withheld or destroyed relevant evidence.  TIC has a right

to an explanation.  Below is an example of a highly relevant e-mail produced by the

Kalaga Defendants, but not produced by the Joseph Defendants, where Joseph

instructs Sudhakar Kalaga over a series of e-mails to conceal their coordination of

bids by demanding that Kalaga resend a bid proposal to D'Agostino's TIC account

to delete a line that says "met representative from OnePoint, Inc.," and instructing

Kalaga to "DO not CC me but BCC me instead:"

| | |
|---|---|
| **From:** | Abraham Joseph <ajoseph@onepointinc.com> |
| **Sent:** | Monday, January 26, 2009 12:34 PM |
| **To:** | Sudhakar Kalaga |
| **Subject:** | Re: Proposal for Structural Engineering Report |

Sudhakar:

Resend e-mail. Ask him to delete earlier e-mail.
Remove "met representative from OnePoint, Inc.
Do this ASAP

--- On **Mon, 1/26/09, Sudhakar Kalaga** *<skalaga@kitprofs.com>* wrote:

From: Sudhakar Kalaga <skalaga@kitprofs.com>
Subject: Proposal for Structural Engineering Report
To: "Pablo Dagostino" <Pablo.Dagostino@tic.toshiba.com>
Cc: ajoseph@onepointinc.com
Date: Monday, January 26, 2009, 12:40 PM

Dear Mr. D'Agostino,

Please find the attached proposal to provide professional Structural Engineering services for the
evaluation of existing cracks in the Precast Concrete Panel at Stair Well of the office building & cracks
in the Concrete Drainage Channel at Toshiba International Corporation's (TIC) Industrial Division
facility.

If I can be of any, further service or answer any additional questions, please feel free to call me at below
numbers.

Thanks,

Sudhakar Kalaga, P.E.

| | |
|---|---|
| From: | Abraham Joseph <ajoseph@onepointinc.com> |
| Sent: | Monday, January 26, 2009 12:35 PM |
| To: | Sudhakar Kalaga |
| Subject: | Re: Proposal for Structural Engineering Report |

DO not CC me but BCC me instead

In another example of a relevant e-mail chain produced to TIC by the Kalaga Defendants (but not produced by the Joseph Defendants), Defendant Vinod Vemparala e-mailed a fake bid from his company to D'Agostino's TIC account. Kalaga informed Joseph of this "competing" bid, who then proceeded to give instructions on how the bid should be delivered to D'Agostino at TIC:

| | |
|---|---|
| From: | Abraham Joseph <ajoseph@onepointinc.com> |
| Sent: | Wednesday, November 3, 2010 9:51 AM |
| To: | Sudhakar Kalaga |
| Subject: | RE: FW: Predominant Use Study Proposal |

OK all is good.

--- On **Wed, 11/3/10, Sudhakar Kalaga <*skalaga@kitprofs.com*>** wrote:

From: Sudhakar Kalaga <skalaga@kitprofs.com>
Subject: RE: FW: Predominant Use Study Proposal
To: "Abraham Joseph" <ajoseph@onepointinc.com>
Date: Wednesday, November 3, 2010, 9:44 AM

The guy is in Ohio…he sent an email to him.  Did I mess up?

Thanks,

Sudhakar Kalaga, P.E.

KIT Professionals, Inc.

15

Additional examples of relevant e-mails not produced by the Joseph Defendants include:

- **KIT CIVIL 00036551:** In this e-mail exchange from January 15, 2014, Joseph reaches out to Sudhakar Kalaga, cc'ing Chetan Vyas, and states: "Sudhakar/Chetan: We are experiencing a very slow business cycle and we need your help with this project below.  I am bidding on a small project for Pablo and he wants me to get with you to make sure that this is designed by KITS."  After some exchanges about the proposed project, Kalaga then replies back only to Joseph and writes, "Just so you know….Pablo might be there in the afternoon."  Joseph then responds, "He is aware I am working with u on this, do no [sic] worries."

- **KIT CIVIL 00128155:** In this e-mail exchange from February 5, 2014, Joseph e-mails Kalaga with the subject line "Office visit" and writes, "Pablo called me and said that you told him I was there.  I told him how nice your office was and how I am proud of you.  He was cool with everything."

- **KIT CIVIL 00067015:** In the first e-mail of this exchange from August 12, 2016, Abraham Joseph writes an e-mail to himself with the subject line, "Any upcoming projects" that says: "Gentlemen: We are currently experiencing a very slow period and have staff on hand in office with no projects on hand.  Please call us if you have any construction needs and we are ready to serve you immediately."  Pablo D'Agostino (who must have been BCC'ed on the message) then forwards the e-mail to Kalaga and writes: "WTF [emojis] I'm furious."

The Joseph Defendants should be compelled to answer the 30(b)(6) questions about their document preservation, collection, and production, and the Court should award TIC its attorneys' fees and costs.

### B. The Joseph Defendants Were Unprepared or Refused to Answer Topics 13 to 18 Relating to Their Document Preservation, Collection, and Production.

Topics 13 to 18 sought testimony relating to the Joseph Defendants' document preservation, collection, and production as follows:

**TOPIC 13:**  The e-mail systems, electronic data storage systems, and text messaging services used by OnePoint from 2007 to 2019, including the identity of the e-mail service providers, the existence of physical or cloud-based backups, and the deletion or destruction of OnePoint's e-mails and text messages.

**TOPIC 14:**  The e-mail systems, electronic data storage systems, and text messaging services used by Abraham Joseph from 2007 to 2019, including the identity of the e-mail service providers, the existence of physical or cloud-based backups, and the deletion or destruction of Mr. Joseph's e-mails and text messages.

**TOPIC 15:**  All the steps taken by OnePoint to preserve electronic data and physical documents, including e-mails, following TIC's filing of the Complaint in October 2019, TIC's interview of Mr. Joseph in December 2019, and the filing of TIC's Amended Complaint against OnePoint and Mr. Joseph in February 2020.

**TOPIC 16:**  All the electronic data and physical documents, including e-mails, that OnePoint and/or Mr. Joseph destroyed following TIC's filing of the Complaint in October 2019, TIC's interview of Mr. Joseph in December 2019, and the filing of TIC's Amended Complaint against OnePoint and Mr. Joseph in February 2020.

**TOPIC 17:**  All the steps taken by OnePoint, Abraham Joseph, and their agents, including counsel, to search for, collect, and review electronically stored documents and physical documents potentially responsive to TIC's Requests for Production issued to OnePoint and Abraham Joseph.  This will include: (1) the volume of documents collected, (2) the document review methodology to identify responsive documents, (3) instructions given to Defendants' e-discovery vendor, (4) the elimination of non-responsive documents, and (5) the keywords used for the document review.

**TOPIC 18:**  An explanation for why OnePoint and Mr. Joseph produced just 199 e-mails for a time period spanning 2007 to 2019, including just 20 emails with Pablo D'Agostino.

At his deposition, Joseph testified that he did not know the answers to these questions and/or was unprepared to answer them.  *See, e.g.*, Joseph Dep. Tr. at 277:20–278:25 (Joseph unprepared to answer questions regarding his email service provider), 279:18–21 (Joseph unprepared to answer questions regarding OnePoint's IT personnel), 280:22–281:12 (Joseph unprepared to answer questions regarding the frequency of the destruction of his and/or OnePoint's emails), and 288:20–289:19 (Joseph unprepared to answer what document review methodology was used to determine responsiveness to TIC's document requests).   In addition, Joseph's counsel interfered with the questioning and instructed Joseph not to answer.

Cases in the Fifth Circuit are clear that these e-discovery topics are proper subjects for a 30(b)(6) deposition.  *See, e.g.*, *Retractable Techs., Inc. v. Abbott Labs., Inc.*, No. 5:05-CV-157, 2010 U.S. Dist. LEXIS 156618, at \*12–14 (E.D. Tex. May 20, 2010) (allowing deposition questioning into defendants' processes related to document retention and actions taken to preserve relevant materials); *see also Thigpen v. Fla. Gas Transmission Co.*, No. 14-1415, 2015 U.S. Dist. LEXIS 199289, at \*11–13 (E.D. La. Aug. 24, 2015) (compelling defendant to produce a 30(b)(6) witness "to testify on its ESI, how its ESI can be produced in this litigation, and how it has been produced in other litigations to which [defendant] was a party").

For example, in a Fifth Circuit district court case, *BBC Baymeadows, LLC v. City of Ridgeland*, the judge denied a motion to quash deposition topics relating to

18

defendant's document preservation and destruction policies, and its efforts to "gather, collect, review, and produce documents in response to [plaintiff's] discovery requests, including . . . any methodology used to search paper and electronic documents, including any electronic search terms used." No. 3:14-cv-676-HTW-LRA, 2015 U.S. Dist. LEXIS 64053, at *6–7 (S.D. Miss. May 15, 2015). The defendant objected that this material was privileged, but the court disagreed, and found these topics were particularly relevant where plaintiff alleged it was aware of responsive documents not produced by the defendant. *See id.* at *7–8. Similarly, OnePoint's counsel's instructions not to answer questions regarding e-discovery were improper, particularly where TIC knows that responsive documents exist but have not been produced by OnePoint. The Court should compel the testimony and award TIC its attorneys' fees and costs.

## V. The Court Should Compel OnePoint and Joseph to Provide Testimony and Award TIC Its Attorneys' Fees and Costs.

When OnePoint named Joseph as its corporate representative, "it was bound to educate [him] whether through documents, past employees, and/or other sources so that [he] could fully answer [TIC's] questions" about the requested topics. *Robinson v. Nexion Health at Terrell, Inc.*, 312 F.R.D. 438, 442 (N.D. Tex. 2014). If a corporate representative "is not knowledgeable about relevant facts" and the corporation "has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance

at all." *Brazos River Auth.*, 469 F.3d at 433–34 (citations omitted).  Because of OnePoint's lack of preparation and the Joseph Defendants' counsel's improper instructions not to answer, TIC requests that it be awarded its fees and costs in connection with preparing this Motion and for a second deposition. *See, e.g.*, *Serv. Lloyds Ins. Co. v. N. Am. Risk Servs*., No. A-19-CV-518-RP, 2020 U.S. Dist. LEXIS 149549 (W.D. Tex. Aug. 18, 2020) (granting sanctions where corporation produced 30(b)(6) witness who was not knowledgeable about the designated topics); *Rivas v. Greyhound Lines, Inc.*, No. EP-14-CV-166-DB, 2015 U.S. Dist. LEXIS 199188 (W.D. Tex. Apr. 27, 2015) (granting sanctions where attorney improperly instructed a 30(b)(6) witness not to answer); *Citgo Petroleum Corp. v. Seachem*, No. H-07-2950, 2013 U.S. Dist. LEXIS 72898 (S.D. Tex. May 23, 2013) (granting sanctions where 30(b)(6) witness was unprepared).

Dated:  January 22, 2021                        **WHITE & CASE**LLP

                                          By*:   /s/ Michael Rodgers*
                                               Michael Rodgers
                                               Texas State Bar No. 24095114
                                               S.D. Tex. Bar No. 2638667
                                               michael.rodgers@whitecase.com
                                               609 Main Street, Suite 2900
                                               Houston, TX 77002
                                               tel.: (713) 496-9700
                                               fax: (713) 496-9701
                                               *Attorney-in-Charge for Toshiba*
                                               *International Corporation*

OF COUNSEL
Christopher M. Curran (*pro hac vice*)
ccurran@whitecase.com
Samuel J. Sharp (*pro hac vice*)
samuel.sharp@whitecase.com
**WHITE & CASE**LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
tel.: (202) 626-3600
fax: (202) 639-9355

Daniel Fridman (*pro hac vice*)
dfridman@ffslawfirm.com
Fridman Fels & Soto, PLLC
2525 Ponce de Leon Boulevard
Suite 750
Coral Gables, FL 33134
tel.: (305) 569-7720
fax: (786) 627-4145

*Counsel to Toshiba International Corporation*

## CERTIFICATE OF SERVICE

On January 7, 2021, counsel for Plaintiff and the Joseph Defendants discussed the relief sought in this Motion to Compel.  The Parties did not reach an agreement on Movant's requested relief.

Respectfully submitted,

**WHITE & CASE**LLP

By: */s/ Michael Rodgers*
    Michael Rodgers
    michael.rodgers@whitecase.com
    609 Main Street, Suite 2900
    Houston, TX 77002
    tel.: (713) 496-9700
    fax: (713) 496-9701

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021, I caused to be electronically filed Plaintiff's Motion to Compel Deposition Testimony from Defendants Abraham Joseph and OnePoint, Inc. with the Clerk of the Court using the CM/ECF system, which will send notifications of filings to all counsel of record.

Respectfully submitted,

**WHITE & CASE**LLP

By: */s/ Michael Rodgers*
    Michael Rodgers
    michael.rodgers@whitecase.com
    609 Main Street, Suite 2900
    Houston, TX 77002
    tel.: (713) 496-9700
    fax: (713) 496-9701