# Exhibit A

CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION
3      TOSHIBA INTERNATIONAL        )
       CORPORATION                  )
4                                   )
             Plaintiff,             )
5                                   )
       v.                           ) NO.:  4:19-cv-04274
6                                   )
       ABRAHAM JOSEPH, an           )
7      individual, ONEPOINT,        )
       INC., RUDOLPH CULP, as       )
8      independent administrator    )
       of the ESTATE OF PABLO       )
9      D'AGOSTINO, PD RENTALS,      )
       LLC, JANUARY 22 1992,        )
10     LLC, VINOD VEMPARALA, an     )
       individual, V2V              )
11     SOLUTIONS, LLC, and          )
       CHETAN VYAS, an              )
12     individual,                  )
                                    )
13           Defendants.            )
14
15
16     ********************************************************
17             ORAL AND VIDEOTAPED DEPOSITION OF
18                     CONFIDENTIAL
19                    ABRAHAM JOSEPH
20                  December 16, 2020
21                      Volume 1
22     ********************************************************
23
24
25

CONFIDENTIAL

Page 2

1        ORAL AND VIDEOTAPED DEPOSITION OF ABRAHAM

2   JOSEPH, produced as a witness at the instance of the

3   Plaintiff, and duly sworn, was taken in the above-styled

4   and numbered cause on the 16th day of December, 2020,

5   from 7:03 p.m. to 7:20 p.m., via videoconference before

6   Abigail Guerra, CSR, in and for the State of Texas,

7   reported by machine shorthand, via Zoom where all

8   attendees appeared at their respective locations,

9   pursuant to the Federal Rules of Civil Procedure and the

10  provisions stated on the record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

```
 1                A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4    Mr. Daniel Fridman (Via Videoconference)
      FRIDMAN FELS & SOTO, PLLC
 5    2525 Ponce de Leon Boulevard
      Suite 750
 6    Coral Gables, Florida 33134
      Phone:  (305) 569-7720
 7    Email:  Dridman@ffslawfirm.com
 8         - and -
 9    Mr. Samuel J. Sharp
      WHITE & CASE LLP
10    701 13th Street, N.W.
      Washington D.C. 20005
11    Phone:  (202) 626-3600
      Email:  Samuel.sharp@whitecase.com
12
           - and -
13
      Ms. Stephanie Rice
14    WHITE & CASE LLP
      1200 Smith Street
15    Suite 2300
      Houston, Texas 77002
16    Phone:  (713) 496-9700
      Email:  Stephanie.rice@whitecase.com
17
           - and -
18
      Ms. Dara Jeffries
19    Ms. Ashley Stoner
      WHITE & CASE LLP
20    200 S Biscayne Boulevard
      Southeast Financial Center
21    Suite 4900
      Miami, Florida 33131
22    Phone: (305) 371-2700
      Email:  Dara.jeffries@whitecase.com
23            Ashley.stoner@whitecase.com
24
25
```

CONFIDENTIAL

Page 4

```
 1            A P P E A R A N C E S (cont'd)
 2
 3   FOR THE DEFENDANTS ONEPOINT INC. and JOSEPH ABRAHAM:
 4   Mr. Doug Daniel (Via Videoconference)
     THE JACKSON LAW FIRM
 5   3900 Essex Lane
     Suite 1116
 6   Houston, Texas 77027
     Phone:  (713) 522-4435
 7   Email:  Daniel@jacksonlaw-tx.com
 8        - and -
 9   Mr. Kelly Stephens
     STEPHENS DOMNITZ MEINEKE PLLC
10   2500 Tanglewilde
     Suite 3210
11   Houston, Texas 77063
     Phone:  (713) 463-6000
12   Email:  Kstephens@sdmattorneys.com
13        - and -
14   Ms. Lauren Held Harris
     DANIELS & TREDENNICK
15   6363 Woodway Drive
     Suite 700
16   Houston, Texas 77057
     Phone:   (713) 917-0024
17   Email:  Lauren@dtlawyers.com
18
     FOR THE DEFENDANTS D'AGOSTINO:
19
     Mr. Sanford L. Dow
20   DOW GOLUB REMELS & GILBREATH, PLLC
     2700 Post Oak Boulevard
21   Suite 1750
     Houston, Texas 77056
22   Phone:  (713) 526-3700
     Email:  Dow@dowgolub.com
23
24
25
```

CONFIDENTIAL

Page 5

```
 1              A P P E A R A N C E S (cont'd)
 2

    FOR THE DEFENDANTS VINOD VEMPARALA, V2V SOLUTIONS:
 3
 4    Mr. Penn Huston
      MOUER HUSTON
 5    349 Heights Boulevard
      Houston, Texas 77007
 6    Phone:  (832) 209-8836
      Email:  Phuston@mouerhuston.com
 7
 8    ALSO PRESENT:
            Mr. Dan Lapeyrouse, Videographer
 9          Ms. Margaret McKay
            Ms. Kay Peterson
10          Mr. Timothy Fraser
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 6

1                          INDEX

2

3    Appearances...................................    3

4    ABRAHAM JOSEPH

5         Examination by Mr. Fridman..................   12

6         Examination by Mr. Dow......................  326

7         Examination by Mr. Huston...................  330

8         Examination by Mr. Fridman..................  333

9    Signature and Changes...........................  338

10   Reporter's Certificate..........................  340

11

12                         EXHIBITS

13   NO.           DESCRIPTION                  PAGE

14   Exhibit 11    TMPE Area Building Proposal     143

15                 Package

16                 Bates Nos. TIC-00110858 to 860

17   Exhibit 12    Letter                          145

18                 Bates Nos. OnePoint021887 to 888

19   Exhibit 23    Purchase Requisition            162

20                 Bates Nos. TIC-00119704 to 9713

21   Exhibit 24    ERC Proposal Remediation Module  166

22                 #1

23   Exhibit 37    OnePoint's Verified Supplemental  32

24                 Responses to Plaintiff's First

25                 Interrogatories

CONFIDENTIAL

```
                                                    Page 7

 1                      EXHIBITS (cont'd)

 2       ..............................................

 3       NO.             DESCRIPTION....................... PAGE

 4       Exhibit 48   First Interrogatories to one point    17

 5       Exhibit 50   Ford Truck Composite                  52

 6                    Bates Nos. TIC-00129337 to 339;

 7                    OnePoint36609

 8       Exhibit 55   Atkins Bids Combined                 156

 9                    Bates Nos. TIC-00054122 to 47226

10       Exhibit 60   Invoice                              189

11                    Bates Nos. OnePoint016246

12       Exhibit 61   Invoice                              190

13                    Bates Nos. OnePoint016248 to 249

14       Exhibit 62   Invoice                              203

15                    Bates Nos. OnePoint021427

16       Exhibit 63   Invoice                              201

17                    Bates Nos. OnePoint021428 to 429

18       Exhibit 64   Invoice                              208

19                    Bates Nos. OnePoint000810 to 815

20       Exhibit 71   Email                                217

21                    Bates Nos. TIC-00091911 to 913

22       Exhibit 74   Email                                219

23                    Bates Nos. TIC-00106193 to 199

24       Exhibit 75   Email                                222

25                    TIC-00106186 to 191
```

CONFIDENTIAL

Page 8

1            EXHIBITS (cont'd)

2    ...........................................

3    NO.              DESCRIPTION...................... PAGE

4    Exhibit 76    Purchase Requisition            225

5                  Bates Nos. TIC-00010807 to 879

6    Exhibit 77    Email                           233

7                  Bates Nos. TIC-00062110 to 111

8    Exhibit 78    Email                           236

9                  Bates Nos. KIT_CIVIL_00066003 to

10                 119333

11   Exhibit 80    Email                           246

12   Exhibit 81    Email                           261

13                 Bates Nos. KIT_CIVIL_00119209

14   Exhibit 82    Email                           264

15                 Bates Nos. KIT_CIVIL_00036551 to

16                 554

17   Exhibit 90    Notice of Deposition            270

18   Exhibit 92    Expert Report of Randall Lemer  294

19   Exhibit 105   Restroom Remodel Policies       121

20                 Bates Nos. OnePoint000387 to 460;

21                 OnePoint000387-1 to

22                 OnePoint000387-74

23

24

25

CONFIDENTIAL

Page 9

1            THE VIDEOGRAPHER:  We're now on the record.

2    Today is December 16, 2020.  The time is approximately

3    9:11.  This is Video 1 of Abraham Joseph.

4            Will counsel please identify themselves and

5    the parties they represent.

6            MR. DANIELS:  This is Doug Daniels.  With

7    me in the room is Kelly Stephens and Lauren Harris on

8    behalf of OnePoint and Mr. Joseph.

9            MR. DOW:  Sanford Dow on behalf of the

10   D'Agostino defendants.

11           MR. HUSTON:  Penn Huston on behalf of

12   Vinod Vemparala and V2V Solutions.

13           MR. FRIDMAN:  All right.  For the

14   plaintiffs, I am Dan Fridman from the law firm of

15   Fridman, Fels & Soto on behalf of the plaintiff Toshiba

16   International Corporation.

17           With me here today is cocounsel, appearing

18   virtually, Sam Sharp, Stephanie Rice, Dara Jeffries --

19   just a second -- and Ashley Stoner.

20           And appearing on behalf of Toshiba

21   International Corporation are Timothy Fraser, Margaret

22   McKay, and Kay Peterson.

23           THE VIDEOGRAPHER:  Thank you.

24           Will the court reporter please swear in the

25   witness.

CONFIDENTIAL

1              (Witness sworn.)

2              MR. DANIELS:  Can we get a couple of things

3    on the record first, Dan?

4              MR. FRIDMAN:  Sure.  Go ahead.

5              MR. DANIELS:  So first of all, we're going

6    to designate this transcript as confidential pursuant to

7    the protective order.  I want to do that now in case I

8    forget it again.

9              And then the other thing is, we didn't talk

10   about time limits.  I -- I wanted to make this point

11   that -- that OnePoint is not Toshiba.  Toshiba is a huge

12   company with hundreds of thousands of different people,

13   different operation areas.  OnePoint is, in effect,

14   Mr. Joseph in the sense that there's very little aside

15   from a few mundane details about -- that he would know

16   as the corporate rep that he would not also know

17   individually.

18             So I'm willing to extend the normal seven

19   hours by a little bit, but I think we ought to be able

20   to do this, his individual and corporate rep capacity in

21   eight hours of testimony.  I'm willing to concede that,

22   but let's -- you know, we -- let's see how it goes, and

23   if it looks like we may need a little more, we can talk

24   about it.  But I just wanted to make that point at the

25   outset that most of what he would know as a corporate

CONFIDENTIAL

Page 11

1    representative, he would also know in his individual

2    capacity.

3                   MR. FRIDMAN:  Understood, Mr. Daniels.  We

4    have taken some steps ourselves to try to expedite the

5    deposition by sending you, by FileShare, all the

6    exhibits premarked in advance, and we've already

7    uploaded them all to the share site so we don't have to

8    spend time waiting for documents to load.

9                   And, you know, we -- we'll see how it goes.

10   Our goal is to finish today, but we'll -- we'll check in

11   throughout the day and -- and make sure we're on track

12   for that.

13                  MR. DANIELS:  Okay.

14                  MR. HUSTON:  Can I ask a question?  This is

15   Penn Huston.  If you do not finish today, do you intend

16   to continue tomorrow or -- or reconvene at -- on a

17   different day?

18                  MR. FRIDMAN:  We've discussed with counsel,

19   Mr. Joseph {sic}, to have tomorrow open if -- if needed

20   as we did for Toshiba's corporate reps.  So that --

21   that's our -- our plan.  Although, again, we -- we would

22   like to try to finish today.

23                  MR. HUSTON:  Okay.  Yeah.  That -- that

24   would be wonderful.  And I have some -- some interest in

25   knowing as soon as possible whether this will continue

CONFIDENTIAL

Page 12

1    into tomorrow.  So if you discuss that offline, please

2    include me in those communications.  I have some things

3    I need to move around.

4                    MR. FRIDMAN:  Understood.

5                    MR. HUSTON:  Thank you.

6                    MR. FRIDMAN:  All right.  Any other

7    preliminary matters?

8                    MR. DANIELS:  None here.

9                    MR. FRIDMAN:  All right.  Then let's

10   proceed.

11                   Has Mr. Joseph been sworn in?

12                   MR. DANIELS:  He has.

13                   THE WITNESS:  Yes.

14                   MR. FRIDMAN:  I'm -- I'm looking at the

15   transcript, and I -- I don't see -- I don't see the

16   sworn in.  Can we just repeat it just in case?

17                   THE CERTIFIED STENOGRAPHER:  He was sworn,

18   and I just put in the blurb that he was sworn in.  We

19   did it before you did the instructions.

20                   MR. FRIDMAN:  Understood.

21                         ABRAHAM JOSEPH,

22   having been first duly sworn, testified as follows:

23                      DIRECT EXAMINATION

24   BY MR. FRIDMAN:

25       Q.  All right.  Good morning, Mr. Joseph.

CONFIDENTIAL

Page 13

1       A.  Good morning, Dan.

2       Q.  Have you been sworn in to testify under oath

3  today, Mr. Joseph?

4       A.  Yes.

5       Q.  And the testimony you will give today will be

6  truthful, right?

7       A.  Yes.

8       Q.  Mr. Joseph, do you know what a bribe is?

9       A.  Yes.

10      Q.  Tell me what is your understanding of what a

11  bribe is.

12                  MR. DANIELS:  Objection.  Form.

13                  You can answer.

14      A.  A bribe is where someone gets something for

15  a -- for a service that is -- that is rendered to them,

16  almost like quid pro quo.

17      Q.  (BY MR. FRIDMAN)  So can -- can we agree that a

18  bribe is a giving of a benefit to a company employee to

19  influence that employee's decision in your favor?

20                  MR. DANIELS:  Objection.  Form.

21                  You can answer.

22      A.  It's not just a company.  It could be an

23  individual.  It could be anybody.

24      Q.  (BY MR. FRIDMAN)  Like a politician?

25      A.  Yes.

CONFIDENTIAL

Page 14

1    Q.  All right.  So focusing in on a company

2  employee, tell me what your understanding would be of

3  paying a bribe to a company employee.

4              MR. DANIELS:  Objection.  Form.

5              You can answer, if you know.

6    A.  I -- I cannot answer that.  I -- I don't have

7  the answer to that.

8    Q.  (BY MR. FRIDMAN)  Okay.  So can we agree that

9  for a company employee, the payment of a bribe is the

10  giving of a benefit to that employee to influence a

11  decision that that employee would make in your favor?

12              MR. DANIELS:  Objection.  Form.

13              Answer if you can.

14    A.  I don't know the answer to that.

15    Q.  (BY MR. FRIDMAN)  All right.  Well, is it wrong

16  to pay bribes?

17              MR. DANIELS:  Object to the form.

18    A.  Yes.

19    Q.  (BY MR. FRIDMAN)  Why?

20    A.  Because you're getting something for paying

21  that you're not entitled to.

22    Q.  And who are you paying?

23              MR. DANIELS:  Objection.  Form.

24    A.  To the person making the decision.

25    Q.  (BY MR. FRIDMAN)  And you said before that it's

CONFIDENTIAL

Page 15

1    like a quid pro quo, right?

2         A.   That is correct.

3         Q.   You pay the employee, and the employee returns

4    the favor to you, right?

5         A.   Correct.

6         Q.   That's what a bribe is?

7         A.   Correct.

8         Q.   Do you understand that it is against the law to

9    pay bribes?

10                  MR. DANIELS:   Object to the form.

11        A.   Yes.

12        Q.   (BY MR. FRIDMAN)  Does your company, OnePoint,

13   allow its employees to accept bribes?

14        A.   No.

15        Q.   Why not?

16        A.   Because it's not the right thing to do.

17        Q.   Does your company, OnePoint, allow its

18   employees to pay bribes?

19        A.   No.

20        Q.   Why not?

21        A.   It's not the right thing to do.

22        Q.   Do you expect your employees to always do

23   things in the best interest of your company?

24        A.   Yes.

25        Q.   Did you ever give a bribe to Pablo D'Agostino?

CONFIDENTIAL

Page 16

1      A.  No.

2      Q.  All right.  I'm going to put on the screen the

3   first exhibit, which will be Exhibit 48.

4            MR. FRIDMAN:  So if everyone goes through

5   the marked exhibits and clicks through Exhibit 48, you

6   will see that Exhibit 48 is Toshiba International

7   Corporation's first set of interrogatories to defendant,

8   OnePoint, Inc.

9            MR. DANIELS:  Just a second.

10           MR. FRIDMAN:  What I'm going to do --

11           MR. DANIELS:  Yeah, just a second.  We're

12   trying to pull it up.

13           MR. FRIDMAN:  What I'm going to do is share

14   the screen so that you can see the document.

15           MR. DANIELS:  Do you see it?

16           THE WITNESS:  I see it, but I need -- I --

17   I have another little thing that is on top of it.  So

18   should I click "continue" --

19           MR. DANIELS:  Not yet.

20           MR. FRIDMAN:  Having a little trouble

21   hearing you, Mr. Joseph.  Can -- maybe you got --

22           MR. DANIELS:  Yeah.  He had -- he had a --

23   a Zoom --

24           THE WITNESS:  -- superimposed on the

25   document.

CONFIDENTIAL

Page 17

1                   MR. FRIDMAN:  Superimposed.  He fixed that,

2       so he can see it now.

3                   THE WITNESS:  Yeah.

4           Q.  (BY MR. FRIDMAN)  Okay.  And -- and I -- I've

5       zoomed in on the document that I'm showing you.

6                   Can you see that, Mr. Joseph?

7                   (Exhibit 48 marked.)

8           A.  Yes.

9           Q.  (BY MR. FRIDMAN)  All right.  So have you seen

10      Exhibit 48 before?

11          A.  Yes.

12          Q.  These are questions that Toshiba International

13      Corporation asked you to answer in this litigation,

14      right?

15          A.  Yes.

16          Q.  And did you answer the questions?

17          A.  Yes.

18          Q.  So what I'm going to do now is I'm going to go

19      to one of the exhibits that's attached to Exhibit 48 at

20      the end.

21                  Actually, before I get there, let's --

22      yeah, let's -- let's go straight to Exhibit A.

23                  Do you see that on your screen?

24          A.  Yes.

25          Q.  All right.  Exhibit A contains two W-2s issued

CONFIDENTIAL

Page 18

1    by OnePoint, Inc.  I'm going to scroll through them so

2    that you can see them.  One is for 2007, and the other

3    is for 2008.

4                 Do you see that?

5        A.  Yes.

6        Q.  Let's start with the 2007 W-2.  It says that

7    the employer's name is OnePoint, Inc., correct?

8        A.  Correct.

9        Q.  And the employee's name is identified as

10   Pablo H. D'Agostino; is that right?

11       A.  That is correct.

12       Q.  And it says that Pablo H. D'Agostino received

13   wages in 2007, from OnePoint, Inc. of $24,084; is that

14   right?

15       A.  Correct.

16       Q.  So in 2007, did OnePoint have Pablo D'Agostino

17   on its payroll?

18       A.  Yes.

19       Q.  You were responsible for putting Pablo

20   D'Agostino on OnePoint's payroll, right?

21       A.  Yes.

22       Q.  So in 2007, how much did OnePoint pay Pablo

23   D'Agostino through payroll?

24       A.  24,084.

25       Q.  Okay.  Let's go to 2008.

CONFIDENTIAL

Page 19

1          Did -- did OnePoint have Pablo D'Agostino

2     on its payroll as an employee in 2008?

3          A.  Yes.

4          Q.  How much did OnePoint pay Pablo D'Agostino as

5     an employee in 2008?

6          A.  66,553.90.

7          Q.  Okay.  So I -- I believe -- you can correct me

8     if I'm wrong -- I believe it's 66,453.90?

9          A.  That is correct.

10         Q.  All right.  Were you uncomfortable putting

11    Pablo D'Agostino on OnePoint's payroll?

12         A.  I was hesitant to do it.

13         Q.  Why?

14         A.  The way he put it to me, he said that if you

15    want to continue to work at Toshiba, you'll have to

16    compensate me, and I -- I looked -- I viewed him as

17    Toshiba.  He was the face of Toshiba, and I complied to

18    his and Toshiba's requirements.

19         Q.  Did you have any concerns that it was against

20    the law to place Pablo D'Agostino on OnePoint's payroll?

21         A.  I did not know that.

22         Q.  Well, you said you were hesitant to do it.  Why

23    were you hesitant?

24         A.  My initial thought was that I just didn't want

25    to put him on my payroll.

CONFIDENTIAL

Page 20

1      Q.   Why?

2      A.   Because no one is -- none of my other clients

3  have -- has ever told me to do that before.  This is the

4  first time that someone from a major company asked me to

5  do that.

6      Q.   So why did you do it?

7      A.   I did it because we wanted to stay in Toshiba

8  and continue working in Toshiba, and he said -- and we

9  complied with what -- to me, he was the face of Toshiba.

10  He demanded it, and I complied to it.  And I played by

11  his rules -- Toshiba's rules.

12      Q.   So is that a -- an example of a quid pro quo?

13      A.   I don't know.

14      Q.   What is a quid pro quo?

15      A.   I think a quid pro quo is something that is

16  directly assigned to -- to a project or something that

17  you're guaranteed.  This is just -- there is no

18  guarantee that I will be there.  But he said that this

19  is the requirement, and I was following the

20  requirements.

21      Q.   All right.  So Pablo -- your -- your testimony

22  is that Pablo D'Agostino said to you that in order for

23  you to do business with Toshiba, you had to pay him; is

24  that right?

25      A.   He said if you want to continue to stay in

CONFIDENTIAL

Page 21

1   Toshiba, then put me on your payroll.

2        Q.   Okay.  And that's what you did, right?

3        A.   That's what I did.

4        Q.   When was the first payment that you made to

5   Pablo when he was on your payroll?

6        A.   I'll have to go back.  Whatever the date was.

7   I think -- I -- I don't remember the exact date.

8        Q.   All right.  How often did you pay Pablo

9   D'Agostino?

10       A.   There was no fixed -- as and when he asked me,

11  I wouldn't pay him.

12       Q.   So he wasn't getting payments from OnePoint

13  every week or every month?

14       A.   Oh.  On this payroll, yes, he was getting on a

15  biweekly basis.

16       Q.   Biweekly?

17       A.   Yeah.

18       Q.   So what was his salary?

19       A.   I don't remember, and I don't want to

20  speculate.  But if we -- I guess if we do the math, we

21  can -- I think it was -- I'm just going to speculate, it

22  was 25, 30 bucks an hour, maybe.

23       Q.   So you had him on your payroll as an hourly

24  employee?

25       A.   That is correct.

CONFIDENTIAL

Page 22

1    Q.  And you were paying him 25 to $30 an hour?

2    A.  I -- I don't know the exact number, but

3    probably in that range.

4    Q.  Were you paying him overtime?

5    A.  No.

6    Q.  And all this time that Pablo D'Agostino was on

7    OnePoint's payroll, he was a full-time employee at

8    Toshiba International Corporation, right?

9           MR. DANIELS:  Objection to form.

10          Answer if you know.

11   A.  That is correct.

12   Q.  (BY MR. FRIDMAN)  What work did Pablo

13   D'Agostino do for OnePoint while he was on OnePoint's

14   payroll?

15   A.  Nothing really.  But every once in a while he

16   would say, Hey, there is a project that you could do,

17   you know, somewhere else.  He would just give me a

18   little lead or something.

19   Q.  He would refer you work?

20   A.  He wouldn't refer me directly to a person.  He

21   would just suggest to me what other work I could do

22   somewhere else.

23   Q.  And would he personally work on the project?

24   A.  No, he would not.

25   Q.  And did any of the leads that Pablo D'Agostino

CONFIDENTIAL

Page 23

1    gave you result in any work for you?

2         A.  It did not.

3         Q.  How did OnePoint pay Pablo D'Agostino?

4                   MR. DANIELS:  Object to form.

5                   You're talking about during this time?

6                   MR. FRIDMAN:  Yes.  Between 2007 and 2008,

7    when Pablo D'Agostino was on OnePoint's payroll, how did

8    OnePoint transfer the funds for its payment to him?

9         A.  I don't recall exactly whether it was directly

10   through Paychex or if I wrote a check.  I don't recall.

11        Q.  (BY MR. FRIDMAN)  So do you remember if it was

12   a physical check or a wire transfer?

13        A.  It was a physical check.

14        Q.  And who would sign the checks?

15        A.  I'm looking at this W-2.  If Paychex is the

16   company that I used, they would -- they already have my

17   signature in their -- my signature block is in there.

18   So I was not personally signing it to the best of my

19   knowledge.

20        Q.  Okay.  How would Paychex know to send a payment

21   to Pablo D'Agostino?

22        A.  Because they are in the -- in the list of all

23   the other employees.  So the checks would be billable to

24   us by a paycheck, or in some cases, it would be a direct

25   deposit.

CONFIDENTIAL

Page 24

1    Q.  So did Pablo D'Agostino give you his bank
2    account information for direct deposit?
3    A.  I don't recall if it was direct deposit or if
4    he was picking up the check.  I don't recall.
5    Q.  Did you mail the checks to him or give them to
6    him personally?
7    A.  I did not mail it to him, but I don't recall
8    how he picked it up.
9    Q.  Did you give him the checks in person at
10   Toshiba?
11   A.  I don't remember that.
12   Q.  So if I'm doing my math right, OnePoint paid
13   Pablo a total of about $100,000 between 2007 and 2008?
14   A.  If that is the total, yes.
15   Q.  Did OnePoint pay taxes on Pablo D'Agostino's
16   wages?
17          MR. DANIELS:  Objection.  Form.
18   A.  Yes.
19   Q.  (BY MR. FRIDMAN)  Did OnePoint take a deduction
20   as an expense in its income tax filings for Pablo
21   D'Agostino's salary?
22   A.  I don't remember.  But if -- if he was on the
23   payroll, yes.
24   Q.  Okay.  Was Pablo D'Agostino ever a real, bona
25   fide employee of OnePoint?

CONFIDENTIAL

Page 25

1          MR. DANIELS:  Object to the form.

2     A.  No.

3     Q.  (BY MR. FRIDMAN)  So he was a fake employee on

4     your payroll, right?

5          MR. DANIELS:  Form.

6          (Reporter clarification.)

7     A.  I'm not sure if he was a fake employee because

8     he said he was going to give me some leads.  I was

9     hoping something would happen.

10    Q.  (BY MR. FRIDMAN)  But he also said that you

11    needed to pay him so that he would send you business

12    from Toshiba International Corporation, right?

13         MR. DANIELS:  Object to the form.

14    A.  He did not say he'll send me business.  He

15    said, if you want to continue to stay in Toshiba and if

16    you want to be in Toshiba, put me on the payroll.

17    Q.  (BY MR. FRIDMAN)  Did you tell your accountant

18    for OnePoint that Pablo D'Agostino was not a bona fide

19    employee?

20    A.  I don't recall that conversation.

21    Q.  Who was your accountant in 2007 and 2008?

22    A.  I don't recall his name right now.

23    Q.  Can you find out?

24    A.  I can find out.

25    Q.  Is -- do you have the same accountant today?

CONFIDENTIAL

Page 26

1      A.   No.

2      Q.   Who is your accountant today?

3      A.   His name is Jay Ojha.

4      Q.   Can you spell that?

5      A.   J-A-Y, O-J-H-A.

6      Q.   And is Mr. Ojha in the Houston area?

7      A.   Yes.

8      Q.   Why did you put Mr. D'Agostino on your payroll

9  instead of, say, giving him a suitcase of $100,000 in

10 cash?

11            MR. DANIELS:   Objection.   Asked and

12 answered.

13     A.   He did not ask me for a suitcase full of bank.

14 He asked me to put me on the payroll if I wanted to

15 continue to stay at Toshiba.

16     Q.   (BY MR. FRIDMAN)   Okay.   So -- and was -- was

17 the reason for it to disguise the wages -- to disguise

18 as wages the illegal purpose of the money you were

19 paying him?

20            MR. DANIELS:   Object to the form.

21     A.   No, it was not to disguise.   I followed his

22 instructions.   I viewed him as Toshiba Corporation, and

23 I complied with his requirements.

24     Q.   (BY MR. FRIDMAN)   Did you ever discuss with

25 anyone at Toshiba International Corporation the fact

Page 27

1  that you were placing Pablo D'Agostino on your payroll?

2      A.  I did not.

3      Q.  Why not?

4      A.  At that time, the only person I knew at Toshiba

5  was Pablo.

6      Q.  So you didn't complain to Pablo's supervisor?

7      A.  No, I did not.

8      Q.  You didn't complain to the president of

9  Toshiba?

10     A.  No, I did not.

11     Q.  Why not?

12     A.  Because I thought I was doing what both him and

13  the company required.

14     Q.  Well, if you were uncomfortable about it, as

15  you put it, "hesitant," why didn't you complain to

16  someone higher up in the company?

17     A.  I was hesitant because none of my other 20-odd

18  clients that I have have ever made this request.  It was

19  a very strange request.  So I was initially hesitant.

20     Q.  So you agreed with Pablo D'Agostino to pay him

21  in this way through your payroll, right?

22     A.  I complied with his -- his request, and I

23  played with TIC's requirements.

24     Q.  Well, you keep saying it's TIC's requirements,

25  and I understand that is the defense you come here with

CONFIDENTIAL

Page 28

```
 1    today, but please explain to me where you got, other
 2    than from Pablo D'Agostino, that Toshiba required you to
 3    pay its facilities manager?
 4                    MR. DANIELS:  Object to the sidebar.
 5                    You can answer.
 6         A.  Can you repeat the question, please?
 7         Q.  (BY MR. FRIDMAN)  Yes.
 8                    I understand that is the defense you've
 9    come here today, but please explain to me where you got,
10    other than from Pablo D'Agostino, that it was a
11    requirement of Toshiba International Corporation for you
12    to put its facilities manager on its payroll?
13                    MR. DANIELS:  Again, I object to the
14    sidebar.
15                    Answer if you can.
16         A.  I -- I don't know the answer.  I don't know.
17                    I viewed him -- I viewed him as a
18    representative of Toshiba.
19         Q.  (BY MR. FRIDMAN)  Did you understand that each
20    payment you made to Pablo D'Agostino on a bimonthly
21    basis was a bribe?
22                    MR. DANIELS:  Object to the form.
23         A.  No, it's not.
24         Q.  (BY MR. FRIDMAN)  Why isn't it a bribe?
25                    MR. DANIELS:  Object to the form.
```

CONFIDENTIAL

Page 29

1      A.  Because, there again, I'm complying with what

2  he asked me to do.

3      Q.  (BY MR. FRIDMAN)  So if Mr. D'Agostino asked

4  you to join him in robbing a bank, would you have

5  complied with that?

6            MR. DANIELS:  Object to the form.

7      A.  I would not.

8      Q.  (BY MR. FRIDMAN)  Why not?

9      A.  Because that would be -- I -- I wouldn't rob a

10  bank.  I've not done that.  So I wouldn't comply with

11  it.

12      Q.  All right.  So you're willing to say that you

13  wouldn't do everything that Pablo D'Agostino might ask

14  you to do to -- to continue to do business with Toshiba?

15  There's a limit; is that right?

16      A.  Yes.

17      Q.  So robbing a bank with him is out of the

18  question, right?

19      A.  Yes.

20      Q.  Placing him on his payroll -- on your payroll,

21  that was okay?

22      A.  At that time, I thought it was okay.

23      Q.  And do you understand that by agreeing to pay

24  Pablo D'Agostino, you were engaging in theft from

25  Toshiba?

CONFIDENTIAL

Page 30

1           MR. DANIELS:  Object to the form.

2      A.  I didn't see it that way.

3      Q.  (BY MR. FRIDMAN)  Do you see it that way now?

4      A.  I don't see it that way now, too.

5      Q.  All right.  So let me go to the next document

6  here.

7           Was this the only time that you had

8  Pablo D'Agostino on your payroll?

9      A.  That is correct.

10      Q.  When did you remove Pablo D'Agostino from

11  his -- from your payroll?

12      A.  I have to look at the W-2.  I guess it was

13  in -- whatever is on the W-2.  It was in August 2009.  I

14  don't know the exact dates.

15      Q.  You think it was August of 2009?

16      A.  I think so.  I'm not sure.

17      Q.  And when did you first place him on the

18  payroll?

19      A.  I don't know the exact date.  Maybe six or

20  seven months prior to that.

21      Q.  Well, he had about $26,000 -- sorry -- $24,000

22  of wages in 2007, right?

23      A.  I'm not sure if I put him on 2007 or 2008.  But

24  if you can put the W-2 back, I can tell you exactly.

25      Q.  All right.  Let me share my screen again.

CONFIDENTIAL

Page 31

1        Can you see that now?

2    A.  Yeah, I see that now.

3    Q.  All right.  Clearly part of it.

4    A.  Yeah, probably.

5    Q.  So what is your -- your best understanding of

6  when OnePoint first put Pablo D'Agostino on its payroll

7  in 2007, considering that he received $24,084 that year?

8    A.  My best estimate would be towards the latter

9  part of 2007.

10   Q.  Was that close to the time that you first

11  started doing work for Toshiba International

12  Corporation?

13   A.  It wouldn't be the exact time, but it would be

14  after some time that I was there.

15   Q.  Approximately, how long after you started doing

16  work for Toshiba International Corporation did you pay

17  -- pay -- place Pablo D'Agostino on your payroll?

18   A.  It was in the same year, but I don't know it --

19  exactly how many months later.

20   Q.  It was in the same year, but -- of 2007, right?

21   A.  That is correct.

22   Q.  And maybe a few months before?

23   A.  It's definitely a few months.  I started

24  definitely a few months later.  But I don't know exactly

25  how many months lapsed between me starting and starting

CONFIDENTIAL

Page 32

1   him on the payroll, but there was definitely a gap in

2   between.

3              MR. FRIDMAN:  All right.  I'm going to show

4   Mr. Joseph Exhibit 37.

5              (Exhibit 37 marked.)

6      Q.  (BY MR. FRIDMAN)  And I'm going to put that on

7   the screen for you, Mr. Joseph.

8      A.  Okay.

9      Q.  Can you see Exhibit 37?

10     A.  Yes.

11     Q.  All right.  Exhibit 37 is "Defendant OnePoint,

12  Inc.'s Supplemental Objections and Responses to

13  Plaintiff's First Set of Interrogatories," right?

14     A.  Right.

15     Q.  Do you recognize Exhibit 37?

16     A.  Yes.

17     Q.  Are these the sworn interrogatory responses

18  that you provided, answering the questions that we sent

19  to OnePoint?

20              MR. DANIELS:  Can you page all the way down

21  so we can confirm that his signature --

22     Q.  (BY MR. FRIDMAN)  So I've turned to page -- I

23  think it would be 55 where it says, "verification."

24              Is that your signature on Page 55?

25     A.  Yes.

CONFIDENTIAL

Page 33

1          Q.  And you wrote (as read):  "I, Abraham Joseph,

2     declare that I am properly authorized to execute

3     defendant OnePoint, Inc.'s Supplemental Objections and

4     Responses to Plaintiff's First Set of Interrogatories,"

5     right?

6          A.  Right.

7          Q.  And you wrote (as read):  "I have reviewed

8     OnePoint, Inc.'s Supplemental Responses and declare,

9     under penalty or {sic} perjury, under the laws of the

10    United States that the facts stated in the foregoing

11    supplemental responses are true and correct as of

12    October 14th, 2020, to the extent those facts are based

13    upon my personal knowledge that I am informed and

14    believe that the facts are true and correct," correct?

15         A.  That's correct.

16         Q.  So I want to turn your attention to your

17    response to Interrogatory No. 1.  And Interrogatory

18    No. 1 asks you to explain why OnePoint placed TIC's

19    facilities manager, Pablo D'Agostino, on its payroll as

20    an employee, right?

21         A.  Right.

22         Q.  You understand that when I say "TIC" during

23    this deposition, I'm referring to the plaintiff Toshiba

24    International Corporation, right?

25         A.  Right.

CONFIDENTIAL

Page 34

1    Q.  So in your response, you wrote (as read):  "In
2    November 2007, Pablo D'Agostino pressured OnePoint to
3    put him on its payroll and Mr. D'Agostino was removed
4    from OnePoint's payroll in August 2008"; is that right?
5    A.  That is correct.
6    Q.  So is November 2007, when you first put
7    Pablo D'Agostino on your payroll?
8    A.  That is correct.
9    Q.  Do you have any records that you're aware of
10   that would show when Pablo D'Agostino was placed on your
11   payroll?
12   A.  I believe I do.
13   Q.  What records would you have?
14   A.  It could be from Paychex.
15   Q.  So you think it's something that you can
16   request from Paychex?
17   A.  I can -- yes.
18   Q.  And do you understand that the W-2s that I
19   showed you, we didn't get those W-2s from OnePoint.
20   A.  I did not have the W-2 in my possession.  They
21   did ask me.  I do not have it.
22   Q.  We received them from the estate of
23   Pablo D'Agostino.
24       Did you know that?
25   A.  I -- I don't know where you got it from.

CONFIDENTIAL

Page 35

1      Q.   And Mr. D'Agostino apparently had it in a safe

2   deposit box.

3               MR. DANIELS:  Is that a question?

4               MR. FRIDMAN:  Yes.

5      Q.   (BY MR. FRIDMAN)  Are you aware of that?

6      A.   Oh, no.  I was not aware of that.

7      Q.   What efforts did you make to contact Paychex to

8   get records of these payments for Toshiba International

9   Corporation?

10               MR. DANIELS:  Him personally or his lawyers

11   on his behalf?

12               MR. FRIDMAN:  Both.

13               MR. DANIELS:  Don't answer about your

14   lawyers.  You can answer if you personally did.

15      A.   I looked for actual Paychex reports that we

16   had, not -- I definitely did not have the W-2.  I told

17   them that point-blank.  But as far as the -- the yearly

18   reports, I could not go as far back as 2007.  But I -- I

19   recently moved and -- I recently moved and we -- we

20   moved from one office to the other.  So I think I may

21   have -- not the W-2s for sure -- I may have Paychex's --

22   biweekly reports where I can probably look for this

23   particular document that shows that he was on the

24   payroll.

25      Q.   (BY MR. FRIDMAN)  All right.  Do you have

CONFIDENTIAL

Page 36

1  company tax returns from 2007 and 2008?

2      A.  I believe I do, but I'm not sure.

3      Q.  Have you tried to locate those tax returns?

4      A.  Not recently.

5      Q.  All right.  So Pablo D'Agostino asked you to

6  pay him, right?

7      A.  He didn't ask me to pay him.  He told me to put

8  -- put him on the payroll.

9      Q.  Okay.  And you did that, right?

10     A.  Yes, I did that.

11     Q.  And you had Paychex issue him checks bimonthly,

12  right?

13     A.  I believe it was -- yeah, bimonthly.  That is

14  correct.

15     Q.  And in exchange, Pablo D'Agostino made sure

16  that OnePoint won lucrative TIC projects for

17  construction and maintenance, right?

18          MR. DANIELS:  Objection to form.

19     A.  That is not true.  I was guaranteed that I will

20  be kept at TIC and not fired from TIC.

21     Q.  (BY MR. FRIDMAN)  I fail to see the

22  distinction, Mr. Joseph.

23          What -- what about my statement is not

24  true?

25          MR. DANIELS:  Object to the sidebar.

CONFIDENTIAL

Page 37

1    A.  He did not clearly tell me that -- put me on

2    the payroll, and I'm going to give you an X, Y, and Z

3    project.  There was no direct correlation.

4    Q.  (BY MR. FRIDMAN)  But from 2007 to about 2011,

5    OnePoint received at least $32 million worth of business

6    from TIC, right?

7    A.  I don't have the exact number, but close to

8    that.

9    Q.  That sounds about right, doesn't it?

10   A.  I don't know exactly, but it -- it could be

11   close.

12   Q.  And OnePoint won probably close to at least 100

13   bids in that period of time, right?

14        MR. DANIELS:  I'm going to object to you

15   asking him about specific numbers if you have documents

16   that show that.  Otherwise, you're asking him to recall

17   numbers from 13 years ago that -- it's not fair.  You're

18   asking him specific numbers, not showing him anything to

19   refresh his recollection, so I'm objecting to that.

20        MR. FRIDMAN:  Mr. Daniels, are you

21   testifying here today?

22        MR. DANIELS:  You know the answer to that.

23        MR. FRIDMAN:  All right.  So please stop

24   coaching the witness.

25        MR. DANIELS:  No.  I'm not coaching the

CONFIDENTIAL

Page 38

1    witness.  I'm coaching you to ask better questions.

2        Q.  (BY MR. FRIDMAN)  Mr. Joseph, can you answer

3    the question, please?

4        A.  Can you repeat the question?

5        Q.  Yes.

6            Give me your best recollection of how many

7    times you bid and won a bid at TIC between 2007 and

8    2011?

9        A.  I cannot give you an exact number because we

10   did several projects over there.  So without going

11   through my actual reports, I cannot tell you that.  But

12   we have also launched several projects, too.

13       Q.  Is it more than ten projects that you bid on

14   and won?

15       A.  In a period of how long?

16       Q.  Between 2007 and 2011?

17       A.  It's more than ten.

18       Q.  Is it more than 20?

19       A.  Yes.

20       Q.  More than 30?

21       A.  Yes.

22       Q.  More than 50?

23       A.  I'm not sure.  I don't know.

24       Q.  So between 30 and 50 projects that OnePoint bid

25   on and won at Toshiba between 2007 and 2011, right?

CONFIDENTIAL

Page 39

1      A.   That's my best estimate.

2      Q.   Okay.

3      A.   It could be more; it could be less.

4      Q.   So Pablo D'Agostino delivered for OnePoint,

5  right?

6                MR. DANIELS:  Objection.  Form.

7      A.   He did not deliver.  We -- we bid on projects,

8  we gave them our quality work.  They were happy with our

9  work, and we got paid for our work.

10     Q.   (BY MR. FRIDMAN)  And you didn't tell anyone

11 at TIC that you paid Pablo almost $100,000, right?

12     A.   No, I did not.

13     Q.   And you didn't tell anyone at TIC because you

14 wanted to keep your payments to Pablo D'Agostino secret,

15 right?

16     A.   I didn't -- I didn't tell anybody that because

17 I wanted to -- the business with TIC and stay in TIC.

18     Q.   Well, I mean, and you knew that if Pablo

19 D'Agostino's supervisor found out about it, you would no

20 longer be doing business for TIC, right?

21     A.   I -- I don't know that.

22     Q.   You're telling me you think TIC was going to

23 let Pablo D'Agostino get payments from a major vendor?

24                MR. DANIELS:  Objection.  Form.

25     A.   I don't know what -- what their policy is.  I

CONFIDENTIAL

Page 40

```
 1   viewed Pablo as the front of TIC.
 2        Q.  (BY MR. FRIDMAN)  Is that your policy for your
 3   company?  Do you allow your employees to take payments
 4   of $100,000 from vendors?
 5        A.  It depends on what conditions they are taking
 6   it.
 7        Q.  Okay.  What -- what condition would you allow
 8   your employees to get paid by a vendor?
 9        A.  I can't think of an answer for that.
10        Q.  It's because it's unreasonable, right?
11             MR. DANIELS:  Objection.  Form.
12        A.  It may not be unreasonable to some companies.
13   That might be their normal business practice.
14        Q.  (BY MR. FRIDMAN)  What company have you ever
15   heard of that would allow this conduct?
16        A.  I can't name any particular companies, but
17   there could be some.
18        Q.  Isn't this just a justification you've come up
19   with after the fact to justify bribery of Toshiba's
20   facilities manager, right?
21             MR. DANIELS:  Objection.  Form.  Don't
22   answer that.
23             (Reporter clarification.)
24        Q.  (BY MR. FRIDMAN)  You didn't want TIC's
25   payments to OnePoint to end, right?
```

CONFIDENTIAL

Page 41

1    A.  Can you repeat that question, please?

2    Q.  You didn't want TIC's payments to OnePoint --

3   which, as you've testified, were in the neighborhood of

4   $32 million between 2007 and 2011 -- to end, right?

5    A.  I did not wanted to be fired from TIC, I wanted

6   to continue to stay in TIC.

7    Q.  Were you aware that in later years,

8   Pablo D'Agostino received payments from Mr. Sudhakar

9   Kalaga?

10    A.  I found out about that after this lawsuit

11   happened in reading some of the -- I guess the -- the

12   complaints.

13    Q.  So you did not know that Pablo D'Agostino was

14   receiving payments at the time he was receiving them

15   from Mr. Kalaga?

16    A.  I did not know that for a fact.  I couldn't

17   prove it.

18    Q.  Did you suspect it?

19    A.  Just a little bit, yes.

20    Q.  Tell me, when did you first suspect Pablo was

21   receiving payments from Sudhakar Kalaga?

22    A.  I don't know when he first received it.

23   Sorry -- what was your question again?

24    Q.  My question was when you first suspected that

25   Pablo was receiving money from Sudhakar Kalaga.

CONFIDENTIAL

Page 42

1      A.  Well, I had a little suspicion because I would

2    be bidding on a lot of jobs, and I would never get those

3    projects.  And so -- and he would be getting all those

4    projects.  And each time, I would go back to Toshiba,

5    and I would see the projects that I bid on would be

6    under construction.  I was never told I didn't even get

7    it.

8              I would ask Pablo.  I said, How come I

9    didn't get this job?  And he would say, Well, that --

10   that was a corporate decision, and I had nothing to do

11   with it.  And then I would see Sudhakar's stack on the

12   jobsite.  So that's when I started suspecting something

13   was going on.

14     Q.  And did you discuss your suspicions with

15   anyone?

16     A.  No, I did not.

17     Q.  And why did you suspect that Pablo was getting

18   paid by Mr. Kalaga?

19     A.  Because he's -- he almost quit, and then he --

20   he started giving -- I saw they were -- they were

21   getting a lot of jobs.  And so I just felt that

22   something was up, but I had no proof to prove it.

23     Q.  So did you suspect that Pablo was doing with

24   Mr. Kalaga what Pablo had been doing with you?

25     A.  I don't know what exactly he was doing with

CONFIDENTIAL

Page 43

1   Kalaga, so I cannot speculate on that.

2       Q.  Did you suspect that Mr. Kalaga was paying

3   Pablo more than you paid Pablo?

4       A.  I -- I don't know exactly what Kalaga paid

5   Pablo, so I can't make a comparison.

6       Q.  Do you know now?

7       A.  I know now by looking at all these reports.

8       Q.  And what is your understanding of how much

9   Mr. Kalaga paid Pablo?

10              MR. DANIELS:  Object to the form.

11      A.  I don't know the exact dollar amount, but I

12  read the whole thing about some properties that they

13  have together and stuff like that.

14      Q.  (BY MR. FRIDMAN)  Do you have an understanding

15  that Mr. Kalaga paid Pablo millions of dollars?

16              MR. DANIELS:  Objection.  Form.  Objection

17  speculation.

18              MR. FRIDMAN:  Just asking what he

19  understands about the litigation.  Not asking him to

20  speculate.

21      A.  I don't know the exact dollar amount.

22      Q.  (BY MR. FRIDMAN)  All right.  Let's stick with

23  Exhibit 37, and I'm going to take you to Interrogatory

24  No. 2.

25              Interrogatory No. 2 asked you to identify

CONFIDENTIAL

Page 44

1    all persons with knowledge, including current and former

2    OnePoint, Inc. officers, directors, and employees about

3    OnePoint, Inc. having Pablo D'Agostino on its payroll as

4    an employee.

5              Do you recall that question?

6         A.  Yes.

7         Q.  (BY MR. FRIDMAN)  And in response, you

8    identified David Headrick, right?

9         A.  Yes.

10        Q.  Who's David Headrick?

11        A.  He was one of my employees.

12        Q.  And what was his position?

13        A.  Project manager.

14        Q.  Between what years did he work for you?

15        A.  I don't know the exact years, but he was there

16   roughly 2007 to 2017, '18.

17        Q.  In response -- go ahead and finish.

18             MR. DANIELS:  He didn't say anything.  He

19   was finished.

20        A.  I'm finished.

21        Q.  (BY MR. FRIDMAN)  In response to Interrogatory

22   No. 2, you wrote (as read):  "Sometime well after

23   Mr. D'Agostino was taken off the OnePoint payroll,

24   Mr. Headrick learned D'Agostino was once on the

25   payroll."

CONFIDENTIAL

Page 45

1              Do you see that?

2       A.  Yeah, I see that.

3       Q.  Did you listen in on the deposition of

4   Mr. Headrick that occurred last week?

5       A.  I saw bits and pieces of it, not the entire

6   deposition.

7       Q.  Are you aware that Mr. Headrick denied any

8   knowledge of -- that OnePoint had Pablo D'Agostino on

9   its payroll?

10      A.  That is correct.

11      Q.  So why did you think that he knew about this?

12      A.  Because after this lawsuit happened, as soon as

13  I was -- I -- I called David and I told him that, Hey,

14  just want to let you know there is an investigation

15  going on, and I'm -- and I'm involved, and I'm dragged

16  into it or whatever.  I don't know the exact words.  So

17  he just listened to the whole thing and he immediately

18  said -- he said, you know, Abraham, I've never told you

19  this, but during my time at OnePoint, sometimes I would

20  just look at the Paychex reports.  And I did see Pablo's

21  name in there.

22              So the minute he told me that, I

23  immediately informed -- that's -- so I don't know why he

24  never told me while I was there.  But when he told me

25  that, I let my attorneys know about it.

1    Q.  Well, first -- first -- yeah.  First of all, I

2    don't want to know what you discussed with your

3    attorneys.

4    A.  Okay.  Thank you.

5    Q.  But on -- on the first point, so was -- was

6    Mr. Headrick lying during his deposition that he did not

7    remember Pablo D'Agostino ever being on the payroll?

8    A.  I'm not sure if he was lying.  Maybe he did not

9    recall it, that conversation with me.

10   Q.  Well, it seems like from the way you tell it,

11   it was the first thing that came to his mind, right?

12   A.  I'm not sure it was the first thing but he --

13   he said, Well, that's pretty bad, and Pablo was a jerk

14   and this and that.  And then he said, Oh, by the way, I

15   just want to let you know that I have seen Pablo's name

16   in the Paychex reports.  But he never mentioned to -- to

17   me during his employment.  He told me after his

18   employment.

19   Q.  Right.  I understand.

20            And approximately, when was this

21   conversation?  Was it -- maybe to give you a better

22   sense, was it before or after the interview that we had

23   with you on December 4th, 2019?

24   A.  Definitely after the interview.

25   Q.  So it was approximately --

CONFIDENTIAL

Page 47

1      A.   I don't know exactly.

2      Q.   In 2020?

3      A.   Yes, in 2020 for sure.

4      Q.   Was it before or after OnePoint and -- and

5   yourself got sued by Toshiba International Corporation

6   in February of 2020?

7      A.   And what was that date?

8      Q.   February of 2020.

9      A.   Might have been April or so.  I don't know the

10  exact month.

11     Q.   Okay.  Other than putting Pablo D'Agostino on

12  your payroll, tell me in every other instance in which

13  you provided Pablo D'Agostino with something of value.

14     A.   I did sell him a -- a Ford 250 truck for a --

15  for a good price -- for a -- for a lower-than-market

16  price.

17     Q.   Okay.  Let me -- let me stop the screen share

18  here so we can see each other better.

19          Tell me about the truck.

20     A.   I don't know the exact date, but the truck was

21  purchased in August or something.  And six months later,

22  I transferred the title to his name for $9,000.  And it

23  was worth more than that.

24     Q.   Was that August of 2009?

25     A.   About right.

CONFIDENTIAL

Page 48

1       Q.   What do you think the market price was of the
2   truck when you transferred it to him?
3       A.   Probably 20,000.
4       Q.   $20,000?
5       A.   Approximately.
6       Q.   Do you know how much OnePoint paid for the
7   truck?
8       A.   Roughly back six months ago, about 37 or so.
9       Q.   So you're applying a lot of depreciation for
10  six months; is that right?
11      A.   I'm just -- I'm just coming up with some
12  numbers that -- that I think is fair.
13      Q.   But was there something wrong with the truck?
14  For example, had the truck been in an accident?
15      A.   Well, it was a construction truck.  So it was
16  not in the best condition.
17      Q.   When OnePoint purchased that truck in
18  August 2009, was that at Pablo's direction?
19      A.   No.  I bought it on my own.
20      Q.   So tell me, how did you come to transfer that
21  truck to Pablo?
22      A.   He told me to transfer the truck to -- on his
23  name.
24      Q.   And you say that in -- that he paid you $9,000?
25      A.   That is correct.

CONFIDENTIAL

Page 49

1      Q.  Was that by check or in cash?

2      A.  In cash.

3      Q.  And what -- how -- how did you receive the

4   cash?  Was it in a paper bag or a suitcase?

5      A.  He just handed it to me.

6      Q.  So do you have any proof that Pablo paid you

7   $9,000 in cash for that truck?

8      A.  I don't have anything now, no.

9      Q.  All right.  Let me -- I'm going to put another

10   exhibit on the screen.

11             Tell me, why did you transfer that truck to

12   Pablo at a below-market price?

13      A.  I just wanted to get rid of that truck.  We

14   already had two or three trucks at that time.

15      Q.  You said that Pablo asked you for it?

16      A.  He said he liked the truck, and he asked me if

17   I wanted to sell it.

18      Q.  And how did you agree to give -- sell it to him

19   for, as you say, $9,000 in cash?

20      A.  That's what we both agreed upon.

21      Q.  All right.  I'm going to put another exhibit on

22   the screen.  So this is Exhibit 37, and I'm going to do

23   a share screen.  Sorry.  This will be Exhibit 48.  I'm

24   going to put Exhibit 48 on the screen.

25             Can you see Exhibit 48?

CONFIDENTIAL

Page 50

1       A.   Yes.

2       Q.   Do you need me to zoom it in more?

3       A.   Yes, please.

4       Q.   Is that better?

5       A.   That's better.

6       Q.   All right.  So once again, this is Toshiba

7    International Corporation's first set of interrogatories

8    to defendant, OnePoint, and we're going to go to Exhibit

9    C.

10           Exhibit C is a motor vehicle report, and I

11   want to check with you to see if this is the same truck

12   that you -- we are talking about right now.

13           MR. DANIELS:  I think you need to zoom out.

14      Q.  (BY MR. FRIDMAN)  Can you see it now?

15      A.   Yeah, I can see it.

16           (Simultaneous cross-talk ensues.)

17           MR. DANIELS:  We have it there.

18           MR. FRIDMAN:  Oh, okay.

19           THE WITNESS:  I've yet to see it on the

20   screen.

21      Q.  (BY MR. FRIDMAN)  So you see the -- the company

22   is identified as OnePoint with the "I" -- the letter "I"

23   is missing.

24      A.   Right.

25      Q.   But that is the address that your company had

CONFIDENTIAL

Page 51

1    at that time, right?

2         A.   That is correct.

3         Q.   And it says the original registration date was

4    August 18th of 2009?

5         A.   Right.

6         Q.   And the truck is identified as a 2009 Ford

7    F-250 Super Duty, right?

8         A.   Right.

9         Q.   And the last five digits of the vehicle

10   identification number are - -49561?

11        A.   Right.

12        Q.   So can we agree that this is the same truck

13   you've been talking about?

14        A.   Yes.

15        Q.   Then if we scroll up to the next entry in the

16   motor vehicle registration report, we see the name of a

17   new owner, Pablo H. D'Agostino.

18             Do you see that?

19        A.   Yes.

20        Q.   And same truck, - -49561, right?

21        A.   Right.

22        Q.   So this shows that the truck was, in fact,

23   transferred to Pablo D'Agostino, right?

24        A.   It was the title transfer, yes.

25        Q.   And it says that the base price was $37,950 at

CONFIDENTIAL

Page 52

```
 1   the time of transfer.
 2        A.   That was the price of purchase, not at the time
 3   of transfer, I think.
 4        Q.   That's the purchase price?
 5        A.   That's the base -- base price of the truck.
 6        Q.   All right.  Well, I see that that matches up
 7   with the base price on -- when OnePoint was the owner,
 8   right?
 9        A.   Right.
10        Q.   Okay.  So I am going to show you another
11   exhibit now, Exhibit 50.  Exhibit 50 is a composite
12   exhibit that we have put together to save time,
13   combining some research that we did at the Motor
14   Vehicles Department and some of the documents that we
15   received from OnePoint.
16             Can you see Exhibit 50 on your screen?
17             (Exhibit 50 marked.)
18             MR. DANIELS:  What's the Bates number on
19   this document, Dan?
20             MR. FRIDMAN:  It's TIC-129337.
21             MR. DANIELS:  Okay.  Thank you.
22             MR. FRIDMAN:  And the last document was the
23   one that was produced by OnePoint.  It's OnePoint 36609.
24        Q.   (BY MR. FRIDMAN)  So this is a document that we
25   received as a supplemental production from OnePoint for
```

CONFIDENTIAL

Page 53

1    a -- a 2010 F-250, which appears to have a net price of

2    $57,820.

3                    What -- what does this truck have to do

4    with the truck that you transferred to Pablo D'Agostino?

5        A.  Well, I -- I had this in my -- I was shopping

6    around for trucks, so I had several of these printouts.

7                    Can you scroll it down a little bit?  All

8    the way down to the bottom?

9        Q.  Yes.

10       A.  Yeah.  So I was looking at trucks on different

11   websites, and this was one of the ones that I -- I had

12   it with me.

13       Q.  Okay.  I see the date of this printout is

14   July 27th, 2009.

15       A.  Right.

16       Q.  Is this the truck that you wound up buying?

17       A.  I don't think so.  I'm not -- I'm not sure.  I

18   don't know.

19       Q.  Is that your handwriting on this paper?

20       A.  Yes.  That is my handwriting, yes.

21       Q.  All right.  Then if we scroll up to the next

22   document, which is TIC-129339, we see a certificate of

23   origin for the truck that has the VIN number ending in -

24   -49561.  So this is for the truck that we are talking

25   about that you gave to Pablo, right?

CONFIDENTIAL

Page 54

1      A.  If it's the same VIN -- VIN number, yes.

2      Q.  Okay.  Remember, we agreed it was -49561.  Do

3  you see that on the screen?  Can you see me pointing --

4      A.  I see that on the screen, yes.

5      Q.  Can you see me pointing at different parts of

6  the document on your screen?

7      A.  Yes, I -- I do.

8      Q.  Okay.  So I scrolled up to the next document,

9  which is TIC-129335, and that shows a sales price of

10  $46,999.

11      A.  Yeah, I see that.

12      Q.  And it's the same VIN number, -49561, right?

13      A.  Right.

14      Q.  So is it -- is it possible that that's really

15  how much the car cost?

16      A.  I don't know.

17      Q.  You have no records to show how much you paid

18  for the truck?

19      A.  I have no records.

20      Q.  But you agree with me this is an official

21  record of the Texas Department of Transportation, right?

22      A.  If it says Texas Department of Transportation,

23  yes, it is an official record.

24      Q.  And it says here that there was a trade-in

25  allowance of $18,000.

CONFIDENTIAL

Page 55

```
 1              Did you trade in another truck to buy this?
 2       A.  I may have, but I don't recall.
 3       Q.  Well, scroll up to TIC-129337.  Everything is
 4   blacked out here because of Texas privacy laws, but we
 5   can tell that we're talking about the same truck by
 6   looking at the VIN number, which is -49561.
 7              Do you see that?
 8       A.  Yes.
 9       Q.  So this appears to be the application for a
10   certificate of title for the truck when it was new with
11   16 miles on the odometer.
12              Do you see that?
13       A.  Yes.
14       Q.  And it says here that the sales price is
15   $46,999.
16              Do you see that?
17       A.  Yes.
18       Q.  And it was a trade-in of $18,000?
19       A.  Yes.
20       Q.  And they computed a net -- net taxable amount
21   of $28,999.
22       A.  Yes.
23       Q.  And it's dated August 7th, 2009.
24       A.  Yes.
25       Q.  So it appears from this document that OnePoint
```

CONFIDENTIAL

Page 56

1    paid $46,999 for this truck, right?

2              MR. DANIELS:  Object to form.

3         A.  Based on this document, yes.

4         Q.  (BY MR. FRIDMAN)  Does that appear unreasonable

5    to you, or does it seem right?

6         A.  It seemed high to me now that I -- I thought it

7    was around 30,000 or 40,000.  I didn't know it was

8    46,000 -- 47,000.

9         Q.  All right.  So assuming that you paid $46,999

10   for the truck, do you really think the truck was only

11   worth $20,000 when it was transferred to

12   Pablo D'Agostino?

13             MR. DANIELS:  Object to the form.

14        A.  I don't know what it was worth when I

15   transferred it to him at that time.

16        Q.  (BY MR. FRIDMAN)  Is it reasonable to assume

17   that it was probably worth more than $20,000?

18             MR. DANIELS:  Object to the form.

19        A.  I really don't know.

20        Q.  (BY MR. FRIDMAN)  All right.  So we've been

21   going for about an hour, would you like to take a break?

22             MR. DANIELS:  Yes, I would like to.

23             MR. FRIDMAN:  Is that what you were going

24   to ask, Mr. Daniels?

25             MR. DANIELS:  It is.

CONFIDENTIAL

Page 57

1                MR. FRIDMAN:  I -- I anticipated your --

2    your thought.  All right.  So let's take a -- how long?

3    Ten minutes?

4                MR. DANIELS:  I don't need that long.

5                MR. FRIDMAN:  All right.  Seven minutes.

6                MR. DANIELS:  That's fine.

7                MR. FRIDMAN:  All right.  Let's go off the

8    record.

9                THE VIDEOGRAPHER:  This now ends Video 1 of

10   Abraham Joseph.  Off the record at 10:24.

11               (A break was taken from 10:24 a.m. to

12   10:33 a.m.)

13               THE VIDEOGRAPHER:  We're now back on the

14   record with Video 2 of Abraham Joseph.  The time is

15   approximately 10:33.

16       Q.  (BY MR. FRIDMAN)  All right.  So, Mr. Joseph --

17   so we've -- we've discussed that in 2007 and 2008 you

18   had Pablo D'Agostino on your payroll, right?

19       A.  Yes.

20       Q.  In 2009, you gave Pablo D'Agostino a truck at a

21   below market value price, right?

22       A.  I didn't give it to him.  I -- I sold it to him

23   for a price.

24       Q.  You say you sold it to him at a below market

25   value price, right?

CONFIDENTIAL

Page 58

1      A.  Slightly below market value, yes.

2      Q.  Why did you take Pablo D'Agostino off your

3  payroll in 2008?

4      A.  I don't know why I did that, but I did take him

5  off.

6      Q.  Was that at your decision, or was it at his

7  request?

8      A.  It was my decision.

9      Q.  Was it because you were uncomfortable with

10  having a Toshiba employee on your payroll?

11      A.  I just didn't want him on my payroll.  So I

12  took him off.

13      Q.  You didn't want him on your payroll because you

14  didn't like the amount of money you had to pay him?

15      A.  I just didn't want him on my payroll.

16      Q.  So instead, did you find other ways to pay

17  Pablo?

18      A.  No, I did not.

19      Q.  Well, what about the truck in 2009?  Wasn't

20  that another way to transfer something of value to

21  Pablo?

22      A.  I sold the truck to Pablo.

23      Q.  Right.

24          And as we've seen, the truck

25  was potentially as -- as valuable as $47,000, right?

CONFIDENTIAL

Page 59

1              MR. DANIELS:  Object to the form.

2       A.  I don't know what the value of the truck was at

3  that time.

4       Q.  (BY MR. FRIDMAN)  And Pablo kept sending you

5  business from Toshiba International Corporation, right?

6       A.  He did not send me business.  He would ask me

7  to look at projects.

8       Q.  Right.

9              And as you've said, during this period of

10  time, OnePoint received around $32 million from Toshiba

11  International Corporation, right?

12      A.  If that is the number, yes.

13      Q.  So that was a quid pro quo, right?

14             MR. DANIELS:  Object to the form.

15      A.  No, it's not.

16             We performed our work.  We did good work.

17  There was no complaints, and we got paid for our work.

18      Q.  (BY MR. FRIDMAN)  Were there -- does OnePoint

19  have other customers?

20      A.  Yes.

21      Q.  And for these other customers, did you put

22  their employees on your payroll?

23      A.  No.

24      Q.  And for these other customers, did you sell

25  them trucks at below market value?

CONFIDENTIAL

Page 60

1     A.   I must have sold them some equipments that they

2    were interested in.

3     Q.   Did you sell them at below market value?

4     A.   I must have sold them at fair market value.

5     Q.   And were you selling it to the company or the

6    employees of the company?

7     A.   I've sold some to companies, and I've sold some

8    to employees.

9     Q.   Are you proud that you had Pablo D'Agostino on

10   your payroll?

11            MR. DANIELS:   Object to the form.

12    A.   I don't know the answer to that.

13    Q.   (BY MR. FRIDMAN)  All right.  Let's go back to

14   Exhibit 37.  Once again, Exhibit 37 is OnePoint's

15   "Supplemental Objection and Responses to Plaintiff's

16   First Set of Interrogatories."

17            I want to take your attention to

18   Interrogatory No. 3.

19            Can you see that?

20    A.   Yes.

21    Q.   Interrogatory No. 3 states (as read):

22   "Identify each instance in which OnePoint, Inc. and/or

23   Abraham Joseph gave Pablo D'Agostino, Melissa

24   D'Agostino, and/or Ashley Tucker a gift.  Gift includes

25   giving cash, vacations, show tickets, payment of credit

CONFIDENTIAL

Page 61

1  card expenses, and the payment of personal expenses such

2  as the purchases reflected in the 2018 Home Depot

3  receipts attached as Exhibit B to these

4  interrogatories."

5          Do you recall answering that question?

6      A.  Yes.

7      Q.  So the first part of your answer you write (as

8  read):  "In or about 2009, Mr. Joseph and Mr. D'Agostino

9  traveled to Las Vegas, Nevada for one, two-day trip.

10 The trip was Mr. D'Agostino's idea.  OnePoint does not

11 have receipts for this client development trip.  Based

12 on Mr. Joseph's recollection, the airfare, hotel, and

13 entertainment cost less than $2,000"; is that correct?

14     A.  That is correct.

15     Q.  Did you pay the cost of Mr. D'Agostino's trip

16 to Las Vegas?

17     A.  Yes, I did.

18     Q.  Tell me how this trip came about.

19     A.  He told me he wanted to see a show in Las

20 Vegas, and he told me, Why don't you arrange for that

21 trip.

22     Q.  And was it just you and him that went, or did

23 other people go?

24     A.  Just me and him.

25     Q.  And what show did he want to see?

CONFIDENTIAL

Page 62

1        A.   The Criss Angel show.

2        Q.   And why did you do this trip?

3        A.   It's part of the business development.  It's

4   marketing strategy.  Companies take clients out for

5   golfs.  So I -- I thought it was appropriate to take the

6   client out for a trip.

7        Q.   Did you enjoy spending time with

8   Pablo D'Agostino?

9        A.   I enjoyed the Criss Angel show.

10       Q.   But not spending time with Pablo D'Agostino?

11       A.   It wasn't an enjoyable time.  It was just okay.

12       Q.   Next, you say (as read):  "Sometime in 2010 or

13   2011, Mr. D'Agostino requested that Mr. Joseph pay for a

14   trip, hotel, and airfare to San Francisco, California

15   for Mr. D'Agostino and a companion.  OnePoint has no

16   records or receipts for this trip.  Based on

17   Mr. Joseph's recollection, the best estimation of the

18   cost of the trip was less than $3,000"; is that correct?

19       A.   That's correct.

20       Q.   Tell me how this trip that cost $3,000 came

21   about.

22       A.   He asked me to go with him for this trip to

23   California, and I -- I told him no because I -- I just

24   didn't want to go with him.  So he said, Well, I'm going

25   to go with someone.  Can you arrange for the tickets?

CONFIDENTIAL

Page 63

1    And I did.

2         Q.   Do you know who he took?

3         A.   I have no idea.

4         Q.   And why did you pay for this trip?

5         A.   It was part of our marketing expense for the

6    company, and -- and we do that for clients.  We take

7    them out for baseball games.  So this was a way to

8    appreciate the customer.

9         Q.   Do the baseball games cost $3,000?

10        A.   No, they don't.

11        Q.   Are they less?

12        A.   Yes.

13        Q.   How much does a baseball game cost?

14        A.   Well, the whole thing might be 4-, $500 with

15   everything; parking, food.  Well, it depends on what

16   seats we -- it depends on the seats I guess.  Maybe

17   1,000 bucks.

18        Q.   Did you pay this trip for Pablo D'Agostino

19   because he asked you to?

20        A.   He asked me for the trip -- to join him on the

21   trip.  I did not join him, but it was part of our

22   business development program.

23        Q.   Okay.  So you call -- you don't call this a

24   bribe?

25        A.   Oh, absolutely not.

CONFIDENTIAL

Page 64

```
 1       Q.  You call this business development?

 2       A.  Correct.

 3       Q.  Was having Pablo D'Agostino on your payroll

 4  in 2007 and 2008 business development?

 5       A.  This was purely what TIC and Pablo wanted, and

 6  I complied with their rules.

 7       Q.  Well, you've told me that no one other than

 8  Pablo D'Agostino at TIC told you to put him on your

 9  payroll, right?

10       A.  He's the one -- he was the face of Toshiba, so

11  I listened to him.

12  ██   ███  ███████████████████

    █ ██████████████

    █   ██  ████████████████████████  ████

    █ ███████████████████████████████

    █ ██████████

17       Q.  Is it a bribe?

18       A.  It's not a bribe.

19       Q.  Was it a quid pro quo?

20       A.  No.

21       Q.  All right.  Let's scroll a little further down

22  in your answer here.  You say at the end of

23  Interrogatory No. 3 (as read):  "Off and on,

24  Mr. D'Agostino also demanded cash from Mr. Joseph.

25  Mr. D'Agostino threatened to stop sending TIC business
```

CONFIDENTIAL

Page 65

1  to OnePoint if Mr. Joseph did not provide him with

2  spending money.  As a result, OnePoint had to provide

3  Mr. D'Agostino cash payments."

4              Do you see that?

5      A.  Yes, I see that.

6      Q.  Is that correct?

7      A.  That is correct.

8      Q.  Tell me how much cash did you provide to

9  Mr. D'Agostino off and on.

10     A.  I don't have the exact dollar amount.

11     Q.  Give me your best recollection.

12             MR. DANIELS:  Object to the form.

13     A.  It could be $400 at one time or it could be

14  $1,000 at another time.  It could be $1,500 at another

15  time, but I don't know the exact amount.

16     Q.  (BY MR. FRIDMAN)  And you say off and on you

17  provided this cash of between 300 and $1,500, right?

18     A.  In that range.  I don't know the exact number.

19     Q.  Can you tell me the period of time in which you

20  provided him with this cash?

21     A.  It could have been from 2010, maybe, or so.

22     Q.  Until when?

23     A.  Maybe until 2017, '18 -- '17.

24     Q.  When was the last time you remember giving

25  Pablo D'Agostino cash?

CONFIDENTIAL

Page 66

1      A.   I don't remember the exact date.

2      Q.   Was it in 2019?

3      A.   Possible.

4      Q.   It's possible you gave him cash in 2019?

5      A.   Yes.

6      Q.   How much cash is it possible you gave him in

7  2019?

8      A.   I don't know the exact amount.

9      Q.   Is it in the range of $300 to $1,500 or more?

10     A.   It could be more.

11     Q.   Okay.  How much more?

12          MR. DANIELS:  Object to form.

13     A.   It could be $2,000.

14     Q.   (BY MR. FRIDMAN)  Okay.  So you think you gave

15  him $2,000 in 2019?

16          MR. DANIELS:  Objection --

17     A.   No.  I don't know the entire amount given to

18  him in 2019.  I don't have a grand total per se.

19     Q.   (BY MR. FRIDMAN)  Was it multiple payments or

20  one single payment?

21     A.   It was multiple.

22     Q.   How would you deliver cash to Pablo D'Agostino

23  in 2019?

24     A.   I may have given it to him either at the TIC

25  property or at his -- at his residence.

CONFIDENTIAL

Page 67

1      Q.  You would bring cash to TIC's property and give
2   it to Pablo in -- at TIC; is that right?
3      A.  I've done it on a few occasions, yes.
4      Q.  Would you do that in his office?
5      A.  That is correct.
6      Q.  With his door closed?
7      A.  His door was open.
8      Q.  And would the -- the cash be concealed in any
9   way --
10     A.  No.
11     Q.  -- or were you giving cash out in the open?
12     A.  It would be in an envelope.
13     Q.  You would give it to him in an envelope?
14     A.  Correct.
15     Q.  And what would he say to you?
16     A.  He -- he wouldn't say anything.
17     Q.  Would he thank you?
18     A.  No.  He didn't -- he didn't -- he never said
19  thank you.
20     Q.  And you would also visit Pablo D'Agostino at
21  his home?
22     A.  I wouldn't visit him at his home.  I would meet
23  him in his -- in the lobby area of his building.
24     Q.  Which building is it?
25     A.  The -- the Bancroft Building.

CONFIDENTIAL

Page 68

1      Q.   When he lived at Bancroft --

2      A.   That's correct.

3      Q.   -- you would meet in the lobby of the Bancroft

4   Building and give him an envelope of cash; is that

5   right?

6      A.   Correct.

7      Q.   In 2019, right?

8      A.   No.   2019, he was -- it was in Arabella.

9      Q.   Okay.   Did you ever meet -- meet him in the

10  lobby of Arabella and give him cash?

11     A.   I may have met him once or twice in the

12  Arabella lobby, yes.

13     Q.   And that was in 2019?

14     A.   Yeah.   2019, yes.

15     Q.   And how -- how much cash did you give him the

16  time that you remember meeting him at Arabella?

17     A.   I don't know the exact total.

18     Q.   Was it between $300 and $1500, or more?

19     A.   Sometimes it was more, sometimes it was less.

20     Q.   Up to $2,000 in cash?

21     A.   I don't remember the exact dollar amount.

22     Q.   Was it ever more than $2,000 in cash?

23     A.   Possible.

24     Q.   Okay.   What's the largest amount of cash you

25  remember giving to Pablo D'Agostino?

CONFIDENTIAL

Page 69

1        A.   I think up to $4,000.

2        Q.   $4,000 at one time?

3        A.   Yes.

4        Q.   When did you give Pablo D'Agostino $4,000 in

5    cash?

6        A.   I don't know the exact date.

7        Q.   Can you give me your best recollection of when

8    that was?

9        A.   It would be 2018, '19.

10       Q.   So in 2018 or '19, you gave Pablo D'Agostino

11   $4,000 in cash at one time --

12       A.   Correct.

13       Q.   -- correct?

14            And where did you do this?

15       A.   I believe it was in his building -- his

16   residence building in the lobby.

17       Q.   In the lobby of his residence, is that --

18       A.   Correct.

19       Q.   -- what you're saying?

20       A.   Correct.

21       Q.   And which lobby was it?  Bancroft or Arabella?

22       A.   I believe it was Bancroft.

23       Q.   You recall it was Bancroft?

24       A.   Yes.

25       Q.   Did anyone ever witness you give

CONFIDENTIAL

Page 70

1    Pablo D'Agostino this cash?

2         A.  I'm not aware of it.  No.  No one -- no, one

3    saw it, no.

4         Q.  Did Ashley Tucker ever see you give

5    Pablo D'Agostino cash?

6         A.  No, she did not.

7         Q.  Was Pablo D'Agostino alone when you gave him

8    cash?

9         A.  Yes, correct.

10        Q.  Every time?

11        A.  Every time.

12        Q.  So why did you give Pablo D'Agostino $4,000 in

13   cash in the lobby of the Bancroft in 2018 or 2019?

14        A.  Because he demanded it.  And we wanted to do --

15   to continue to work at Toshiba in --

16        Q.  So it was a quid pro quo?

17        A.  No.  It was our way of staying in Toshiba.

18        Q.  Is that a bribe?

19        A.  It's not a bribe.

20        Q.  Did you continue doing business with Toshiba

21   after you paid him $4,000 in cash in 2018 or 2019?

22        A.  Yes, we were still there.

23        Q.  In fact, you continued doing business with

24   Toshiba until Pablo D'Agostino's termination in

25   September 2019, right?

CONFIDENTIAL

Page 71

1      A.   Right.

2      Q.   After Pablo was terminated, you stopped doing

3   business with Toshiba, right?

4      A.   I didn't stop.  Toshiba did not call me back.

5      Q.   Toshiba stopped sending you business after

6   Pablo D'Agostino was terminated, right?

7      A.   I never heard back from Toshiba, so I did not

8   go there.

9      Q.   And during this period of time, 2018 and 2019,

10  what was the primary business that you had with Toshiba?

11     A.   It was mostly with the journeymen electricians

12  and then some repair works throughout the -- like, some

13  repair works in the complex.  Maintenance-type

14  activities.

15     Q.   So with the journeymen electricians, how much

16  business was OnePoint doing, approximately per year,

17  with Toshiba in 2018 and 2019?

18     A.   I don't know the exact amount.

19     Q.   Is it in the hundreds of thousands of dollars?

20     A.   I really don't know, but -- I don't know right

21  now.

22     Q.   Okay.  Is it $1 million?

23     A.   No, it's not $1 million.

24     Q.   So less than $1 million?

25     A.   Definitely less than $1 million in '18 and '19,

CONFIDENTIAL

Page 72

1    yes.

2         Q.  More than $200,000?

3         A.  Trying to think.  We were billing them every

4    two weeks, so I don't -- I don't want to do quick math

5    in my head.  So I really don't have the numbers in front

6    of me, so I cannot give you an exact number.

7         Q.  Okay.  But the business was important enough to

8    you that you gave Pablo D'Agostino $4,000 in cash,

9    right?

10        A.  I wanted to stay in Toshiba and continue to

11   provide them with service.  Yes, I wanted to be there.

12        Q.  Right.  You wanted to continue to receive those

13   payments every other week from Toshiba?

14        A.  I wanted to continue to receive payments for

15   services that we rendered to them and to retain us over

16   there in Toshiba.

17        Q.  But how many times a year did you give

18   Pablo D'Agostino cash?

19        A.  I don't know the exact number of times.

20        Q.  Well, let's break this up.  Let's talk about

21   2017, 2018, and 2019.

22             In those years, how often would you give

23   Pablo D'Agostino an envelope of cash?

24        A.  I don't know the exact duration, but...

25        Q.  Please give me your best estimate.

CONFIDENTIAL

Page 73

1        A.   What's the question, again?

2        Q.   In 2017, 2018, and 2019, how often did you give

3    Pablo D'Agostino cash?

4        A.   About 30, 40 -- 30 times, maybe, in three

5    years.

6        Q.   So an average of ten times a year?

7        A.   Sometimes more, sometimes less.

8        Q.   Was it every time you saw Pablo you gave him

9    cash?

10       A.   It's not each and every time I saw him, but I

11   had to see him to give it to him.

12       Q.   More often than not, when you went to see

13   Pablo, you also had an envelope of cash for him?

14       A.   Can you repeat the question, please?

15       Q.   Yes.

16            Is it fair to say that more often than not,

17   when you went to see Pablo D'Agostino in 2017, 2018, and

18   2019, you had an envelope of cash for him?

19       A.   Not each and every time I went to see him, no.

20       Q.   Right.

21            So is it greater than 50 percent of the

22   time that you went to see him you had an envelope of

23   cash?

24       A.   I -- I don't know whether it was 50 percent or

25   30 percent.  I don't know, so...

CONFIDENTIAL

Page 74

1     Q.  All right.  Where did the cash come from?

2     A.  I would withdraw it from my bank.

3     Q.  From your personal bank account or from

4  OnePoint's bank account?

5     A.  My company account.



25

CONFIDENTIAL

Page 75



CONFIDENTIAL

Page 76



1

18

24          It wasn't just for Pablo.  It could be for

25    anybody, any client.

CONFIDENTIAL

Page 77

1       Q.  Are there other clients that you gave envelopes

2   of cash to?

3       A.  No, I did not --

4       Q.  Pablo --

5       A.  -- except TIC.

6       Q.  Pablo was the only person that you gave

7   envelopes of cash to?

8       A.  That is correct.

9   ███ █████████████████████████████████████

███ ████████████████████████████████████████████

███ ██████████████████████████████████

███ ███ ██████████

███ ███ █████████████████████████████

███ ████████████████████████████████████

███ ███ ████████████████████████

███ ███ ██████████████████████████

███ ███ ███ ███████████████████████

███ ███ ███████████████████████████████

███ ███ █████████████████████████████████

███ ██████████████

███ ███ ████████████████████████████████████

███ ████████████████████████████████

███ ███ ███████

███ ███ ████████████████████████████████████

███ ███████████████████████

CONFIDENTIAL



CONFIDENTIAL

1   ████████

2       Q.  Who is in charge of OnePoint's accounting

3   books?

4       A.  It would be my CPA.

5       Q.  Who is your CPA?

6       A.  I believe I said that earlier, but I can say it

7   again if you want to.

8       Q.  Let's see.  Jay Ojha?

9       A.  That is correct.

10      Q.  O-J-H-A?

11      A.  That is correct.

12      Q.  Does Mr. Ojha know about you paying

13  Pablo D'Agostino in cash?

14      A.  No, he does not.

15      Q.  You've never told your accountants about that?

16      A.  No, I did not.

17      Q.  Does Mr. Ojha also provide bookkeeping services

18  for OnePoint?

19      A.  I believe he does.

20      Q.  Or do you have a bookkeeper that works for you

21  in-house?

22      A.  We have an in-house person, but she's not

23  qualified.  So I think Ojha does most of the -- the

24  accounting-related work.

25      Q.  Who is your in-house person?

CONFIDENTIAL

Page 80

1      A.   Anne.

2      Q.   Who is Anne?

3      A.   She is my bookkeeper in the office.

4      Q.   Okay.

5      A.   And -- and she's my sister.

6      Q.   What is Anne's full name?

7      A.   Anne Kurian.

8      Q.   And Anne Kurian is your sister?

9      A.   Yes.

10     Q.   And does she function as a bookkeeper for you?

11     A.   She doesn't have the formal education, but she

12  does -- she does the -- the numbers, the invoicing, and

13  all that, yes.

14     Q.   What bookkeeping software do you use?

15     A.   QuickBooks.

16     Q.   And how long have you been using QuickBooks?

17     A.   I believe we've had it since 2010, I believe.

18     Q.   Do you have QuickBooks records going back to

19  2010?

20     A.   We may have it, yes.  I -- I don't get into

21  QuickBooks but -- I'm -- I'm not sure, but, yes.  I

22  don't know.

23     Q.   So QuickBooks is not your domain.  It is the

24  domain of Anne Kurian or Mr. Ojha?

25     A.   That is correct.

CONFIDENTIAL

Page 81

```
1        Q.  Does Anne Kurian know that you were paying
2    Pablo D'Agostino cash?
3        A.  No, she does not know that.
4        Q.  Does she know that now?
5        A.  Yes, she does.
6        Q.  When did she find out?
7        A.  After this.  After I got sued.
8        Q.  You had a conversation with her?
9        A.  Yes, I did.
10       Q.  And what did you tell her?
11       A.  I told her about all the allegations on the
12   lawsuit.
13       Q.  Did you tell her that they were true?
14           MR. DANIELS:  Object to the form.
15       A.  I told her portions of it was true.
16       Q.  (BY MR. FRIDMAN)  Which portions of the
17   allegations in the complaint are true?
18           MR. DANIELS:  Object to the form.
19           Don't answer that.
20           Too broad.  If you want to ask him specific
21   allegation by allegation, but you -- I'm not going to
22   have him testify from memory to a 40-plus page
23   petition -- complaint.
24           MR. FRIDMAN:  Are you finished,
25   Mr. Daniels?
```

1              MR. DANIELS:  Yeah.

2        Q.  (BY MR. FRIDMAN)  All right.  Mr. Joseph,

3    please answer the question.

4              MR. DANIELS:  No.  He's been instructed not

5    to answer the question, Counsel.  It isn't a fair

6    question.

7              MR. FRIDMAN:  It is.  I -- I disagree with

8    you.  It is not --

9              MR. DANIELS:  If you're going to ask him

10   allegation by allegation, you can do so.

11             MR. FRIDMAN:  Well --

12             MR. DANIELS:  I told you you can't ask him

13   the topic.  I'm saying I'm not going to have him testify

14   from memory and by narrative.

15        Q.  (BY MR. FRIDMAN)  Do you remember your

16   conversation with your sister, Mr. Joseph?

17        A.  Briefly, yes.

18        Q.  Okay.  What do you remember about your

19   conversation with your sister?

20        A.  I told her there's an investigation going on by

21   Toshiba, and I'm getting sued.

22        Q.  And you told her about the allegations in the

23   lawsuit, right?

24        A.  I mentioned most of it to her, yes.  I did not

25   show the --

CONFIDENTIAL

Page 83

1      Q.  What about --

2      A.  Go ahead.

3      Q.  No, I want you to finish.

4      A.  I said I did not show the actual document.  I

5  -- I mentioned, I guess, most of it, not the details of

6  it.

7      Q.  What allegations did you mention to her?

8      A.  I did mention to her about the -- about the

9  bribery, or whatever y'all call it in your thing, about

10  paying cash, and about the trips to Las Vegas, the --

11  the truck, the -- the W-2s, the payroll thing.  That's

12  all I can remember for right now.

13      Q.  Did you tell her about the fake bids?

14      A.  I believe I did.  Yes, I did.

15      Q.  You told her that -- that you had created bids

16  in the names of other companies?

17      A.  Yes, I did.

18      Q.  She didn't know about that before?

19      A.  She did not know about it.

20      Q.  And you told her about payments that you had

21  made to Pablo?

22      A.  I didn't tell her exact payments.  I said I

23  have made some payments to Pablo, yes.

24      Q.  What was her reaction?

25      A.  I -- I don't recall her reaction, but -- I

1    don't recall her reaction.

2         Q.  Was she upset?

3         A.  I -- I didn't see it on her face, but I'm -- I

4    don't know what her reaction internally was.  I can't

5    speak for her.

6         Q.  All right.  What did she say --

7         A.  But obviously, not -- she was not excited, I

8    guess, so...

9         Q.  Was she shocked or was she not surprised about

10   this at all?

11        A.  She was -- she was unhappy to hear that I'm --

12   I'm being sued.

13        Q.  Was she unhappy with the fake bids and the

14   payments to Pablo?

15        A.  She did not tell me that specifically, but she

16   was unhappy about the fact that I'm being sued.

17        Q.  Other than your sister Anne Kurian, who else

18   did you discuss this lawsuit with apart from your

19   lawyers, as well?

20        A.  I did talk to Jay Atkins.  I talked to Sam

21   Kurian.  I spoke to Kommy Azarpour.  I mentioned it to

22   my wife and Brad Jackson.

23        Q.  You had these conversations with these people

24   you identified after you got sued?

25        A.  I believe in some cases.  Some of them I spoke

CONFIDENTIAL

Page 85

 1   to them after the December meeting at TIC.

 2        Q.  Okay.  Tell me about your conversation with

 3   Jay Atkins.

 4        A.  Actually, he was the one who called me.  He

 5   called me and he said that there was a private

 6   investigator who showed up at his house, and they said

 7   it was something regarding Toshiba.  So he called me,

 8   and that's when I told him that there is an ongoing

 9   investigation going on.

10        Q.  Did you tell Mr. Atkins that you had created

11   bids in the name of his company?

12        A.  Yes, I did tell him that.

13        Q.  And that it was done without his knowledge?

14        A.  I did tell him that, yes.

15        Q.  That's what you did, right?

16        A.  Yes, I did.

17        Q.  And the name of Mr. Atkin's company is A & A --

18   sorry, the Atkins Group, right?

19        A.  That is correct.

20        Q.  And what did Mr. Atkins tell you?

21        A.  He was not happy about the fact that the PI

22   showed at his house while he was not in the house.  So

23   he was not happy about it.

24        Q.  Was he upset that you had created bids for

25   Toshiba International Corporation in the name of his

```
 1    company without his knowledge?
 2         A.  I'm sure he was upset, but I didn't see his
 3    facial reaction to judge that.  He was on the phone
 4    talking to me.
 5         Q.  Anything else you discussed with Mr. Atkins?
 6         A.  No, that was it.
 7         Q.  Did you apologize to him?
 8         A.  I don't recall apologizing to him.  I did
 9    apologize to Kommy.
10         Q.  Kommy Azarpour?
11         A.  Yes, I did.
12         Q.  Okay.  What about Sam Kurian.  What --
13         A.  I --
14         Q.  Tell me about the conversation with Sam Kurian.
15         A.  I told him that I had used his company name as
16    complementary bids, and I -- and I signed his signature.
17         Q.  What's the name of Sam Kurian's company?
18         A.  Millenium Enterprise, Millenium Construction.
19         Q.  Could it be Millenium Performance?
20         A.  I don't know exactly, but I have to look.
21         Q.  Okay.  And did you make these complementary
22    bids without Sam Kurian's knowledge?
23         A.  Yes.
24         Q.  Did you apologize to Sam Kurian?
25         A.  I don't think so.
```

CONFIDENTIAL

Page 87

```
 1        Q.  Did you explain to him why you did those bids
 2   in his name?
 3        A.  No.  I didn't get into the details.
 4        Q.  Is Sam Kurian related to your sister Anne
 5   Kurian?
 6        A.  Yes.
 7        Q.  How are they related?
 8        A.  That's her husband.
 9        Q.  So Sam Kurian is your brother-in-law?
10        A.  Correct.
11        Q.  And what do you mean by complementary bids?
12        A.  Pablo requested us -- requested me rather, and
13   he -- on some of the bids, he would say, get me two
14   other bids.  I don't care where you get it from.  Just
15   get me two bids and -- and the number should be higher
16   than yours.
17        Q.  So you received this instruction from Pablo?
18        A.  Yes.
19        Q.  It wasn't your idea?
20        A.  It's not my idea.
21        Q.  He told you to get him two other bids?
22        A.  Yes.
23        Q.  Did you tell him that you were going to do the
24   bids yourself?
25        A.  No, I did not.
```

CONFIDENTIAL

Page 88

1    Q.  Did Pablo know that you were providing bids in

2    the names of other companies?

3    A.  I don't think he knew that I was the one

4    preparing it.

5    Q.  Okay.  How -- but you would send them to him,

6    right?

7    A.  That is correct.

8    Q.  How did you send him those bids?

9    A.  I would hand-deliver it to him.

10   Q.  Along with OnePoint's bid?

11   A.  Maybe at different times, whenever -- whenever

12   I prepared it.  Not all three at the same time.

13   Q.  Would you mail it to him?

14   A.  I would hand-carry it to him.  I would -- I

15   would not mail it to him.

16   Q.  You would hand-carry it to him and say, here

17   Pablo, here's a bid from Millenium Performance?

18   A.  Correct.

19   Q.  So Pablo knew that he was getting those

20   complementary bids from you?

21   A.  I don't know if he knew whether I was preparing

22   it or if I was seeking it directly from them.

23   Q.  But he knew that you were obtaining, for him,

24   bids in the names of other companies at a higher price

25   than your bid?

CONFIDENTIAL

Page 89

1      A.   That is correct.

2      Q.   And why did they have to be at a higher price

3  than what you bid?

4      A.   That I would get the job.

5      Q.   Right.   That's right.

6      A.   Right.

7      Q.   You understood that he had to present to

8  Toshiba management multiple bids for a project, right?

9      A.   I'm -- I'm assuming so, yes.   I'm -- I'm not

10  sure what their internal processing is for bids.

11      Q.   Well, I'm asking you about your understanding,

12  what you -- what you thought at the time.

13      A.   My understanding is, yeah, they probably

14  required one or two other bids.   Not on each and every

15  project but on some projects.

16      Q.   The more expensive ones?

17      A.   I would think generally as a rule, yes.

18      Q.   So you understood that these bids that you were

19  getting for Pablo at prices higher than yours were to

20  fool Toshiba management into thinking that there had

21  been a competitive bid process, right?

22      A.   I gave Pablo what he requested.   He told me to

23  get two other complementary bids, and I gave it to him.

24  How he used it, I -- I really don't know about their

25  internal decision-making process.

CONFIDENTIAL

Page 90

1      Q.  Did you ever lose a bid to one of the

2  complementary bidders that you provided to Pablo?

3      A.  I don't recall.  But there were several that

4  did not even materialize -- they decided not to do it.

5      Q.  Right.  For the ones that they decided to do

6  that you submitted a complementary bid, did you ever

7  lose?

8      A.  I don't think so.

9      Q.  Were you uncomfortable providing these bids?

10     A.  I thought it was strange because none of my

11 other clients have ever asked me to do this.  But then I

12 thought this might be the TIC's -- I don't know.  I -- I

13 was surprised, yes.

14     Q.  Do you know what the term "bid rigging" means?

15     A.  Not really.

16     Q.  Have you ever heard that term before?

17     A.  I've heard it after this lawsuit.  I -- I have

18 heard it in passing, yes.

19     Q.  What is your understanding of what bid rigging

20 is?

21          MR. DANIELS:  Objection.  Form.

22     A.  I don't know the exact meaning, so I'm not

23 going to -- I can't tell you what exactly it means.

24     Q.  (BY MR. FRIDMAN)  Do you understand what fake

25 bids are?

CONFIDENTIAL

Page 91

1            MR. DANIELS:  Objection.  Form.

2       A.  I don't know the exact definition of a fake

3  bid.

4       Q.  (BY MR. FRIDMAN)  Were the complementary bids

5  that you described coming from the Atkins Group or

6  Millenium -- were those real bids or fake bids?

7            MR. DANIELS:  Objection.  Form.

8       A.  They were -- they were bids.  I don't know if I

9  would classify them as complementary or fake.

10      Q.  (BY MR. FRIDMAN)  Well, they were bids to -- at

11  a higher price than OnePoint's bids, right?

12      A.  That's correct.

13      Q.  And they were designed to allow OnePoint to be

14  the lowest bidder, right?

15      A.  I'm not sure if it was designed.  They asked me

16  for two more bids at a slightly higher price, and I

17  complied with their requirements.

18      Q.  When you say "their," do you mean

19  Pablo D'Agostino?

20      A.  To me, TIC and Pablo is the same.  He is the --

21  he is the officer of the company, and I -- they are the

22  same to me.

23      Q.  Did you ever discuss your complementary bids

24  with anyone at TIC other than Pablo D'Agostino?

25      A.  No, I did not.

CONFIDENTIAL

Page 92

1      Q.  Why not?

2      A.  I -- I just assumed that this is the norm for

3  TIC, and I just continued to comply with their

4  requirements.

5      Q.  Have you ever heard of any other company asking

6  for complementary bids prepared by one of the bidders?

7      A.  Aside from TIC, no other companies I've heard

8  that's -- do that.

9      Q.  So did you ever complain to Pablo D'Agostino's

10  supervisor that Pablo was asking you to submit bids in

11  the names of other companies at higher prices?

12      A.  No, I did not.

13      Q.  Did you ever complain to the president of

14  Toshiba International Corporation?

15      A.  No, I did not.

16      Q.  Why did you keep it a secret?

17      A.  It was not a secret.  Pablo made it very, very

18  clear that no one goes past him.  He is very adamant

19  about us talking to -- to his immediate bosses, forget

20  about talking to the president.  So that was his

21  requirement -- that you don't go past me.  I am -- I am

22  the face of Toshiba, and you deal with me.

23      Q.  So were you concerned that if you went past

24  Pablo, you might stop doing business with TIC?

25      A.  I just didn't want to rock the boat.  If that

CONFIDENTIAL

Page 93

1   was -- that's what he told me to do, I followed his

2   instruction.  He said to not talk with anybody else.

3   Not -- he was very protective about us -- anybody

4   talking to anybody above him.

5        Q.  Tell me the process you followed to prepare

6   these bids -- or complementary bids, as you call them --

7   from the Atkins Group and Millenium.

8        A.  Well, I would first walk the project.  I would

9   look at the scope of work.  I would prepare my bid

10  first.  And in their cases, I would -- I would make up a

11  -- a Word document and put in the information that's put

12  in, into that project and give it to him.

13       Q.  So you developed a template for the Atkins

14  Group and Millenium?

15       A.  It was just something that I just made on -- on

16  a Word document, yes.

17       Q.  And what -- what computer did you use to make

18  these documents?

19       A.  My personal computer, I guess.

20       Q.  What is that?

21       A.  The -- the letterhead -- well, I take that

22  back.  The letterhead -- in some -- some cases, I just

23  did it on the Word document.  In some cases, I actually

24  went to a printing place, and I got them to print me a

25  letterhead.

1    Q.  You got them to print you a letterhead?

2    A.  Correct.

3    Q.  What printing place would you go to?

4    A.  I don't recall where it was.  It could be --

5    Q.  So --

6    A.  -- FastSigns -- FastSigns or Signarama.

7    Q.  Do you have -- do you still have these Word

8    documents?

9    A.  No, I don't.

10   Q.  Why not?

11   A.  Well, the Word documents was strictly the --

12   the scope of work, which I would just print it onto

13   the -- onto the letterhead.

14   Q.  And how would you figure out what higher price

15   to put on the letterhead?

16   A.  I would just come up with a random

17   percentage -- 10, 15 percent, more, 20 percent.

18              MR. FRIDMAN:  So we've been going for about

19   another hour.  Do -- do you want to take a break or keep

20   going?

21              MR. DANIELS:  It's lunchtime where some of

22   you guys are.  What do you want to do?  We're going to

23   just have lunch brought in up here so we can kind of

24   break whenever, but -- I mean -- I think we're good to

25   go for at least another 15 or 20 minutes if you want to

CONFIDENTIAL

Page 95

1    do that.

2                   MR. FRIDMAN:  All right.  That's fine.  We

3    -- we can keep going.

4                   MR. DANIELS:  Why don't we go until 12:45

5    your time, 11:45 here --

6                   MR. FRIDMAN:  All right.

7                   MR. DANIELS:  -- and break then.

8         Q.  (BY MR. FRIDMAN)  All right.  So, Mr. Joseph,

9    you mentioned that you would hand-deliver these

10   complementary bids from the Atkins Group and Millenium

11   to Pablo, right?

12        A.  Yes.

13        Q.  Why wouldn't you email them to him?

14        A.  Because he wanted me to hand-deliver it to him.

15        Q.  Were those his instructions?

16        A.  That is correct.

17        Q.  And what was your understanding of why he

18   wanted you to hand-deliver them to him?

19        A.  I have no idea what his understanding was.

20        Q.  I'm asking for your understanding.

21             Why did you think he wanted you to

22   hand-deliver them and not give him -- not email it to

23   him?

24        A.  I don't know.

25        Q.  Did you think that it was so that there would

1  not be an electronic trail that these complementary bids

2  were coming from you?

3      A.  I don't know.

4      Q.  I'm asking you if -- if you thought that.  Is

5  that what you thought?

6      A.  If I thought, that would be speculation.

7      Q.  Well, not -- not if it's what you thought.  I'm

8  only asking what you thought at the time.

9          What did -- why did you think Pablo asked

10 you to hand-deliver them instead of emailing it to him?

11     A.  I really don't know.

12     Q.  You didn't think about it at all?

13     A.  I didn't think about it.

14     Q.  Did you think that it was probably better that

15 way for you and Pablo so that there wouldn't be an

16 electronic mail trail that you had sent these documents

17 to Pablo?

18         MR. DANIELS:  Objection.  Form.

19         I'm sorry.  Madame Court Reporter, I

20 objected to that question.

21     Q.  (BY MR. FRIDMAN)  You can answer.

22         MR. DANIELS:  Yeah, you can answer.

23     A.  He asked me to hand-deliver it, and I

24 hand-delivered it to him.

25     Q.  (BY MR. FRIDMAN)  All right.  Was there

1    anything else about the conversation with Sam Kurian

2    about the lawsuit that you remember?

3        A.  Not really.

4        Q.  Was he disappointed by what you told him?

5        A.  I believe so.  But I couldn't -- I -- I don't

6    know what was going on through his mind.

7        Q.  Did you apologize to him?

8        A.  No, I did not.

9        Q.  Did Sam Kurian have any knowledge about what

10   you were doing -- using the name of his company in

11   preparing complementary bids for Toshiba?

12       A.  No, he did not.

13       Q.  You also mentioned that you spoke to Kommy

14   Azarpour about this lawsuit, right?

15       A.  Right.

16       Q.  Tell me about your conversation with Mr.

17   Azarpour.

18       A.  I told him about the lawsuit and the meetings

19   that we had in December.  And I -- I did tell him that I

20   was sorry for what I did, and he was obviously not

21   happy.  And he said you shouldn't have done this thing.

22       Q.  And what did you tell him that you did?

23       A.  I told him I created fake bids on his company

24   letterhead.

25       Q.  And what company's letterhead did you use to

1    create these fake bids?

2        A.   In his case, it was A & A Premier.

3        Q.   And how did Mr. Azarpour react to you telling

4    him this?

5        A.   He was disappointed.

6        Q.   Was he mad at you?

7        A.   He was disappointed.

8        Q.   Did you tell Mr. Azarpour how many fake bids

9    you created in the name of A & A Premier Builders?

10       A.   I don't recall telling him that.

11       Q.   Do you recall how many fake bids you created in

12   the name of A & A Premier Builders that you submitted to

13   Pablo D'Agostino?

14       A.   I don't recall that number.

15       Q.   More than ten?

16       A.   Yes.

17       Q.   More than 20?

18       A.   I don't know.

19       Q.   30?

20       A.   I really don't know.

21       Q.   And for A & A Premier Builders, did you use the

22   same method that you described for Millenium and the

23   Atkins Group?

24       A.   Yes.

25       Q.   You had a template in Word?

CONFIDENTIAL

Page 99

1          A.  I didn't have a template in Word, I had a

2     letterhead that I got printed.  And I would type it on

3     Word and then print it on the letterhead.

4          Q.  Where did you get the letterhead printed?

5          A.  I don't recall from where I did it.

6          Q.  Does Mr. Azarpour have any other companies?

7          A.  Yes, he does.

8          Q.  What -- what are Mr. Azarpour's other

9     companies?

10         A.  It's ERC.

11         Q.  What is ERC?

12         A.  Environmental Resource Consultant.  It's an

13    abatement company.

14         Q.  What is an abatement company?

15         A.  They do asbestos abatement or any environmental

16    issues in industrial buildings.

17         Q.  Did you create fake bids in the name of ERC?

18         A.  Yes, I did.

19         Q.  How many fake bids did you create in the name

20    of ERC?

21         A.  No more than two or three.

22         Q.  Did you tell Mr. Azarpour that you had done

23    that?

24         A.  Yes, I did.

25         Q.  So so far, we have four companies that you have

CONFIDENTIAL

Page 100

1  told us you created fake bids for, right?

2      A.  Correct.

3      Q.  Are there any others?

4      A.  None that I recall.

5      Q.  You said you spoke to Brad Jackson as well,

6  right?

7      A.  Yes.

8      Q.  Who is Brad Jackson?

9      A.  He's the owner of Electrical & Mechanical

10  Solutions.

11      Q.  What is Electrical & Mechanical Solutions?

12      A.  It's an electrical company.

13      Q.  Do they also go by the initials "EMS"?

14      A.  Correct.

15      Q.  And what relationship do you have with Brad

16  Jackson?

17      A.  I've used him for electrical work, and I've

18  also used him to supply me with journeymen electricians.

19      Q.  Did you use him to provide you with journeymen

20  electricians for projects at TIC?

21      A.  I believe so.  Maybe on 1 or 2 project but

22  mostly for the -- for the journeymen electrician.

23      Q.  What is the distinction?

24      A.  Well, if it's a project, then it's a turnkey

25  project that involves the -- the construction, supplying

Page 101

1    the materials, supplying the labor, supplying all the

2    equipments.  It's a whole package.  Whereas supplying

3    labor would be I'm just supplying them labor, and then

4    TIC uses them at their discretion.

5         Q.  I understand.

6             Tell me about your conversation with

7    Brad Jackson.

8         A.  I told him about the investigation and about

9    the -- the meeting with you in December, and I told him

10   I am -- I'm not worried about it because you did good

11   work for us.  You supplied us the labor.  And I told him

12   that -- that Pablo is being sued, and I was not sued at

13   that point.

14        Q.  Were you concerned that you were going to be

15   sued?

16        A.  I wasn't thinking about that at that time.

17        Q.  So why did you reach out to him to talk about

18   the lawsuit against Pablo?

19        A.  If I'm not mistaken, he -- he called me to tell

20   me that -- that Pat Medacki [phonetic] called him, and

21   that's what initiated the conversation.  Pat Medacki

22   called him, and then Pat directed the phone to you, and

23   you'd started questioning him, and then he said that,

24   I'm working under OnePoint, and I'm going to be talking

25   to OnePoint.  I -- I believe, so he -- he called me, and

CONFIDENTIAL

Page 102

1  that's when this whole conversation started.

2       Q.  I see.

3            Did you talk to him about how much you were

4  billing Toshiba for journeymen electricians that he

5  provided?

6       A.  No.  I did not tell him the number.

7       Q.  Did you talk to him about the fake bids?

8       A.  No.

9       Q.  Did you ever create any fake bids from

10 Brad Jackson?

11      A.  No.

12      Q.  Or EMS?

13      A.  No.

14      Q.  All right.  Is there anyone else that you've

15 discussed this lawsuit with, other than your lawyers and

16 your wife?

17      A.  I mentioned it to my brother.

18      Q.  What is your brother's name?

19      A.  Reggie Joseph.

20      Q.  Okay.  Who else?

21      A.  Well, obviously, Millenium and Jay -- I don't

22 know if Jay Atkins know about it.  I haven't talked

23 to -- Kommy obviously knows about it now that he was

24 deposed.

25      Q.  Right.  We've talked about Kommy.

CONFIDENTIAL

Page 103

1           Did you also talk to his business partner,

2     Kambiz Moayedi?

3           A.  I did not.

4           Q.  All right.  So you spoke to Reggie Joseph.

5     Anyone else?

6           A.  I'm trying to think.

7           Q.  Did you ever talk to Pablo?

8           A.  No.  He -- I think he was dead by the time I

9     got sued, I think.  I did talk to him after he was fired

10    from them.

11          Q.  Okay.  All right.  So on the question of who

12    did you talk to about the lawsuit against your --

13    yourself, who else?

14          A.  I talked to Anne about it, about the lawsuit.

15          Q.  Uh-huh.

16          A.  And my office staff -- they have a rough idea

17    that something is going on.  So there's two employees,

18    they know that I'm going through this thing.

19          Q.  How many people do you have working for you

20    right now?

21          A.  In the office, there is just three people.

22          Q.  And do you have any other direct employees?

23          A.  Yes.  I do have -- I believe we gave you the

24    whole list.  But if you want me to give you the list, I

25    can -- I can give you the names again.

CONFIDENTIAL

Page 104

1       Q.   It wasn't clear from the list who is still

2    working for you and who isn't.

3       A.   Okay.

4       Q.   So if you can tell me who is working for

5    OnePoint right now as a direct employee?

6       A.   Yeah, there is Mary Alar.   Susan.

7       Q.   What is Susan's last name?

8       A.   Bautista?

9       Q.   Uh-huh.

10      A.   Fredrico Lara [phonetic].

11      Q.   Uh-huh.

12      A.   My wife is on the payroll, Regina Joseph.

13      Q.   What does she do specifically for the company?

14      A.   And Gabriel Perez.

15      Q.   Mm-hmm.

16      A.   And that's it.

17      Q.   Okay.

18      A.   And myself.

19      Q.   Right.   You're an employee, as well?

20      A.   Correct.

21      Q.   Is your company a corporation or an S Corp?

22      A.   It's an S Corp.

23      Q.   Okay.   And what is your wife's name?

24      A.   Regina Joseph.

25      Q.   Okay.   And what have you told the employees

CONFIDENTIAL

Page 105

1   that aren't related to you about this case?

2        A.  Well, Fredrico was already subpoenaed, I guess.

3   So he -- I had to tell him that I'm being -- I said I

4   cannot -- based on my counsel's advice, I said I can't

5   discuss anything further, but there is a possibility

6   that you will have to do a deposition.  I told that to

7   Fredrico for sure.  And Mary and Susan knows they --

8   that -- that something is going on.  So I just told them

9   that I -- I am being sued by Toshiba.

10       Q.  Okay.

11       A.  I did not explain -- I did not say anything to

12  Gabriel.

13       Q.  All right.  What was the last fake bid that you

14  remember preparing?

15            MR. DANIELS:  Counsel, can I clarify?  Are

16  you asking for the date or the day of the project?

17            MR. FRIDMAN:  I'm asking for the when.

18       Q.  (BY MR. FRIDMAN)  When was the last fake bid

19  you prepared?

20       A.  I'm going to guess it was 2011, maybe 2012.

21       Q.  You kept bidding on Toshiba projects after

22  2012, right?

23       A.  Yes.

24       Q.  And for any of those bids, did you prepare

25  complementary bids as well?

CONFIDENTIAL

Page 106

1      A.  Not that I know of.

2      Q.  So if we see an A & A Premier bid, is that from

3  you?

4      A.  One is from me, and one is not from me.

5      Q.  Okay.  Which one is from you?

6      A.  I don't have it in front of me, so I can't -- I

7  don't know which one it is.

8      Q.  Okay.  I will show them to you --

9      A.  Okay.

10     Q.  -- and we can go through that.

11          I'm going to put an exhibit on the screen

12  for you.  It is a -- again, it -- it's Exhibit 37, the

13  interrogatory answers.

14          Can you see that?

15     A.  Yes, I can see that.

16     Q.  Is it big enough for you?

17     A.  Yes, it is.

18     Q.  Okay.  So we were talking about all the cash

19  that you had given to Pablo, the trips that you had paid

20  for, but there are a couple of things that we still

21  haven't reviewed.  So I'd like to go over that with you

22  right now, all right?

23     A.  Okay.

24     Q.  So we're looking at Interrogatory No. 3 -- your

25  response to Interrogatory No. 3 -- and I want to direct

Page 107

1    your attention to the paragraph that starts where you

2    write (as read):  "Prior to June 2014, Mr. D'Agostino

3    would sporadically demand that OnePoint pay his Bank of

4    America credit card bills.  Mr. D'Agostino made it clear

5    to Mr. Joseph that if OnePoint did not make payments to

6    his credit card account, OnePoint would lose TIC's

7    business.  OnePoint will produce documents reflecting

8    payments it made to Bank of America due to the -- the

9    demands of Mr. D'Agostino"; is that correct?

10        A.  That is correct.

11        Q.  So tell me about OnePoint paying Pablo

12   D'Agostino's Bank of America credit card bills.

13        A.  He would write his -- his credit card account

14   number and -- and give it to me on a piece of paper, and

15   he would ask me -- he'd say, can you -- can you pay X

16   amount of dollars on this credit card account?

17        Q.  And how would you send the payment?

18        A.  I would write a check, and I would go in person

19   and pay it at Bank of America.

20        Q.  Would the check be a personal check from you,

21   Mr. Joseph, or from OnePoint?

22        A.  It's a OnePoint check.

23        Q.  And tell me the amount that you paid

24   Mr. D'Agostino's credit card bills for.

25        A.  I don't recall all those numbers right now.

Page 108

1      Q.  I just want to get an idea of the range of
2  amounts that you recall paying.
3      A.  Anywhere from $4,000 to $8,000.
4      Q.  From $4,000 to $8,000?
5      A.  Correct.
6      Q.  Was it ever more than $8,000?
7      A.  Possible.  I -- I don't -- I don't recall.
8      Q.  How often would you pay Mr. D'Agostino's credit
9  card bills from Bank of America?
10     A.  Whenever he told me to do it.  I -- I believe I
11  did it about 8 or 9 times.
12     Q.  So 8 or 9 times between 4,000 and $8,000; is
13  that fair?
14     A.  That's fair.
15     Q.  So between 36,000 and $72,000; is that right?
16     A.  Total?
17     Q.  Yes.
18     A.  It's more than that.
19     Q.  You paid more than that?
20     A.  Yes.
21     Q.  Okay.  Tell me what you think you paid for
22  Mr. D'Agostino's Bank of America credit card bills.
23     A.  I don't know the exact number, but it's more
24  than the number that you just give.
25     Q.  It's more than $100,000?

CONFIDENTIAL

Page 109

1        A.   Possible.

2        Q.   More than 150,000?

3        A.   I don't -- I don't know.

4        Q.   What's -- what's your best estimate of the

5   range of amounts?

6        A.   Under 200,000.

7        Q.   So somewhere between 100,000 and $200,000 worth

8   of Pablo D'Agostino's credit card bills were paid by

9   OnePoint; is that right?

10       A.   Based on my recollection, yes.

11   ███ ████████████████████████████████

███ ██████████████████████████

███ ███ █████████████████████████ ██████

███ █████████████████████ ████████████████

███ ███ █████████████████████████████████████

███ ████████████████████████

███ ███ ████████████████████████████████████

███ ██████████████████████

19       Q.   Okay.  Did you tell your accountant that you

20   were paying the expenses of Pablo D'Agostino?

21       A.   No, I did not.

22       Q.   So how can we identify the checks that you

23   wrote to Pablo D'Agostino's credit card?

24       A.   Because it is made to Bank of America.

25       Q.   Do you have it -- go ahead.

CONFIDENTIAL

Page 110

1      A.  I don't have an account -- I don't have an
2  account with Bank of America.
3      Q.  You don't have an account anymore?
4      A.  Well, I do have an account now, just last year,
5  but back then I did not have an account with Bank of
6  America.
7      Q.  I see.  You -- you weren't paying OnePoint's
8  bills, you were paying Pablo's bills with -- at Bank of
9  America?
10      A.  I was paying -- he -- his credit card was with
11  Bank of America, and I was writing with my company Wells
12  Fargo checks.
13      Q.  Right.  So your company account was at Wells
14  Fargo?
15      A.  Yes.
16      Q.  All right.  And every time, you would
17  personally go to Bank of America and deposit a check to
18  pay Mr. D'Agostino's credit card bills?
19      A.  Yes.
20      Q.  Were you doing this for him every month?
21      A.  There was no consistency.  It could have been
22  every two months, every three months, every month.
23  There was no pattern.
24      Q.  Okay.  And from what period of time did you do
25  this?

CONFIDENTIAL

Page 111

1    A.  I don't know the exact period, but I can give

2  you a broad range if you want me to.

3    Q.  Sure.  Give me a broad range as best you can.

4    A.  2011 to 2013 maybe.

5    Q.  To 2013?

6    A.  Possibly.

7    Q.  Right.

8        Because I -- I noticed in your answer that

9  you write (as read):  "Prior to June 2014."

10       So what -- what happened in June 2014?

11   A.  He stopped asking me to pay for his credit

12  cards.

13   Q.  And then -- so you stopped paying the credit

14  cards when he stopped asking?

15   A.  Correct.

16   Q.  And how do you pinpoint it to June 2014?  How

17  do you know that that's the month he stopped asking?

18   A.  In reading this, I must have found the last

19  check that was written to Bank of America, and that's

20  how I came up with that date.

21   Q.  You found the last check?

22   A.  Right.

23   Q.  I see.

24       Can you describe the -- the document to me?

25   A.  What document?

CONFIDENTIAL

Page 112

1      Q.  The -- the last check.

2           Or do you have a physical copy of the check

3  that you wrote?

4      A.  I don't have it with me.  Yeah.  There is -- I

5  mean, there's -- there's probably an image of the check

6  with me.

7           MR. FRIDMAN:  Okay.  Has that been produced

8  to us, Mr. Daniels?

9           MR. DANIELS:  I am the last person to

10  answer that question, but I will find out.

11          MR. FRIDMAN:  Okay.  Please let us know.

12          I -- I don't -- my -- my cocounsel may

13  correct me, but I -- I don't remember seeing that.

14          MR. DANIELS:  Yeah.  I know it's in our

15  response to the interrogatory.  We say we'll produce the

16  documents reflecting payments.  I don't know.

17          MR. FRIDMAN:  Right.  I didn't --

18          MR. DANIELS:  And, Lauren -- Ms. Harris is

19  telling me we did produce the checks, but we'll -- I'll

20  try to find out where that is in the production.

21          By the way, it's -- it's past 11:45, almost

22  noon.  Whenever you get to a logical stopping point,

23  let's break for lunch.

24          MR. FRIDMAN:  Okay.  I'm -- I'm comfortable

25  at breaking at this point in time.

CONFIDENTIAL

                                        Page 113

1              MR. DANIELS:  Okay.

2              MR. FRIDMAN:  So let's -- let's go off the

3    record, and how long of a break would you like?

4              THE VIDEOGRAPHER:  Excuse me, sir.  This is

5    off the record.

6              This is now the end of Video 2 of

7    Abraham Joseph.  We're off the record at approximately

8    11:52.

9              (A break was taken from 11:52 a.m. to

10   12:41 p.m.)

11             THE VIDEOGRAPHER:  Now, back on the record

12   with Video 3 with Abraham Joseph.  The time is

13   approximately 12:42.

14        Q.  (BY MR. FRIDMAN)  All right.  Mr. Joseph, when

15   we left off, we were talking about the payments that you

16   had made to Pablo D'Agostino, including the ones that

17   you had identified in your interrogatory responses.  So

18   I want to put your interrogatory responses back up on

19   the screen.  Just give me a moment.

20             MR. DANIELS:  That's No. 37?

21             MR. FRIDMAN:  This No. 37, yes.

22        Q.  (BY MR. FRIDMAN)  Can you see Exhibit 37,

23   Mr. Joseph?

24        A.  Yes, sir.

25        Q.  All right.  I'm going back to Interrogatory No.

CONFIDENTIAL

Page 114

1  3.  We had talked about the payment of Pablo

2  D'Agostino's Bank of America credit card bills.  Other

3  than Bank of America credit card bills, did you ever pay

4  other credit cards for Pablo D'Agostino?

5      A.  I did not.

6      Q.  All right.  Then let's go to the paragraph

7  above, the one about the Bank of America credit card

8  bills where you wrote (as read):  "Attached as Exhibit B

9  to TIC's interrogatories are two Home Depot receipts,

10  one dated April 20th, 2018, and the other July 5th,

11  2018."

12            Do you see that?

13      A.  Yes.

14      Q.  In the -- in the document?

15      A.  Yes.

16      Q.  Okay.  Do you recall those credit card

17  receipts?

18      A.  Yes, I do.

19      Q.  All right.  So you write (as read):  "OnePoint,

20  Inc.'s Home Depot credit card with the name of Roberto

21  Carlos on it, paid for the items on the receipt.  To the

22  best of Mr. Joseph's recollection, Mr. Carlos was

23  Mr. D'Agostino's handyman who performed services on

24  Mr. D'Agostino's houses.

25            "Mr. D'Agostino's demanded that OnePoint

Page 115

1    pay for the home improvement purchases made at Home

2    Depot in order for OnePoint to keep receiving TIC

3    business, and that OnePoint will provide the Home Depot

4    credit card statements for Mr. Carlos' card."

5              Do you see that?

6    A.  Yes, I do.

7    Q.  Is that correct?

8    A.  Yes.

9    Q.  So explain to me the circumstances surrounding

10   OnePoint obtaining a Home Depot credit card in the name

11   Mr. D'Agostino's handyman, Roberto Carlos.

12   A.  Pablo asked me if we had any paint or other

13   materials for his -- for his house, and I told him I

14   don't have any.  So he said, Can you go and buy me some

15   materials for me that I need for my house?  I said, No,

16   I can't do that.  So he said he has a handyman.  He said

17   the handyman can go buy it.  Can you issue him with a

18   credit card, and I did.

19   Q.  Okay.  When did you issue the credit card to

20   the handyman?

21   A.  I don't know the exact date when I issued it.

22   Q.  What is your best approximation?

23   A.  Maybe a year or so ago.

24   Q.  So was it in -- in 2018?

25   A.  I really don't -- I don't recall the exact

CONFIDENTIAL

Page 116

1    date.

2        Q.  Okay.  Well, let -- let me show you the credit

3    card receipts.  I'm going to go back to Exhibit 48.

4                All right.  Exhibit 48 is TIC's first set

5    of interrogatories to OnePoint.

6                Do you see that?

7        A.  Yes, I do.

8        Q.  All right.  If we go to Exhibit B, we have two

9    Home Depot credit card receipts that I'm going to zoom

10   in here for you.  The date on the first receipt is

11   April 20th, 2018, right?

12       A.  Right.

13       Q.  You see the total is $725.96, right?

14       A.  Right.

15       Q.  You see it says, under that amount "OnePoint,

16   Inc."?

17       A.  Yes.

18       Q.  And under OnePoint, Inc. it says "Roberto

19   Carlos"?

20       A.  Yes.

21       Q.  Is Roberto Carlos Pablo D'Agostino's handyman?

22       A.  Yes.

23       Q.  So at least as early as April 20th, 2018,

24   Mr. Carlos was carrying a OnePoint credit card, right?

25       A.  Yes.

CONFIDENTIAL

Page 117

1       Q.  Do you know how long before this date he first

2  got it?

3       A.  I'm going to say maybe a -- maybe a year before

4  that.

5       Q.  Maybe in 2017?

6       A.  '17, yes.

7       Q.  And then the second receipt on the next page is

8  dated July 5th, 2018, for $120.

9            Do you see that?

10      A.  Yes, I do.

11      Q.  And, again, it says "OnePoint, Inc.," and under

12  that it says "Roberto Carlos," right?

13      A.  Yes.

14      Q.  And your understanding is that these were

15  purchases for the properties that Pablo D'Agostino

16  owned; is that right?

17      A.  That's what he told me, yes.

18      Q.  Do you know how much, in terms of Home Depot

19  purchases, OnePoint paid for Roberto Carlos,

20  Pablo D'Agostino's --

21      A.  No.  I don't know -- I don't know.

22      Q.  You see a little bit further down under

23  Roberto Carlos, it says "2018 Pro XTRA spend includes,"

24  and it says "$13,868."

25            Do you see that?

CONFIDENTIAL

Page 118

1      A.  I see that.

2      Q.  That appears to me to be a total spend for 2018

3  up to that point for Mr. Carlos, right?

4      A.  I'm not sure about that because there are other

5  employees with credit cards also.  So the Pro account

6  could be all lumped together.

7      Q.  Right.

8          I -- I agree with you.  I -- it's -- it's

9  unclear from this receipt --

10     A.  Right.

11     Q.  -- whether it is just for Mr. Carlos or for

12  OnePoint as an entity.

13     A.  Right.

14     Q.  How can we figure that out?

15     A.  I have no idea how to figure it out because

16  even -- I've got -- well, I used to have a Home Depot

17  card.  I don't know if I still have it, but -- I don't

18  know what the breakdown is between Carlos and my

19  existing two or three employees who have the same card.

20     Q.  Have you provided us with all the credit card

21  statements for Home Depot?

22     A.  Not that I know of.  I don't -- I don't recall.

23          MR. DANIELS:  We don't think so, Counsel.

24          MR. FRIDMAN:  Okay.

25     Q.  (BY MR. FRIDMAN)  Do you have those available?

CONFIDENTIAL

Page 119

1       A.  I'm not sure.

2       Q.  All right.  And do you have any sense of how

3  much in Home Depot expenses were paid for Pablo's

4  benefit by OnePoint?

5       A.  I don't know the answer to that.

6       Q.  Do you have a sense of whether it's thousands

7  of dollars or more?

8       A.  I don't know.

9       Q.  Was this credit card ever cancelled by

10  OnePoint?

11       A.  Frankly, I -- I don't know.

12  ████  █████████████████████████████

████  █████████████████████████████

████  ████  ███████████████████████

████  ███████████████████████  ███████████████

████  ████████

17       Q.  So you provided this credit card so

18  Pablo D'Agostino would keep sending you TIC business,

19  right?

20       A.  That's not true.

21       Q.  Then why did you provide this credit card for

22  Pablo D'Agostino to use?

23       A.  He asked me to get a credit card for

24  Mr. Carlos.

25       Q.  And you did as he asked?

CONFIDENTIAL

Page 120

1      A.  I did what he told me to do.

2      Q.  And during this period of time we've discussed

3  before, you were providing journeymen electricians to

4  TIC, and earning at least hundreds of thousands of

5  dollars, right?

6      A.  I was providing journeymen electricians.  I

7  don't know the exact number of what the total was for

8  journeymen electricians.

9      Q.  So when Pablo asked you for a Home Depot credit

10 card from OnePoint, you provided it so that you would

11 keep that business, right?

12     A.  I provided it because he asked me to provide

13 it.

14     Q.  Okay.  Did you keep the business?

15     A.  In 2018, I was still there.

16     Q.  And by still there, you mean at TIC?

17     A.  I was still at -- I was still at TIC.

18     Q.  And, you know, in your interrogatory responses,

19 as we reviewed, you wrote (as read):  "Mr. D'Agostino

20 demanded that OnePoint pay for the Home Depot -- home

21 improvement purchases made at Home Depot in order for

22 OnePoint to keep receiving TIC's business," right?

23     A.  I continued to stay there, yes.

24     Q.  So is that an example of a quid pro quo?

25     A.  I don't think so.

CONFIDENTIAL

Page 121

1    Q.  What do you consider that?

2    A.  I consider that as marketing expenses for us to

3    continue doing business with Toshiba and staying there.

4    Q.  Do you consider providing Pablo D'Agostino an

5    envelope with $8,000 in cash a marketing expense?

6    A.  That's what he asked me, and that's what I -- I

7    don't know about the $8,000.  If he asked me for cash, I

8    -- I did give it to him, and I consider that to be part

9    of a marketing expense and a requirement by TIC and

10   Pablo.

11   Q.  All right.

12          (Exhibit 105 marked.)

13          MR. FRIDMAN:  So I'm just going to ask my

14   team, can you upload Exhibit 105?  Because that has not

15   gone through for me.

16          MR. SHARP:  Yes, we'll do that.

17   Q.  (BY MR. FRIDMAN)  Other than what we have

18   already discussed today, which includes the -- about

19   $100,000 paid to Pablo in payroll from 2007 to 2008, the

20   below market value sale of a truck to Pablo in 2009,

21   providing Pablo thousands of dollars in cash all the way

22   up through 2019, paying Pablo's credit card bills from

23   Bank of America up through 2014 to the tune of a couple

24   of hundred thousand dollars, and these Home Depot credit

25   cards, and the trips, what else of value did you give to

Page 122

1    Pablo D'Agostino?

2         A.   I don't recall anything else that I gave to

3    him.

4         Q.   And did you ever give anything of value to his

5    friends or family?

6         A.   Absolutely not.

7         Q.   To Melissa D'Agostino, his ex-wife?

8         A.   I did not.  I did not.

9         Q.   To Ashley Tucker?

10        A.   I did not.

11        Q.   So you started providing payments to

12   Pablo D'Agostino within months of OnePoint starting to

13   do work for TIC in about August of 2007, right?

14        A.   I don't know exactly when I started it.  I -- I

15   don't know exactly when I started working there and when

16   I -- when I gave the payment.  I don't know the exact --

17   within -- whether it was within months or a year, I

18   don't know the exact number of months.

19        Q.   But what we've discussed today so far is that

20   as of -- about August of 2007, you had Pablo D'Agostino

21   on your payroll, right?

22        A.   That is correct.

23        Q.   And what we see is all the way through to 2019,

24   you are continuously providing Pablo D'Agostino with

25   cash and other benefits, right?

CONFIDENTIAL

Page 123

1    A.  At different intervals, not continuously.  At

2    different intervals.

3    Q.  Right.

4           But spanning that entire period of time,

5    right?

6    A.  That is correct.

7    Q.  And during that entire period of time up

8    from 2007 to 2019, you were doing work for TIC, right?

9    A.  Yes, I was working there, yes.

10   Q.  And Pablo D'Agostino kept giving you work,

11   right?

12   A.  Not all the time.  He -- well, he didn't give

13   me the work.  I -- I bid on the jobs, and I got the

14   jobs.

15   Q.  Right.

16          He also gave you the journeymen

17   electricians, right?

18          MR. DANIELS:  Objection to form.

19   A.  I was the only one who was -- who was asked to

20   bid on the journeymen electricians.  No one else was

21   called in.

22   Q.  (BY MR. FRIDMAN)  That was your thing?

23   A.  I'm not understanding what you mean.

24   Q.  That's what --

25   A.  Yeah, it was just me, yeah.

CONFIDENTIAL

Page 124

1      Q.  That was just you, right?

2      A.  That was just me.  Yes, sir.

3      Q.  And was that from 2007 all the way through

4  September 2019?

5      A.  That is correct.

6      Q.  So during that period of time, you always were

7  billing TIC for providing journeymen electricians,

8  right?

9      A.  Yes, I was.

10      Q.  That was a constant, right?

11      A.  Yes.

12      Q.  And your payments to Pablo D'Agostino ceased

13  when he was terminated as an employee of Toshiba, right?

14      A.  It did not -- it did not cease the day he was

15  terminated.  I think it ceased even before that.  I

16  don't know when is the last time I -- I gave him

17  anything.

18      Q.  All right.  Let me show you Exhibit 105.  I'm

19  going to share my screen with you now.  This is a

20  document that you produced through OnePoint,

21  Exhibit 105, Bates No. OnePoint000387, and it is a

22  document titled "Agreement for Services or Work

23  Performed on Premises."  And --

24      A.  Can you zoom then -- can you zoom that --

25      Q.  Yes.

CONFIDENTIAL

Page 125

1          A.  -- a little bit, please?

2          Q.  Is that better?

3          A.  Okay.  Yes, it's much better, yeah.

4          Q.  And it seems to relate to a PEP restrooms

5     project?

6          A.  Yes.

7          Q.  Do you recall this project?

8          A.  Vaguely.

9          Q.  Okay.  And this is a document that came out of

10    your files because it has your Bates number on it.

11         A.  Uh-huh.

12         Q.  Do you see that?

13         A.  Yes.

14         Q.  So the first part of this document, "Agreement

15    for Services or Work Performed on Premises," is a

16    contract between OnePoint and Toshiba International

17    Corporation.

18              Do you see that?

19         A.  Yes.

20         Q.  Do you see on Section 4 of that contract, it

21    says (as read):  "Compliance with law.  In the

22    performance of the work, the contractor shall comply and

23    satisfy all the requirements of all applicable laws,

24    regulations, standards, and codes, including, without

25    limitation, federal and state occupational safety and

CONFIDENTIAL

Page 126

1  health laws and environmental laws."

2              Do you see that?

3      A.  Yes.

4      Q.  Did you agree to do that?

5      A.  I haven't signed this piece of document, so...

6      Q.  I'm going to scroll through the documents.

7      A.  Okay.

8      Q.  It's going to take a minute to catch up and

9  load.

10              All right.  So I'm now on Page 7 of 9 of

11  this agreement, and there's a signature for Toshiba

12  International Corporation.  It appears to be Michael

13  Ayers.

14              Do you see that?

15      A.  Yes.

16      Q.  And is that your signature under OnePoint?

17      A.  Yes.

18      Q.  And the printed name on there is Abraham

19  Joseph, right?

20      A.  Yes.

21      Q.  Signed as president?

22      A.  Right.

23      Q.  On August 17th, 2007, right?

24      A.  Yes.

25      Q.  So this was close to the time that you started

CONFIDENTIAL

Page 127

1    working for Toshiba, right?

2        A.   Possible.   I thought it was before that, but

3    maybe that -- I don't know.

4        Q.   You started working in -- at Toshiba in 2007,

5    right?

6        A.   That is correct.

7        Q.   This is also close to the time that you first

8    placed Pablo D'Agostino on OnePoint's payroll, right?

9        A.   That's about right, yes.

10       Q.   All right.   So I'm going to scroll down the

11   document.   Attachment A appears to have your bid for the

12   total sum of about $124,911.

13               Do you see that?

14       A.   Yes.

15       Q.   And did you sign that bid?

16       A.   Yes.

17       Q.   Attachment B contains company policies.

18               Do you see that?

19       A.   Yes.

20       Q.   I'm going to draw your attention to the

21   standards of conduct for Toshiba America Group, okay?

22       A.   Yes.

23       Q.   Sometimes they're referred to as SOC for

24   standard of conduct, all right?

25       A.   Okay.

CONFIDENTIAL

Page 128

1          Q.  So I'm going to go forward to Page 12.  I'll

2     read you the Bates number.  All right.  We'll start at

3     Page 11.  So Page 11 reads, "Chapter 1, SOC for business

4     activities."  So standards of conduct for business

5     activities.

6                    Do you see that?

7          A.  Yes.

8          Q.  That is Bates No. OnePoint409.  Also, it has a

9     second Bates number of OnePoint387-23.

10                   So part two of his procurement section, you

11    see we're on Section 4, it talks about procurement?

12         A.  Yes.

13         Q.  Okay.  Part two says what directors and

14    employees shall do, all right?

15         A.  Okay.

16         Q.  Subheading 3, on the next page, which is

17    OnePoint410 says (as read):  "Directors and employees

18    should 'refrain from receiving personal benefits from

19    suppliers with regard to corporate procurement, and

20    fulfill contractual obligations to suppliers in good

21    faith, ensuring that all transactions fully comply with

22    ethically sound commercial practices and with all

23    applicable laws and regulations to protect suppliers.'"

24                   Do you see that?

25         A.  Yes.

CONFIDENTIAL

Page 129

1    Q.  Does that statement inform you that it is

2    against Toshiba policy for an employee of Toshiba to

3    receive a personal benefit from a supplier with regard

4    to corporate procurement?

5              MR. DANIELS:  Object to the form.

6              You mean now?

7              MR. FRIDMAN:  I'm asking for his

8    understanding of the statement.

9              MR. DANIELS:  I'm just asking -- at what

10   time frame?

11             MR. FRIDMAN:  Yeah, as he sits here now.

12    Q.  (BY MR. FRIDMAN)  As we're talking right now,

13   what is -- what does this statement mean to you?

14    A.  To me, it applies to somebody in Toshiba's

15   purchasing department who would be buying copper or

16   steel or whatever, that they're not supposed to receive

17   any personal benefits.

18    Q.  Well, this doesn't seem to be limited to a

19   purchasing department.  It says, "Directors and

20   employees shall."  It's not limited, is it?

21             MR. DANIELS:  Object to the form.

22    A.  When I -- when I read the line where it says

23   "procurement," I'm thinking of somebody, a director or

24   an officer of the -- of the purchasing or the materials

25   management department.

CONFIDENTIAL

Page 130

1     Q.  (BY MR. FRIDMAN)  Where do you see purchasing

2   or materials management department?

3     A.  Oh, because when I see procurement, I'm

4   thinking in my mind, procurement as in somebody who is a

5   buyer for Toshiba.

6     Q.  Okay.  So you're -- you're adding words that

7   aren't there, right?

8     A.  You asked me what my understanding was, and I'm

9   telling you what my understanding is about this

10  paragraph.

11    Q.  Well, is it fair to say that this paragraph

12  means that one of the standards of conduct for Toshiba

13  employees is to refrain from receiving personal benefits

14  from suppliers?

15          MR. DANIELS:  Objection.  Form.

16    Q.  (BY MR. FRIDMAN)  Right?  That's the policy.

17    A.  I really can't interpret the policy of Toshiba.

18  I -- I don't understand.

19    Q.  You don't understand the policy?

20    A.  I gave you my best understanding of the policy.

21    Q.  Okay.

22          I'm going to scroll to the end of this.

23  This is the last page in the document.  It says (as

24  read):  "Acknowledgment of receipt of policies of

25  Toshiba International Corporation."

CONFIDENTIAL

Page 131

1              Do you see that?

2       A.  Yes.

3       Q.  Is that your signature?

4       A.  Yes.

5       Q.  And the date is August 17th, 2017, right?

6       A.  Correct.

7       Q.  It says that (as read):  "You certify that you

8    have been provided a copy and read and understand the

9    policies of Toshiba International Corporation concerning

10   standards of conduct, equal employment, recycling and

11   waste disposal procedure, drug-free workplace,

12   contractor safety manual, drug-free workplace, workplace

13   drug and alcohol policy," correct?

14      A.  Correct.

15      Q.  And it further says (as read):  "I agree to

16   adhere and follow the policies of the company."

17              Do you see that?

18      A.  Yes.

19      Q.  Did you agree to that?

20      A.  Well, I agreed to -- there was -- in this,

21   there is one that is specifically for contractors where

22   they talk about lock-out/tag-out, safety, where to park,

23   what's speed you can drive with, what is the fire

24   evacuation routes, what is the confined space

25   requirements.  So I did sign -- which I think is part of

CONFIDENTIAL

Page 132

1    this package, so I was emphasizing more on the -- the

2    contractor side of things.

3        Q.  So when you signed this, you were carving out

4    compliance with standards of conduct of Toshiba; is that

5    right?

6                    MR. DANIELS:   Object to the form.

7        A.  I was not carving out.  That is the one that

8    Pablo was focusing on, the part that applies to general

9    contractors.

10       Q.  (BY MR. FRIDMAN)  Did you read --

11       A.  And the --

12       Q.  Go ahead and finish.

13       A.  The emergency number, I assume, it was 3911.

14   All those requirements, he really was begging to us

15   following those.  So I -- I really honed down on those,

16   yes.

17       Q.  Did you read the standards of conduct?

18       A.  I don't recall reading it.  I don't know.

19       Q.  But you agree that you received them, right?

20       A.  Yeah, it says "yes."  It does say on this

21   document.

22       Q.  So you received Toshiba's standards of conduct

23   in 2007, right?

24       A.  Right.

25       Q.  And then the -- the rest of this acknowledgment

CONFIDENTIAL

Page 133

1    that you signed says (as read):  "I understand the

2    compliance with the policies is a condition of my

3    performance of work on company premises and that any

4    violation of the policies may subject me to immediate

5    removal from company premises and prohibition from the

6    performance of any further work for the company."

7                    Do you see that?

8        A.  Yes.

9        Q.  So you understood that if you provide an

10   employee a benefit, such as payments that the employee

11   should not be receiving, that you could lose the right

12   to work at Toshiba, right?

13                   MR. DANIELS:  Object to the form.

14       A.  The way I understand it is the standard of

15   conduct applies to the employees, and it does not apply

16   to me as a contractor.

17       Q.  (BY MR. FRIDMAN)  So as a contractor, you don't

18   need to have ethics?

19                   MR. DANIELS:  Object to the form.

20       A.  The standard of conduct that I'm reading over

21   here and what you just scrolled through is, it applies

22   to employees of Toshiba.  I don't know if it applies to

23   me.

24       Q.  (BY MR. FRIDMAN)  It applies to -- oh -- so it

25   does -- so you feel -- you signed this agreement, but it

CONFIDENTIAL

Page 134

1   doesn't apply to you; is that right?

2               MR. DANIELS:  Object -- object to the form.

3               You're just arguing with him, Counsel.

4   Move on.

5        Q.  (BY MR. FRIDMAN)  Go ahead and answer,

6   Mr. Joseph.

7               MR. DANIELS:  No, don't.

8               THE WITNESS:  Okay.

9               MR. DANIELS:  It's an argumentative

10  question.  Move on.

11       Q.  (BY MR. FRIDMAN)  Did you feel the standards of

12  conduct did not apply to you, Mr. Joseph?

13              MR. DANIELS:  That's been asked and

14  answered.

15       Q.  (BY MR. FRIDMAN)  Okay.  Please answer the

16  question.

17              THE WITNESS:  Can I answer?

18              MR. DANIELS:  Yeah, answer it again.

19       A.  The answer is, to me, the standard of conduct

20  is applicable to the employees of Toshiba.  What applies

21  to me is what I need to stick to the contractor's safety

22  requirements, and I did adhere to that.

23       Q.  (BY MR. FRIDMAN)  So if -- if the standards of

24  Toshiba say suppliers should not pay employees, that

25  doesn't apply to you?

CONFIDENTIAL

                                                    Page 135

1            MR. DANIELS:  Object to the form.  That's
2    not what it says.  You're just arguing with him, and
3    you're mischaracterizing the document to do it.  Move
4    on.
5            Don't answer.
6       Q.  (BY MR. FRIDMAN)  You're not going to answer?
7            MR. DANIELS:  No, he's not going to answer.
8    Move on.
9       Q.  (BY MR. FRIDMAN)  All right.  You know, you --
10   you've produced to us a bunch of the -- of these similar
11   types of documents that you have signed acknowledging
12   receipt of Toshiba's standards of conduct.  I could show
13   each one to you, but to save time, do you agree that
14   you've received Toshiba's standard of conduct in a
15   similar format multiple times over the years?
16      A.  I don't know how many times I have received it,
17   but I have received it.
18      Q.  I am scrolling up to another section of the
19   standards of conduct.
20            Do you know if the standards of conduct
21   also prohibited submitting fake bids?
22            MR. DANIELS:  You're asking him if he
23   knows?
24            MR. FRIDMAN:  Yes.
25      A.  I don't know that.

Page 136

1       Q.   (BY MR. FRIDMAN)  You never read them, though,

2   right?

3       A.   I don't recall now if I read it or not, but --

4   but I don't recall anything about fake bids in this

5   contract.

6       Q.   Okay.

7            So I'm taking you to Page 17 of the

8   standards of conduct, which is Bates No. OnePoint415.

9            Do you see where it says "Competition law"?

10      A.   Yes.

11      Q.   So it -- first, it says (as read):  "Toshiba

12  Group companies shall comply with any and all laws and

13  regulations enacted for the purpose of maintaining free

14  and fair competition," right?

15      A.   Right.

16            MR. HUSTON:  I'm sorry to interrupt.  I --

17  I missed the Bates number.  Can you either put the Bates

18  number on the screen -- thank you.

19      Q.   (BY MR. FRIDMAN)  And then it says in part two

20  (as read):  "Directors and employees shall avoid

21  agreements or understandings with competitors relating

22  to pricing, including quotations and bids, the volume of

23  production and sales, allocation of markets, customers

24  or territories, or restrictions on production capacities

25  or technology."

CONFIDENTIAL

Page 137

1              Do you see that?

2        A.   Yeah, I see that.

3        Q.   So doesn't that policy tell you that the

4   practice that you followed of submitting fake

5   complementary bids with yours would be a potential

6   violation of Toshiba's competition policy?

7              MR. DANIELS:   Object to the form.

8        A.   I disagree to that.

9        Q.   (BY MR. FRIDMAN)   So had you read Toshiba's

10  standards of conduct, you would have known that it was

11  against Toshiba policy for its employees to receive

12  benefits from providers, like OnePoint, and against

13  company policy to engage in rigging of bids, right?

14             MR. DANIELS:   Object to the form.

15       A.   I don't know the answer to that.

16       Q.   (BY MR. FRIDMAN)   You don't know the answer, or

17  you don't want to answer?

18       A.   I don't know the answer to that.  I don't know

19  the answer to that.

20       Q.   So the bottom line is that your position today

21  that you thought Pablo D'Agostino was reflecting Toshiba

22  corporate policy when he asked to be placed on the

23  payroll and receive hundreds of thousands of dollars in

24  cash from you from 2007 to 2019, that that was

25  consistent with Toshiba policy is completely undermined

CONFIDENTIAL

Page 138

1    by the fact that Toshiba policy was clear and you

2    received it in 2007, right?

3               MR. DANIELS:  Don't answer that.  That's an

4    argumentative question.

5               Move on.

6               MR. FRIDMAN:  You're instructing him not to

7    answer this question, too?

8               MR. DANIELS:  You bet.  You heard me.  I'll

9    let you ask some fact questions the livelong day.  I'll

10   let you ask his understanding, but I'm not going to let

11   you argue with him, Counsel.  Not going to do it.

12   You'll have an opportunity to make your arguments, as

13   will we.  Save it for then.

14              MR. FRIDMAN:  Okay.  Look, I mean that --

15   we're making note of the times that you're asking him

16   not to answer, and if he has to go back and answer the

17   questions after a motion to compel, then we'll do it.

18              MR. DANIELS:  If you get a motion to compel

19   on that question granted, I will buy you a beer.

20              (Reporter clarification.)

21        Q.  (BY MR. FRIDMAN)  I'm going to show you

22   Exhibit 51.  Exhibit 51 is a composite of some account

23   QuickReport printouts from OnePoint, Inc. that you

24   produced to us.

25        A.  Can you zoom it out, please?

CONFIDENTIAL

Page 139

1          MR. DANIELS:  And, Counsel, do you know why

2     these aren't Bates labeled?  Did we produce them to you

3     in native?

4          MR. FRIDMAN:  Yeah.  I -- I can't answer

5     that question, but that's -- that's the only way we

6     would have gotten them.

7          Yeah.  If -- I'm happy for my team to jump

8     in if they know the answer.

9          MR. DANIELS:  No.  I -- we think -- we

10    think it's because we produced them in native.

11         MR. FRIDMAN:  Okay.

12      Q.  (BY MR. FRIDMAN)  So I -- I believe that you

13    produced these documents to show some additional gifts

14    that were provided to Pablo D'Agostino, but I -- I can't

15    tell by looking at this what was for Pablo.  So I'm

16    going to ask you to go page by page and identify for me

17    what from these printouts that you provided to us were

18    additional gifts for Pablo.

19         MR. DANIELS:  So just -- let me be clear.

20    I'm going to get an objection on the record, Counsel,

21    about that being the purpose for which we produced them.

22    I'm not sure that's correct, but I'll -- I'll let him

23    answer, though, your question about it.  I just wanted

24    -- wanted to note that.

25      A.  Okay.  So can you repeat the question, again,

CONFIDENTIAL

Page 140



1    please?

2        Q.   (BY MR. FRIDMAN)   Yes.

3

CONFIDENTIAL

Page 141



CONFIDENTIAL

Page 142



```
14              MR. DANIELS:  The --
15              MR. FRIDMAN:  Sorry, Mr. Daniels, did you
16    say something?
17              MR. DANIELS:  No.  I was about to break my
18    own rule in speculating what it might be, but I'm not
19    here to help you out, sorry.
20              MR. FRIDMAN:  Happy to have your help.
21              MR. DANIELS:  I will -- I will, however,
22    try to figure out what we've produced it in response to.
23              MR. FRIDMAN:  Okay.
24         Q.  (BY MR. FRIDMAN)  And excuse me as I take a
25    couple of moments here because we covered a bunch of
```

Page 143

1    things, and I -- I wanted to just get through everything

2    we've covered.

3                    All right.  I'm going to put on the

4    screen -- it's just taking a moment to load.

5                    MR. DANIELS:  Are we waiting on a new

6    exhibit?

7                    MR. FRIDMAN:  Yes, it's just taking a

8    moment.

9                    (Exhibit 11 marked.)

10       Q.  (BY MR. FRIDMAN)  So I want to transition you

11   to talking about the bids that we prepared, and I'm

12   going to put on the screen Exhibit 11.  Exhibit 11 says

13   (as read):  "TMPE Area Building Proposal Package," and

14   it says, "Contractor AAA-Builders acknowledged by Komy

15   {sic}, K-O-M-Y, Azarpour."

16                    Do you see that?

17       A.  Yes, I do.

18       Q.  It says "December 2014."

19                    Do you see that?

20       A.  Yes, I do.

21       Q.  And then on the next page, there's a document

22   Bates No. TIC-110859 that is dated January 9th, 2015,

23   with a bid from A & A Premier Builders for the TMPE

24   project for $1.95 million.

25                    Do you see that?

CONFIDENTIAL

Page 144

1      A.   Yes, I do.

2      Q.   Is that one of the fake bids that you prepared?

3      A.   I'm not sure about this one.  I don't know.

4      Q.   Is this the one that you are not sure about?

5      A.   That is correct.

6      Q.   And why are you not sure about this one?

7      A.   Because A & A Premier did bid on -- did a

8  legitimate bid on -- around this time frame on a

9  project, so that is why I am not sure.

10     Q.   Okay.  And do you remember the name of the

11 project that they did a legitimate bid on?

12     A.   I don't know the exact name, but I'm confused,

13 that's why I can't answer that.  There was two projects

14 around the same time.  So I can't pinpoint which one it

15 was.

16     Q.   Okay.  And who at A & A would know about that

17 bid?

18     A.   Luis Lopez.

19     Q.   Who is Luis Lopez?

20     A.   He's -- he was their project manager.

21     Q.   Okay.  And would Mr. Azarpour know about it?

22     A.   Yes, he would.

23     Q.   And what about Mr. Moayedi?

24     A.   Possibly, I'm not sure.

25     Q.   All right.  So you're not sure if this one of

CONFIDENTIAL

Page 145

1    your fake bids or a legitimate bid --

2         A.   I'm not sure about --

3         Q.   -- from A & A Premier, right?

4         A.   Correct.

5         Q.   Okay.  Let's put another one on the screen for

6    you.

7              MR. DANIELS:  Can you give us the exhibit

8    number as it's pulling up so we can pull it up

9    simultaneously?

10             MR. FRIDMAN:  Yes.

11             It is Exhibit 12.

12             (Exhibit 12 marked.)

13             MR. DANIELS:  Thank you.

14        Q.   (BY MR. FRIDMAN)  All right.  So Exhibit 12 is

15   similar to the one we just looked at except it has a

16   different date.  This one says January 14th, 2015.  I

17   believe the other one said January 9th, but this one is

18   still for the TMPE project at $1.95 million.

19             Do you see that?

20        A.   I see that.

21        Q.   This one we got out of your files.  It has a

22   OnePoint Bates number, so this came from your company.

23        A.   Okay.

24        Q.   So the Bates number here is OnePoint021887.

25             Do you see that?

CONFIDENTIAL

Page 146

1      A.  Yes, I see that.

2      Q.  Does that help you understand that this is a

3  fake bid that you created in the name of A & A Premier

4  Builders?

5      A.  I'm not 100 percent sure.

6      Q.  Well, is there any reason why you would have a

7  bid from A & A Premier Builders in your company's files,

8  other than that you used your Word program to create it?

9      A.  I -- I really don't recall this one.

10      Q.  All right.

11          But you don't deny that this was in your

12  company's files, right?

13      A.  If it was sent by the attorneys and if it

14  was -- if that's the Bates number, yes, it was in my

15  file.

16      Q.  What would be a way to determine conclusively,

17  in your view, that this document was created by you as a

18  fake bid in the name of A & A Premier Builders?

19          MR. DANIELS:  Object to the form.

20          You can answer, if you know.

21      A.  I don't know the answer to that.

22      Q.  (BY MR. FRIDMAN)  Did Mr. Azarpour or Moayedi

23  ever send you a bid from A & A Premier Builders for you

24  to submit to Toshiba?

25      A.  No, they did not.

Page 147

1      Q.  Did anyone from your company ever send you a

2  bid from A & A Premier Builders to submit to Toshiba?

3      A.  No, they did not.

4      Q.  All right.  I'm going to load up Exhibit 53.

5  Exhibit 53 is a composite exhibit of all the A & A

6  Premier Builders bids that we have been able to

7  identify.  It starts with TIC-13116 and it goes on, and

8  I -- I can scroll through it for you.

9           And I want you to tell me if there are any

10 bids here that you see that you did not create yourself.

11           MR. DANIELS:  Hang on.  It's not -- it's

12 not populating.

13           MR. FRIDMAN:  Yep.

14           MR. DANIELS:  About how many pages is this

15 document?  It's -- it's 79 pages.  He may need to go

16 through it slower than you're doing it.

17           THE WITNESS:  Yeah, it's going too fast.

18           MR. FRIDMAN:  Yep, I understand.

19           THE WITNESS:  Yeah.

20           MR. DANIELS:  Is there a way for you to let

21 him control the scrolling?

22           MR. FRIDMAN:  Well, what you can do is,

23 I -- we did send you all these files this morning --

24           MR. DANIELS:  Yeah, we -- we can do it.

25 We've got it up on -- on the big screen, but it's...

CONFIDENTIAL

Page 148

```
1                MR. FRIDMAN:  Do you have it there?
2                MR. DANIELS:  Yeah, do it there.  Do it
3     that way for now.
4                THE WITNESS:  So are these from our Bates
5     file or where is this document from?
6                MR. DANIELS:  Document from theirs.
7                THE WITNESS:  From theirs?  From Toshiba's
8     --
9                MR. DANIELS:  You need to ask, Dan.
10               THE WITNESS:  I just wanted to --
11               MR. FRIDMAN:  Hey --
12               THE WITNESS:  Dan?
13               MR. FRIDMAN:  Yes.
14               THE WITNESS:  These documents are things
15    that we have sent to you?
16        Q.  (BY MR. FRIDMAN)  It could be a combination.
17    You can tell based on the Bates number.
18        A.  Okay.
19        Q.  TIC came from TIC's files and OnePoint came
20    from yours.
21        A.  Okay.
22        Q.  Just let me know when you're finished looking
23    through them.
24        A.  Yeah.  You can scroll -- continue scrolling.
25               THE WITNESS:  Oh, sorry.  It's not
```

CONFIDENTIAL

                                              Page 149

1    scrolling on the big screen.

2               MR. DANIELS:  No, no, the big screen is for

3    us.

4               THE WITNESS:  Oh, okay.  Okay.  Can you do

5    it, please?  Okay.

6               So anything with TIC is their document,

7    correct?

8               MR. DANIELS:  Yes, that's right.

9               THE WITNESS:  Okay.  Keep going.

10              MR. DANIELS:  And the question, Counsel,

11   is:  Are there in this composite that were not prepared

12   by Mr. Joseph?

13              MR. FRIDMAN:  Correct.

14              MR. DANIELS:  Is that correct?

15              MR. FRIDMAN:  Correct.

16              THE WITNESS:  Keep going.  Okay.  Stop.

17   Let me see about the description, okay.  Yeah, keep

18   going.

19       Q.  (BY MR. FRIDMAN)  And if you identify one that

20   you did not create, then just call it out for us.

21       A.  Okay.

22              THE WITNESS:  Okay.  Go back on this one,

23   please.  This one.  Because I'm trying to see what this

24   project is.  Yeah, keep going up.  Keep going.  What's

25   the name of the project?

CONFIDENTIAL

Page 150

```
 1              MR. DANIELS:  Is this all one?
 2              THE WITNESS:  Yeah, this is all one, yeah.
 3              Just keep going up.  Yeah, that's -- there
 4    is Okay.  Going up.  Okay.  Hold it right there.  I'm
 5    trying to see what the project is.
 6              Can you make a note of that date, 12/17/10?
 7              MR. DANIELS:  And the Bates number?
 8              THE WITNESS:  Thank you.  Keep going.
 9              MR. DANIELS:  She's got to write the Bates
10    number.
11              THE WITNESS:  Oh, sorry.
12         Q.  (BY MR. FRIDMAN)  Have you identified the
13    document?
14              MR. DANIELS:  He's not -- we're trying to
15    figure that out.
16              THE WITNESS:  The one that -- are you
17    making a note of this?
18              MR. DANIELS:  Yes, we are.
19              THE WITNESS:  Okay.
20              MR. DANIELS:  Is this a new one?
21              THE WITNESS:  It's part of the same one.
22    Just keep going.
23              Yeah, yeah.  That -- that one right there.
24    Can you write that number down, okay.  All right.  Keep
25    going.  Keep going, okay.
```

CONFIDENTIAL

Page 151

1              MR. DANIELS:  This is...

2              THE WITNESS:  Right.

3              MR. DANIELS:  So we're making notes of this

4     Bates number.

5              MR. FRIDMAN:  All right.  What did you say,

6     Mr. Daniels?

7              MR. DANIELS:  I just -- we've come to the

8     one that you've previously showed him that he wasn't

9     sure about, and so I asked Ms. Harris to please make a

10    note of the Bates number, so we're almost done

11    scrolling.

12        A.   Okay.  I've been through the list.

13             So the question is --

14             MR. DANIELS:  Why don't you ask him the

15    question again?

16        A.   Go ahead and question me, Dan.

17        Q.   (BY MR. FRIDMAN)  Sure.  Mr. Joseph, you've had

18    a chance to review composite Exhibit 53 of the A & A

19    Premier Builders bids, right?

20        A.   Right.

21        Q.   Okay.  Have you identified any that you did not

22    prepare yourself?

23        A.   Yes, I did.

24        Q.   Okay.  Which ones?

25        A.   That's the one which I said, the very first one

CONFIDENTIAL

Page 152

1    so...

2                    THE WITNESS:  Okay.

3                    MR. DANIELS:  So, Counsel, I've -- I've

4    handed him the note -- a piece of paper with the date

5    and the Bates number that he asked Ms. Harris to write

6    down.

7         A.  Okay.  Are you ready?

8         Q.  (BY MR. FRIDMAN)  Yes.

9         A.  It is TIC-00010849.

10                   MR. DANIELS:  What was the date?

11        A.  And -- well, there's 849, there's 850, and 851.

12   And the date -- the date is 12/17/10.

13        Q.  (BY MR. FRIDMAN)  Okay.  Is that the only one,

14   or are there others?

15        A.  That's the only one.

16                   MR. DANIELS:  Are you sure?

17                   THE WITNESS:  I'm sure about it now, so I

18   --

19        Q.  (BY MR. FRIDMAN)  Okay.  So let me see.  I

20   think it might be this document.

21        A.  That is correct.

22        Q.  TIC-10849.

23        A.  Right.

24        Q.  Is a document dated December 17th, 2010, on --

25   it says "Estimate" and it purports to be from A & A

CONFIDENTIAL

Page 153

1    Premier Builders, right?

2         A.   That is correct.

3         Q.   And the bid is for $3.695 million?

4         A.   Correct.

5         Q.   Do you know what project this is?

6         A.   I believe it's the HEB project.

7         Q.   Okay.  And how do you know that you did not

8    create this document?

9         A.   Because that's the one -- it's got Luis', he's

10   a senior project manager, signature on it.

11        Q.   So that's the one that Luis, an employee of A &

12   A, put together?

13        A.   That is correct.

14        Q.   Okay.  And how do you know that Luis put that

15   one together?

16        A.   I know that for a fact because Luis was there

17   during the -- when Pablo was giving out the -- the

18   drawings to all the -- to the contractors.

19        Q.   Did you invite Luis to that meeting?

20        A.   I mentioned to Kommy about this project, yes.

21        Q.   Now, have you read Kommy's testimony?

22        A.   No.  I did not read his testimony, no.

23        Q.   I -- I believe -- my recollection of his

24   testimony is that A & A Premier Builders wasn't doing

25   projects of this size.

CONFIDENTIAL

Page 154

1      A.  I -- I don't know what he said.  I did not read

2  his -- but they did bid on this.

3      Q.  Okay.  So this is not a bid you prepared?

4      A.  No.  I did not prepare this bid.

5      Q.  Did you tell them what price you bid?

6      A.  I did not tell them what price I bid on.

7      Q.  Did you tell them what price they should bid

8  at?

9      A.  I did not tell them that.

10     Q.  Okay.  And what is Luis' last name?

11     A.  Lopez, I'm guessing.

12         MR. DANIELS:  Don't guess.

13     A.  Okay.  Sorry.  I don't know his last name.  I

14  really don't know.  Luis for sure.

15     Q.  (BY MR. FRIDMAN)  All right.  I appreciate

16  that.

17     A.  Yeah.

18     Q.  So other than this one bid, all the other bids

19  in composite Exhibit 53 were prepared by you, right?

20     A.  That is -- that is correct.

21     Q.  Okay.

22         MR. DANIELS:  And, Counsel, I'm going to

23  need to break in three minutes to go get my jacket on

24  for my hearing.  If you want to go for that period of

25  time or if you want to go ahead and break now because I

CONFIDENTIAL

Page 155

1    don't want to break your flow.

2                    MR. FRIDMAN:  Well, you know, here's a way

3    that we might be able to put your break time to good use

4    because you've got that hearing, right?

5                    MR. DANIELS:  Yes.

6                    MR. HUSTON:  All right.  Why don't we have

7    Mr. Joseph review Exhibit 56 and Exhibit 55, which are

8    composite exhibits of Atkins bids and Millenium bids.

9                    MR. DANIELS:  Got it.  Just follow --

10   follow the same procedure we just followed.

11                   MR. FRIDMAN:  Go through the same procedure

12   so that when we reconvene after your -- your hearing, he

13   can tell us if there are any in those exhibits that he

14   did not prepare.

15                   MR. DANIELS:  Okay.  That works.

16                   THE WITNESS:  Will that work?

17                   MR. DANIELS:  Yeah.

18                   MR. FRIDMAN:  So we can -- we can go off

19   the record, and you'll let us know when we -- you're

20   back from your hearing.

21                   MR. DANIELS:  Yeah.

22                   MR. FRIDMAN:  All right.

23                   THE VIDEOGRAPHER:  Okay.  This is now the

24   end of Video 3 of Abraham Joseph.  Off the record at

25   1:53.

CONFIDENTIAL

Page 156

1          (A break was taken from 1:53 p.m. to

2     2:15 p.m.)

3               THE VIDEOGRAPHER:  We are now back on the

4     record, Video 4 of Abraham Joseph.  The time is

5     approximately 2:15.

6          Q.  (BY MR. FRIDMAN)  All right.  Mr. Joseph,

7     during the break, did you have an opportunity to review

8     Exhibit 55, the composite of the Atkins Group's bids?

9          A.  Yes, I did.

10         Q.  All right.  Let me put Exhibit 55 on the

11    screen.  After reviewing Exhibit 55, did you identify

12    any bids that you did not create yourself?

13              (Exhibit 55 marked.)

14         A.  I did not find any.

15         Q.  (BY MR. FRIDMAN)  So all the bids in composite

16    Exhibit 55 in the names of -- in the name of the Atkins

17    Group were created by yourself; is that correct?

18         A.  Yes.

19         Q.  And you submitted all of these bids alongside a

20    OnePoint bid, right?

21         A.  Yes.

22         Q.  And when we discussed A & A Premier Builders,

23    Exhibit 53, the bids that you identified as having been

24    submitted by you on behalf of A & A Premier Builders,

25    those were also submitted alongside OnePoint bid from

CONFIDENTIAL

Page 157

1    you, right?

2         A.   Except one of those.

3         Q.   Correct.

4              Except the one that you pointed out to us.

5    All the other ones were submitted alongside a OnePoint

6    bid, right?

7         A.   Yes.

8         Q.   And in each case, the A & A Premier bids that

9    you prepared had a higher price for the project than the

10   OnePoint bid, right?

11        A.   Yes.

12        Q.   And with the Atkins Group, the same thing,

13   right?

14        A.   Yes.

15        Q.   I'm going to share my screen.  We can take a

16   look at the first document on Exhibit 55.  It's dated

17   August 22nd, 2007, "Upgrades to Restrooms in

18   Administrative Building A."

19              Do you see that?

20        A.   Yes.

21        Q.   So if we go to the third page, there's a

22   signature there that purports to be on behalf of Jay

23   Atkins, right?

24        A.   Right.

25        Q.   Who wrote that signature then?

CONFIDENTIAL

Page 158

1      A.   I did.

2      Q.   That's your handwriting?

3      A.   Yes.

4      Q.   So that's a -- a forged document, right?

5      A.   I signed it.

6      Q.   You signed it in the name of the other person

7  who didn't consent, right?

8      A.   He did not know about it.

9      Q.   Okay.  And then for the record, happy to be

10  corrected on this, but as far as A & A Premier bids, we

11  -- we had 35 in that composite exhibit.  So minus the

12  one that Mr. Joseph says he did not prepare, there

13  should be 34 A & A Premier bids that were created by

14  yourself, Mr. Joseph.

15           Does that sound about right?

16      A.   It's about right.

17      Q.   Or do you think there were more?

18      A.   That -- that was it.

19      Q.   And then from the Atkins Group, I believe we've

20  also counted about 35 bids prepared by you from the

21  Atkins Group in composite Exhibit 55.

22           Does that sound about right?

23      A.   Sounds right.

24      Q.   Okay.  Let's go onto Exhibit 56.  I will put

25  that on the screen.

CONFIDENTIAL

Page 159

1          Do you see Exhibit 56 on the screen?

2      A.  Yes, sir.  I do.

3      Q.  Okay.  And Exhibit 56 is the composite about

4  the Millenium bids, and Millenium is spelled

5  M-I-L-L-E-N-I-U-M, right?

6      A.  Based on what I'm reading here, yes.

7      Q.  And the name of the company on the bids is

8  Millenium Performance, right?

9      A.  Right.

10      Q.  All right.  So you have looked through

11  composite Exhibit 56, right?

12      A.  Yes.

13      Q.  And are there any bids in composite Exhibit 56

14  that you did not prepare?

15      A.  No.

16      Q.  So all of the Millenium Performance bids that

17  are in composite Exhibit 56 were prepared by yourself,

18  right?

19      A.  Yes.

20      Q.  And you see where it says on the first page,

21  March 20, 2008, bid from Millenium Performance signed by

22  Sam Kurian.

23          Whose signature is that?

24      A.  It's my signature.

25      Q.  That's not your brother-in-law's signature?

CONFIDENTIAL

Page 160

1      A.  No, it was not.

2      Q.  And Mr. Kurian was not aware that you were

3  doing this in the name of his company?

4      A.  That is correct.

5      Q.  And these Millenium Performance bids, were they

6  submitted to TIC alongside bids from OnePoint that you

7  prepared?

8      A.  Yes.

9      Q.  I believe we've counted about 45 Millenium

10  Performance bids.

11          Does that sound right?

12      A.  Sounds right.

13      Q.  So had you forged Mr. Kurian's signature on

14  this document?

15          MR. DANIELS:  Object to the form.

16      A.  Yes, I have.

17      Q.  (BY MR. FRIDMAN)  Do you know if submitting a

18  forgery is against the law?

19          MR. DANIELS:  Object to the form.

20      A.  I don't know the law on forgery.

21      Q.  (BY MR. FRIDMAN)  Were you uncomfortable

22  creating these Millenium Performance bids in the name of

23  Sam Kurian?

24      A.  I was asked to get complementary bids, and I

25  got the complementary bids.

CONFIDENTIAL

Page 161

1      Q.  But these were fake bids, right?

2      A.  These were complementary bids required by Pablo

3  and TIC.

4      Q.  Again, anyone other than Pablo D'Agostino ask

5  you to submit a bid, a complementary bid?

6      A.  No.

7      Q.  Now, on this Millenium Performance document, do

8  you see this email, it says "kurian_sam@hotmail.com"?

9      A.  Yes.

10     Q.  Is that your brother-in-law's email address?

11     A.  I'm -- I'm sure that's his email address back

12  then.  I don't know if he still has it.

13     Q.  Or did you create a fake email address for any

14  of these companies?

15     A.  No, I did not.

16     Q.  And for each of these bids in the name of

17  Millenium, Atkins, and A & A, each of them you

18  hand-delivered personally to Pablo D'Agostino?

19     A.  Yes.

20     Q.  Did you ever send them by email?

21     A.  I don't recall sending it by email.

22     Q.  Is it possible you did?

23         MR. DANIELS:  Object to the form.

24     A.  I don't know.

25     Q.  (BY MR. FRIDMAN)  Did you send any by FedEx?

CONFIDENTIAL

Page 162

1      A.  I don't recall sending it by FedEx.

2      Q.  What about U.S. mail?

3      A.  I don't recall.

4      Q.  All right.  You also testified this morning

5   that you submitted bids in the name of ERC, right?

6      A.  That is correct.

7      Q.  All right.  I'm going to show you a bid from

8   ERC.  So we're going to take a look at Exhibit 23.

9              MR. DANIELS:  23?

10             MR. FRIDMAN:  23.

11             (Exhibit 23 marked.)

12     Q.  (BY MR. FRIDMAN)  Do you see Exhibit 23 on the

13  screen?

14     A.  Yes, sir, I do.

15     Q.  It's a document with Bates label TIC-119704.

16     A.  Yes, sir.

17     Q.  And it is a purchase requisition from Toshiba

18  International Corporation.

19             Do you see that?

20     A.  Yes, I do.

21     Q.  All right.  You see on the top of the bid, it

22  has "Suggested/Recommended sources.  OnePoint, Inc.,

23  Environmental Resource Consultant, and On The Spot

24  Construction."

25             Do you see that?

CONFIDENTIAL

Page 163

1      A.  Yes, I do.

2      Q.  What is On The Spot Construction?

3      A.  It's another construction company.

4      Q.  Is it a legitimate construction company?

5      A.  Yes, sir.  It is.

6      Q.  Did you prepare bids in the name of On the Spot

7  Construction?

8      A.  I did not.

9      Q.  Did you coordinate bids with On the Spot

10  Construction?

11      A.  I did not.

12      Q.  Who is in charge of that company?

13      A.  I don't know.

14      Q.  Have you ever had business dealings with them

15  before?

16      A.  I vaguely remember them from 2008.

17      Q.  In what way?

18      A.  Well, I've seen their billboards here in town

19  or in the -- in the construction industry, I just knew

20  about them.

21      Q.  Okay.  You've seen their -- their billboards,

22  but apart from that, you haven't had any dealings with

23  them?

24      A.  No, I did not.

25      Q.  All right.  Let's take a look at the

CONFIDENTIAL

Page 164

1  description of the project.  It says (as read):

2  "Project No. 799-08 Asbestos Abatement and Oversight in

3  Mod 1."

4              Do you see that?

5      A.  Yes, I do.

6      Q.  And the total amount is $34,211, right?

7      A.  That is correct.

8      Q.  OnePoint won this bid, right?

9      A.  Right.

10      Q.  Do you recall this project?

11      A.  Yes, vaguely.

12      Q.  What do you remember about it?

13      A.  This was in -- the Mod 1 is Module 1 where we

14  had to tear down the ceilings, the floor.  Take out all

15  the -- the asbestos-containing materials.  And then as

16  GC, we were supposed to put everything back, back to

17  what it was before.

18      Q.  Okay.  So I'm scrolling to the second page of

19  this document, and we see a bid from OnePoint for

20  $34,211.

21              Do you see that?

22      A.  Yeah.  I'm just trying to switch my glasses,

23  sir.

24      Q.  You see -- I could zoom it in a little bit more

25  for you.

CONFIDENTIAL

Page 165

1       A.  Can you zoom it a bit?

2       Q.  Can you see that?

3       A.  Yeah, I see it.

4            Can you zoom it in a bit?  Yeah, I see it

5   now, yeah.

6       Q.  Okay.  And whose signature is on that bid?

7       A.  It's my signature.

8       Q.  All right.  And if we go to the next document,

9   we see a bid that purports to be from ERC for

10  engineering and remediation services at the Toshiba

11  complex, Module No. 1.

12           Do you see that?

13      A.  Yes, I do.

14      Q.  And the ERC bid is more than OnePoint's bid,

15  right?

16      A.  Yes.

17      Q.  It's $37,681, right?

18      A.  Right.

19      Q.  Who prepared this ERC bid?

20      A.  I prepared it.

21      Q.  And how was it that you prepared it?

22      A.  I just created it on the computer as a Word

23  document.

24      Q.  And whose signature up here is under the VP of

25  operations under the name Mike Afshar, A-F-S-H-A-R.

CONFIDENTIAL

Page 166

1      A.  It -- it could be his signature, but I could

2    have used the page from -- from somewhere else maybe, I

3    don't know, or I may have forged it.  I'm not sure -- I

4    don't know.

5      Q.  Okay.  So either you forged it or maybe you did

6    a cut and paste of his signature from another document;

7    is that right?

8      A.  I don't recall.  But I don't know the answer to

9    that.  I -- I can't answer to that.  I don't know.  I

10   can't tell.

11     Q.  Okay.  But Mike Afshar did not sign this,

12   right?

13     A.  Again, I -- I don't know.

14     Q.  Because you created this document, right?

15     A.  I did create this document.  It was in 2008.  I

16   -- I don't recall who signed it.

17     Q.  Okay.  How did you send that document to

18   Pablo D'Agostino?

19     A.  I hand-carried it to him and gave it to him.

20     Q.  All right.  So I'm going to show you

21   Exhibit 24.  Exhibit 24 is a proposal from ERC to you at

22   OnePoint for engineering or remediation services at the

23   Toshiba complex, Module 1.

24              Do you see that?

25              (Exhibit 24 marked.)

CONFIDENTIAL

Page 167

1      A.  Yes, I do.

2      Q.  (BY MR. FRIDMAN)  So was ERC your subcontractor

3   for this project?

4      A.  Yes.

5      Q.  And I'm scrolling through the document.  What

6   was ERC's price to you?

7      A.  On this document it was 12,430.

8      Q.  All right.  And do you recall what you billed

9   Toshiba for this project?

10      A.  I think it was 27, 37, something like that.

11   I'm not sure.  I'd have to look at the document.

12      Q.  About $36,000?

13      A.  I don't know what -- I can't -- I don't know.

14   I'd have to look in the actual -- my proposal.

15      Q.  Okay.  So we'll remember that this one was

16   12,430, right?

17      A.  Yes.

18      Q.  We'll go back to Exhibit 23.

19              34,211, right?

20      A.  That's -- that's correct.  That's -- that's --

21      Q.  That was OnePoint's proposal?

22      A.  Correct.

23      Q.  So did you mark up this project almost three

24   times as much as it cost OnePoint?

25      A.  No, I did not.

CONFIDENTIAL

Page 168

1      Q.   Okay.

2      A.   Because there is -- go ahead.

3      Q.   Okay.  I -- please explain.

4      A.   Because this project in the module plan,

5  Module 1 involved not just the asbestos abatement.

6  Typically, somebody like ERC would just come there like

7  a bull in a China shop, tear everything out, and go

8  away.  But we were responsible for even putting back the

9  ceiling; the ceiling grips; the lights; removing the

10  furnitures out for them; putting the furnitures back;

11  putting the floor because they just ripped everything

12  off.  So ours was a turnkey price to do everything as a

13  GC.

14      Q.   Okay.  And who did you get to do that work?

15      A.   Several of those -- some of those were done by

16  my in-house employees.  We are capable of doing ceiling

17  work, ceiling-grade flooring.  If it was minor DCT

18  flooring, we must have done it.  Some of it, we must

19  have outsourced it.  But it was -- some done in-house

20  and some outsourced.  Moving the furnitures and all that

21  was done by -- and these modules are sitting up -- high

22  up in the air.  We are bringing everything down, put it

23  back up; put the containment; take out the containment.

24  So there's more -- more than just doing the asbestos

25  abatement.

CONFIDENTIAL

Page 169

1      Q.  All right.  And how much did that project cost
2   you?
3      A.  I don't recall what it was back in 2008.
4      Q.  And it's your position that ERC did not do that
5   work?
6      A.  ERC does not do those kinds of work.  They just
7   do the asbestos engineering consultation and the
8   abatement work.  They did not do the actual construction
9   work.
10      Q.  And what backup can you provide us for your
11   position on how much this project costs you?
12      A.  I don't have any backups right now in my
13   possession.
14      Q.  Do you have a project file for this?
15      A.  I'm sure there's a -- there should be a project
16   file.  I don't -- I don't make the project file until
17   it's complete with all the trades that worked on that
18   12, 13 years ago.  I'm not sure.  And there are a lot of
19   functions that's done my -- by my in-house employees.  I
20   don't keep track of all that on each and every project.
21      Q.  Which project do you keep track of?
22      A.  Well, every project -- if there is -- if there
23   is a project that involves a -- a big portion of the
24   project -- which probably will be in the -- in the
25   project folder.  But I don't -- if I was to keep

CONFIDENTIAL

Page 170

1   tracking -- no, I don't keep track of each and every
2   item that went into that project.
3        Q.  So why did you submit a fake bid for this
4   project?
5        A.  Because Pablo requested me to get another
6   complementary bid.
7        Q.  All right.  Let's talk about the journeymen
8   electricians.  You provided journeymen electricians to
9   TIC, right?
10       A.  Yes.
11       Q.  From 2007 to 2019, right?
12       A.  Yes, sir.
13       Q.  And the journeymen electricians were
14  subcontracted to OnePoint primarily by EMS, right?
15       A.  Yes, sir.
16       Q.  That's Brad Jackson's company, right?
17       A.  Yes, sir.
18       Q.  And you used EMS from 2007 to 2019, right?
19       A.  Yes, sir.  Correct.
20       Q.  And EMS generally charged $1.40 an hour for
21  regular time for journeymen electricians and $6 an hour
22  for overtime for journeymen electricians from 2007 to
23  2019, right?
24       A.  I don't know the exact number.  It could be 38.
25  I don't know the exact dollar amount.

CONFIDENTIAL

1     Q.  Yeah.  I -- I just want to be approximate.

2   Generally speaking, it was about 40 and 60, right?

3     A.  If it is overtime, yeah, it would be 60, yes.

4     Q.  And 40 for regular?

5     A.  Well, I don't know.  I think at some point it

6   was even 38 at some -- at one point, if I recall.

7     Q.  Okay.  But it wasn't significantly above or

8   below 40, right?

9     A.  That is true.  That is correct.

10    Q.  And then, in turn, OnePoint charged TIC $80 an

11  hour for regular time and $120 an hour for overtime for

12  the journeymen electricians provided by EMS, right?

13    A.  And $180 an hour for overtime for the

14  journeymen electricians, right.

15    Q.  And that's 100 percent profit margin for you,

16  right?

17            MR. DANIELS:  Object to the form.

18    A.  It's not 100 percent profit.  I have to factor

19  a lot of other things in my profit.

20    Q.  (BY MR. FRIDMAN)  Okay.  Tell me what you

21  considered?

22    A.  Okay.  So, first of all, we -- we were engaged

23  in this -- providing journeymen electricians after they

24  had a death in Toshiba where a person was electrocuted

25  and died based on what I was told, and they wanted to

CONFIDENTIAL

Page 172

1    just not deal with it and just sub it out to somebody.

2    And that's -- so I knew about -- frankly, that someone

3    had actually died and electrocuted on the premises.  So

4    I had to put in all kinds of contingency to take care of

5    sending anybody over there and making sure that nobody

6    is going to be electrocuted and I get sued for whatever,

7    number one.

8              Number two, I knew that these people would

9    be working around very, very high sensitive, secretive,

10   and very, very expensive equipment in the Toshiba

11   Industrial Complex that one mistake on the part of these

12   electricians, it would have been my fault.  So I had to

13   take some serious consideration as far as the loss of

14   life, and loss of equipment, and also loss of business

15   in case we screwed up something.  So those were two of

16   my biggest factors.

17             Apart from that, before I even supplied

18   them with journeymen electricians, I have used

19   journeymen electricians working under me as

20   subcontractors, and they -- and I've talked to several

21   companies, they have given me price ranges anywhere from

22   $77 to $100 range.  That was a range I got from other

23   electrical subcontractors.  And when I talked to them

24   about using their services at -- working under me

25   full-time, five days a week, seven days a week for 13

CONFIDENTIAL

Page 173

1    years indefinitely, they said we cannot even honor that.

2    If we can give you one or two persons for maybe a week,

3    maybe at the most.  But we're are not going to time out

4    full-time.  But even at that, they were going to charge

5    me 77 to $80 an hour.

6                So considering the risk, considering the

7    fact that they were being supervised by Toshiba

8    employees, their exposure to being in very high

9    locations, expensive equipments, that was the number I

10   came up with.  And the administrative cost that I have

11   to incur, so there was a lot to it than just taking $40

12   and just doubling it to $80.

13       Q.  So let's -- let's take that part a bit.

14       A.  Okay.

15       Q.  So your -- your position is that you were

16   taking on risk?  Did you ensure that risk?

17       A.  Absolutely.  I had insurance, obviously.  But I

18   remember even during the latter part of this project, I

19   -- I upped my insurance all the way up to $9 million

20   just to -- just to be safe.

21       Q.  So you carried $9 million of liability

22   insurance?

23       A.  Not -- not in the first year, but in -- about a

24   few years down the road, yes, I just -- because I was

25   really concerned about -- at one point, we had 10, 12

CONFIDENTIAL

Page 174

1   people on the premises.  They wanted me to ramp up the

2   number of electricians if they had an emergency, and it

3   was always, let's do it now.  Hurry up.  So that's when

4   I ramped it up to $9 million.

5        Q.   Okay.  And what year did you do that?

6        A.   I don't recall the exact year, but I did do

7   that.

8        Q.   Okay.  Was it before 2015?

9        A.   Oh, yeah.  Way before 2015, yes.

10       Q.   Before 2010?

11       A.   I don't know the exact date.

12       Q.   What were your liability insurance premiums?

13       A.   I had up to $9 million in liability coverage.

14       Q.   How much did that --

15       A.   Oh, the -- oh, the premiums.  I don't -- I

16   don't know my premiums.  I don't know the exact number.

17       Q.   All right.  And was that $9 million just for

18   the journeymen electricians, or was it for all the work

19   OnePoint did?

20       A.   For all the work that we did.

21       Q.   For all clients?

22       A.   Correct.  But my other clients did not require

23   that.  It was just -- I did that for Toshiba because I

24   -- I even recall Pablo asking me to up it to, you know,

25   5, 6, 7, 8, $9 million.

Page 175

1      Q.  Did -- was that part of an agreement or
2  contract that you had with Toshiba to carry that much
3  insurance?
4      A.  No, it was not a contract.  It was verbally --
5  verbal discussions with Pablo.
6      Q.  And the liability insurance that you got would
7  cover your subcontractors working at Toshiba?
8      A.  Yes, they would.
9      Q.  Okay.  And who wrote the policy?
10     A.  Well, I -- I --
11             MR. DANIELS:  No, who -- who -- objection.
12  What's the question again?
13             MR. FRIDMAN:  I could rephrase it,
14  Mr. Daniels.
15             MR. DANIELS:  Rephrase it.
16     Q.  (BY MR. FRIDMAN)  Yes.
17             What --
18     A.  Can you repeat that, please?
19     Q.  -- what insurance company provided the
20  liability policy that you got?
21     A.  So my insurance keeps changing.  I have Dean &
22  Draper who's my agent.  They will look around for the
23  best rates.  So sometimes it could be CNA Insurance.
24  Sometimes it could be Safeco.  It could be Chubb's.  I
25  don't -- it just keeps changing so.  But my -- my --

Page 176

1    yeah, Dean & Draper is my insurance agent.

2        Q.  They've been your insurance agent since 2010?

3        A.  For sure, yes.

4        Q.  Would you be able to provide us with

5    information about how much your insurance premiums cost?

6                MR. DANIELS:  We can talk about that

7    offline, Counsel.

8                MR. FRIDMAN:  I just want to know if he has

9    that information available.

10               MR. DANIELS:  You can answer that.

11               MR. FRIDMAN:  I'm not -- I'm not asking him

12   to agree.

13       A.  At one point, I think it was close to over

14   120,000-something in premiums.

15               MR. DANIELS:  That's not his question.

16               THE WITNESS:  Oh, I'm sorry.

17               MR. DANIELS:  His question was:  Do you

18   have the ability to go back and find that information if

19   available?

20       A.  Yes, it is available.

21       Q.  (BY MR. FRIDMAN)  Okay.  And what you're

22   telling me is that the insurance -- liability insurance

23   premium costs $120,000 a year?

24       A.  Based on my recollection.  I'm not sure about

25   it.

CONFIDENTIAL

Page 177

1      Q.  Did you ever have to submit a claim under the

2   policy related to Toshiba?

3      A.  Never.  Never.  We had no problems.

4   Absolutely, no complaints.

5      Q.  All right.  What were your administrative

6   costs?

7      A.  I don't know the exact number of it.  I don't

8   know what the exact dollar amount would be.

9      Q.  Well, describe for me what you consider to be

10  the administrative burden of providing OnePoint

11  subcontracted electricians to Toshiba?

12     A.  Well, I would -- I would make site visits once

13  in a while.  I would get bills from Brad Jackson.  We

14  would have to process the bill, send the invoices to

15  Toshiba, get paid for it, and constantly getting phone

16  calls from either Pat Medacki or Pablo about ramping up

17  the number of people or reducing the number of people,

18  going out and seeking more people.  See what else?

19  Yeah.  Those are all my administrative responsibilities.

20          Oh, also replacing people as needed.  If --

21  if there was one or two instances where they did -- they

22  did not like a certain person, so we had to immediately

23  replace them.  And there were times when they were

24  hiring our employees, and then we have to replace them

25  within a moment's notice.  So those were all my

CONFIDENTIAL

Page 178

1   administrative expenses.

2       Q.  So your position is the liability that you

3   state that you were exposed to by having electricians

4   on-site and this administrative burden from billing and

5   collections, that justifies doubling the price that EMS

6   charged you?

7       A.  Not just those two, but even the exposure to

8   any business interruption that could happen because of

9   these electricians working on Toshiba property.

10              I was also very, very concerned because

11  there were several times they would give us -- they

12  would give the guys printed -- circuit diagrams of

13  millions of dollars' worth of equipment that came from

14  Toshiba, and they swore to them that this -- this

15  information cannot leak.  This is supposed to be very

16  confidential.  So I was really concerned about all of

17  that.  It's just a matter of time before one of the

18  electricians could take those drawings, take it

19  somewhere else then I would be sued for it.

20              So it was concern about people's debt,

21  concerned about business interruption, concerned about

22  damage to equipment, and the administrative headaches,

23  and the going market price back then based on what I

24  have documented and what I've paid other electrical

25  contractors up to $80 an hour.

CONFIDENTIAL

Page 179

1     Q.  Was there ever an issue with damage to Toshiba

2  equipment?

3     A.  Absolutely not.

4     Q.  So is there anything else that you take into

5  account when you consider what your costs were from

6  having these journeymen electricians work at Toshiba?

7     A.  Yes, there is.

8        Because they were working on the directions

9  of Toshiba employees, they were given equipments.  I'm

10  not talking about the basic -- not the basic tools

11  but certain very highly specialized equipment that they

12  were using.  They were exposed to being in very high

13  elevated areas on manlifts and cranes that I was not

14  there to oversee it or neither was my project manager.

15  So I -- I'm just at their mercy.  So those were all my

16  concerns.

17     Q.  And did you have an agreement with Brad Jackson

18  that you were taking on all of that liability?

19     A.  Yes, he knew that.

20     Q.  And was that formalized in some written

21  document with him?

22     A.  It -- it was not.

23     Q.  Because I would imagine that if you have those

24  concerns, then Brad Jackson would have those concerns,

25  too?

CONFIDENTIAL

Page 180

1      A.  But he never asked me for any formalized

2  contract.

3      Q.  But, yet, he was still able to provide you with

4  those electricians at $40 an hour for regular time and

5  $60 for overtime, right?

6      A.  Right.  He was supplying me that.

7      Q.  And could he have supplied them at that price

8  directly to Toshiba?

9      A.  He could have, but he was not approached by

10  Toshiba.

11      Q.  Did you have an indemnity agreement with

12  Brad Jackson and EMS?

13      A.  I don't understand that question.  Could you

14  rephrase that for me, please?

15      Q.  Yes.

16          Did you have an agreement with EMS where if

17  there was some kind of claim against one of the

18  electricians brought by Toshiba that you would take full

19  responsibility, financial responsibility for that claim?

20      A.  No.  I did not have that agreement with EMS,

21  no.

22      Q.  And do you know if EMS carried its own

23  insurance?

24      A.  I believe they did, but it was very small.

25      Q.  All right.  Are there any other costs to

CONFIDENTIAL

Page 181

1   OnePoint that you take into account that we haven't

2   discussed?

3        A.  Yes, there is.

4            Because all the -- all the breakers, and

5   the disconnects, and all the electrical components, the

6   transformers, the variable frequency drives, and all

7   that was supplied by Toshiba to the electricians.  And I

8   was, again, concerned that if any of those things

9   failed, I would have been blamed for damages to

10  equipment for something that I did not provide.  It was

11  something that Toshiba provided my electricians.

12       Q.  Okay.  And did that ever happen?

13       A.  Nothing happened fortunately.

14       Q.  Okay.  So how did you quantify your costs for

15  your portion of the administrative and risk of these

16  electricians for Toshiba?

17       A.  Well, first of all, even before I quantify it,

18  when I saw what the market-going rate was, the market

19  rate was anywhere from 77 to $80.  So that was a fair

20  market price even at that time.  And I have paid that

21  fair market price.  I, myself, have paid that to other

22  electrical contractors.  So I -- I did not think it was

23  out of line to charge that price.

24       Q.  Well, isn't the EMS price the fair market rate?

25       A.  I have no idea how EMS was giving me

CONFIDENTIAL

Page 182

1   electrician at such low price, but that was -- that was

2   the price I got.

3       Q.  And the price was pretty stable from 2007 to

4   2019, right?

5       A.  That is correct.

6       Q.  So what do you contend was your true profit

7   margin on the journeymen electricians?

8       A.  I can't put a number to it.

9       Q.  Did you make money off of them?

10      A.  Yes, I did make money.

11      Q.  Okay.  Do you know how much money you made off

12  of them?

13      A.  I don't know exactly how much.

14              You mean the entire total?

15      Q.  Yes.

16      A.  You're talking about actual total profits, or

17  you're talking about total invoices from Toshiba to me

18  during the entire time?

19      Q.  I'm talking about how much money do you contend

20  you actually made from providing journeymen electricians

21  to Toshiba?

22              MR. DANIELS:  I think it's confusing,

23  Counsel.  It's between revenues and profits.

24      A.  And I'm also getting confused of what periods

25  you are talking about.

CONFIDENTIAL

Page 183

1    Are you talking about all the way from 2007
2  to 2019?
3    Q.  (BY MR. FRIDMAN)  Yes.  I'm talking about the
4  entire period.  But if there are periods that you are
5  more familiar with, then you can start there.
6    A.  I can start from the initial -- during the
7  initial times, the revenues were much higher because in
8  the initial -- I'm going to say five or six years when
9  Toshiba was doing all kinds of expansions, they were
10  getting ready to get a big order from Ford for
11  hydroelectric plant.  So at those time, I think we had
12  upwards of 8, 9, 10 electricians.  So that was the
13  highest revenue periods.  And then towards the latter
14  part, we were just down to two to three electricians
15  on-site when things slow down.  But every once in a
16  while, it would spike up for a few times and then it
17  would go down again.
18    Q.  Okay.  So from 2011 to 2019, how much did you
19  make from journeymen electricians?  We can start with a
20  revenue figure.
21    A.  I -- I don't know the exact number.  No, I
22  don't.
23    Q.  Is it about $6 million?  Does that seem right?
24    A.  6 million from what -- from what period to what
25  period?

CONFIDENTIAL

Page 184

1  Q. 2011 to 2019.

2  A. No, it's not.

3  Q. Okay.  What is your sense of it?

4  A. My sense of the entire -- the entire cost

5 from 2007 to 2019, total cost, total actual invoicing

6 -- I'm just talking about the total invoicing is about 3

7 to $4 million.

8  Q. Okay.  And how much of that was profit to you?

9  A. I cannot -- I do not -- I don't know how much

10 of that was profit.

11  Q. Did you have a particular profit margin target

12 that you worked towards?

13  A. No.

14    For journeymen electricians or for any

15 project?

16  Q. We'll start with journeyman, and if there's a

17 difference with regular projects, you can tell me.

18  A. Okay.

19    Typically, I would say on a journeyman

20 electrician, I would -- I would try to go on the -- I

21 would err towards the higher side because of the risk

22 and exposure that I was exposed to.

23  Q. Okay.  So what was your profit margin then?

24 What was your target?

25  A. I cannot come up with a profit margin number

Veritext Legal Solutions

800-726-7007                   305-376-8800

CONFIDENTIAL

Page 185

1    because there are too many variables on this job.  So I
2    gave -- I gave Toshiba the prevailing rates that was
3    going on at that time based on medium-sized companies in
4    that area.
5          Q.   Okay.  So do you even know if you were making
6    money from the journeymen electricians?
7          A.   I believe I was making money.
8          Q.   Okay.  You just don't know how much?
9          A.   I just don't know how much.
10         Q.   All right.  What about for regular construction
11   work?  What was your profit margin target?
12         A.   That would also vary depending on the size of
13   the project, the complexity of the project, the -- the
14   risk associated with the project.  So many factors.  So
15   there is not a one-size-fits-all number that I use.
16         Q.   Okay.  Do you have a range?
17         A.   I can't think of a range.  Each project is
18   different from each other.
19         Q.   So could it range from 10 percent to
20   100 percent?
21         A.   It could be somewhere in between that.
22         Q.   I'm -- I'm just asking what you used.  And if
23   your answer is you don't use any target in particular,
24   then that's your answer.  I just want -- I'm trying to
25   understand what you --

CONFIDENTIAL

Page 186

1      A.  Sure.

2      Q.  -- what you typically --

3      A.  We don't -- we don't have a one fixed number

4  for all profit margin.  It varies from project to

5  project.

6      Q.  Okay.  When you price a project, do you try to

7  figure out your costs first?

8      A.  I do.

9      Q.  Do you solicit quotes from subcontractors?

10     A.  In some cases, yes; some cases, no.

11     Q.  Some cases, you know from your personal

12  experience what things cost, right?

13     A.  That is correct.

14     Q.  So once you get your cost for the project, do

15  you then decide how much money you're going to make from

16  it.

17     A.  Yeah.  I will -- I will come up with all the --

18  all the things that could go wrong on the project, what

19  could be -- I would throw in some contingencies in

20  there, and I would come up with a percentage.

21     Q.  Okay.  And was there a typical percentage you

22  would come up with?

23     A.  No typical percentages.  Typically, if you want

24  a typical -- if it was a small project, the project

25  slight -- would be slightly higher than for a very large

Page 187

1  project.  Obviously, it would be slightly lesser.

2      Q.  Okay.  So I'm -- I'm just trying to get a sense

3  of what ballpark we're talking about.  Are we talking

4  about 10 to 30 percent?  Are we talking about 50 percent

5  to 70 percent?

6          MR. DANIELS:  Object to the form.

7      A.  I cannot come up with a percentage right now.

8  It depend -- you'll have to ask me about a specific job,

9  and then I can answer that.

10      Q.  (BY MR. FRIDMAN)  Okay.  Well, I did.  I asked

11  you about the journeymen electricians, but you couldn't

12  answer that one, right?

13      A.  Because there was too many variables in there,

14  so I could not answer that.

15      Q.  Okay.  Did having fake bidders submit

16  complementary bids alongside OnePoint allow you to build

17  in a higher profit margin for OnePoint?

18      A.  No.  We gave Toshiba a fair market price

19  based -- and they accepted my base -- accepted my -- my

20  price, and we gave them a good quality work.

21      Q.  But you agree that it was not a competitive

22  bidding process, right?

23      A.  That is correct.

24      Q.  It was just your bid and that -- that's what it

25  was?

CONFIDENTIAL

Page 188

1    A.  It was my bid, but I gave Toshiba a fair market

2    price based on -- and, obviously, Toshiba accepted the

3    price based on whatever budget they had in mind.  So I

4    didn't even know what their budget was.  But I gave them

5    a price and it was accepted, and I did not try to

6    increase my price just because I was giving

7    complementary bids.

8    Q.  Although there were times where you lost bids

9    to KIT Construction, right?

10   A.  I'm sure there was several times.  Yes, I did

11   lose, yes.

12   Q.  And your bids were higher than KIT

13   Construction's, right?

14   A.  If I -- not necessarily.  There was one where I

15   was lower than KIT's.  In some cases, I was higher than

16   KIT's.  And the cases where I was higher was where

17   Toshiba and Pablo did not give me the right scope of

18   work, and I -- based on what they told me and so my

19   numbers were higher.

20          And I also very clearly put in my proposal

21   that these are not bids, but these are budgetary

22   estimates.

23   Q.  Okay.  When you submitted those budgetary

24   estimates, were you trying to win the work?

25   A.  Obviously, I would love to do all work at

CONFIDENTIAL

Page 189

1   Toshiba.  My intention was to do the job.  My intention

2   was to get the job done right.  And every time I bid on

3   all those jobs, yes, I wanted to get the jobs.  And I

4   bidded what I thought was a fair market price.  But if

5   somebody does not get me a full set of documents, I

6   cannot give them -- I can just give them a budgetary

7   number.

8        Q.  All right.  I'm going to show you an exhibit in

9   just a moment.  Okay.  I'm going to show you Exhibit 60.

10   It's a document with Bates No. OnePoint16246.  Just a

11   minute.

12             Do you see that document?

13             (Exhibit 60 marked.)

14        A.  Yes, I do.

15        Q.  (BY MR. FRIDMAN)  All right.  So this is a bill

16   from OnePoint to Toshiba?

17        A.  Correct.

18        Q.  For journeymen electricians, right?

19        A.  Correct.

20        Q.  And it is for work done throughout the

21   electrical plant -- electrical work done throughout the

22   plant from July 23rd, 2011, to August 5, 2011, right?

23        A.  Correct.

24        Q.  And the total for that work was seven

25   journeymen who worked 575 hours for regular time, right?

CONFIDENTIAL

Page 190

1      A.   Right.

2      Q.   And 218 hours overtime?

3      A.   Correct.

4      Q.   And the total charge to Toshiba was $72,200

5  plus $5,234 in tax?

6      A.   Correct.

7      Q.   For a total of $77,434, right?

8      A.   And $0.50.

9      Q.   And $0.50.

10            I'm going to show you Exhibit 61.  Can you

11  see Exhibit 61?

12            (Exhibit 61 marked.)

13     A.   Yes, I can.

14     Q.   (BY MR. FRIDMAN)  So this is an invoice or a

15  composite of two invoices sent by Electrical &

16  Mechanical Solutions, LLC and Brad Jackson for work done

17  at Toshiba from July 23rd, 2011, through July 29th,

18  2011.

19            Do you see that?

20     A.   Correct.

21     Q.   Whose handwriting is on this page?

22     A.   This is Anne's handwriting.

23     Q.   That's Anne's handwriting?

24     A.   Correct.

25     Q.   Okay.  Does your handwriting appear anywhere on

CONFIDENTIAL

Page 191

1    this page?

2         A.  It does not.

3         Q.  So did you instruct Anne on how to process

4    these invoices?

5         A.  She knew what the rates was, and she was trying

6    to -- and she billed it based on those rates.  The only

7    instruction that we received during the latter parts

8    was -- well, instructions -- I instructed her to make

9    the bills every two weeks because that's what TIC wanted

10   us to do.  But then somewhere down the line, Pablo

11   called me and Anne and he said -- well, initially, they

12   would give us both POs and we would exhaust the POs and

13   we would get another PO and we would -- we could

14   not zero out the PO.  So we would have some monies left

15   in the PO, and we would just leave it hanging and, you

16   know, just stop and go onto the next PO.

17              So since about 2007 to about 2011 or so,

18   11 years, we were -- we were always leaving some monies

19   left in the PO.  But then one day, he got a call from

20   accounting telling him that -- that I need to close out

21   the PO 100 percent.  So -- and we get -- and Anne -- I

22   didn't get into the details of all this calculation, and

23   Anne kept telling him that I can't close out exactly to

24   the penny because the hours are sometimes more than

25   what's left in the PO.  So he said just go ahead and

1    round it up and just go ahead round it up.  And so she

2    was doing up the rounded up -- rounding up business.

3                 So while that was going on, that was, I

4    think, around 2011 or 2012 or so.  And I had asked --

5    and Anne told me that, hey, Pablo told me just round it

6    up.  So I was under the impression in my head that --

7    that Anne was rounding it up and then on the back end,

8    she was taking it out.  But I just found out very

9    recently when the expert brought it to our attention

10   that that -- that from the back end it was not coming

11   out.  So I confronted Anne, and I asked Anne, why didn't

12   you start subtracting the ones that you added?  She

13   said, well, Pablo told me just to do it.  And then she

14   even told Pablo, hey, listen, this -- we're getting more

15   hours for something we have not done.  He said don't

16   worry, I'll get Abraham to do miscellaneous repairs over

17   here and don't worry about it.  So all that was just --

18   I just found out all that here just very, very recently.

19   So those are the facts.

20       Q.  Okay.  I -- I think you -- you anticipated a

21   question I was going to ask.  My question was:  What

22   were your instructions to Anne, and what I take it as

23   your answer is you told her to round up; is that it?

24                 MR. DANIELS:  Object to the form.

25       A.  I -- I told her that all the POs should be

CONFIDENTIAL

Page 193

1   billed in full, completely.  Don't leave any monies in

2   the PO and I -- the other instruction was make sure you

3   send the bill every two weeks.

4       Q.  (BY MR. FRIDMAN)  Okay.  So then let's look at

5   these notations here.  Do you see that for Victor

6   Castro, there is 40 regular hours marked?

7       A.  Right.

8       Q.  And the invoice from Brad Jackson, and it's

9   got -- the 40 has a handwritten line through it, and it

10  says 48 above it?

11      A.  Yep, I see that.

12      Q.  And you see that same thing appears for

13  Pablo Martinez, Julio Dominguez, Shawn King, and Edrick

14  Archie, right?

15      A.  Yes.

16      Q.  Is that what you mean by rounding up?

17      A.  No, that's not what I meant.

18          So I cannot explain what that is right

19  there.  Sometimes she'll get a PO from Brad which is not

20  a corrected one and then he'll send a corrected one.  We

21  had over 300 of these things come to us in the 13 years.

22  So just pulling out a number.

23          No. I did not instruct her to do that, and

24  that's not part of the rounding up.

25      Q.  So when you see the same part on the second

CONFIDENTIAL

Page 194

1   part of this invoice for August 1st, 2011, to August

2   5th, 2011, 40 has been crossed out and changed to 48 for

3   the hours?

4        A.  Well, to me -- to me, it looks like it's been

5   changed from 40 to 8.  So I don't know the -- the rhyme

6   or reason behind that.  It's not 48 and based on what

7   I'm looking at.

8        Q.  Okay.  Well --

9        A.  It's actually gone down.  So I don't know --

10  this is the first time I'm seeing this.

11       Q.  Okay.  So it looks like what Anne has done is

12  she added up the regular hours --

13       A.  Right.

14       Q.  -- and we're on -- on the August 1st invoice --

15  at 40, and she came out with 240 hours.

16       A.  Correct.

17       Q.  That checks out, right?  6 times 40, 240?

18       A.  Yeah, right.

19       Q.  And then for overtime, she's got 18 hours of

20  overtime, and she comes out with 108.

21       A.  Correct.

22       Q.  All right.  So that's consistent with the EMS'

23  invoice?

24       A.  Correct.

25       Q.  But then it looks like to the 240, she's added

CONFIDENTIAL

Page 195

1    32.   Do you see this number 272 times 80 here?

2         A.   I do see that, yes.

3         Q.   And that corresponds to adding eight four

4    times.

5         A.   Oh, I see what you're saying.  Okay.  Got it.

6    Okay.

7         Q.   You see that?

8         A.   Yeah, I see that, yes.

9         Q.   So what she's done is she's increased the

10   regular time hours by 32 hours and multiplied it by $80

11   an hour, which is Toshiba's rate, right?

12        A.   That is correct.

13        Q.   And if you look above that, she has the

14   240 hours --

15        A.   Correct.

16        Q.   -- and multiplied it by the $40 rate, which is

17   the actual --

18        A.   Right.

19        Q.   -- rate that EMS charged your company, right?

20        A.   Right.

21        Q.   So where did these extra 32 hours come from?

22        A.   I cannot explain that.  I really don't know the

23   answer to that.  I did not instruct her to add any

24   hours.

25        Q.   Okay.  And if -- if you go to the same time

CONFIDENTIAL

Page 196

1    period for the first page of Exhibit 61, July 23rd, you

2    see that she's done the same thing?

3         A.  Correct.  I see that, yep.

4         Q.  So instead of 263.5 regular time hours, she's

5    come out with 303 regular time hours, right?

6         A.  Right, correct.

7         Q.  Because she added eight hours to -- one, two,

8    three, four, five -- five different people.  So she

9    added an extra 40 hours of regular time?

10        A.  Right.

11        Q.  So an extra hours of 40 -- 40 hours on the

12   first invoice plus 32 hours on the second invoice is 72

13   extra hours that Toshiba was billed at $80 an hour,

14   right?

15        A.  Correct.

16        Q.  And if you multiply that out -- can you see my

17   calculator on the screen?

18        A.  No, I don't see it.

19        Q.  No?  Okay.

20             I get an extra $5,760 billed to Toshiba.

21   Can you explain that to me?

22        A.  Well, I cannot because I'm just looking at a

23   snapshot of a working copy of someone's -- I don't know

24   if -- if she ended up paying Brad more than what is

25   specified over here.  So it's very -- then this looks

CONFIDENTIAL

Page 197

1    like -- I cannot explain that.  I don't know -- this is

2    the final numbers that went to Toshiba?  Was this the

3    final invoice that we paid Brad?

4        Q.  I'll put the invoice to Toshiba back.

5        A.  Yeah, okay.

6        Q.  Just -- just so we're clear here, we have 303

7    hours .5.

8        A.  Right.

9        Q.  Right?

10              Over here that includes the extra 40 hours

11   that she added.

12       A.  Right.

13       Q.  And then here we have 272 hours.

14       A.  Right.

15       Q.  That includes the extra 32 hours that she

16   added.

17       A.  Right.

18       Q.  And that should give us 575.5 hours, right?

19       A.  Correct.

20       Q.  So let's -- let's go back to Exhibit 60.

21              575.5 hours --

22       A.  Right.

23       Q.  -- of regular time were billed to Toshiba by

24   OnePoint?

25              Do you see that?

CONFIDENTIAL

Page 198

1      A.  I see that.

2      Q.  Please explain why.

3      A.  I just said a while ago.  I cannot explain this

4  because I did not do this.  I did not instruct her to --

5  there is some reason she was -- I kept asking her the

6  same question.  She said that we were told to round it

7  up and finish the PO.  I don't have an answer for this.

8  I really don't.  This is the only one I'm going to be --

9  I don't have an answer.  I don't know.

10      Q.  Okay.  Mr. Joseph?

11      A.  Yeah.

12      Q.  This is not -- this is not an anomaly.  We do

13  see this happen over and over again over years including

14  as recently as 2019.

15      A.  2019, I did look at it.  It was towards the

16  latter part where -- in fact, she has shown me several

17  invoices where we had even short-changed Toshiba.  I'm

18  not the one who did the accounting.  So I -- I cannot

19  speak for -- on behalf of this -- I really don't know

20  the answer to this.

21      Q.  So you -- you have no explanation for me on --

22  on this?

23      A.  Well, all I can say is that in the first six,

24  seven, eight years because everything was great, we had

25  monies left over.  But I -- I don't have an explanation.

CONFIDENTIAL

Page 199

1   Yes, I'm -- I really don't know.

2        Q.   To -- to us, without any other information from

3   you, this looks like you're inflating your hours.

4              Do you understand why we think that?

5              MR. DANIELS:   Object to the form.

6              Yes, you can answer.

7        A.   If that's the way you take it.   I don't know

8   what to say -- I -- I don't have an answer.

9        Q.   (BY MR. FRIDMAN)   All right.   Because what

10  we're seeing is you're adding hours to Toshiba's invoice

11  without support.

12       A.   I understand.

13       Q.   So my question is, what is your explanation for

14  this?

15             MR. DANIELS:   He -- he just told you he

16  doesn't have --

17       A.   I -- I wish I had an answer.   Believe me.   I --

18  I didn't sleep over this thinking about this.   I really

19  don't know and so is Anne.   We just --

20       Q.   (BY MR. FRIDMAN)   Right.

21       A.   Show off the rounding business, I don't know.

22  I really don't know.

23       Q.   The extra $5,760 plus tax that you billed to

24  Toshiba was pure profit for OnePoint, right?

25       A.   If that was the case.   It was an honest

CONFIDENTIAL

Page 200

1    mistake.  It was not a malicious intent and that's all I

2    can say.

3         Q.  But it's a mistake that is repeated over and

4    over again every year?

5         A.  Not all the way from 2007 to 2019.

6         Q.  Okay.  Well --

7              MR. DANIELS:  I'm not --

8              MR. FRIDMAN:  Yes.

9              MR. DANIELS:  I'm not interrupting your

10   line of questioning.  But when you get to a logical

11   break point, we've been going over an hour.

12             MR. FRIDMAN:  Let's -- let's break now.

13   It's okay.

14             MR. DANIELS:  We don't have to, but if it's

15   a good time, then let's take a break.

16             MR. FRIDMAN:  I won't deny the witness a

17   break.  So if -- if Mr. Joseph wants to take a break --

18             THE WITNESS:  No.  I want to -- want to

19   keep going.

20             MR. DANIELS:  No, I'm the one requesting

21   it.  I get it.  But, again, I don't need it right this

22   minute.  If you want to keep going on this line -- I

23   don't want to interrupt your line of questioning.

24             MR. FRIDMAN:  I understand.  Mr. Daniels,

25   if you need to take a break, let's take a break.  Let's

CONFIDENTIAL

Page 201

1  reconvene in seven minutes.

2           MR. DANIELS:  Okay.

3           THE WITNESS:  Okay.  Thanks.

4           THE VIDEOGRAPHER:  Okay.  This now ends

5  Video 4 of Abraham Joseph.  Off the record at 3:20.

6           (A break was taken from 3:20 p.m. to

7  3:30 p.m.)

8           THE VIDEOGRAPHER:  Now, back on the record.

9  Video 5 of Abraham Joseph.  The time is approximately

10  3:30.

11     Q.  (BY MR. FRIDMAN)  Okay.  Mr. Joseph, I'm going

12  to show you Exhibit 63.

13           Do you see that on your screen?

14           (Exhibit 63 marked.)

15     A.  Yes, I do.

16     Q.  (BY MR. FRIDMAN)  Okay.  So this is an example

17  from 2019.

18     A.  Okay.

19     Q.  Exhibit 63 is a composite of two invoices from

20  Electrical & Mechanical Solutions to OnePoint covering

21  the time period from June 14, 2019, through June 27,

22  2019, for work at Toshiba.

23           Do you see that?

24     A.  Yes.

25     Q.  And you see that the billings for the first

CONFIDENTIAL

Page 202

1   week are 40 regular hours and 20 overtime hours.

2            Do you see that?

3       A.  Yes.

4       Q.  And the second week was the same.  40 regular

5   hours and 20 overtime hours.

6            Do you see that?

7       A.  Yes.

8       Q.  So based on that, what would you expect

9   Toshiba's bill to -- to show for that period of time?

10      A.  80 regular hours and 40 overtime.

11      Q.  Right.

12           So let's take a look at what happened in

13  this one.  So the handwriting on this page, is this also

14  Anne?

15      A.  Yes.

16      Q.  So you see here, Anne does a calculation on the

17  right where she multiplies 40 by 80?

18      A.  Right.

19      Q.  And by 120, right?

20      A.  Right.

21      Q.  And then she has an arrow pointing down and she

22  does it again, 40 times 80, but then adds an extra

23  15 hours to the overtime and multiplies 35 by 120.

24           Do you see that?

25      A.  Right.  I see that, yeah.

CONFIDENTIAL

Page 203

1      Q.  And then if you go to the second week, she does

2  the same thing.

3      A.  Correct.

4      Q.  She takes the 20 hours of overtime and adds

5  another 15, multiplies it by 120.

6      A.  Correct.

7      Q.  Do you see that?

8      A.  Right.

9      Q.  So I'll show you the Toshiba bill, but it isn't

10  what we would expect.  I'm showing you Exhibit 62, which

11  is the bill for the same period.

12          (Exhibit 62 marked.)

13      A.  Right.

14      Q.  (BY MR. FRIDMAN)  June 14th to June 27th --

15      A.  Correct.

16      Q.  -- 2019.

17          Do you see that?

18      A.  I see that.

19      Q.  And it has 80 hours regular.

20      A.  Right.

21      Q.  Right?

22          Which is with EMS, right?

23      A.  Right.

24      Q.  And then 70 hours overtime.

25      A.  Correct.

CONFIDENTIAL

Page 204

1      Q.  So it seems that Toshiba has been billed for an

2  extra 30 hours of overtime that aren't reflected in EMS'

3  invoice to OnePoint?

4      A.  Correct.

5      Q.  And then overtime is more expensive for

6  Toshiba, right?

7      A.  Right.

8      Q.  That's charged at a rate of $120 an hour?

9      A.  Yeah.

10      Q.  So if there's an extra 30 hours of overtime at

11  $120 an hour, that is an extra $3,600 that Toshiba was

12  charged on this invoice plus tax in July of 2018, right?

13      A.  Right.

14      Q.  Can you explain why this extra 30 hours of

15  overtime was added?

16      A.  So can you scroll down to her handwritten

17  notes?  I just saw something on the right.

18      Q.  Yes.  I will go to --

19      A.  Yeah.

20      Q.  -- Exhibit 63.  Okay.

21      A.  Okay.  So if you see to -- right where it says

22  Exhibit 0063 directly above it.

23      Q.  Yes.

24      A.  She has a note that says CF 15 hours overtime,

25  whatever that number is, okay?

CONFIDENTIAL

Page 205

1     Q.  Right.

2     A.  I know -- I asked Anne and what she said was CF

3  means "carry forward."  So I'm just throwing it out

4  there so that you see what that means, okay?

5     Q.  Okay.

6     A.  I don't know how to explain this.  I don't have

7  an answer, and I really -- I really don't have an

8  answer.  But I did not instruct her to add hours.  I

9  know she was instructed to complete the PO to add hours

10  to complete the PO, but I was under the assumption that

11  she was taking and backing it out also, but that was not

12  happening and it was -- it wasn't a malicious intent to

13  cheat Toshiba or anything.

14     Q.  Okay.  So --

15     A.  I don't have an answer for that.  I really

16  don't.

17     Q.  Okay.  Well -- so now that you've learned about

18  this overbilling --

19     A.  Correct.

20     Q.  -- are you going to return the money to

21  Toshiba?

22           MR. DANIELS:  Don't answer that.

23           Counsel, that's -- a deposition is not an

24  appropriate time to have that conversation.

25           MR. FRIDMAN:  Okay.

CONFIDENTIAL

Page 206

1      Q.   (BY MR. FRIDMAN)  You're not going to answer?

2              MR. DANIELS:  Don't answer.

3              THE WITNESS:  Okay.

4      Q.   (BY MR. FRIDMAN)  All right.  But at least you

5  can see that the same problem that I pointed out to you

6  with the prior exhibits, 60 and 61, were occurring with

7  62 and 63 in 2019, right?

8      A.   It did happen in this one case, but it was very

9  clean all the way.  I mean, there was no -- none of

10 these issues all the way from 2007.  If you're looking

11 at 90- -- I'm going to say a good 80 percent of them,

12 there's -- none of these problems are there.  But -- so

13 it's not -- it's not a recurring thing all the way from

14 day one until 2019.

15     Q.   So by -- by sending Toshiba these bills, how --

16 how would OnePoint typically send these journeymen

17 invoices to Toshiba in 2018?

18     A.   I would hand-carry to them.

19     Q.   Would you -- would Anne email them?

20     A.   I don't think so.  For the most part, I would

21 hand-carry it.  She may have if -- if Paige or somebody

22 requested us to send a copy, she may have emailed it to

23 Paige, who's Pablo's assistant.

24     Q.   How did you receive your payments from Toshiba?

25     A.   It was mailed to us by checks.

CONFIDENTIAL

Page 207

1      Q.  You would receive a paper check, right?

2      A.  Yes.

3      Q.  And it was sent to you by Toshiba through U.S.

4  mail, right?

5      A.  Correct.

6      Q.  And that was true from 2007 through 2019,

7  right?

8      A.  Right.

9      Q.  Are you aware that Toshiba's expert report --

10  experts have gone through all these invoices and

11  calculated the overbilling of hours by OnePoint, right?

12      A.  I believe so, yes.

13      Q.  And that our experts came out with 882 hours

14  were overbilled for regular time and 705 hours -- sorry

15  -- 882 hours were overbilled for regular time and

16  705 hours were overbilled for overtime.

17      A.  I did not know the exact hours.  No, I did not.

18      Q.  And the total, if you multiply it out, is

19  $155,000.  Were you aware of that?

20      A.  I knew it was around 100,000.  I think I read

21  it somewhere in the report.

22      Q.  So do you have any explanation for this other

23  than it was -- that it was an attempt to overbill

24  Toshiba?

25      A.  It was absolutely not an attempt to overbill

CONFIDENTIAL

Page 208

1    Toshiba.  I never instructed Anne to do that.  I really

2    don't know what happened, and I also keep saying it was

3    an honest mistake.  I really don't know the

4    circumstances.  I did not do this billing, so I don't

5    know.

6        Q.  And are you saying that this is explainable

7    based on a conversation that you say Pablo had with

8    Anne, or is this something different?

9        A.  I don't have an answer.  I guess Anne would be

10    the right person to probably answer if she has an

11    answer.  I really don't know, but she did have a

12    conversation with Pablo, yes.

13        Q.  All right.

14            All right.  I'm going to put another

15    document on the screen.

16            MR. DANIELS:  Will you call it out?

17            MR. FRIDMAN:  Yeah.

18            It's going to be Exhibit 64.

19            (Exhibit 64 marked.)

20        Q.  (BY MR. FRIDMAN)  Can you see Exhibit 64 on the

21    screen?

22        A.  Yes, I do.

23        Q.  All right.

24            MR. DANIELS:  Are you looking at the whole

25    thing?

CONFIDENTIAL

Page 209

1              MR. FRIDMAN:  Yes.

2              Tell me if I'm scrolling too quickly.

3              MR. DANIELS:  I just wanted him to --

4        A.  It's good.  Keep going.

5        Q.  (BY MR. FRIDMAN)  Do you want me to keep going?

6        A.  It's all of the same company?

7        Q.  Yes.

8              I'm -- I'm only going to ask about the

9     first few documents.

10        A.  Okay.  That's fine.  I'm okay with it.

11        Q.  All right.  Mr. Joseph, let me call your

12     attention to the first page of Exhibit 64, which is an

13     invoice from OnePoint to Toshiba dated March 1st, 2008,

14     for one line electrical diagram, professional services

15     from February 1st, 2008, to February 29th, 2008.

16              Do you see that?

17        A.  Yes.

18        Q.  Okay.  Please tell me what this project was

19     about.

20        A.  Okay.  So this -- the -- Toshiba is such a old

21     facility that none of their electrical panels and

22     disconnects, and all the way coming from center point

23     power to the transformer, transformer to all the

24     distribution panels was completely -- there was no

25     proper labeling of any sort.  So Pablo wanted us to

Page 210

1   build a brand new as-built joints showing what the

2   current conditions was.  Drawings as in one-line diagram

3   which is -- that shows the location of the transformer,

4   the capacitors, the generators, the whole thing for the

5   entire -- however big the campus is, 10 acres, 20 acres.

6   So -- so he wanted the latest and greatest set of plans,

7   not for the layout of the plan, but it's for all the

8   electrical details all the way down to every little

9   circuit coming down from the power company down to the

10  last outlet.

11        Q.  Okay.  And how is that work typically done?

12        A.  So there's several people involved in doing

13  this thing.  So you would need -- at the very top, you

14  would need an electrical engineer, who would be, like,

15  the main person.  Then under him, you will have some

16  journeymen electricians.  Under him, you will have some

17  companies that specializes in scaffoldings and lifts

18  that goes to areas that you cannot reach because there

19  were some breaker panels; it goes way up there.

20              Then there's a lot of coordination with my

21  employees, we'll have to work with this whole team.

22  Coordination with each department, like if we would

23  bring something in the motor plant, we had to coordinate

24  with the motor plant when we could turn off the power.

25  Because in order to trace the lines, we have to turn off

1    the breakers, identify the breakers, then we had another

2    team that did all the labeling.  We had another team

3    that did all the -- the CAD drawings.  So there was a

4    combination of several people involved in this thing.

5    And Telios is the one who's finally certifying and

6    checking what we are doing.

7        Q.  And what -- so Telios, you mentioned, was one

8    of the subcontractors, right?

9        A.  Right.

10       Q.  Were there any other subcontractors involved in

11   this project?

12       A.  We had to get -- well, there was several of my

13   employees on staff.  There was some journeymen

14   electricians that I had to use, just to help the

15   engineers with the tracing of the circuits.  We had to

16   rent equipments to -- we had to get somebody to do all

17   the drawings.  We had to get another company to do all

18   the labeling and label all the panels.  We had to put

19   together documents, and we submitted the whole thing to

20   Toshiba to take.

21       Q.  So what were the names of the other

22   subcontractors that you used?

23       A.  I may have used EMS electricians for some of

24   the other job, but I -- I don't -- I don't know the name

25   of the AutoCAD guy.  I don't know the name of the --

Page 212

1    well, a lot of my employees were there.  I don't know

2    the name of the company who did the labels.  I -- I

3    don't recall all of them right now.

4        Q.  Okay.  Well, what we have here to support your

5    costs, because the invoice for February 2008 is a total

6    of $26,580.

7              Do you see that?

8        A.  I see that.

9        Q.  And as support, we see an invoice from Telios

10   for MEP Engineering, one engineer at $95 per hour for

11   44 hours.

12             Do you see that?

13       A.  Right.  I see that, yeah.

14       Q.  And that is for the period of February 1st,

15   2008, to February 29th, 2008.

16             Do you see that?

17       A.  I see that.

18       Q.  And the total charge from Telios to OnePoint

19   was $4,432?

20       A.  That is correct.

21       Q.  All right.  So first question is, if you look

22   at the Telios invoice, which is at Bates label

23   OnePoint811, you see the engineer billed 44 hours from

24   Telios, right?

25       A.  Right.

CONFIDENTIAL

Page 213

1      Q.   At $95 an hour.

2             Did you have any other engineers working on

3   this?

4      A.   I believe I do.

5      Q.   Because when I go up here to MEP Engineering --

6      A.   Right.

7      Q.   -- I see a charge for 64 hours at --

8      A.   Right.

9      Q.   -- $103 per hour.

10     A.   Yes.

11     Q.   So can you explain that to me?  Is -- is that

12  another example of adding hours to work like what we saw

13  with EMS, or is there --

14     A.   Now, this --

15     Q.   -- another explanation?

16     A.   The explanation is we also had EIT.  Those are

17  engineers in training working directly for me.  We had a

18  lot of other trades.  This is -- the engineers was just

19  the one -- the final stamping and making sure everything

20  was done right.  So that bill right there is a

21  combination of several activities, not just the --

22  engineers are not going to be crawling up and down and

23  going to the panels and that stuff.  So we had a whole

24  bunch of other crew doing all that.  They're just --

25  they're just certifying the job, and this job was done

CONFIDENTIAL

Page 214

1    in several different phases.

2        Q.  Right.

3        A.  So this is not a direct bill just for Telios.

4    This is for a combination of all the people that I've

5    just mentioned earlier.

6        Q.  All right.  Do you have the support for the

7    other professionals that were billed on this bill to

8    Toshiba?

9        A.  Can you repeat that question again?

10       Q.  Yes.

11              So we -- we -- you have the Telios bill

12   here, right?

13       A.  Correct.  Right.

14       Q.  Do you have the bills and backup documentation

15   to support the balance of the hours from the MEP

16   Engineering principal, the project engineer, the

17   administrative clerical, and the journeyman?

18       A.  I do not have it with me, no.

19       Q.  Do you have it at OnePoint?

20       A.  I don't -- we gave -- whatever we had, we gave

21   it to our -- to our attorneys.

22       Q.  Because I don't think we've seen anything to

23   support all these other hours that you billed Toshiba

24   for.

25       A.  If it is not in the folder, it's -- it's not

CONFIDENTIAL

Page 215

1   here.

2       Q.   So -- and your position is that MEP Engineering

3   was not just Telios?  There was another company?

4       A.   There was several companies.  There was a

5   company that does the AutoCAD drawing.  There was a

6   company that does all the rigging for the lifts to get

7   to the higher locations.  There was a company that did

8   the labeling.  There was an electrician that would

9   coordinate with these guys to do the tracing of the

10  circuits.  There was jobs involved with shutting down

11  plants to turn off breakers to identify the -- the

12  outlets.  So there was, like, six or seven different

13  people involved in this whole thing.

14      Q.   I understand.

15           My -- Mr. Joseph, my focus is on this one

16  line item here.  (As read):  "MEP Engineering:

17  principal, 64 hours."

18           Which company did that part of the job?

19      A.   So all the ones that I've mentioned is all

20  lumped in that one invoice, all the -- the hours for all

21  that.  I didn't break it down by an AutoCAD person or by

22  labeling guys, or I didn't break it down by the rigging

23  companies or anything.

24      Q.   I -- I feel like we might be talking past each

25  other because you -- you have other line items here.

CONFIDENTIAL

Page 216

1   You have project engineer.  You have administrative,

2   clerical, and you have journeyman.

3                Do you see that?

4        A.  Yeah, I see that.

5        Q.  Okay.  I am just focused on this first line.

6   And my impression is that that matches up with the

7   description from Telios, MEP Engineering engineer.

8        A.  Correct.

9                I just said we also had some EIT engineers,

10  which is engineers in training who are not professional

11  engineers helping us on this job also.

12       Q.  And they get billed out at the same $140 hourly

13  rate as --

14       A.  I don't --

15       Q.  -- ones not in training from Telios?

16       A.  I don't -- I don't remember what their -- the

17  rates were at that time.  I don't know what I paid them.

18       Q.  You're paying a project engineer -- you're

19  charging a project engineer here at 95, and I assume

20  that that's not an engineer in training either, right?

21       A.  I -- I really don't know what that is.  This

22  was in 2008 or -- and 2008 -- I -- I don't know the

23  answer to that.  I can't recall.

24       Q.  So as you sit here today, you can't explain the

25  discrepancy between MEP Engineering principal 64 hours

CONFIDENTIAL

Page 217

1   at 140 per hour and the Telios bill?

2        A.  No.  I cannot explain something that happened

3   12 years ago.  I really don't recall it.  So I cannot

4   answer it.

5        Q.  And you don't have -- other than what you've

6   given to the attorneys, you don't have anything else

7   to -- to provide to us to substantiate these charges?

8        A.  That is correct.  I do not have anything with

9   me.

10       Q.  All right.  Did you sometimes submit bills --

11   sorry -- strike that.

12            Did you sometimes submit bids to TIC using

13   Federal Express?

14       A.  You mean as in FedEx?

15       Q.  Yes.

16       A.  I'm not understanding the question.  Did I mail

17   something to them by FedEx?

18       Q.  Yes.  Did you ever mail bids to TIC using

19   FedEx?

20       A.  That is correct.  Yeah.  I -- I may have done

21   about one or two projects where the requirement --

22   requirement was you send your proposal through FedEx,

23   yes.

24            (Exhibit 71 marked.)

25       Q.  (BY MR. FRIDMAN)  I'm going to show you

CONFIDENTIAL

Page 218

1    Exhibit 71.  So take a look at Exhibit 71.  I'll give

2    you a chance to read it.  And as you do, I'll describe

3    it.  Exhibit 71 is Bates labeled TIC-91911, and it's an

4    email from Abraham Joseph to Anne Sam copying

5    Pablo D'Agostino, subject (as read):  "Bid for Okanella

6    Warehouse door installation."  Dated August 21st, 2007.

7                     Do you see that?

8         A.  I see that, yeah.

9         Q.  So is this an example of the time that you

10   emailed the bid to Pablo?

11        A.  I'm not even sure if this -- when I said to

12   Anne, please mail a hard copy to D'Agostino, I'm not

13   even sure if she mailed it by email or if she sends it

14   by regular U.S. mail.  I -- I really don't know what

15   the -- this is -- this is not very common, but if that's

16   what Pablo requested, that's what I'm going to do.

17        Q.  Okay.  You see where it says "attachment"?

18        A.  Yes.

19        Q.  It says (as read):  "570-07" --

20        A.  Yes.

21        Q.  -- "door install at Oakanella warehouse.doc."

22        A.  Okay.

23        Q.  And then here's the next document.

24        A.  Okay.  So it is an email then.  Okay.  Email

25   with an attachment, yes.

CONFIDENTIAL

Page 219

1       Q.  So that's an example of when you emailed a bid

2   to Pablo?

3       A.  Correct.  Which is not very, very common,

4   but -- but it's done as I can see it right now.

5       Q.  Okay.  Did you sometimes communicate with

6   Pablo D'Agostino using his personal email?

7       A.  I -- I may have in few instances.

8       Q.  And why would you do that?

9       A.  Because he asked me to use his personal email

10  in some cases.

11      Q.  Did he tell you which cases he wanted you to

12  use his personal email?

13      A.  No.  He did not specify it, but he just -- he

14  told me to send it to his personal emails.

15                  (Exhibit 74 marked.)

16      Q.  (BY MR. FRIDMAN)  I'm going to show you

17  Exhibit 74.  This is an email that Pablo forwarded to

18  his work account on November 4th, 2010, title "HEV bid,"

19  and it -- or it's an email from you, and it says (as

20  read):  "Abraham Joseph to Abraham Joseph."  Perhaps

21  Pablo was blind copied on this.

22                  Do you know?

23      A.  I don't remember.

24      Q.  So it attaches an HEV building construction bid

25  from November 4th, 2010.

CONFIDENTIAL

Page 220

1            Do you remember this?

2        A.   I remember this.

3        Q.   And the bid price you proposed is

4    $2.349 million.  You see that?

5        A.   I see that, okay.

6        Q.   It says (as read):  "Due to our history of a

7    healthy working relationship between OnePoint and TIC,

8    we are offering a 6 percent discount and this is

9    reflected in the above pricing."

10        A.   Okay.

11        Q.   What does -- what does that mean?

12        A.   Well, I'm just trying to get the job.  So I'm

13    trying to tell them that I'm dropping my price down by

14    6 percent.

15        Q.   Were you competing against other companies for

16    this bid?

17        A.   Okay.  So I don't know if this is a job that

18    I -- that I did this job or if I was just bidding it.

19    I -- I really don't know.  I have to -- I don't know who

20    was competing again.  But 2010, I was bidding

21    aggressively.  2010 and '11, all the way up to '19,

22    aggressively to get jobs that -- can you go back to the

23    very top?  I want to read what my email said.  Yeah,

24    right there.

25            Yeah, okay.  All right.  I read that file.

CONFIDENTIAL

Page 221

1      Q.  Okay.  Does having read your email refresh your

2  memory about this?

3      A.  Well, if he's trying to meet a target and I'm

4  trying to tell him that yeah, I'm trying to -- well, not

5  his target, whatever they're budgeted for -- I'm trying

6  to tell him that, hey, I've cut my numbers down, I'm

7  trying to -- down to the bare-bones and I'm offering TIC

8  a 6 percent discount.

9      Q.  Okay.

10     A.  And I have a feeling I did not even get this

11 job, so...

12     Q.  So the final price that you had proposed here

13 to Pablo, which you sent to his personal email was about

14 $2,349,000, right?

15     A.  If it was sent to his personal email, that's

16 what it says.

17     Q.  That's what it appears.

18     A.  Okay.  I didn't see his personal email address

19 anywhere.

20     Q.  See where it says "from" and it says Pablo in

21 little letters and he's forwarding it to his TIC

22 account?

23     A.  Right.

24     Q.  All right.

25     A.  I don't know if it says Pablo and that is his

CONFIDENTIAL

Page 222

1   personal -- I really don't know what that email address

2   is.

3        Q.  Okay.  I'm going to show you Exhibit 75.  Do

4   you see that?

5             (Exhibit 75 marked.)

6        A.  Can you zoom it out a little bit?

7        Q.  (BY MR. FRIDMAN)  Okay.  What I'm going to do

8   is I'm going to scroll through the document and let you

9   read it.

10       A.  Okay.

11       Q.  But it is an email chain dated December 17th,

12  2010, that has as an attachment a document called

13  "Latest HEV Building1.doc."

14       A.  Okay.

15       Q.  Do you see how it says from Abraham Joseph, and

16  it says ajoseph@onepointinc.com, right?

17       A.  Right.

18       Q.  Is that your work email?

19       A.  Yes, it is.

20       Q.  And it says "to Pablo."  Do you see that?

21       A.  Yes, I do.

22       Q.  The email address to Pablo mm007pd@aol.com.  Do

23  you see that?

24       A.  Yes, I do.

25       Q.  Was that a personal email address for Pablo?

CONFIDENTIAL

Page 223

1     A.  Yes, it is.

2     Q.  That's not his Toshiba email address, right?

3     A.  Right.

4     Q.  So you sent this document to him to his

5  personal address, right?

6     A.  Right.

7     Q.  Is this the same bid that we were talking about

8  before HEV building?  Is that the same project?

9     A.  Well, here's the thing, again.  The HEV

10  building had two phases.  So I don't know which phase

11  this one deals with.  I did one phase of the HEV

12  building.

13     Q.  Okay.  I'm happy to put the other one back on

14  to compare.

15          What I want to point out to you, though, is

16  if you look at the price, it's $1 million more expensive

17  than the last bid we saw from you.

18     A.  Okay.

19     Q.  Right?

20     A.  That's correct.

21     Q.  This price is at $3.328 million?

22     A.  Right.

23     Q.  And the other one was about $2,349,000, right?

24     A.  What was the date on the first one?

25     Q.  All right.  I'll go back to it.

CONFIDENTIAL

Page 224

1              So the date on this bid is December 17th.

2    A.  Okay.

3    Q.  And on Exhibit 74, the date is November 4th,

4    2010.

5    A.  Got it.

6    Q.  And it says (as read):  "New HEV building

7    construction."

8    A.  Got it.

9    Q.  So is this the same project?

10   A.  If isn't -- yeah, I'm assuming it's the same

11   project, yes.

12   Q.  And feel free to -- if you want to read the

13   scope of work on there.

14   A.  Well, I'm just going by the dates.  And it

15   seems like it is the same one for this -- within

16   two months from each other, so, yes.

17   Q.  Okay.  So in two months, the price that you

18   proposed went up about $1 million, right?

19   A.  It could go up to triple the price.  It depends

20   on what -- what the scope of work is.  Toshiba is

21   typical of not giving a complete set of drawings.

22   They're typical about changing their minds.  They're

23   typical about adding to the job.  They're typical about

24   reducing the scope of work.  And then it has all to be

25   approved all the way up to Tokyo.  So I've gone through

Page 225

1   these gyrations with them hundreds of times; back and

2   forth.  So they'll say, oh, this is what we want to do

3   now.  I'll give them a price.  Two days later, they

4   said, we've decided not to do this.  I will give them

5   another price.  And it was just -- it was a constant

6   back forth.  It could go by $1 million, it could go by

7   $2 million.  On this HEV project, at one point, they

8   wanted the put elevators and then they decided not to

9   put elevators.  Then they wanted to add the elevators,

10  so, yes, there was changes in pricing.  And I've

11  qualified myself in a lot of those proposals, too, about

12  what the conditions were.

13      Q.  All right.  Do you recall winning this project?

14      A.  I believe I did the first part of the HEV

15  project.  Yes, I did.

16      Q.  Okay.  I'm going to show you Exhibit 76, which

17  is the purchase requisition form from Toshiba for the

18  HEV renovation.

19              Do you see that?

20              (Exhibit 76 marked.)

21      A.  I see that, yes.

22      Q.  (BY MR. FRIDMAN)  And the final price was

23  $3.793 million.

24              Do you see that?

25      A.  I see that.  I'm trying to look at the date

CONFIDENTIAL

Page 226

1    also.  This is about a year later from the initial

2    bidding almost.  Maybe three, four months later, yes.

3         Q.  Right.  The requisition date is November 10th,

4    2011?

5         A.  Right.

6         Q.  The first date we looked at was from

7    November 2010, right?

8         A.  Right.

9         Q.  So a couple of months later?

10        A.  Right.

11        Q.  And do you see what other companies bid against

12   OnePoint for this project, right?

13        A.  I see it now, but I did know at that time about

14   the other three companies.

15        Q.  Do you see A & A Premier Builders?

16        A.  Yes, I do.

17        Q.  So was this one of the bids that you prepared?

18        A.  No.  This was the one I identified as them

19   actually bidding on it.

20        Q.  Okay.  And Millenium Construction, is that one

21   of your fake bids, or is that real Millenium

22   Construction?

23        A.  If -- if there is a document in there, I would

24   like to see that on Millenium Construction.

25        Q.  Okay.  I believe they're all the way at the

1    end.  I'm going to scroll all the way down.

2            The other companies on there, Parsons.

3    Have you ever heard of Parsons?

4       A.  Never heard of them.

5       Q.  And Pace --

6       A.  Never heard of them.

7       Q.  Do you know Pace Construction?

8       A.  Never heard of them.

9       Q.  Did you know that Cris Parsons was related to

10   Pablo's ex-wife?

11           Did you know that?

12      A.  I had no -- I had no idea.

13      Q.  And did you know that Cris Parsons worked at

14   Bill Pace's gun store?

15      A.  I don't know anything about this gun store.

16           Now, I have seen his name appear in one of

17   these, I guess, legal paperworks, yeah.

18           THE CERTIFIED STENOGRAPHER:  I'm sorry to

19   interrupt but this is Abby, and I was kicked out.  So

20   the last question I got was, "And the Millenium

21   Construction, is that one of your fake bids, or is that

22   a real Millenium Construction?"

23           MR. FRIDMAN:  Okay.  We've got the

24   videotape, right?  Could you pick it up off of there?

25   Should we -- should we go off the record and talk about

CONFIDENTIAL

Page 228

1    this for a minute?

2                     THE CERTIFIED STENOGRAPHER:  Yeah.  Yeah.

3    Let's go off the record for just a minute.

4                     THE VIDEOGRAPHER:  Okay.  We're now going

5    off the record.  The time is approximately 4:11.

6                     (A break was taken from 4:12 p.m. to

7    4:21 p.m.)

8                     THE VIDEOGRAPHER:  Back on the record.

9    Video 6 of Abraham Joseph.  The time is approximately

10   4:21.

11       Q.  (BY MR. FRIDMAN)  Mr. Joseph, you asked to see

12   the Millenium part of this bid package, so I've had it

13   up on the screen for you.

14                     Do you see it?

15       A.  I don't see it yet.

16       Q.  Well --

17       A.  I see a vendor confidentiality agreement.

18       Q.  Okay.  Yes.  You're seeing the beginning of it.

19   Do you see how it says Millenium on the top?

20       A.  Yes.

21       Q.  Okay.

22       A.  I can't read the second -- okay, go ahead.

23       Q.  I'm going to scroll to it.

24       A.  Okay.  All right.

25       Q.  Do you know David Williams?

CONFIDENTIAL

Page 229

1          A.   No, I don't.

2          Q.   We're on --

3          A.   I don't --

4          Q.   Okay.  We're on TIC-10848, and there's a

5     business card for David F. Williams from Millenium

6     Project Solutions?

7          A.   I don't know him.

8          Q.   And you don't know this company, right?

9          A.   Never heard of it.

10         Q.   Does Mr. Kurian's Millenium Performance company

11    actually do any type of work?

12         A.   With this company?

13         Q.   No.  Putting this company aside for a moment.

14         A.   Okay.

15         Q.   Mr. Kurian's company, are -- are you aware

16    whether it is engaged in any business at all at any

17    time?

18         A.   They may have been back in 2007/2008, yes.

19         Q.   Do you know what kind of work the company did?

20         A.   Oh, I really don't know.

21         Q.   Okay.  And then we see the bid from A & A

22    Premier Builders?

23         A.   That is correct.

24         Q.   All right.  Do you know Strive Concepts?

25         A.   I do not know them.

CONFIDENTIAL

Page 230

1      Q.   You've never heard of this company?

2      A.   Only after the lawsuit, yes.

3      Q.   Do you know a person named Vinh Dang?

4  V-I-N-H --

5      A.   I don't.  I do not.

6      Q.   Okay.  All right.  I'm going to put this

7  document away unless there's anything else on this that

8  you want to share.

9      A.   Nothing to share.

10     Q.   Okay.  I want to talk, Mr. Joseph, about

11 Sudhakar Kalaga.

12          When did you first meet Sudhakar Kalaga?

13     A.   I think in 2006.

14     Q.   And how did you meet him?

15     A.   I met him in the Society of Engineers meetings.

16     Q.   What is the Society of Engineers?

17     A.   It's a group of engineers from the local

18 Houston area.  It's a professional group of engineers.

19     Q.   Are you an engineer?

20     A.   I'm not a professional engineer.  I don't have

21 my PE license, but I am an engineer.

22     Q.   You're an engineer by education?

23     A.   By education.

24     Q.   Okay.  Tell me about that.  What is your --

25     A.   Well, I've done my electrical and mechanical

CONFIDENTIAL

Page 231

1   engineering from India.  And then I've done piping and

2   processing engineering from the University of Houston

3   here in Houston.

4        Q.  Were you active in this group of engineers?

5        A.  Yes.  I served on the board, and I was also the

6   president.

7        Q.  How about Mr. Kalaga?  Was he active, as well?

8        A.  I -- I don't know if he served on the board,

9   but he was -- I've seen him a few times, four or five

10  times in those meetings, yes.

11       Q.  Do you know what the official organization name

12  of the organization is?

13       A.  ASIE.

14       Q.  What does that mean?

15       A.  American Society of Indo-American Engineers

16  {sic}.

17       Q.  Do you know a Chetan Vyas?

18       A.  Yes, I do.

19       Q.  Did you meet him at a meeting of that group?

20       A.  Yes, I do.

21       Q.  Do you know Ravi from Geotest Engineering?

22       A.  I've met him a couple of times.  I don't know

23  him personally.

24       Q.  You've never done business with him?

25       A.  I don't believe so, no.

CONFIDENTIAL

Page 232

1      Q.  Were you responsible for introducing Mr. Kalaga

2    to Pablo D'Agostino?

3      A.  Yes.

4            Pablo asked me for three engineering

5    companies, and he was one of them.

6      Q.  At the time that you introduced Mr. Kalaga to

7    Pablo, what type of work was Mr. Kalaga doing?

8      A.  He was specializing in drainage projects,

9    retention ponds.  Anything to do with the county and the

10   city for hydraulic, those kinds of things.  Civil

11   engineering-type work.

12     Q.  What was the name of his company?

13     A.  KITS.

14     Q.  KITS?

15     A.  Correct.

16     Q.  Were they also known as KIT Professionals?

17     A.  That's correct.  KIT Professionals.

18     Q.  Did KIT Professionals do construction?

19     A.  I -- I did not know they were doing

20   construction.

21     Q.  All right.  Do you remember, approximately,

22   when you first introduced Pablo D'Agostino to

23   Mr. Kalaga?

24     A.  Yeah, around 2008/2009.  In that time frame.

25     Q.  I'm going to show you an email.

CONFIDENTIAL

Page 233

1      A.  Yeah.

2      Q.  Exhibit 77.  Can you see that?

3              (Exhibit 77 marked.)

4      A.  Let me get my glasses.

5              Yes, I see it.  Can you -- can you blow

6   that up a little bit more, please?

7      Q.  (BY MR. FRIDMAN)  How's that?

8      A.  Yes, I see it.  Much better.

9      Q.  So it is an email chain between you and

10  Mr. Kalaga and Mr. D'Agostino.

11              Do you see that?

12     A.  I see that.

13     Q.  And I'll scroll to the end so you could see the

14  whole chain.

15     A.  Okay.

16     Q.  So you see it -- it begins with an email from

17  you to Mr. Kalaga copying Pablo.

18     A.  Correct.

19     Q.  Subject of the meeting is "Meeting" -- the

20  subject of the email is, "Meeting with corporate

21  facilities manager at Toshiba."  The date is January 8,

22  2008.

23              Do you see that?

24     A.  I see that.

25     Q.  Was this the first time that you introduced

CONFIDENTIAL

Page 234

1    Pablo to Mr. Kalaga?

2         A.  I would think so, yes.

3         Q.  Do you -- do you recall this meeting?

4         A.  I don't recall it now.

5         Q.  So what happened after your meeting with

6    Pablo D'Agostino and Sudhakar Kalaga?

7         A.  This --

8              MR. DANIELS:  Let me object to the form,

9    but you can answer.

10        A.  So we had some problems on that control plant

11   expansion building, and there was some issues with water

12   plumbing.  So that's when Pablo asked me to respond to

13   it, and I told him I don't have the expertise to do all

14   these kind of jobs.  So he said, can you make some

15   recommendations?  I gave three company names and

16   Sudhakar was -- KIT was one of them.  I think he spoke

17   to all three companies.  And then he told me to set up

18   this meeting with Sudhakar, and then KIT and Pablo was

19   working on doing the -- whatever they had to do for the

20   retention pond and stuff like that.

21        Q.  (BY MR. FRIDMAN)  Okay.  And that was the

22   first?

23        A.  That is correct.  That would be the first one,

24   yes.

25        Q.  Were there other projects that you worked on

Page 235

1   together with Mr. Kalaga together at Toshiba?

2       A.  Yes, I did.

3       Q.  Okay.  Can you identify the other projects?

4       A.  Anytime there's a project that involves civil

5   engineering matters or structural engineering because he

6   has a group of structural engineers, I would sway out of

7   that because that's not my expertise, and I didn't want

8   to stick my neck out on the line.  So Pablo would call

9   him directly to do all the design calculations and come

10  up with the drawings.  And he would tell me to work

11  closely with him while I do the -- the guy for doing the

12  repairs, he's the one coming up with the designs.  So

13  there was two or three instances where I worked with him

14  on some projects.  Where he did the engineering and I

15  did the construction.

16      Q.  Do you remember the names of the projects?

17      A.  I recall -- the was one -- there was a canopy

18  that we were going to build for Toshiba, and there was

19  some concerns about how strong it should be anchored to

20  the floor concerning the hurricane situation.  So he --

21  he came up with the design for that.  There was another

22  structural engineering wall that was either failing or

23  cracking.  So he came up with the design for that one,

24  and he also was involved in the HEV project that we

25  finished , but he got involved at the -- at the very

CONFIDENTIAL

Page 236

1    tail end of it to do all the as-built drawings for the

2    fire marshal's -- for the fire marshal's office.

3        Q.   Okay.  Do you remember a predominant use study?

4        A.   I saw that, in this case, yes.

5        Q.   You didn't remember it before you saw it in

6    this case?

7        A.   I don't remember it at all.

8        Q.   Okay.  All right.  Let me show you a document

9    and you can let us know if it refreshes --

10       A.   Okay.

11       Q.   -- your memory.

12              I'm going to show you Exhibit 78.  And

13   Exhibit 78 is an email chain between you and Mr. Kalaga

14   dated November 3rd, 2010, titled "Predominant Use Study

15   Proposal."  I'm -- I'm going to go to the end of this

16   chain and then scroll up, so you could see the entire

17   document.

18              You tell me to stop if you need to read

19   this.

20              (Exhibit 78 marked.)

21       A.   Can you stop right there?  Can you go down a

22   little bit?  Keep going down.  Okay.  I got it.  Okay.

23       Q.   (BY MR. FRIDMAN)  Okay.

24       A.   All right.

25       Q.   I'll show you the rest of the emails.  You see

CONFIDENTIAL

Page 237

1    it?

2         A.   I see it, yeah.

3         Q.   Okay.  So let's start with the proposal that's

4    attached at the very end.

5              Do you know who Vinod Vemparala is?

6         A.   I do not know him.

7         Q.   Have you ever spoken to him before?

8         A.   Never spoke to him.

9         Q.   Do you know what V2V Solutions is?

10        A.   I have no idea.

11        Q.   So if you look at -- and I'll give you the

12   Bates number KIT_CIVIL_119331.  You see an email from

13   Sudhakar Kalaga to you attaching the email that

14   Mr. Vemparala sent to Pablo D'Agostino with the

15   proposal.

16             Do you see that?

17        A.   I see from -- yes, I see that, yes.

18        Q.   And Mr. Kalaga writes to you (as read):  "FYI,

19   second proposal."

20        A.   Okay.

21        Q.   Was this because you had asked him to obtain

22   multiple complementary bids for this project?

23        A.   No, I did not.

24        Q.   Do you know who did?

25        A.   I have no idea who did.  Who's the second

CONFIDENTIAL

Page 238

1    proposal, I have no idea.

2         Q.   And why is Mr. Kalaga sending this to you as an

3    FYI as second proposal?

4         A.   Okay.  So now that I've read the actual

5    proposal.  So this was something that Pablo said that

6    they were going to do a study, and he found an expert

7    who can save a lot of money in their consumption of gas

8    or electricity, which is not my expertise at all.  I --

9    I know nothing about it.  So in order to do this -- and

10   I was already in Toshiba for the last three years.  I

11   was very, very well-versed with the -- the layout of

12   Toshiba.

13            He copied me to make sure that I am in the

14   loop because I knew the location of all the gas meters.

15   I knew the location of all the generators.  I knew the

16   location of all the five KV8 transformer locations.  So

17   I was very knowledgeable about the whole layout.  So I

18   was going to help them with the -- with all the -- the

19   details -- technical details if they wanted it.  But I'm

20   not an expert on this.  So he must have copied me on

21   this, so I could assist them in showing where all the

22   things were.

23        Q.   So if V2V Solutions was the second proposal,

24   what was the first proposal?

25        A.   I -- I have no idea what the first proposal

Page 239

1   was.  I really don't.

2        Q.  Was that the KIT proposal?

3        A.  I cannot speculate.  I only know for a fact

4   that I did not bid on this job because this is not my

5   expertise.

6        Q.  Okay.  So further up in the chain, we go to

7   KIT_CIVIL_66004.  You respond to the second proposal

8   email from Mr. Kalaga, and you say (as read):  "Great.

9   Hand-deliver to him."

10              What did you mean by that?

11       A.  I told him -- basically, I'm telling him you

12  deal with him directly.  I -- I don't -- this is not my

13  specialty.  I don't do this thing, and you work with him

14  directly.

15       Q.  It seems --

16       A.  I was --

17       Q.  Go ahead.

18       A.  I said, I was -- I was more than happy to help

19  them with any, you know, of the layout of the land, but

20  I did not bid on it, and I told them to hand it over to

21  Pablo.

22       Q.  Well, it seems from this email that you are

23  giving Mr. Kalaga orders or -- or direction on what to

24  do.

25              MR. DANIELS:  Objection.

CONFIDENTIAL

Page 240

1      Q.   (BY MR. FRIDMAN)   Is that accurate?

2      A.   I'm not ordering him.   I did -- I did not

3   demand him.   He -- he may have called me and said, hey,

4   should I email this?   I don't -- I don't know what the

5   context was back in 2010, but if I told him to

6   hand-deliver it, that's what I told him.   Why I told him

7   to do that, I don't know.

8      Q.   Okay.   And then Mr. Kalaga responds to you and

9   says (as read):   "The guy is in Ohio.   He sent an email

10  to him.   Did I mess up?"

11              So why is Mr. Kalaga asking you if he

12  messed up?

13              MR. DANIELS:   Objection.   Form.

14     A.   I have no idea why he's asking me that

15  question.

16     Q.   (BY MR. FRIDMAN)   Were you instructing

17  Mr. Kalaga on how to submit complementary bids?

18     A.   Absolutely not.

19     Q.   Because you are aware that V2V Solutions was a

20  company that had a similar function to A & A Premier

21  Builders and Millenium Performance.   It was a fake

22  bidder.

23              Are you aware of that?

24              MR. HUSTON:   Object to the form.

25              MR. DANIELS:   Objection.   Form.

CONFIDENTIAL

Page 241

 1     A.  I don't know if they were fake or real.  I know
 2  nothing about V2V.
 3                (Reporter clarification.)
 4                MR. HUSTON:  This is Penn Huston.  I
 5  objected to the form.
 6                THE CERTIFIED STENOGRAPHER:  Thank you.
 7                MR. DANIELS:  And I followed up with his
 8  objection.  And to avoid this problem -- it's late in
 9  the depo to be doing this -- but can we just from now on
10  have an objection -- agreement that an objection as to
11  one is good as to all?
12                MR. FRIDMAN:  Yes, of course.
13                MR. HUSTON:  Thank you.
14     Q.  (BY MR. FRIDMAN)  All right.  So -- and then
15  you respond to Mr. Kalaga (as read):  "Okay.  All is
16  good."
17                Why did you tell him that?
18     A.  That's my standard thing -- that's my standard
19  phrase in law of communication.  I say all is good.  All
20  is good.  That's how I respond to most of my
21  communications.
22     Q.  Even though Mr. Kalaga didn't hand-deliver the
23  V2V proposal to Pablo D'Agostino, your view was that it
24  was okay; all is good; is that right?
25     A.  I don't even know if he hand-delivered it to

CONFIDENTIAL

Page 242

1    Pablo or not.  I have no idea if he delivered it or not

2    delivered it.

3        Q.  All right.  So it's your position that you were

4    not giving direction or instruction to Mr. Kalaga on

5    what to do; is that right?

6        A.  Absolutely.  I'm not giving any directions to

7    him.

8        Q.  Let me show you another document, Exhibit 79.

9    All right.  Exhibit 79 is an email chain.  It start with

10   Bates No. KIT_CIVIL_79020, and it starts at the top with

11   an email from you to Mr. Kalaga dated January 26, 2009,

12   and it says (as read):  "Proposal for structural

13   engineering report."

14              Do you see that?

15       A.  I see that.

16       Q.  All right.  Let me start at the bottom to give

17   you an opportunity to read the email.

18       A.  Okay.  Can you keep scrolling?

19       Q.  Have you had a chance to read it?

20       A.  Yes, I did.

21       Q.  All right.  So the project that's being

22   discussed in this email is the concrete drainage

23   channel.

24       A.  Right.

25       Q.  Right?

CONFIDENTIAL

Page 243

1      A.  Yes.

2      Q.  Do you remember this project?

3      A.  Yes, I do.

4      Q.  Okay.  Tell me what this project was.

5      A.  So they had some issues with some water --

6  water infiltration -- no, wait a minute.  Yes, yes.

7  Water infiltration in some of the buildings, and they

8  were trying to design a channel so that they could route

9  the water in a different direction of the building and

10 also Pablo asked -- showed me the project first.  I told

11 them this is not my expertise.  I can do the repairs if

12 someone will come up with the -- with the engineering

13 for this.  We can do the repairs for it.  We can do the

14 correction for it.

15          So he showed me the project.  I -- I

16 believe I must have shown -- me, Pablo, and Sudhakar

17 must have seen the project together.  And for some

18 reason, Sudhakar copied me on it, and I -- and I told

19 him I don't -- no, well, he said that he met the

20 representative from OnePoint.  I didn't want to stick my

21 neck on the line because I'm not a structural engineer.

22 So basically, I'm telling him to take my name out of it.

23 If you want to put the TIC rep's name, that's okay.  I

24 don't want to be responsible for something that he

25 designed and used me because that's not my expertise,

CONFIDENTIAL

Page 244

1    and that's what this whole thing is about.

2        Q.  So you think by being cc'd on an email you're

3    taking responsibility for work that Mr. Kalaga did?

4        A.  No.  Because he clearly says -- on his

5    proposal, it says something about I met representatives

6    from OnePoint.  So he's basically saying that he took

7    orders from me.

8        Q.  Okay.  So --

9        A.  And I'm not willing to take that risk.

10       Q.  If you go to the last email on the chain, which

11   is at KIT_CIVIL_65818.  Mr. Kalaga writes an email to

12   Pablo and copies you in on the email, right?

13       A.  I see that, yes.

14       Q.  And he says (as read):  "Please find the

15   attached proposal to provide professional structural

16   engineering services" --

17       A.  Correct.

18       Q.  -- "for the evaluation of resisting cracks."

19            Do you see that?

20       A.  Right.  I see that, yes.

21       Q.  And then you respond just to Mr. Kalaga (as

22   read):  "Do not cc me, but bcc me instead."

23       A.  Yes, I did.

24       Q.  Why did you instruct him to that?

25       A.  Because I had a very strong feeling that if I

CONFIDENTIAL

Page 245

1    was going to be doing this job, I wanted to be very

2    involved in this project.  I wanted to see what the

3    scope of his design was, and I want to be mentally

4    prepared for this job.

5         Q.  Why did you want Mr. Kalaga to bcc you?

6              MR. DANIELS:  Objection.

7         A.  Because if he was to copy me on this, and if he

8    was to use the language that based on meeting that

9    OnePoint rep, I did not want to be associated with any

10   responsibilities on that job.  I don't mind being bcc'd

11   so I can -- I would know what the scope of work is so I

12   was -- I would be at the curve to start taking care of

13   that problem.

14        Q.  (BY MR. FRIDMAN)  Is that something Mr. Kalaga

15   did often?  He bcc'd you on emails?

16        A.  I had very, very, very limited emails with

17   Kalaga.

18        Q.  How many times did he bcc you on emails?

19        A.  I -- I don't know.

20        Q.  And then at the top of the -- the chain, you

21   tell him to resend his email, and then you write (as

22   read):  "Ask him to delete earlier email, remove met

23   with OnePoint, Inc.  Do this ASAP."

24              When you --

25        A.  Correct.  But -- go ahead.

1        Q.  When you say "ask him to delete earlier email,"
2   is the "him" you're referring to Pablo D'Agostino?
3        A.  I -- I really don't know who I'm referring to
4   over there.  I do not recall.
5        Q.  Who else could it be?
6        A.  I -- okay.  I don't want to speculate.  It
7   could be somebody from his office who sent that email
8   with -- saying that that was there.  I don't know.
9        Q.  So is this an example of you giving Mr. Kalaga
10  instructions on how to deal with Toshiba?
11       A.  No, this is not an example.  This is
12  communication between two professionals.  I'm telling
13  him exactly what to do.  Do not include me in a
14  structural design that I'm not involved in.
15       Q.  Well, you're telling him to delete emails,
16  right?
17               MR. DANIELS:  Objection to the form.
18       A.  I'm asking him to delete the emails where he
19  used the words "met representative from OnePoint, Inc.,"
20  which I did not like the language.
21               (Exhibit 80 marked.)
22       Q.  (BY MR. FRIDMAN)  Going to show you Exhibit 80.
23  I'm going to show it to you on your screen now.
24               Exhibit 80 is a composite of various emails
25  that we've put together.  They are generally unrelated

CONFIDENTIAL

Page 247

1  to each other, but I want to show you some of them.

2              So the first email, you have

3  Pablo D'Agostino bcc'ing you on an email with Chaffin

4  Associates.

5              Do you see that?

6      A.  Yes, I did see that.

7      Q.  Why was he bcc'ing you?

8              MR. DANIELS:  Objection to form.

9      A.  Can I read the contents of the email?

10             MR. DANIELS:  There's no Bates on this,

11  Counsel.

12             MR. FRIDMAN:  Sorry, say that again.

13             MR. DANIELS:  There's no Bates numbering on

14  this.  When was this produced?

15             MR. FRIDMAN:  I'd have to ask my team about

16  it.

17             MR. DANIELS:  Well, I'm not prepared to let

18  him go forward -- okay, here we go.  Here we go.

19             MR. FRIDMAN:  All right.  Oh, here's what

20  it is.  I think I understand what -- what this is.  So

21  in order to be able to see a bcc.  We've -- we've

22  produced all documents to you in their -- in their

23  native form.  To print out an email that has a bcc, you

24  have to print it out as a text document, not as the way

25  it was displayed in Outlook.

CONFIDENTIAL

Page 248

1              MR. HUSTON:  Okay.

2              MR. FRIDMAN:  So my -- my co-counsel --

3     correct me if I'm wrong -- but these are -- these are

4     text extracts from the emails to show the bcc line, but

5     they have been produced to you before.

6              MR. DANIELS:  Okay.  On that

7     representation, then I'll let -- I'll let you proceed to

8     ask him about the ones with number.

9              MR. FRIDMAN:  Right.

10        Q.  (BY MR. FRIDMAN)  Okay.  So, Mr. Joseph, I'm

11     going to let you read this chain, okay?

12        A.  Okay.

13              MR. HUSTON:  Objection to the form.

14        A.  Yeah, you can scroll down.

15              MR. DANIELS:  You skipped one, Dan.

16              THE WITNESS:  Oh, yeah.

17        A.  Okay.

18        Q.  (BY MR. FRIDMAN)  And my question is, why is

19     Pablo D'Agostino bcc'ing you on this email?

20              MR. DANIELS:  Objection to form.

21              MR. HUSTON:  Objection.

22        A.  I have no idea why he is bcc'ing me on this

23     one.  And I know who Chaffin is; he's the architect that

24     was hired by Toshiba.

25        Q.  (BY MR. FRIDMAN)  I'm not going to ask you

CONFIDENTIAL

Page 249

1   about all the ones we have here.  So I'm going to skip

2   to the next one.

3              So the first one I'm showing you is an

4   email from Sudhakar Kalaga dated January 26, 2009, to

5   Pablo D'Agostino where you are bcc'd, and it says (as

6   read):  "Proposal for structural engineering report."

7              Do you see that?

8       A.  Yeah, I see that.

9       Q.  Do you know why you are bcc'd here?

10      A.  If -- if this is pertaining to the earlier

11  email where he's attaching a proposal, by removing that

12  words, then he's following my instructions where I told

13  him to bcc me --

14      Q.  Okay.  So Mr. Kalaga --

15      A.  -- if that's the same thing.

16      Q.  Mr. Kalaga followed your instruction, right?

17      A.  He didn't follow my -- I -- I had issues with

18  him using the language where he said that he met

19  representatives from OnePoint, and I told him to remove

20  the word, and I told him to bcc me so I would be in the

21  loop.  So I would -- if I was to do the construction, I

22  would be ahead of the curve, and I would like to see

23  what design he's coming up with.

24      Q.  Okay.  I've gone to -- forward and skipped a

25  couple of emails.  And now, we're looking at one from

CONFIDENTIAL

Page 250

1    Sudhakar Kalaga to Pablo D'Agostino on January 30th,

2    2009, where you are bcc'd, and it's -- the subject is

3    (as read):  "Letter report for the damage done to

4    support column by a forklift at Toshiba warehouse."

5                     Do you see that?

6         A.  I see that.

7         Q.  You are bcc'd on this email.  What is your

8    explanation for that?

9         A.  I have no explanation.  I don't know why he

10   bcc'd me on this one.

11        Q.  Did you ask Mr. Kalaga to keep you copied into

12   emails with Pablo D'Agostino?

13        A.  I don't recall.  No, I did not.

14        Q.  Did you ever tell Mr. Kalaga to stop bcc'ing

15   you on communications involving Pablo D'Agostino?

16        A.  I did not tell him that.

17             MR. FRIDMAN:  And, Mr. Daniels, for

18   clarification, I think the way we have this setup is you

19   have the text extract and then --

20             MR. DANIELS:  I see what you did.

21             MR. FRIDMAN:  Yeah.

22             MR. DANIELS:  I see what you did.

23             MR. FRIDMAN:  All right.

24        Q.  (BY MR. FRIDMAN)  Here's another one.  This one

25   is from Mr. Kalaga to Pablo D'Agostino from

CONFIDENTIAL

Page 251

1    February 3rd, 2009, bcc'ing you, again, about the

2    engineering report for the damage done to the support

3    column.

4         A.   I have no idea why he bcc'd me.

5         Q.   Do you recall this?

6         A.   I recall this particular project, yes.

7         Q.   What do you remember?

8         A.   I remember there was a forklift that knocked

9    one of the column supports, yes.

10        Q.   Was that damage caused by OnePoint or another

11   company?

12        A.   It was caused by the Toshiba drivers in the

13   loading dock area.

14        Q.   Did OnePoint have to fix the damage?

15        A.   I don't remember exactly.  I don't remember.

16        Q.   All right.  I'm showing you another email from

17   Mr. Kalaga to Pablo D'Agostino where you are bcc'd,

18   dated February 3rd, 2009.  This one is attaching an

19   engineering report for existing cracks in the precast

20   concrete panel at the stairwell.

21        A.   I believe this was the same one we were talking

22   about earlier.

23        Q.   This is -- you think this is the same email we

24   just --

25        A.   I believe so.

CONFIDENTIAL

Page 252

1          Well, it's the same context of the same

2    email about the concrete where water percolation was

3    happening.

4        Q.  This -- this is damage done to the support

5    column.

6        A.  No, no.  Earlier than that, we were talking

7    about another structural --

8        Q.  Okay.  Did you ask Mr. Kalaga to keep you bcc'd

9    with Pablo D'Agostino?

10       A.  Now, again, if you are talking about the one

11   that we talked about earlier, this is the same one.  I

12   did tell him to bcc just that one -- particular one.

13       Q.  Okay.

14       A.  So this is appearing twice.  So I don't want

15   to...

16       Q.  Here's another example.  This one's from

17   February 4th, where you are bcc'd once again with the

18   revised engineering report.

19          Do you see that?

20       A.  I see that.

21       Q.  I'm going to scroll down a little bit more.

22          Now, I'm on an email dated March 10th,

23   2009, from Sudhakar Kalaga to Pablo D'Agostino where you

24   are bcc'd, and it is a proposal for structural field

25   investigation and engineering report for the shipping

CONFIDENTIAL

Page 253

1   area.

2              Do you see that?

3       A.  I see that.

4              MR. DANIELS:  What -- what page of the

5   exhibit are you on?

6              MR. FRIDMAN:  I can't tell the page.  Maybe

7   it's --

8              MR. DANIELS:  There's no way -- I mean,

9   we've got no Bates numbers.  We've got an 80-page

10  document.  You're scrolling through it.  It's not even

11  one document.  It's a whole bunch of documents collected

12  together.  It's just...

13             MR. FRIDMAN:  All right, Mr. Huston, if you

14  look for KIT_CIVIL_65826 and scroll to the next

15  document, which is the text extract, you'll find it.

16  And, again, it's -- I believe they are in chronological

17  order.  This is March 10th, 2009.

18             MR. DANIELS:  Bear with me.

19             MR. FRIDMAN:  It's also on the screen.

20             MR. DANIELS:  I know.  But I want to be

21  able to see the whole document, not just what you're

22  choosing to show.  I'm sure you can understand that.

23      Q.  (BY MR. FRIDMAN)  Mr. Joseph --

24             MR. DANIELS:  Please let me get to the

25  document before you ask any questions.  I have to

Page 254

1  understand whether my client is addressed in any of

2  these documents.  If -- if you're asking him questions

3  that implicate my client, I have a right to object to

4  them, and I need to see the document in order to know

5  whether that's what you're doing.  So, please, wait.

6              MR. FRIDMAN:  This document does not

7  implicate your client.

8              May I proceed?

9              MR. DANIELS:  Not yet.

10             I'm there.

11             MR. FRIDMAN:  All right.

12      Q.  (BY MR. FRIDMAN)  Mr. Joseph, in this email

13  from March 10th, 2009, you are bcc'd on an email from

14  Mr. Kalaga to Pablo D'Agostino concerning a proposal for

15  structural field investigations and engineering report

16  for the shipping area.

17             Do you see that?

18      A.  I see that.

19      Q.  Did you have any involvement in putting

20  together such a proposal?

21      A.  I'm not qualified to put such a proposal

22  together, and I have no involvement.

23      Q.  Why is Mr. Kalaga bcc'ing you on this?

24             MR. DANIELS:  Objection to the form.

25      A.  I have no idea why he is bcc'ing me.

CONFIDENTIAL

Page 255

1              MR. DANIELS:  Give me time to get my

2      objection.

3              THE WITNESS:  I'm sorry.

4              MR. DANIELS:  That's okay.

5              (Reporter clarification.)

6              MR. DANIELS:  Object to the form.

7      Q.  (BY MR. FRIDMAN)  I have scrolled forward to

8      another document.  It is right after KIT_CIVIL_65886.

9      The date is March 18, 2009.  It is an email from

10     Sudhakar Kalaga to Pablo D'Agostino where, Mr. Joseph,

11     you are bcc'd, and the subject is (as read):

12     "Geotechnical investigations core and soil samples at

13     shipping area."

14              Do you see that?

15     A.  I see that.

16     Q.  Do you recall what this was about?

17     A.  I don't recall.

18     Q.  And, yet, you're bcc'd on this email, right?

19     A.  That is correct.

20     Q.  And I'm -- I'm just going to keep scrolling

21     and -- and to the end because we certainly don't have

22     the time to go through each one.  But here's another

23     example at the very end.

24              MR. FRIDMAN:  Mr. Huston {sic}, you can

25     find it, it's a few pages up from the end document right

1    after KIT_CIVIL_66051.

2         Q.   (BY MR. FRIDMAN)   That is from Sudhakar Kalaga

3    to Pablo D'Agostino where, Mr. Joseph, you are bcc'd on

4    July 26, 2010.  And the subject is (as read):  "Invoice

5    for 50 percent complete, West Little York entrance drive

6    away and roadside ditch slope paving improvements."

7                   Do you see that?

8         A.   Yes, I see that.

9         Q.   So this document is well over a year after we

10   -- we -- you know, the first few documents that we saw

11   you were being bcc'd on, right?

12        A.   Correct.

13        Q.   So --

14        A.   Go ahead.

15        Q.   Go ahead.  Please finish.

16        A.   No, no.  You go ahead.

17        Q.   My question, Mr. Joseph, is it appears that

18   Mr. Kalaga was keeping you in the loop as a bcc on his

19   dealings with Toshiba and Pablo D'Agostino, right?

20        A.   That is not true, but I can speak a little

21   about this particular project because I know about this

22   one.

23                   Can I do that?

24        Q.   Please go ahead.

25        A.   All right.  I don't want to say anything.  In

CONFIDENTIAL

Page 257

1   some cases, it is very important in this particular case

2   I had to get a permit to finish this job, and it was

3   being held up because the fire marshal would not let me

4   finish the completion of the project until all the

5   driveway and the emergency access and fire trucks access

6   and all the drawings was done right.  And I'm -- as a

7   GC, I'm responsible for completing the job.  And in this

8   case, if he's keeping me in the loop to let me know

9   what's going on, I think it is good information so I --

10  because when the fire marshal in the county comes for

11  the inspection, I need to be in the loop of what's going

12  on, so I can close out the project.  So I think it's a

13  good practice for him to -- if he has bcc'd me, I have

14  no problems with this particular one.

15       Q.  Why didn't he cc you?

16       A.  I -- I have no idea why.

17       Q.  Was he just following your instruction to him

18  that we saw earlier where you said bcc me, do not cc me?

19       A.  I did not give minimum instructions across the

20  board, no.

21       Q.  Do you also go by the name "Roy"?

22       A.  Yes, I do.

23       Q.  Is that a nickname?

24       A.  Yeah, it's a nickname.

25       Q.  Did Mr. Kalaga call you Roy?

CONFIDENTIAL

Page 258

1      A.  Yes, he did.

2      Q.  And where does Roy come from?  Where does that

3  nickname come from?

4      A.  Well, my official baptized name is Abraham

5  Joseph and many people would call me Abrahim or Abraham

6  or -- so my parents said, well, you know, we just want

7  to call you Roy.  It's easy to pronounce.  So among --

8  yeah, so some people know me as Roy, yes.

9      Q.  Is it among friends?

10      A.  Not among friends, among outside of work.

11      Q.  Did Pablo D'Agostino call you Roy?

12      A.  No, he called me Abraham.

13      Q.  Now, after -- so at what -- at what point did

14  you notice that KIT Construction started to replace

15  OnePoint as Pablo's contractor of choice?

16      A.  I'm not sure if -- if he was Pablo's contractor

17  of choice.  I cannot answer that, but around 2010 and

18  '11, I noticed jobs were dwindling for me.

19      Q.  Did you notice that jobs were increasing from

20  Mr. Kalaga?

21      A.  I would see them on the premises, yes.

22      Q.  Did you address that with him?

23      A.  I confronted him a couple of times and I asked

24  him.

25      Q.  And what did he tell you?

CONFIDENTIAL

Page 259

1      A.  I said, Well, that's a project I just bid on.

2  What happened to that?  You didn't even tell me where

3  I -- he said, Oh, I have -- I have no control over it.

4  It's being done by -- the corporate has made a decision

5  to get -- he would -- he would just lie to me.

6           Corporate decided to get me another

7  contractor there.  And he wouldn't even tell me the name

8  of the contractor, but I would see KIT's employees

9  there.

10     Q.  Oh, so Mr. Kalaga wouldn't tell you that he was

11  doing the work?

12           MR. DANIELS:  Objection to the form.  He

13  thought he was speaking about Mr. D'Agostino.

14     A.  I was talking about -- yeah, Pablo wouldn't

15  tell me who the contractor that got the job.

16     Q.  (BY MR. FRIDMAN)  I see, okay.

17     A.  Yeah.

18           MR. DANIELS:  He was -- just so you know,

19  he was asking, did you confront Kalaga?

20     A.  No, no.  I did not confront Kalaga.  No,

21  absolutely no.  No.

22     Q.  (BY MR. FRIDMAN)  I'll -- I'll -- let me -- let

23  me try again.

24           MR. DANIELS:  Clean that up.

25           MR. FRIDMAN:  Sure.

CONFIDENTIAL

Page 260

1      A.  Okay.

2      Q.  (BY MR. FRIDMAN)  I want to talk to you about

3  whether you talked -- discussed this with Pablo and with

4  Kalaga.  So let's start with Kalaga first.

5          Did you --

6      A.  Okay.

7      Q.  -- discuss this diminution of work to OnePoint

8  with Mr. Kalaga?

9      A.  I did not tell him that.  No, I did not.

10     Q.  You never did?

11     A.  I did not tell him -- I mean, no, I did not

12  tell him that I lost jobs.  No, I did not.

13     Q.  Did you ever complain to Mr. Kalaga that you

14  were not getting big projects from Toshiba?

15     A.  I don't recall.  I might have mentioned it to

16  him, but I don't recall telling him.  I met Kalaga three

17  or four times during this whole period after that, so...

18     Q.  And what about with Pablo D'Agostino?  Did you

19  discuss it with him?

20     A.  Yes, I did.

21     Q.  Okay.  Tell me what your discussion was.

22     A.  He would keep calling me and say, Well, we've

23  got a great project, can you come bid on it?  And I

24  would go, and I wouldn't get it.  Then he would call me

25  a few months later.  So after a while, I just started

CONFIDENTIAL

Page 261

1   getting aggravated, and I said, What's going on?  I'm

2   not getting any projects here.  So I see that -- and I

3   started pointing out some construction that was

4   happening.  So he got mad at me, he's saying, What, are

5   you checking on me?  What is your, you know -- and so he

6   was getting irritated if I was asking him about it.

7        Q.  Did the subject of payments to him come up

8   during these discussions?

9        A.  No, it did not.

10       Q.  And did you discuss this with him over the

11  years about why you weren't getting selected?

12       A.  I think I discussed it with him once or twice.

13  That's it.  And then I stopped asking him.

14                 (Exhibit 81 marked.)

15       Q.  (BY MR. FRIDMAN)  I'm going to show you

16  Exhibit 81.  Can you see that?

17       A.  Yes.

18       Q.  Okay.  Exhibit 81 KIT_CIVIL_119201.

19       A.  Yes.

20       Q.  Email from you to Mr. Kalaga copying

21  Chetan Vyas dated October 16, 2012.  Subject "My

22  concerns."

23                 Do you see that?

24       A.  Yes, I do.

25       Q.  And you write that you have gone out of your

CONFIDENTIAL

Page 262

1  way to introduce KIT's Professional to Toshiba, even

2  though I knew several other Indo-American companies

3  providing the same services.  I did this, because I

4  trusted KIT's Professionals, right?

5       A.  Correct.

6       Q.  Is that correct?

7       A.  Well, that's what the email says.

8       Q.  And you write (as read):  "I have tried very

9  hard not to ask KIT's Professionals for any service --

10 for any favors, civil engineering related or anything

11 else, although I made a mistake of once asking for a

12 favor for my personal property water retention issue,

13 and I did receive a lukewarm response at best."

14            What are your referring to there?

15      A.  I had some water plumbing in the back of my

16 house, and I did ask him to help me with that.

17      Q.  And did they help you?

18      A.  No, they did not.

19      Q.  And then you write -- skipping ahead a little

20 bit.  (As read):  "I am NOT" -- capitalized NOT --

21 "asking KIT's to thank me for referral or do any favors

22 for me, but I am requesting KIT's Professional not to

23 put me out of business."

24            Why did you tell them that?

25      A.  Well, so let me back up a little bit.  So

CONFIDENTIAL

Page 263

1   Chetan Vyas was on the jobsite, and I saw him one day,

2   and I told him, I said, If y'all have any crumbs left of

3   any jobs see if you can direct them my way.  So he said,

4   Well, in that case, why don't you just send an email to

5   Sudhakar and talk to him about it, and that's what

6   initiated this email.

7        Q.  Uh-huh.

8             And then you write (as read):  "I am sure

9   you have heard the phrase 'Don't bite the hand that

10  feeds you.'  I feel like my hands have been bit."

11            Why did you feel your hands have been bit?

12       A.  Well, because I -- I got them into Toshiba in

13  good faith, and he was doing well.  So I just felt like

14  that he just overstepped his boundaries, and I was -- I

15  was pretty much getting kicked out of there.

16       Q.  You still work -- you have the journeymen

17  electricians, though, right?

18       A.  Yeah, I did.

19       Q.  And you still, during this time period, were

20  making periodic payments of Pablo D'Agostino's credit

21  card bills and giving him cash, right?

22       A.  Correct.

23       Q.  And that was a way for you to at least keep the

24  journeyman work from Toshiba, right?

25            MR. DANIELS:  Object to the form.

Page 264

1      A.  I was just getting that so that I could
2  continue to stay in Toshiba and hopefully land some big
3  projects.
4      Q.  (BY MR. FRIDMAN)  Did you get a response to
5  this email you wrote to Mr. Kalaga?
6      A.  I -- I don't believe so, no.  Not that I
7  recall, no.
8      Q.  You don't -- you never spoke to him?
9      A.  I don't think -- I spoke to Chetan about it,
10 and he just threw his hands up and said, Well, why don't
11 you talk to Sudhakar about it?
12     Q.  Okay.
13              Waiting for an email to load up.
14              MR. DANIELS:  You know the exhibit number?
15              MR. FRIDMAN:  It should be 82.
16              MR. DANIELS:  Thanks.
17              (Exhibit 82 marked.)
18              MR. FRIDMAN:  Okay.  It's loaded up.
19     Q.  (BY MR. FRIDMAN)  Mr. Joseph, I'm showing you
20 Exhibit 82.  The first document has Bates number
21 KIT_CIVIL_36551.
22     A.  Yes.
23     Q.  I'll scroll to the bottom and let you read it.
24     A.  If you can scroll up.  Okay.  Keep going.
25 Okay.  Keep going.  Yes, I'm done reading.

CONFIDENTIAL

Page 265

1      Q.  Okay.  So the email chain is the email

2   exchanges between you, Chetan Vyas, and Sudhakar Kalaga

3   around February 5th, 2014, regarding a Toshiba project.

4      A.  That is correct.

5      Q.  In the email at the bottom of the chain on

6   KIT_CIVIL_36553 January 15, 2014, you write to Sudhakar

7   and Chetan and you say that (as read):  "We are

8   experiencing a very slow business cycle, and we need

9   your help with this project below."

10              What was going on with OnePoint that you

11   were experiencing a slow business cycle?

12      A.  Well, we were slow, in general, during that

13   time frame.  I don't know what -- what was the -- I

14   don't know if it was Hurricane Ike, or I don't know what

15   it was.  So we were slow at that time.  We were slow, in

16   general, with Toshiba to start with, so...

17      Q.  Well, what -- tell me a date range for when you

18   perceived OnePoint was slow?

19      A.  I don't know the exact date range when we were

20   slow.  But at that time, when I sent that email to him,

21   I could have been slow, and that's why I put that in the

22   email.

23      Q.  Were you slow in 2013?

24      A.  I really don't know.

25      Q.  You were slow in 2014?

CONFIDENTIAL

Page 266

1     A.  I was slow in 2014 as I put in this email, yes.

2     Q.  Were you slow in 2015?

3     A.  As far as Toshiba jobs or in jobs in general?

4     Q.  Well, that's a good distinction.  When you

5   write "we're experiencing a very slow business cycle,"

6   are you referring to in general or with respect to

7   Toshiba?

8     A.  I'm referring in general.

9     Q.  Okay.  So in general, were you slow in 2015?

10    A.  I probably was.  Yes, I was.

11    Q.  What about 2016?

12    A.  I don't know.

13    Q.  Are you slow now?

14    A.  I'm very slow right now --

15    Q.  What about --

16    A.  -- because of COVID.

17    Q.  What about in 2019?

18    A.  It was an okay year.

19    Q.  2018?

20    A.  I don't know how I was in 2018.

21    Q.  Is it fair to say that you were slow after

22   Toshiba shifted its construction work to KIT

23   Construction?

24    A.  I would say, yes.

25    Q.  In the years that you were working for Toshiba

1  and billed about $32 million between 2007 and 2011, did

2  Toshiba make up a large portion of OnePoint's revenue in

3  those years?

4          MR. DANIELS:  Object to the form.

5      A.  I don't know the exact percentage, but I did

6  have other customers along with Toshiba at that time,

7  also.

8      Q.  (BY MR. FRIDMAN)  What percent of your revenue

9  would you say was Toshiba work --

10     A.  I really don't know.

11         MR. DANIELS:  He literally just said he

12  doesn't know.

13     A.  Well, I don't know.

14     Q.  (BY MR. FRIDMAN)  Was it 50 percent?

15         MR. DANIELS:  He literally just said he

16  doesn't know.

17         You know what?  Let's take a break because

18  we've been going for an hour.

19         MR. FRIDMAN:  All right.  Take a break.

20         MR. DANIELS:  Before everybody leaves, Dan,

21  what are you looking at?  How much longer are you going

22  to be?

23         And, Mr. Videographer, what's our time --

24  our running time?

25         THE VIDEOGRAPHER:  Let me get us off the

CONFIDENTIAL

Page 268

1    record.  This is now the end of Video 6 of Abraham

2    Joseph.  We're off the record at 5:20.

3                  (A break was taken from 5:20 p.m. to

4    5:33 p.m.)

5                  THE VIDEOGRAPHER:  Now back on the record.

6    Video 7 of Abraham Joseph.  The time is approximately

7    5:34.

8         Q.  (BY MR. FRIDMAN)  All right.  Mr. Joseph, I'm

9    going to put back on the screen Exhibit 82 that we were

10   talking about when we took the break.  Do you see it?

11   This is the email where you were telling Mr. Kalaga and

12   Mr. Vyas that you had a slow business cycle.

13        A.  Right.

14        Q.  And -- so were you asking them for help in

15   getting work from Toshiba?

16        A.  On this email, I'm saying that because I want

17   them to get aggressive on -- on designing that.  Hold

18   on.  Let me just read what it says.

19        Q.  You see, I have it on the screen here.  It

20   says --

21        A.  Right.  Yeah, yeah.  I see what it is.

22                  I said that because this is such a small

23   project for them that they may -- they may not get onto

24   it.  So I figured if I would say that I'm slow, they

25   might expedite the project in some way.

CONFIDENTIAL

Page 269

1    Q.  Okay.  Did you have conversations with Kalaga

2    or Vyas about trying to get you more work from TIC?

3    A.  Can you repeat that question, please?

4    Q.  Yes.

5          From time to time after 2011, did you have

6    conversations with Mr. Vyas or Mr. Kalaga about trying

7    to get you more work from TIC?

8    A.  I talked to Vyas once in person.  And then the

9    second time, I've never spoken to Chetan -- I mean, to

10   Sudhakar directly.  And the second communication was

11   that email where I -- where I ask.  But it was not for

12   TIC work, it could be -- I found out later that they

13   have a construction coming.  So if they have any other

14   projects, to send it my way.

15   Q.  Did they ever send any work your way?

16   A.  Zero.  Nothing.

17   Q.  Did they ever ask you to do something that you

18   considered improper?

19   A.  Absolutely not.

20   Q.  Did they ever ask you to submit complementary

21   bids to their bids to Toshiba?

22   A.  No, they did not.

23   Q.  Did Pablo?  Let me -- let me clarify my

24   question.

25   A.  Yeah.

CONFIDENTIAL

Page 270

1      Q.  Did Pablo D'Agostino ever ask you to submit a

2   complementary bid for a bid that KIT Construction

3   submitted to TIC?

4      A.  No, he did not.

5      Q.  Did Pablo D'Agostino ever tell you what price

6   to bid on a project for TIC?

7      A.  No, he -- he did not.

8      Q.  All right.  Mr. Joseph, what I'm going to do

9   is -- you understand that you were here both in your

10  individual capacity and as a corporate representative

11  for OnePoint, Inc., right?

12     A.  Yes.

13     Q.  So what I'm going to do to try to move this

14  along is I'm going to put on the screen Exhibit 90.

15  Exhibit 90 is the 30(b)(6) notice of taking the

16  deposition of OnePoint.

17             Have you seen this document before?

18             (Exhibit 90 marked.)

19     A.  I believe I do.

20     Q.  (BY MR. FRIDMAN)  All right.  I'm going to put

21  it on the screen.

22     A.  Okay.

23     Q.  Do you see it?

24     A.  Yes, I do.

25     Q.  All right.  So through the day, we've covered a

CONFIDENTIAL

Page 271

1   lot of the topics that are on this list.  So what I want

2   to do is cover the ones that we haven't discussed before

3   and try to finish up that way.

4        A.  Okay.

5        Q.  So I'm going to scroll through the topics.  So

6   we've discussed Topic 1.  We've discussed Topic 2.

7   We've discussed 3 through 5 and Topic 6.  We've

8   discussed 7, and 8.  We've discussed 9.  We've discussed

9   10.

10                  Agreed?

11       A.  Yes.

12       Q.  For Topic 11, did you ever discuss OnePoint's

13  bids with anyone at TIC other than Pablo D'Agostino?

14       A.  No one.

15       Q.  It was always with Pablo?

16       A.  Yes.

17       Q.  Did you ever discuss anything with Paige St.

18  Fluer?

19       A.  Can you rephrase that question?  I have

20  discussed -- go ahead rephrase that question.

21       Q.  Did you ever -- did you ever discuss anything

22  with Paige St. Fluer?

23              THE WITNESS:  So Mr. Fridman is saying

24  "anything."

25       A.  So I have discussed with her -- related or just

CONFIDENTIAL

Page 272

1   anything?

2        Q.  (BY MR. FRIDMAN)  Anything at all.

3             And the next question I'll ask you is if --

4   if you have, what -- what have you discussed with Paige?

5        A.  I've had a few email communications with her

6   about some POs or some late payments or something like

7   that.

8        Q.  So billing, administrative stuff; is that fair?

9        A.  Correct.  Correct.  Nothing to do with bids.

10       Q.  Have you ever discussed anything with a Toshiba

11  president?

12       A.  No.

13       Q.  Have you ever met any Toshiba president?

14       A.  I have seen them in -- well, we did some

15  projects in the C-suite.

16       Q.  Have you had meetings with them?

17       A.  Back in 2007 when I first was introduced to

18  Toshiba, I had a meeting in the conference room with the

19  president, the CFO, several of other C-suites.  I

20  believe Margaret McKay was there, Ken Shaffer was there.

21  And they would be -- put me through this vetting

22  process.  So I did meet about ten people in their

23  conference room when I first came to Toshiba.

24       Q.  How did you first come to Toshiba?

25       A.  Through Pablo D'Agostino.

CONFIDENTIAL

Page 273

1       Q.  And how did Pablo D'Agostino contact you about
2  Toshiba?
3       A.  He called me and he told me he got a job at
4  Toshiba and told me to come there and see him.
5       Q.  And that's what you did?
6       A.  And that's what I did.
7       Q.  Did he ask you to start bidding on projects?
8       A.  I don't know if he's -- not right away.  He
9  said that we have an expansion project coming up, and I
10  think you should meet with the -- the management team.
11       Q.  And is that how you got the meeting with the
12  president, Ken Shaffer, and Margaret McKay?
13       A.  Correct.
14            I did not talk to them in person, but they
15  were all in the meeting and they were asking me some
16  questions.
17       Q.  So Pablo arranged that meeting for you?
18       A.  I don't know if Pablo arranged it or his
19  immediate boss arranged it, but I was in that meeting.
20       Q.  What OnePoint employees would communicate with
21  Toshiba employees?
22       A.  David Headrick, Anne, and maybe some of my
23  workers while they were on the jobsite.
24       Q.  All right.  Let's move on to Topic 12.
25            You recall coming to Toshiba last December

CONFIDENTIAL

Page 274

1    for an interview, right?

2              MR. DANIELS:  You can answer that "yes" or

3    "no."

4        A.  Yes, I was there.

5        Q.  (BY MR. FRIDMAN)  You were accompanied by your

6    lawyer, Kelly Stephens, right?

7              MR. DANIELS:  You can answer that "yes" or

8    "no."

9        A.  Yes.

10       Q.  (BY MR. FRIDMAN)  You came voluntarily, right?

11             MR. DANIELS:  You can answer that "yes" or

12   "no."

13       A.  Yes.

14             MR. FRIDMAN:  I'm sorry, Mr. Daniels.  Why

15   are you giving him instructions on how he should answer?

16             MR. DANIELS:  Because we talked about this

17   yesterday, Counsel.  We're not going to let -- I'm not

18   going to let you go reask all the stuff you asked at

19   that interview.  Besides, you've asked it all today

20   already.

21             MR. FRIDMAN:  And that's not what I'm going

22   to do.  If you hear me ask a question that you have a

23   concern with, you can raise an objection.

24             MR. DANIELS:  Counsel, I'm not going to

25   disclose the contents of my communication with my

Page 275

1  client, but he is aware that we have -- what we've --

2  we've talked about -- about this topic, and so I don't

3  want him to be confused about what he can and can't

4  answer.

5           MR. FRIDMAN:  All right.  So you can --

6           MR. DANIELS:  You can answer any question

7  he asks you unless I tell you not to.  But give me time

8  to give that instruction.

9           THE WITNESS:  Got it.

10     Q.  (BY MR. FRIDMAN)  Mr. Joseph, you came to the

11  meeting at TIC voluntarily, right?

12     A.  Yes.

13     Q.  And you were seated right by the door, right?

14     A.  Yes.

15     Q.  And you remembered that I interviewed you,

16  right?

17     A.  Yes.

18     Q.  Do you recall having a conversation with Kay

19  Peterson towards the end of the interview?

20     A.  I don't know who Kay Peterson is.

21     Q.  She is one of Toshiba's assistant general

22  counsels.  She was present at the meeting.

23           Do you remember that?

24     A.  You're talking about a conversation outside the

25  room or inside the room?

CONFIDENTIAL

Page 276

1      Q.  Outside the room.

2      A.  Outside the room, I spoke to Margaret McKay and

3   one other lady.  I don't know who the other lady was.

4      Q.  Perhaps that was Kay Peterson.

5      A.  I don't know.

6      Q.  What did you tell them?

7               MR. DANIELS:  Don't answer that.

8               MR. FRIDMAN:  You're instructing him not to

9   answer?

10               MR. DANIELS:  Yes.

11      Q.  (BY MR. FRIDMAN)  Did you tell them that you

12   wanted to make it up to Toshiba?

13               MR. DANIELS:  Don't answer that.

14               MR. FRIDMAN:  You're instructing him not to

15   answer?

16               MR. DANIELS:  If I said "don't answer

17   that," I think it's very clear that that's what I'm

18   instructing him.

19               MR. FRIDMAN:  So is it your position,

20   Mr. Daniels, that you won't allow him to ask -- answer

21   any questions about what transpired during the

22   interview?

23               MR. DANIELS:  That's correct.

24               MR. FRIDMAN:  And you'll instruct him not

25   to answer?

CONFIDENTIAL

Page 277

1            MR. DANIELS:  That's correct.

2            MR. FRIDMAN:  All right.  So we'll move on

3    from the topic, but we'll reserve the right to bring

4    this up with the judge.

5            MR. DANIELS:  Look forward to it.

6       Q.  (BY MR. FRIDMAN)  All right.  Let's talk about

7    Topic 13 the email systems, electronic data storage

8    systems, and text messaging services used by OnePoint

9    from 2007 to 2019 including the identity of the email

10   service providers, physical or cloud-based backups, and

11   the deletion or destruction of OnePoint's emails and

12   text messages.

13           Mr. Joseph, what we have noticed in going

14   through the documents we have received through your

15   counsel is that there are very few emails that have been

16   produced to us that it appears you should have.  We

17   count a total of perhaps 500 emails at tops.

18           Does OnePoint have an email system?

19       A.  Yes.

20       Q.  Who is the email provider for OnePoint?

21       A.  It's Microsoft 365.

22       Q.  So do you use Outlook?

23       A.  Yes, I do have Outlook.

24       Q.  How long have you had Microsoft as your email

25   provider?

CONFIDENTIAL

Page 278

1        A.   Just about a year.   2017 or so.   Microsoft --
2    the 365 was about a year ago.
3        Q.   And before that?
4        A.   I think before that, it was some cloud-based
5    system.
6        Q.   And who was the provider for that cloud-based
7    system?
8        A.   I believe it was Bluehost or something like
9    that.
10       Q.   A company called Bluehost?
11       A.   Yes.
12       Q.   And how long did Bluehost provide your email
13   services?
14       A.   I -- I don't know.
15       Q.   Did you research that issue to prepare for your
16   30(b)(6) deposition today?
17       A.   Did I -- can you repeat that question?
18       Q.   Yes.
19            Did you research how long Bluehost had been
20   your service provider for emails to prepare for your
21   30(b)(6) deposition today?
22       A.   No, I did not.
23       Q.   So who was your email provider in 2007?
24       A.   I don't know.   It was the same email address
25   all along.

CONFIDENTIAL

Page 279

1        Q.   Right.

2             Who does your IT?

3        A.   I have a guy who does my IT.

4        Q.   Who is that?

5        A.   His name is Aromus, A-R-O-M-U-S.

6        Q.   Is that his first name or last name?

7        A.   That's his first name.

8        Q.   What's his last name?

9        A.   Rodriguez.

10        Q.   Does he have a company?

11        A.   No.  He just does this on the side.

12        Q.   How long has he been helping OnePoint with its

13   IT?

14        A.   I'm going to say about 5 or 6 years.

15        Q.   So would he have this information about who

16   hosted your email system?

17        A.   I'm -- not sure.  I don't know.

18        Q.   And before he started working with OnePoint,

19   who helped you with your IT?

20        A.   There was a guy, but I don't recall his name or

21   his company.

22        Q.   Are you aware of whether OnePoint has any

23   physical or cloud-based backups of its emails or files?

24        A.   I think so, yes.

25        Q.   Okay.  Tell me about that.

CONFIDENTIAL

Page 280

1      A.  I'm not an expert on this, so I don't know, but

2    it is -- I could go to any computer and I could get into

3    my system, so...

4      Q.  Do you know --

5      A.  I guess it's residing in the Cloud somewhere,

6    so...

7      Q.  How far back do your email records go?

8      A.  I think I can go back 10, 12 years maybe, or I

9    don't know exactly.

10     Q.  You have email records going back 10 or

11   12 years?

12     A.  Possibly, yes.

13     Q.  And how do you access them?

14     A.  How do I access my email?

15     Q.  Yes.

16     A.  That's the question?

17          Well, I just type in my password on my

18   computer, and my email pops up.

19     Q.  So through Microsoft 365, you have access to 10

20   to 12 years' worth of emails; is that right?

21     A.  That is correct.

22     Q.  Do you delete emails?

23     A.  I purge my emails once in a while, yes.

24     Q.  When was the last time you purged your emails?

25     A.  I don't know the exact date.  I don't know

CONFIDENTIAL

Page 281

1    when.

2        Q.  Have you purged your emails since you first

3    learned that Pablo D'Agostino had been terminated from

4    TIC?

5        A.  I don't know the answer to that.  I -- I don't

6    recall.

7        Q.  Did you purge your emails after your interview

8    at TIC with us in December 2019?

9        A.  I don't recall.

10       Q.  Did you purge your emails after you got sued by

11   Toshiba in February of 2020?

12       A.  I don't recall.

13       Q.  Did you take any steps to preserve your emails

14   and prevent them from being purged?

15                MR. DANIELS:  To the extent that that would

16   disclose communications with counsel, I'm instructing

17   you not to answer.  If you can answer that without

18   disclosing things told to you by your lawyers, you can

19   answer.

20       A.  Can you repeat that question?

21       Q.  (BY MR. FRIDMAN)  Yes.

22                Did you take any steps to preserve your

23   emails after you got sued by Toshiba?

24       A.  I didn't take any steps at all.  I didn't do

25   anything.

CONFIDENTIAL

Page 282

1        Q.   Tell me about text messages.  How did you
2    communicate with Pablo outside of email?
3        A.   I have texted him a few times.
4        Q.   What programs did you use to text him?
5        A.   I'm not sure there's a program for texting.
6    Whatever is on my phone, I just texted him on that.
7        Q.   What kind of phone do you have?
8        A.   I have an AT&T phone.
9        Q.   Is it an iPhone or a Samsung or what's the
10   brand?
11       A.   It's an iPhone.
12       Q.   How long have you had iPhones?
13       A.   I guess 6 -- 5, 6 years since iPhones came out,
14   yeah.
15       Q.   Does your iPhone use iCloud as a backup system?
16       A.   I don't know.
17       Q.   Who set up your iPhone?
18       A.   Well, I just go to the AT&T store.  And every
19   time I get a new phone, they will do whatever they have
20   to do to transfer the -- I'm not savvy into doing all
21   that.
22       Q.   So did you use the iPhone's messages app to
23   communicate with Pablo D'Agostino?
24       A.   Are you talking about text messages?
25       Q.   Yes.

Page 283

1      A.  Yes.  I have texted him, yes.

2      Q.  Did you use any other program such as WhatsApp?

3      A.  I might -- I may have used WhatsApp once or

4   twice with him.

5      Q.  What about to communicate with Mr. Kalaga?

6   What programs have you used?

7      A.  I had very limited communication with him, but

8   I may have texted him a few times, yes.

9      Q.  And have you checked your phone to provide us

10  with all those text messages?

11     A.  I believe they -- yes, I have.

12     Q.  Let's go to Topic 14, which is closely related

13  to 13, and I'm assuming that the electronic devices that

14  you use are for both personal and company use; is that

15  correct?

16     A.  On my cell phone?  Yes, yes.  I use it for

17  both.

18     Q.  Do you have a non-work email address that you

19  use?

20     A.  Yes, I do.

21     Q.  And what is that email address?

22     A.  It's a Gmail account.

23     Q.  What is the address?

24     A.  Ajoseph777@gmail.com.

25     Q.  How long have you used that email address?

Page 284

1       A.  I guess -- I don't know exactly how many years,

2   but I have it for a few years.

3       Q.  Did you ever use it to communicate with

4   Pablo D'Agostino?

5       A.  No, I don't recall.

6       Q.  Did you ever use it to communicate with

7   Sudhakar Kalaga?

8       A.  I don't recall.

9       Q.  Is it possible?

10      A.  Will you rephrase that question?

11      Q.  Yes.

12          Is it possible that you've used your

13  personal Gmail account to communicate with either

14  Pablo D'Agostino and Sudhakar Kalaga?

15      A.  It's possible.

16      Q.  Have you searched that account for emails

17  relating to Pablo D'Agostino or Sudhakar Kalaga?

18      A.  I didn't do any searches, no.

19      Q.  Do you know if your counsel did any searches?

20      A.  I don't know.

21          MR. DANIELS:  Counsel, I'll represent to

22  you that we did, and we did search the personal Gmail.

23      Q.  (BY MR. FRIDMAN)  Let's look at Topic 15.  (As

24  read):  "All the steps taken by OnePoint to preserve

25  electronic data and physical documents including emails

CONFIDENTIAL

Page 285

1   following TIC's filing of the complaint in October 2019.

2   TIC's interview of Mr. Joseph in December of 2019 and

3   the filing of TIC's amended complaint against OnePoint

4   and Mr. Joseph in February of 2020."

5               Can you tell me all the steps that OnePoint

6   has taken to preserve electronic data and physical

7   documents?

8       A.  I've not taken any extra steps to preserve it.

9   It is -- it is there, and I just leave it there.

10      Q.  Have you stopped deleting emails?

11      A.  Ever since my attorneys told me, yes, I did.

12              MR. FRIDMAN:  And, Mr. Daniels, you can

13  stop me if -- if this question is too intrusive, but I

14  do want to get a date for when Mr. Joseph was first told

15  to stop deleting the emails.

16              MR. DANIELS:  Yeah.  That would have been

17  handled by Mr. Stephens, who is on the phone.

18              No.  Don't turn your mic on, just...

19              MR. STEPHENS:  Okay.

20              Dan, when we first got the notice that you

21  were trying to talk to him before the December

22  interview, we told them to stop purging, to not delete

23  any evidence or any emails or any text messages or

24  whatever.

25              MR. FRIDMAN:  Okay.  So...

CONFIDENTIAL

Page 286

1            MR. STEPHENS:  So that was prior to the

2    December 19th interview.

3        Q.  (BY MR. FRIDMAN)  All right.  Mr. Joseph, do

4    you remember that instruction?

5        A.  I remember that instruction, but I am going to

6    beg to differ a little bit.  I don't think it was

7    immediately after that meeting.  I think it was a few --

8    well, I don't know.  I don't remember.  I thought it was

9    a couple of months after the meeting, but I don't -- I

10   don't remember.

11       Q.  Is there a way to pinpoint the date like an

12   email?

13       A.  It was a verbal communication.

14       Q.  A what communication?

15       A.  A verbal.

16       Q.  Verbal?

17       A.  Spoken.

18       Q.  Yeah, okay.

19            So you -- to the best of your recollection,

20   you think it was a couple of months after what

21   Mr. Stephens is -- is telling us?

22       A.  Based on my recollection.

23       Q.  Did you follow the instruction?

24       A.  I believe I did.

25       Q.  You're not sure?

CONFIDENTIAL

Page 287

1      A.  I don't know.

2      Q.  Okay.  You're not sure if you stopped deleting

3   emails after your lawyers told you to stop?

4      A.  I think I stopped it, yes.

5      Q.  All right.  Let's go to Topic No. 16.  This

6   topic is asking for documents, physical documents, or

7   electronic documents that OnePoint or yourself destroyed

8   after TIC filed its complaint about Pablo D'Agostino in

9   October 2019.

10            What can you tell me about that?

11      A.  I -- I did not destroy any physical documents,

12   no.

13      Q.  Okay.  Did you delete emails?

14      A.  No.

15      Q.  Did you purge your emails between yourself and

16   Pablo D'Agostino?

17      A.  I don't believe so, no.

18      Q.  Do you know for sure?

19      A.  I'm not sure.  I'm not 100 percent sure.

20      Q.  All right.  Let's go to Topic 17.  (As read):

21   "All the steps taken by OnePoint, Abraham Joseph, and

22   their agents including counsel, to search for, collect,

23   and review electronically stored documents and physical

24   documents potentially responsive to TIC's requests for

25   production issued to OnePoint and Abraham Joseph."

CONFIDENTIAL

Page 288

1           So, first, the volume of documents

2    collected.  Do you know how many documents were

3    collected from yourself and OnePoint?

4        A.  I don't know how many boxes, but I pulled

5    everything from filing cabinets into boxes.  It was

6    picked up by the attorneys' office.

7        Q.  So that's physical documents?

8        A.  Right.

9        Q.  What about electronic documents?  Do you know

10   how many electronic documents were collected?

11       A.  I believe -- I believe they -- they got an

12   image of my computer or something.

13       Q.  Your computer was imaged?

14       A.  Yes.

15       Q.  Do you know if the cloud system that your

16   computer used was imaged too?

17       A.  I don't know.

18       Q.  But --

19       A.  But they imaged my -- I don't know.

20       Q.  Do you know how many emails they collected?

21       A.  I don't know.

22       Q.  Can you tell me what document-review

23   methodology was used to determine what documents were

24   responsive to TIC's request for production?

25               MR. DANIELS:  To the extent that you learn

Page 289

1  that information from counsel, I'm going to instruct him

2  not to answer.  If you can answer without disclosing

3  communications with Counsel, then, you can answer.

4      A.  Can you repeat that question?

5      Q.  (BY MR. FRIDMAN)  Yes.  It's -- it's Point

6  No. 2 on 17.  The question is:  What document-review

7  methodology was used to identify responsive documents

8  responsive to TIC's request for production?

9      A.  I don't know.

10     Q.  You're not prepared to testify about that?

11     A.  No.  I have no idea about what you mean by a

12  methodology.

13     Q.  Well, lawyers use different ways to identify

14  relevant documents including keywords.  So my -- my

15  question is:  What systems were used to identify

16  relevant documents?

17          MR. DANIELS:  Same instruction.

18     A.  I really don't know the answer to that.  I

19  don't know.

20     Q.  (BY MR. FRIDMAN)  All right.  No. 3, do you

21  know what instructions were given to any e-discovery

22  vendors that you are using to host documents that have

23  been collected from you and OnePoint?

24     A.  That vendor was not even my vendor.  I think

25  the attorneys sent the vendors over there.  So I didn't

CONFIDENTIAL

Page 290

1   give them any instructions.

2        Q.   Who is the vendor?

3        A.   I don't know who the vendor is.

4        Q.   Do you know what steps were taken to eliminate

5   nonresponsive documents from the documents that were

6   collected from you?

7        A.   I didn't -- okay.  Can you repeat that

8   question?

9        Q.   Yes.  So I'm -- I'm assuming based on what

10  you've told me that emails were collected from you and

11  physical documents were collected from you.

12             And my question is:  How -- what process

13  was followed to decide what documents were relevant to

14  this lawsuit and what documents that were not relevant?

15             MR. DANIELS:  Answer to the extent you can

16  without disclosing attorney-client privilege.

17       A.   I open the filing cabinets.  I took out the

18  files, put it in the box, and they came and picked it

19  up.

20       Q.   (BY MR. FRIDMAN)  Were all the files that you

21  provided to your lawyers relevant?

22       A.   It was -- it was for the jobs that happened at

23  Toshiba.  I only gave them Toshiba-project jobs.

24       Q.   And what about your emails?  Did you select

25  which emails your lawyers took from you, or did they

CONFIDENTIAL

Page 291

1    collect all of them?

2        A.   They collected everything from my computer.

3        Q.   Do you know how the determination was made

4    about which emails were responsive and were not

5    responsive to Toshiba's request for production?

6        A.   I would have no idea about it.

7        Q.   In the document review that was done, do you

8    know what keywords were used?

9              MR. DANIELS:   Answer only to the extent you

10   can without revealing attorney-client privilege.

11       A.   I don't -- I don't know.

12             MR. FRIDMAN:   So this -- this witness,

13   obviously, is not prepared to discuss these topics.  Do

14   you have somebody else that you're going to put forward

15   as a 30(b)(6) on Topic 17?

16             MR. DANIELS:   Well, you see from our

17   objection, we object him answering pretty much

18   everything after, No. 1, it would invade the

19   attorney-work client privilege.  So, no.

20             MR. FRIDMAN:   Okay.  I mean, it was -- it

21   was your responsibility to seek a protective order from

22   the court prior to the deposition.  The objection is not

23   enough under the Fifth Circuit.  So you needed to get a

24   ruling from the court, and you certainly had plenty of

25   time.  I can cite a couple of cases to you.  Ferko

Page 292

1   versus National Association for Stock Car Auto Racing.

2              MR. DANIELS:  I'm not going to be lectured

3   to by you.  If you've got an issue with the way we did

4   it, you can take it up with Judge Hittner.

5              MR. FRIDMAN:  All right.  We will.

6              MR. DANIELS:  Looking forward to it.

7        Q.  (BY MR. FRIDMAN)  Topic No. 18, an explanation

8   for why OnePoint and Mr. Joseph produced just 199 emails

9   for a time period spanning 2007 to 2019, including just

10  20 emails of Pablo D'Agostino.

11             What do you know about Topic 18?

12       A.  Pablo was not big into emails.  So there's

13  not like there was a lot of emails.  He was more of a

14  big in-person guy.  So he did even know how to write one

15  sentence straight.  So I don't have a lot of emails with

16  him.

17       Q.  Do you think that between 2007 and 2019 that

18  you only exchanged 199 emails with Pablo D'Agostino?

19       A.  I would believe that because -- I would have

20  probably more -- I would have communicated more to Paige

21  than with Pablo.  He -- he could not even type a

22  straight sentence.

23       Q.  Okay.  Do you think it was just 20 emails?

24       A.  I don't know how many emails it was.  I don't

25  know.

1        Q.  So you're telling me that from 2007 to 2019,

2   you only emailed with Pablo 20 times?

3               MR. DANIELS:  That's not what he said,

4   Counsel.  He just said he doesn't know.

5        A.  I don't know.

6        Q.  (BY MR. FRIDMAN)  All right.  So you're not

7   prepared to answer 18, either?

8               MR. DANIELS:  He has answered 18.  He gave

9   an explanation.  The topic called an explanation.  He

10  gave one.

11              MR. FRIDMAN:  The explanation is that Pablo

12  didn't write many emails.  Is that it?

13              MR. DANIELS:  That's his explanation.

14       A.  That's correct.

15       Q.  (BY MR. FRIDMAN)  Topic 19, we've covered.  20,

16  we've covered.  21, we've covered.  22, sales taxes.

17              OnePoint collected sales taxes from TIC,

18  right?

19       A.  That is correct.

20       Q.  Did OnePoint remit all the sales tax it

21  collected from TIC between 2007 to 2019 to the State of

22  Texas and local authorities?

23       A.  Yes, we did.

24       Q.  You understand that your expert report

25  contradicts that statement, right?

CONFIDENTIAL

Page 294

1            MR. DANIELS:  That's not the -- that
2    mischaracterizes that report.
3            MR. FRIDMAN:  All right.  Well, let's --
4    let's put it on the screen.
5            MR. DANIELS:  The report said that they
6    could not find proof that that had been remitted.
7            MR. FRIDMAN:  Are you coaching the witness,
8    Mr. Daniels?
9            MR. DANIELS:  No.  I'm coaching you to stop
10   mischaracterizing the expert report in an effort to
11   mislead the witness.
12           MR. FRIDMAN:  I could ask my cocounsel to
13   call out the number for the expert report.
14           MR. SHARP:  It's Exhibit 92 if you're
15   looking for that Lemer report.
16           MR. FRIDMAN:  All right.  Thank you.
17           (Exhibit 92 marked.)
18      Q.  (BY MR. FRIDMAN)  All right.  Mr. Joseph, I'm
19   showing you Exhibit 92, which is the expert report of
20   Randall Lemer.
21           Do you see that?
22      A.  Yes, I do.
23      Q.  Let me zoom in on it for you.  I'm scrolling to
24   the portion of the opinion that addresses the payment of
25   sales taxes.

CONFIDENTIAL

Page 295

1            Okay.  You see Page 18?

2       A.  Yes, I do.

3       Q.  Okay.  See, Paragraph 48 says BRG, which is

4   TIC's expert, right?  You're aware of that?

5       A.  Yes, I am aware of that.

6       Q.  All right.

7            So it says that (as read):  "BRG states

8   that OnePoint charged TIC a total amount of $444,359

9   {sic} for sales tax on all journeymen electrician work.

10  And if OnePoint did not remit these sales taxes and

11  OnePoint took the wrongly invoiced taxes as excessive

12  and unreasonable profit," right?

13      A.  I'm not agreeing to it.  He put it there "if."

14           MR. DANIELS:  He's quoting from BRG.

15           THE WITNESS:  Oh, he's quoting --

16           MR. DANIELS:  He's quoting from their

17  expert.

18           THE WITNESS:  Okay.  Got it.

19      Q.  (BY MR. FRIDMAN)  Right.  I'm just making sure

20  that you agree that I read that correctly from our

21  expert report, right?

22      A.  Okay.  So --

23      Q.  Right?

24      A.  Okay.  All right.

25      Q.  Okay.  So what your expert did was, first, they

CONFIDENTIAL

Page 296

1   write (as read):  "Based on Counsel's assertion that a

2   five-year statute of limitation applies, they only

3   analyzed payment of taxes from 2015 forward."

4                    Do you see that?

5       A.  Yes, I do.

6       Q.  So your experts ignored everything paid to --

7   all the sales taxes paid by Toshiba to OnePoint before

8   2015, right?

9                    MR. DANIELS:  Object to the form.

10      A.  Is that a question for me, Dan?

11      Q.  (BY MR. FRIDMAN)  Yes, it is, Mr. Joseph.

12      A.  And the question is what again?  Can you repeat

13  it, please?

14      Q.  The question is that based on what your expert

15  is writing here, they only looked at OnePoint payment of

16  sales taxes from 2015 forward, right?

17      A.  I see that, okay.

18      Q.  Your experts ignored all the sales taxes that

19  Toshiba paid to OnePoint before 2015, right?

20                   MR. DANIELS:  Object to the form.

21      A.  I don't know if they ignored it or -- but I

22  have paid sales taxes all the way from 2007 to 2019.

23      Q.  (BY MR. FRIDMAN)  Do you have monthly sales and

24  use tax filings with the State of Texas for before

25  January 2015 reflecting payment of sales taxes collected

CONFIDENTIAL

Page 297

1  from TIC to the State of Texas to the local authorities?

2      A.  Yes, I do.

3      Q.  Have you produced those documents to us?

4      A.  I believe --

5              MR. DANIELS:  Have you requested them?

6              MR. FRIDMAN:  I believe so.

7              MR. DANIELS:  Then you've already requested

8  them.  We haven't objected.  Let me see if we produced

9  them.  To my understanding, we only produced them here

10  because the expert brought them.

11      Q.  (BY MR. FRIDMAN)  All right.  So going to

12  Paragraph 49 of your expert report, your expert note

13  says (as read):  "I noted that for the period from

14  January 2015 through March 2017, OnePoint collected

15  sales tax from TIC based on a rate of 8.25 percent but

16  only provided evidence that 7.25 percent was remitted to

17  the State of Texas."

18              Do you see that?

19      A.  Yeah, I see that, yes.

20      Q.  Is that correct?

21              MR. DANIELS:  That we provided evidence of

22  that, or that -- is what correct?

23              MR. FRIDMAN:  The statement from your

24  expert.

25      Q.  (BY MR. FRIDMAN)  Did OnePoint collect sales

CONFIDENTIAL

Page 298

1    tax from TIC based on a rate of 8.25 percent but only

2    paid 7.25 percent to the State of Texas and ignored the

3    other -- other 1 percent?

4              MR. DANIELS:   That's not what this says.

5    I'm not going to let you mislead the witness by

6    mischaracterizing this -- this document.   I'm not going

7    to do it.   Reask your question, but ask it right.

8        Q.  (BY MR. FRIDMAN)  My question is:  Did OnePoint

9    collect sales tax from TIC on a rate of 8.25 percent,

10   but only paid 7.25 percent to the State of Texas?

11       A.   My answer is we collected sales tax from TIC

12   and we paid whatever -- whatever is by the law of Texas

13   Comptroller's requirements and we did that.

14       Q.   Did you keep the 1 percent difference in sales

15   tax that you collected?

16       A.   I don't know.   I did not.

17       Q.   Do you have evidence to provide to your experts

18   showing that you did not keep that 1 percent?

19       A.   I believe I do.

20       Q.   Why haven't you provided it to your expert?

21       A.   I don't know the answer to that.   I don't know.

22       Q.   All right.   I'm putting Exhibit 90 back on the

23   screen.   Let's talk about 23, the total amounts invoiced

24   to and paid by TIC for work done by OnePoint on an

25   annual basis from 2007 to 2019.

CONFIDENTIAL

Page 299

1          MR. DANIELS:  What's the question?

2      Q.  (BY MR. FRIDMAN)  Can you tell me the total

3  amounts invoiced to and paid by TIC for work done by

4  OnePoint between 2007 and 2019?

5      A.  I don't know the total amount right now.

6      Q.  You're not prepared to testify about that

7  question?

8      A.  I don't want to speculate.  So I don't know the

9  exact number.

10     Q.  Did you do any research to prepare to answer

11 30(b)(6) Topic 23 on behalf of OnePoint?

12     A.  I believe I did.

13     Q.  Did you research 23?

14     A.  I believe I did.

15     Q.  Okay.  So tell me what the results are of your

16 research.

17     A.  It was about 39,000 -- 39 million or so more or

18 less.

19     Q.  About 39 million total?

20     A.  Total, yes.

21     Q.  For that time period?

22     A.  That is correct.

23     Q.  And broken up by year, do you have that

24 information?

25     A.  I don't have it right now, but I can get it.

1      Q.  Okay.  Let's move on to 24.  24 is all

2  complaints that OnePoint and/or Abraham Joseph made to

3  TIC management about Pablo D'Agostino and his conduct

4  including complaints that Pablo D'Agostino made demands

5  for payment from OnePoint.

6                MR. DANIELS:  You covered that.

7      Q.  (BY MR. FRIDMAN)  The answer was there were no

8  complaints from you, right?

9                MR. DANIELS:  The answer was what it was.

10  Move on.

11                MR. FRIDMAN:  I'm sorry, Mr. Daniels.  I

12  can't hear you.

13                MR. DANIELS:  I said the answer was what it

14  was.  Move on.

15      Q.  (BY MR. FRIDMAN)  Okay.  Is that correct,

16  Mr. Joseph?

17      A.  The answer was what it was.

18      Q.  I'm asking -- I'm asking you to -- to answer

19  30(b)(6) Topic 24.

20                MR. DANIELS:  Which he's already done about

21  8 or 9 hours ago.  And I'm not going to let you keep

22  doing this.  You've already just said, again, there are

23  no complaints.  Move on.

24                MR. FRIDMAN:  Are you instructing him not

25  to answer 24?

1          MR. DANIELS:  He did answer it, Dan.  He

2     literally just answered it.

3          A.  I said no complaints.

4          Q.  (BY MR. FRIDMAN)  Thank you.

5               (As read):  "25, identification of all TIC

6     employees that OnePoint informed about payments and

7     gifts OnePoint was making to Pablo D'Agostino," the

8     answer is "nobody," right?

9          A.  Nobody.

10         Q.  (As read):  "Placing Pablo D'Agostino on

11    OnePoint's payroll."  The answer is "OnePoint informed

12    no one at TIC," right?

13         A.  That is correct.

14         Q.  (As read):  "OnePoint submissions of bids in

15    the names of other companies.  OnePoint informed nobody

16    at TIC about this," right?

17         A.  Yes.

18         Q.  Well, let's make sure what your "yes" means.

19              Did you inform anyone at TIC about your

20    submission of bids in the names of other companies?

21         A.  No.

22         Q.  OnePoint's inflated profit margins.  We

23    discussed this yesterday.  So have you discussed

24    OnePoint's profit margins on the work it did for TIC

25    with any TIC employees?

CONFIDENTIAL

Page 302

1      A.  No.

2      Q.  Have you discussed the pattern that we saw

3 earlier today about journeymen electricians' hours being

4 increased with anyone at TIC?

5      A.  I'm not sure if it was padding or if it was an

6 honest mistake, but I did not discuss with anybody.

7      Q.  All right.  And 26 asks about the same topics,

8 but in a slightly different way, it asks (as read):

9 "Are you aware of anyone outside of TIC that has

10 knowledge about Topics 1 through 5, other than the

11 people we've discussed today?"

12      A.  No.

13      Q.  All right.  Let's go to Topic 27.  When did

14 OnePoint first become aware of TIC's lawsuits against

15 Sudhakar Kalaga and Pablo D'Agostino?

16      A.  I would say, when I met with you in that

17 meeting in December 2019.

18      Q.  December 2019 was the first time you became

19 aware of the lawsuit?

20      A.  I'm not understanding the question.  Are you

21 talking about the date of the lawsuit?  I don't know the

22 date of the lawsuit.

23           MR. DANIELS:  When did you learn about the

24 lawsuit?

25      A.  I -- I don't know the exact date when I learned

CONFIDENTIAL

Page 303

1    about it.

2         Q.  (BY MR. FRIDMAN)  Do you remember how you

3    learned about it for the first time?

4         A.  I believe after I met with you.

5         Q.  That was after you met with me, that was the

6    first time that you learned about the lawsuit against

7    Pablo?  Or I -- I thought you had talked to Pablo about

8    it before?

9         A.  Right.  But he did not say anything to me about

10   the lawsuit.  I don't know when the lawsuit happened.  I

11   don't remember the exact date when I exactly was first

12   aware of the lawsuit.

13        Q.  Okay.  So you think it was when you met with me

14   in December 2019, that's the first time that you

15   understood that Toshiba had a lawsuit pending against

16   Pablo D'Agostino and Sudhakar Kalaga; is that right?

17        A.  Well, I knew Pablo was fired from Toshiba.

18        Q.  That's not the question.

19        A.  Okay.

20             I don't know.  I don't know when exactly

21   the lawsuit was filed.

22             MR. DANIELS:  That's not his question,

23   either.  His question is when did you learn that?

24        A.  Let me think about this.

25        Q.  (BY MR. FRIDMAN)  Okay.  I know it's late.

CONFIDENTIAL

1     A.  Okay.  Okay.  So I think know what it is.  So I

2   think in -- probably in November.  November I knew about

3   it.

4     Q.  Okay.  Do you remember how you found out?

5     A.  Right.  I do.  So I was at home, I got a text

6   message from a strange number, and it says that I have

7   bad -- there is bad news about Pablo.  So I don't know

8   who it was, so I texted the person back.  I said, Who

9   are you?  And she said it's Ashley Tucker, and that's

10  when she told me that he killed himself, and there's a

11  lawsuit that's pending against him.  That's when I found

12  out.  This was about a couple of weeks after he was

13  dead.

14    Q.  You found out from Ashley Tucker?

15    A.  That is correct.

16    Q.  Were you friendly with Ashley Tucker before

17  that call or that text, rather?

18    A.  Absolutely not.

19    Q.  Have you met her before?

20    A.  I've met her on maybe 2 or 3 occasions.

21    Q.  Did you ever go on a trip with her and Pablo?

22          MR. DANIELS:  Outside the topic.

23          MR. FRIDMAN:  He can answer if he knows.

24    A.  No.  I did not take a trip with them.

25    Q.  (BY MR. FRIDMAN)  So why was Ashley Tucker

1    texting you to give you this information?

2        A.  I don't know.

3        Q.  Did you visit with Ashley Tucker?

4        A.  Yes, I did.

5        Q.  Tell me about that.

6        A.  When I heard the news, I just thought it was

7    human just to extend my condolences.  So I went to her,

8    and she told me that he shot himself.  And -- and

9    there's a lawsuit pending against him, and I was there

10   for about like 2 or 3 minutes and then I left from

11   there.

12       Q.  You met with her at the penthouse apartment in

13   Arabella?

14       A.  That is correct.

15       Q.  Did you know that Mr. Kalaga owned that

16   apartment in Arabella?

17       A.  No, I did not know that.

18       Q.  All right.  (As read):  "Conversations OnePoint

19   and Abraham Joseph had" -- we're looking at Topic 28 --

20   "regarding TIC's lawsuit outside the presence of counsel

21   including conversation with Pablo D'Agostino, Sudhakar

22   Kalaga, Ashley Tucker, and the owners of A & A Millenium

23   and Atkins."

24              So I think we've talked about all of these

25   people except for Kalaga.  Did you ever discuss the

CONFIDENTIAL

Page 306

1   lawsuit with Mr. Kalaga?

2        A.   I have not.  I have not talked to him.

3        Q.   Did you ever talk to Mr. Kalaga's lawyer,

4   Rusty Hardin?

5        A.   No, I did not.

6        Q.   (As read):  "Topic 29, Pablo D'Agostino and/or

7   Sudhakar Kalaga's instruction or direction to OnePoint

8   to submit bids from projects between 2011 and 2019 at a

9   particular price."

10            Did you ever receive an instruction or

11  direction from Pablo D'Agostino or Sudhakar Kalaga to

12  submit a bid for a project between 2011 and 2019 at a

13  particular price?

14       A.   I did not.

15       Q.   Topic 30, we've gone over some of these.  I'm

16  not going to keep going through them.  So let's skip

17  ahead.

18            (As read):  "Topic 31, OnePoint's overall

19  corporate structure including the shareholders,

20  officers, directors, and the existence of any corporate

21  parent subsidiaries or affiliates."

22            So I want to talk about OnePoint corporate

23  structure between 2007 to 2019.  So you can tell me if

24  the corporate structure has changed at all during those

25  years, all right?  First, starting in 2007, who were the

CONFIDENTIAL

Page 307

1   shareholders at OnePoint?

2       A.   There was no share- -- I was the 100 percent

3   owner.

4       Q.   And has that been true through the present day?

5       A.   That is correct.

6       Q.   And what other positions do you hold at

7   OnePoint?

8       A.   I just have one position as a president.

9       Q.   Are there any other people that have or may

10  have had at one point an ownership interest in OnePoint?

11      A.   No.

12      Q.   Does OnePoint own any other companies?

13      A.   No.

14      Q.   32 and 33, we looked at your website and you

15  described work that you do for other clients.  I just

16  want to know, generally, other than the work that

17  OnePoint did for Toshiba, you know, starting in 2007,

18  what type of work was OnePoint doing?

19      A.   We've done schools.  We have done hospitals.

20  We have done medical clinics.  We have done some work

21  for KBR, Kellogg, Brown, and Root.  We have done

22  churches, universities.

23      Q.   And what type of work have you done for those

24  entities?

25      A.   In some cases, we have done ground-up buildings

CONFIDENTIAL

Page 308

1    from -- all the way -- from grass all the way to a full

2    building.  And in some cases, we have done some interior

3    remodel work.

4        Q.  Does OnePoint own any equipment, heavy

5    machinery?

6        A.  We do own equipment, yes.

7        Q.  What kind of equipment does OnePoint own?

8        A.  We have compressors, generators, negative air

9    pressure machines, scaffoldings, jackhammers --

10       Q.  Do you own any --

11       A.  -- trucks.

12               MR. FRIDMAN:  Did someone object?

13       A.  Sorry.

14               MR. FRIDMAN:  I thought I heard an

15   objection.

16       Q.  (BY MR. FRIDMAN)  All right.  Go ahead.

17       A.  I can repeat -- you want me to repeat those

18   lists again?

19       Q.  No, it's okay.

20               Does OnePoint primarily rely on

21   subcontractors to do the construction work?

22       A.  We have in-house employees, so we do

23   self-perform, too.  But on special things like

24   electrical, plumbing that requires licensing, we sub it

25   out.

CONFIDENTIAL

Page 309

1      Q.  What about ground-up building from the grass?

2      A.  We have done ground-up buildings where the

3   structural and the tilt-wall was outsourced.  But once

4   the framing was done, we did a lot of the interior chips

5   and bolt and framing and all of that stuff,

6   self-performed it.

7      Q.  So is OnePoint like a general contractor or --

8   or something different than that?

9      A.  We are a general contractor.

10     Q.  Is that how you describe yourself?

11     A.  Yes.

12     Q.  (As read):  "Topic 34, the identification of

13  OnePoint employees responsible for preparing bids,

14  hiring subcontractors, performing construction, and

15  maintenance work for TIC projects."

16           So what OnePoint employees were responsible

17  for preparing bids?  Was that just you?

18     A.  Primarily me, but in some cases, in the past,

19  David has done some, too.  David Headrick.

20     Q.  But he didn't prepare the fake bids, right?

21     A.  No, he did not.

22     Q.  And he didn't know about them?

23     A.  He did not know about them.

24     Q.  Who's responsible for hiring subcontractors?

25     A.  I'm responsible, and so could -- David also

CONFIDENTIAL

Page 310

1    could hire subcontractors.  Either one of us.

2         Q.  Okay.  35 is -- is broad.  So I want to focus

3    on it.  35 asks for the identity of the subcontractors

4    used by OnePoint to complete work at TIC's facilities

5    for each purchase order issued to OnePoint.

6              So my -- my question on that topic is this,

7    were there some subcontractors like EMS that OnePoint

8    relied on heavily to do work at TIC over the years?

9         A.  I've relied on some, but I wouldn't use the

10   term "heavily."  I've used Mason Mechanical.

11        Q.  You've used Mason Mechanical?

12        A.  Yes, I have.

13        Q.  For what?

14        A.  For some HVAC work.

15        Q.  Okay.  Any other subcontractors that you've

16   used?

17        A.  I've used Trio Electric, Strong Electric,

18   Keystone, tilt wall companies.

19        Q.  Any others that are significant in your mind?

20        A.  I -- I can't think of any right now apart from

21   the list I just gave you.

22        Q.  Okay.  For 36, we gave you a list of projects

23   and we asked you to be prepared to discuss OnePoint's

24   work pricing, bidding, and profit margins for these

25   projects.  So you see the list of projects there?

CONFIDENTIAL

Page 311

1      A.  Yes, I do.

2      Q.  Can you tell me what your profit margins were

3  for the projects identified in that chart for 36?

4      A.  I do not know.

5      Q.  Why don't you know?

6      A.  Control plant expansion was an extremely

7  extensive project that lasted over three years.  It

8  would be very hard for me to calculate what my profit

9  margin was on that job.

10     Q.  Do you ever calculate your profit margins for

11  jobs?

12     A.  I don't calculate it, but the projects that

13  I've -- that I've launched, I'll be looking into that

14  very carefully.

15     Q.  Now, did you go back and try to calculate the

16  costs for the projects in Paragraph 36?

17     A.  No, I did not.

18     Q.  So you're not able to tell me today what your

19  profit margins were for these projects, right?

20     A.  No, I cannot.

21     Q.  Let's go ahead and go to 37.  I think 37 we've

22  gone over.

23          38, we've hit upon 36 the amount of profit

24  earned by OnePoint on each purchase order issued by TIC

25  and on an annual basis from TIC.  So I understand that

CONFIDENTIAL

Page 312

1    on a project-by-project basis, you don't have the

2    ability to tell me the profit margins because you

3    haven't computed them.  How about on an annual basis

4    from TIC, have you ever calculated the profitability of

5    the work that you did for TIC?

6         A.  I've not done a detailed calculation, but --

7    but I have a rough idea of what it could be.

8         Q.  Tell me what your rough idea is.

9         A.  I'm not sure.  It is a range.  It could be 30

10   to 50 -- 30 to 45 percent in the overall scheme of

11   things.

12        Q.  Right.

13             Altogether, you think your profit margin on

14   TIC projects was about 35 to 40 percent?

15        A.  I really don't know.  I would be speculating at

16   this time.  My best estimate would be around 30 to

17   55 percent.

18        Q.  30 to 55 percent?

19        A.  Yes.

20        Q.  And that -- that would be taking into account

21   what you described earlier as I believe about

22   $39 million worth of work?

23        A.  That's -- that is not the complete profit per

24   se, but I still have to deduct -- that will be just the

25   raw profits.  That's not taking into consideration my --

CONFIDENTIAL

Page 313

1   my general conditions, my overheads, and all that stuff.

2       Q.  Allocations of -- of fixed expenses you're

3   talking about?

4       A.  Yes, correct.  And other expenses.

5       Q.  Did you try to calculate that out to prepare to

6   answer Topic No. 38?

7       A.  No, I did not.

8       Q.  All right.  Topic 39, the relationship between

9   Abraham Joseph and Pablo D'Agostino including

10  conversations between them.

11          So tell me about your relationship with

12  Pablo D'Agostino.

13      A.  Well, to me, Pablo was the face of Toshiba.  We

14  did work for him, and we were happy with the work.  We

15  gave them a quality job, and I would not consider --

16  well, there is no relationship.  I mean, he's not my

17  friend or anything like that.

18      Q.  You didn't consider him to be a friend of

19  yours?

20      A.  No, I did not.

21      Q.  Did you see Pablo D'Agostino before he killed

22  himself?

23      A.  Yes, I did.

24      Q.  After he was terminated from TIC?

25      A.  Yes, I did.

CONFIDENTIAL

1      Q.  And tell me -- tell me about that.

2      A.  He just showed up at my office just clear out

3  of the blue.  He didn't call me or anything.  He was

4  dropping his car at the dealership, and he told me that

5  he was -- he was fired from Toshiba.  He was let go from

6  Toshiba.

7      Q.  Did he tell you why?

8      A.  He mentioned briefly that there was a fire and

9  there was some insurance company issues, and that -- and

10  that was the reason for him being let go.

11      Q.  All right.  And what else did he tell you about

12  his termination?

13      A.  I'm trying to recall.

14      Q.  Did he tell you whether he was under criminal

15  investigation?

16      A.  No.  He did not get into specifics, no.

17      Q.  Did he tell you that he was planning to leave

18  the country?

19      A.  I believe so.  He did say that, yes.

20      Q.  What -- what did he tell you?

21      A.  Well, he said -- well, he -- he blamed

22  Margaret McKay saying she has something to do with this,

23  and -- and he said that I'm flying to -- I might just go

24  back to Argentina.

25      Q.  You knew he was from Argentina?

CONFIDENTIAL

Page 315

1      A.  Yes, I knew that.

2      Q.  Did he ask you for any information about TIC or

3  its employees?

4      A.  No, nothing.

5      Q.  Did he ask you for any information about

6  Margaret McKay since you mentioned her?

7      A.  No, he did -- he did not.

8      Q.  Did he make any threats of physical violence

9  against anyone at TIC while he was with you?

10      A.  He did.

11      Q.  Tell me what he did.

12      A.  He said that he wants to get even with

13  Margaret McKay.

14      Q.  And you took that to mean that -- that he

15  wanted to physically harm her?

16      A.  I assume -- yes, I did.

17      Q.  Okay.  What about what he said made you believe

18  that?

19      A.  Because he used some bad words about her, and

20  he was very upset with her.

21      Q.  Did he say that he wanted to kill her?

22      A.  Pretty close to it.

23      Q.  What -- as best as you can recall, what did he

24  tell you?

25      A.  He said -- he said I want -- I want to beat the

Page 316

1    shit out of her or something to that effect, yeah.

2        Q.  Did you think he was serious?

3        A.  I -- I don't know.

4        Q.  Did he ask you to provide him with any

5    information about the work that you did at Magee McKay's

6    house?

7        A.  Yes, he did.

8        Q.  Tell me what -- what he asked you for?

9        A.  He asked me if I still had documentation of the

10   work that I did at Margaret McKay's house.

11       Q.  And why was he asking for that documentation?

12       A.  I have no idea why.

13       Q.  And what -- what would that documentation show?

14       A.  I know what the documentation is, but I don't

15   know why he wanted the document.

16       Q.  Right.

17            And tell me what -- what is the document.

18   What work did you do at Margaret McKay's house?

19       A.  I've been to her house on two occasions.  First

20   occasion was -- but one occasion was during Hurricane

21   Ike.

22       Q.  Yes.

23       A.  I believe there was some water flooding issues

24   in her house, and the second time it was something to do

25   with some handrails and some plumbing work in her house

Page 317

1    after she has --

2         Q.  And --

3         A.  -- after she had surgery on her leg.

4         Q.  And did you charge Margaret McKay fair market

5    value price for the work?

6         A.  I charged her below the market value price.

7         Q.  Did she ask you to charge her the market price?

8         A.  Her exact words was "Pablo is a bully, and he

9    will tell you not to bill me, but you need to bill me."

10   She didn't use the word fair market price.

11        Q.  But she told you to bill you for the work -- to

12   bill her for the work?

13        A.  She did.

14        Q.  And you billed her for the work?

15        A.  I billed her for the work, but I was caught

16   between Margaret McKay and Pablo because Pablo back then

17   told me that you are not going to charge her at all.

18        Q.  I see.  So you -- you disobeyed Pablo's

19   instruction?

20        A.  I -- I came up with a hybrid plan, and I -- and

21   I came up with a number which was below the market value

22   but -- and, of course, Pablo knew about it, and he was

23   very upset with me about that.

24        Q.  And did Pablo want to use this document in some

25   way against Ms. McKay?

CONFIDENTIAL

Page 318

1      A.  I don't know what his intention was, but he did

2   ask me for the document.  I did not give it to him.

3      Q.  Okay.  All right.  We've covered Topic 40, 41.

4           Topic 42, are you aware of any work that

5   OnePoint was paid for by TIC but it was never completed?

6      A.  I don't -- none.

7      Q.  Are you aware of OnePoint receiving payments

8   from TIC for work that OnePoint never did at all?

9      A.  I don't believe so, no.

10     Q.  You're not sure?

11     A.  I don't think I've left any work unfinished.

12     Q.  Topic 43, did you on occasion prepare

13  PowerPoint presentations for Pablo?

14     A.  I did not.

15     Q.  Did you prepare to -- any PowerPoint

16  presentations to assist Pablo with bids?

17     A.  I did not.

18     Q.  Or justifying work?

19     A.  I did not.

20     Q.  I think we've covered 44.  We've covered 45.

21  We've covered 46.  We've covered 47.

22          All right.  48, and I -- I think your

23  counsel may have an objection to this, but I'll ask it.

24  48 reads (as read):  "In furtherance of TIC's

25  constructive trust claim, provide the total amount of

CONFIDENTIAL

Page 319

```
1    annual distributions of profit and salary by OnePoint to

2    its shareholders from 2007 to 2019.  That includes

3    proceeds of payments made by TIC."

4             Can you provide that information to me?

5       A.  I believe the answer --

6             THE WITNESS:  Do you have some objections?

7             MR. DANIELS:  Yeah -- no, no, no.

8             THE WITNESS:  That's why I'm keeping quiet.

9             MR. DANIELS:  Going back, I'm looking at

10   the notes.  We've already established he doesn't really

11   have a good feel for the profit.

12            MR. FRIDMAN:  The question relates to the

13   annual distributions that Mr. Joseph receives personally

14   as what we know as a sole shareholder of OnePoint

15   between 2007 and 2019.

16            MR. DANIELS:  Yeah.  Dan, let's -- let's --

17   let's not -- I'm going to instruct him not to answer

18   this now.  We can talk about whether there is a

19   different way, if you're willing to do it, to get you

20   this information, and let's -- let's agree to work this

21   one out offline.

22            MR. FRIDMAN:  I'm -- I'm willing to do that

23   or -- or if you want to think about it overnight and we

24   can revisit it tomorrow if --

25            MR. DANIELS:  Yeah.  I mean, I -- if it's
```

CONFIDENTIAL

Page 320

1   information that we ultimately end up being willing to

2   give you.  I think we can give it to you in a way that

3   is just as effective as you asking him about it here,

4   because he's not going to know the answer off the top of

5   his head sitting here.

CONFIDENTIAL

1 ███████████████   █████████████████

2 ███   █████████████████████████

3 ████████████████████████████████

4 ██████████

5 ███   ███████████████   ███████████████

6 ███   █████████████

7 ███   ███

8              MR. FRIDMAN:  All right.  So -- well,

9 Mr. Daniels, we'll -- let's talk about it and -- and see

10 if you can get us the specifics.

11              MR. DANIELS:  Okay.

12    Q.  (BY MR. FRIDMAN)  49 is a similar vein.  Annual

13 revenue and profit figures of OnePoint from 2007 to

14 2019.

15              MR. DANIELS:  Are you able to answer that?

16    A.  Which one was that?  No. 49?

17              MR. DANIELS:  49.

18    Q.  (BY MR. FRIDMAN)  Yes.

19    A.  I cannot answer -- I cannot answer it right

20 now, no.

21    Q.  (BY MR. FRIDMAN)  Okay.

22              MR. FRIDMAN:  Is that one that we can also

23 talk about offline, Mr. Daniels?

24              MR. DANIELS:  Sure.  And, I mean, my point

25 on this series, assuming this is information we're

CONFIDENTIAL

Page 322

1   willing to turn over without the court having to, you

2   know, get involved, I think we can get much more

3   accurate information to you than what he would be able

4   to provide here in a deposition.

5            MR. FRIDMAN:  All right.

6            MR. DANIELS:  I'm not suggesting -- well,

7   later.

8            MR. FRIDMAN:  Yeah.

9       Q.  (BY MR. FRIDMAN)  All right.  Topic No. 50, the

10  identification, location, last known address, telephone

11  number, and email address of any person having or

12  believed to have any documents or -- other electronic or

13  nonelectronic files regarding the topics or facts

14  underlying these topics.

15            Is there anyone that we haven't discussed

16  today that has information that's relevant to the bids,

17  the profits, the payments to Pablo?

18      A.  It's just me.  No, there's nobody else.

19      Q.  What about Karat 22?

20      A.  What about it?

21      Q.  Is that Aku Patel?

22      A.  What is the question?

23      Q.  Are you -- do you know that?  Do you know that

24  establishment?

25      A.  Yes, I do.

CONFIDENTIAL

Page 323

1      Q.  Did you ever purchase anything for

2   Pablo D'Agostino for Karat -- from Karat 22?

3      A.  I did not.

4      Q.  Do you know if Pablo purchased items for

5   himself from Karat 22?

6      A.  I don't know.

7      Q.  What about Sudhakar Kalaga?

8      A.  I believe he did base on what I was told.

9      Q.  What were you told?

10            MR. DANIELS:  And who were you told by?

11            THE WITNESS:  By the son of the jewelry

12   store guy.

13            MR. DANIELS:  You can answer.

14      Q.  (BY MR. FRIDMAN)  What were you told by the son

15   of a jewelry store owner?

16      A.  He said that Sudhakar has come there and bought

17   some stuff.

18      Q.  And did -- did he say whether he was buying a

19   stuff for -- for Pablo or with Pablo?

20      A.  He did not.

21      Q.  All right.  So that takes us to the end of our

22   topics.

23            MR. FRIDMAN:  What I'd like to do is take a

24   brief three-minute break.  I'll regroup with my

25   cocounsel and see if there's any last questions that

CONFIDENTIAL

Page 324

1    we've not addressed and -- and we can pass.

2              MR. DANIELS:  Okay.  And the purpose of

3    this -- I'm going to ask Sandy to go next because he's

4    going to be somewhere at 7:30; and then, Penn, with your

5    indulgence, I will ask you to go after that in case

6    Sandy wants to go and leave because we would like to

7    finish tonight.

8              MR. FRIDMAN:  Yeah.  And I only have a

9    couple of minutes.

10             MR. DANIELS:  All right.

11             MR. FRIDMAN:  All right.  So just give me

12   --

13             MR. DANIELS:  Let's take -- how long do you

14   want, Dan?

15             MR. FRIDMAN:  Just give me five minutes.

16             MR. DANIELS:  Okay.

17             MR. FRIDMAN:  All right.

18             THE VIDEOGRAPHER:  All right.  This is the

19   end of Video 7 of Abraham Joseph.  Off the record at

20   6:54.

21             (A break was taken from 6:56 p.m. to

22   7:00 p.m.)

23             THE VIDEOGRAPHER:  We're now back on the

24   record, Video 8 of Abraham Joseph.  The time is

25   approximately 7:01.

CONFIDENTIAL

Page 325

1      Q.   (BY MR. FRIDMAN)   Mr. Joseph, while we're on a

2  break, your counsel informed us that you had remembered

3  something additional about Karat 22.  So please tell us

4  what you remember.

5      A.   It wasn't additional, I just -- I remember the

6  exact -- so it was not the owner's son who told me about

7  it.  It was Pablo.  He told me that -- that he had gone

8  to Karat 22 with Sudhakar, and I was shocked how would

9  Pablo know about Karat 22, which is an Indian jewelry

10 store.  So that's how I found out about it.

11     Q.   I see.  So you understood that Pablo D'Agostino

12 was introduced to Karat 22 by Sudhakar?

13     A.   That is correct.

14     Q.   I got it.

15          Okay.  Have you ever heard of a

16 construction company called Intertec?

17     A.   I have not.

18     Q.   Do you know a person named Mark Kinsella?

19     A.   No, I do not.

20     Q.   When you first met Pablo D'Agostino, did he

21 appear to be someone that was wealthy?

22     A.   Not to me.

23     Q.   Do you remember what car he drove?

24     A.   I don't remember.

25          MR. FRIDMAN:  All right.  Well, Mr. Joseph,

Page 326

1    I really appreciate your -- your time and patience today

2    in answering my questions.  So thank you very much.

3                    THE WITNESS:  Thank you.

4                    MR. FRIDMAN:  At this time, I'll pass --

5    pass him to the next person.

6                    MR. DOW:  Thank you.  Thank you, Dan.

7                        FURTHER EXAMINATION

8    BY MR. DOW:

9         Q.  Mr. Joseph, my name is Sanford Dow, and the

10   hour is late.  So I just have a few follow-up questions.

11   I represent the estate of Mr. D'Agostino.

12                   And are you familiar with a company called

13   PD Rentals, LLC?

14        A.  I'm not.

15        Q.  Okay.  And what about a company called

16   January 22 1992 LLC?

17        A.  I am not.

18        Q.  When you met with Mr. Fridman in December of

19   2019, who participated in that meeting?

20        A.  From my end or from Toshiba's end?

21        Q.  Everybody.

22        A.  From my end, it was me and my attorney

23   Kelly Stephens.

24        Q.  Okay.

25        A.  And from Toshiba's side, I can just name a few.

CONFIDENTIAL

Page 327

1   I don't know who all those people.  Margaret McKay was

2   there, Dan Fridman, and there was at least six or seven

3   other people in the room.

4        Q.  Okay.  And at that point in time, did you

5   believe that you were a target defendant in this

6   lawsuit?

7        A.  No, I did not -- no.

8        Q.  Okay.  Did anyone from Toshiba tell you that

9   you were not going to be a defendant?

10       A.  Can you rephrase that question?

11       Q.  Sure.

12            Did anybody from Toshiba tell you that if

13   you cooperated with them at this meeting with them that

14   you were not going to be a defendant in this lawsuit?

15       A.  No, they did not.

16       Q.  Okay.  Did anyone from Toshiba tell you that

17   they were going to open a criminal investigation against

18   you?

19       A.  No, they did not.

20       Q.  Okay.  Do you know if a criminal investigation

21   is pending against you?

22       A.  No, I'm not aware of it.

23       Q.  Okay.  Did anyone from Toshiba ever have any

24   material complaints about the quality of work that

25   OnePoint performed?

CONFIDENTIAL

Page 328

1    A.  There was no complaints.

2    Q.  Okay.  And were the charges that OnePoint

3  charged Toshiba consistent with what's sort of an

4  acceptable norm within the industry?

5    A.  Yes, it was.

6    Q.  Okay.  And -- and tell me once again why you

7  made those payments to Mr. D'Agostino?

8    A.  Because he demanded those payments.  We wanted

9  to continue to work in -- in TIC.

10    Q.  Are you aware of any other TIC employees who

11  may have received any monies from Mr. D'Agostino?

12    A.  I'm aware of it now after this -- when I read

13  some -- some of the lawsuits.  I did not know it then.

14    Q.  Okay.  Did any other Toshiba employee ever ask

15  you to make a payment to them?

16    A.  No, they did not.

17    Q.  Are you aware of any Toshiba employees who have

18  been fired as a result of any of the allegations in this

19  lawsuit?

20    A.  I don't know the specific, but I heard some of

21  them were fired.

22    Q.  Okay.  Do you -- do you know who those persons

23  are?

24    A.  I can't speculate, but I'm not sure who they

25  are.

CONFIDENTIAL

Page 329

1    Q.  Okay.  You don't -- you don't have any of their

2  names?

3    A.  I believe Ken Shaffer is fired.

4    Q.  Okay.  Did Mr. Shaffer ever make a request that

5  you or OnePoint pay him any sum of money?

6    A.  No, he did not.

7    Q.  Other than Pablo D'Agostino did anyone from

8  Toshiba ever ask that either you or OnePoint make any

9  type of payment to them?

10    A.  No, they did not.

11    Q.  Has Toshiba offer to -- offer to settle this

12  lawsuit with you?

13          MR. DANIELS:  I think, Counsel, the only

14  way he can answer that if he discloses attorney-client

15  communications.

16          MR. DOW:  Fair enough.  Fair enough.

17          MR. DANIELS:  So I'm going to instruct him

18  not to answer.

19          MR. DOW:  Okay.

20    Q.  (BY MR. DOW)  Did Mr. D'Agostino ever ask you

21  to do anything that you considered to be illegal?

22    A.  No.

23    Q.  (BY MR. DOW)  Other than perhaps violating TIC

24  protocol or internal policy, are you aware of any crime

25  committed by Mr. D'Agostino?

CONFIDENTIAL

Page 330

1          A.  No, I'm not.

2                    MR. DOW:  No further questions.

3                         FURTHER EXAMINATION

4     BY MR. HUSTON:

5          Q.  Good evening, Mr. Joseph.  My name is Penn

6     Huston.  I represent Vinod Vemparala and V2V Solutions.

7     I think I understand this from your earlier testimony

8     today, but I want to confirm it.

9                    Have you ever met or spoken with

10    Vinod Vemparala?

11         A.  No, I have not.

12         Q.  Have you ever communicated with him in writing

13    either by email or text any other written method?

14         A.  I have not.

15         Q.  Before the -- well, have you ever communicated

16    orally or in writing with anyone else from V2V

17    Solutions?

18         A.  No, I have not.

19         Q.  Are you familiar with Sirmag Industrial

20    [phonetic]?

21         A.  I have no idea who they are.

22         Q.  Okay.  To your knowledge, have you ever

23    communicated either orally or in writing with Sirmag

24    Industrial?

25         A.  No, I have not.

CONFIDENTIAL

Page 331

1      Q.  I want to look back at a document that we

2   looked at earlier today.  It's Exhibit 78.

3              Are you -- are you seeing anything on your

4   screen?  Are you seeing a document on your screen?

5      A.  Yes, I am.

6              MR. DANIELS:  But it's a request for

7   production, Penn.

8              MR. HUSTON:  Okay.  Let me try to correct

9   that.  Bear with me one moment.

10             MR. DANIELS:  Or a response.

11             MR. HUSTON:  Yeah.

12             MR. FRIDMAN:  Okay.  We'll probably have to

13  purge whatever documents were not formally introduced as

14  exhibits after this is done.

15             MR. DANIELS:  Could we do it tomorrow?

16             MR. FRIDMAN:  Yes.

17     Q.  (BY MR. HUSTON)   Are you now seeing an email

18  on your screen?

19     A.  Yes, I am.

20     Q.  Okay.  Thank you.  I apologize for that.

21             And this is Exhibit 78.  And you look at it

22  earlier today.  It's -- it's an email.  And because it's

23  an email you kind of read it chronologically from the

24  bottom up, but it began with a bid from V2V Solutions.

25             Do you recall looking at Exhibit 78 earlier

CONFIDENTIAL

Page 332

1   today?

2        A.  Yes, I do.

3        Q.  Okay.  And this bid from V2V Solutions, do you

4   have any reason to believe that it was anything other

5   than a genuine bid?

6        A.  It appears to be a genuine bid.

7        Q.  And there was one email that I wanted to follow

8   up with you about that's in this chain.  There's an

9   email from Mr. Kalaga to you that says (as read):  "The

10  guy is in Ohio.  He sent an email to him.  Did I mess

11  up?"

12            Do you see that?

13       A.  Yes, I do.

14       Q.  And I want to get any understanding that you

15  have about this email.  The -- the second clause here

16  says, "he sent an email to him."

17            Do you know who Mr. Kalaga was referring to

18  when Mr. Kalaga said "he," and who Mr. Kalaga was

19  referring to when he said "him"?

20       A.  I don't know.

21       Q.  Okay.  He also says "did I mess up?"  Do you

22  have any understanding of why Mr. Kalaga was asking you

23  whether he had messed up?

24       A.  I have no idea.

25       Q.  I asked you about the bid that's attached to

CONFIDENTIAL

Page 333

1    Exhibit 78 and asked you if you had any reason to

2    believe it wasn't a genuine bid.  Let me ask more

3    generally.

4                Do you have any reason to believe that any

5    bid submitted by V2V Solutions was not genuine?

6        A.  I have not seen any bid from V2V except this

7    particular one that is on the display.  So I cannot

8    speak for the other bids they have -- other bids that

9    they have sent.

10       Q.  Fair enough.

11               MR. HUSTON:  Thank you.  I pass the

12   witness.

13               MR. DANIELS:  You're good.

14               MR. FRIDMAN:  Just one -- one last quick

15   thing.  Just to follow up on one question that Mr. Dow

16   asked.

17               MR. DANIELS:  I think you've got like 45

18   seconds left on your time.

19                    FURTHER EXAMINATION

20   BY MR. FRIDMAN:

21       Q.  All right.  I am -- I'm going to show you

22   Exhibit 105 one more time.  This is the document that

23   was the agreement for services or work performed on

24   premises from 2007 that contained Toshiba standards of

25   conduct.

CONFIDENTIAL

Page 334

1              Do you remember that?

2       A.  I remember that.

3       Q.  I want to direct your attention to Paragraph 10

4  of the contract you signed with Toshiba.  Paragraph 10,

5  it says (as read):  "Compliance with company policies,"

6  and it says "at all times during the performance of the

7  work, contractor and its employees shall be subject to

8  and shall comply with all of the company's policies,

9  including without limitation, its equal employment

10  opportunity, business conduct, drug-free workplace,

11  safety, and environmental policies."  Copies of each of

12  those policies are attached as Attachment B.

13              And it says "contractor shall execute and

14  cause its employees and subcontractors and their

15  employees performing any portion of the work to execute

16  such agreements and documents evidencing their

17  compliance with the requirements of this paragraph as

18  the company may require."

19              So my question to you is, you agreed in

20  this contract that you signed with Toshiba to comply

21  with Toshiba's standard of conduct that applied to

22  Toshiba's employees, correct?

23              MR. DANIELS:  Object to -- object to form.

24       A.  I'm under the impression that these policies

25  applied to officers and employees of Toshiba.  It

```
 1   doesn't apply to me per se.
 2       Q.  (BY MR. FRIDMAN)  Well, in Paragraph 10, aren't
 3   you agreeing as the contractor that you and your
 4   employees are subject to and will comply with all of the
 5   company's policies including its business conduct
 6   policies, right?
 7                 MR. DANIELS:  Object to the -- object to
 8   the form.  The document speaks for itself.  We've
 9   already gone over this and this is outside -- this has
10   nothing to do with what Mr. Dow asked.
11                 MR. FRIDMAN:  Mr. Dow asked about
12   whether -- other than -- than policies of Mr. D'Agostino
13   had done anything illegal.  So I'm asking Mr. --
14   Mr. Joseph if he believed he was subject to the same
15   policies that Pablo D'Agostino was subject to.
16                 MR. DANIELS:  Totally different line of
17   questioning and line of argument.  And if you -- if you
18   understand what he's asking.
19                 THE WITNESS:  I don't understand what he's
20   asking.  I thought this applies to Pablo's business
21   conduct, and not my business conduct.
22                 MR. FRIDMAN:  Right.
23                 No other questions.
24                 MR. DANIELS:  All right.  Anything further,
25   Penn?
```

CONFIDENTIAL

Page 336

1              MR. HUSTON:  Nothing for me.  Thank you.

2              MR. DANIELS:  I think Sandy left.

3              No, he's there.

4              MR. DOW:  No further.

5              MR. DANIELS:  All right.  You're done.

6              THE VIDEOGRAPHER:  This now ends Video 8 of

7    Abraham Joseph.  Off the record, 7:17.

8              THE CERTIFIED STENOGRAPHER:  Before

9    everyone leaves, I need to confirm orders.

10             Since this is Federal, are there any other

11   stipulations you guys want to put on the record?

12             MR. FRIDMAN:  No, I don't think so.

13             But, Sam, do you want to place the order

14   for the plaintiff?

15             MR. SHARP:  Madame Court Reporter, to the

16   extent we haven't already ordered it, can we please be

17   provided with a rough transcript?  And we do not -- for

18   the transcript, we do not need it synced with the video

19   at this time.

20             THE CERTIFIED STENOGRAPHER:  Would anyone

21   else like to purchase a copy of the rough transcript?

22             MR. HUSTON:  This is Penn Huston.  I would

23   like a copy of the transcript, not rushed, not roughed.

24             THE CERTIFIED STENOGRAPHER:  Okay.

25             THE VIDEOGRAPHER:  You want the video,

CONFIDENTIAL

Page 337

1    Mr. Huston?

2              MR. HUSTON:  No, thank you.

3              MR. DANIELS:  Okay.  This is Doug Daniels.

4    By the way, the witness will read and sign.

5              The defendants, OnePoint and Mr. Joseph,

6    would like a -- just an electronic copy on a regular

7    time schedule, no rough, and we do want the video.  Not

8    synced at this time.

9              THE VIDEOGRAPHER:  Okay.

10             THE CERTIFIED STENOGRAPHER:  Thank you.

11             (Proceedings concluded at 7:20 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 338

1                    CHANGES AND SIGNATURE

2              WITNESS NAME:  ABRAHAM JOSEPH

3          DATE OF DEPOSITION: December 16, 2020

4

5          PAGE       LINE        CHANGE        REASON

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

CONFIDENTIAL

Page 339

1      I, ABRAHAM JOSEPH, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted above.

4

5      _____

    ABRAHAM JOSEPH

6

7

8

9  THE STATE OF_____   )

10  COUNTY OF _____   )

11      Before me, _____, on

12  this day personally appeared ABRAHAM JOSEPH, known to me

13  (or proved to me under oath or through

14  _____) (description of identity card or

15  other document) to be the person whose name is

16  subscribed to the foregoing instrument and acknowledged

17  to me that they executed the same for the purposes and

18  consideration therein expressed.

19      Given under my hand and seal of office this

20  _____ day of _____, 2020.

21

22

23

    _____

24  NOTARY PUBLIC IN AND FOR

    THE STATE OF _____

25  Commission Expires: _____

CONFIDENTIAL

Page 340

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION
 3      TOSHIBA INTERNATIONAL        )
        CORPORATION                  )
 4                                   )
                 Plaintiff,          )
 5                                   )
        v.                           ) NO.:  4:19-cv-04274
 6                                   )
        ABRAHAM JOSEPH, an           )
 7      individual, ONEPOINT,        )
        INC., RUDOLPH CULP, as       )
 8      independent administrator    )
        of the ESTATE OF             )
 9      Pablo D'Agostino, PD         )
        RENTALS, LLC, JANUARY 22     )
10      1992, LLC, VINOD             )
        VEMPARALA, an individual,    )
11      V2V SOLUTIONS, LLC, and      )
        CHETAN VYAS, an              )
12      individual,                  )
                                     )
13              Defendants.          )
14
15              REPORTER'S CERTIFICATION
              DEPOSITION OF ABRAHAM JOSEPH
16                 December 16, 2020
17          That the deposition transcript was delivered
18      to Mr. Daniel Fridman.
19              That a copy of this certificate was served on
20      all parties and/or the witness shown herein on
21      _____.
22              I further certify that pursuant to FRCP
23      Rule 30(f)(1) that the signature of the deponent:
24          ____ was requested by the deponent or a party
25      before the completion of the deposition and that
```

CONFIDENTIAL

Page 341

1    signature is to be before any notary public and returned

2    within 30 days from date of receipt of the transcript.

3             If returned, the attached Changes and

4    Signature Page contains any changes and the reasons

5    therefore:

6             ____ was not requested by the deponent or a

7    party before the completion of the deposition.

8             I certify that I am neither counsel for,

9    related to, nor employed by any of the parties or

10   attorneys in the action in which this proceeding was

11   taken, and further that I am not financially or

12   otherwise interested in the outcome of the action.

13            Certified to by me this ____ day of _____,

14   2020.

15

16

17

18

19            _____

                 ABIGAIL GUERRA, Texas CSR 9059

20               Expiration Date:  12/31/22

                 VERITEXT LEGAL SOLUTIONS

21               Firm Registration No. 571

                 300 Throckmorton Street

22               Suite 1600

                 Fort Worth, Texas 76102

23               Phone:  (817) 336-3042

24

25

CONFIDENTIAL

Page 342

1    COUNTY OF _____        )

     STATE OF TEXAS            )

2

3           I hereby certify that the witness was notified

4    on_____, that the witness has 30 days or

5    (_____days per agreement of counsel) after being

6    notified by the officer that the transcript is available

7    for review by the witness and if there are changes in

8    the form or substance to be made, then the witness shall

9    sign a statement reciting such changes and the reasons

10   given by the witness for making them;

11        That the witness' signature was/was not returned as

12   of _____.

13           Subscribed and sworn to on this, the _____

14   day of _____, 2020.

15

16

17

18

19        _____

          ABIGAIL GUERRA, Texas CSR 9059

20        Expiration Date:  12/31/22

          VERITEXT LEGAL SOLUTIONS

21        Firm Registration No. 571

          300 Throckmorton Street

22        Suite 1600

          Fort Worth, Texas 76102

23        Phone:  (817) 336-3042

24

25

CONFIDENTIAL

Page 343

```
 1        January 8, 2020
 2        ABRAHAM JOSEPH
          C/O: Mr. Doug Daniels
 3        OF: THE JACKSON LAW FIRM
          3900 Essex Lane
 4        Suite 1116
          Houston, Texas 77027
 5        Daniel@jacksonlaw-tx.com
 6         Re: 12/16/2020 Deposition of: ABRAHAM JOSEPH
               Toshiba International Corporation vs.
 7             Abraham Joseph Et Al.
 8        Dear Sir/Madam:
 9            This letter is to advise that the transcript of
          the above-referenced deposition has been completed
10        and is available for review.  Please contact our
          office to come to our office at (800-726-7007 to
11        make arrangements to read and sign or sign below to
          waive review of this transcript.
12
              It is suggested that the review of this
13        transcript be completed within 30 days of your
          receipt of this letter, as considered reasonable
14        under Federal Rules*; however, there is no Florida
          Statute to this regard.
15
              The original of this transcript has been
16        forwarded to the ordering party and your errata, once
          received, will be forwarded to all ordering parties.
17
          Sincerely,
18
          Abigail Guerra, CSR
19
20        WAIVER:
          I, _____ hereby waive the reading &
21        signing of my deposition transcript.
          _____     _____
22         Deponent Signature               Date
23
24        *Federal Civil Procedure Rule 30(e)/Florida Civil
25         Procedure Rule 1.310(e)
```

CONFIDENTIAL

**[& - 1992]**                                                                 Page 344

| & |
|---|
| **&**   3:4,9,14,19 4:14 |
| 4:20 9:15 85:17 |
| 98:2,9,12,21 100:9 |
| 100:11 106:2 |
| 143:23 144:7,16 |
| 145:3 146:3,7,18 |
| 146:23 147:2,5 |
| 151:18 152:25 |
| 153:11,24 156:22 |
| 156:24 157:8 |
| 158:10,13 161:17 |
| 175:21 176:1 |
| 190:15 201:20 |
| 226:15 229:21 |
| 240:20 305:22 |
| 343:20 |

| 0 |
|---|
| **0.50.**   190:8,9 |
| **00010807**   8:5 |
| **00010849**   152:9 |
| **00036551**   8:15 |
| **00054122**   7:9 |
| **00062110**   8:7 |
| **00066003**   8:9 |
| **00091911**   7:21 |
| **00106186**   7:25 |
| **00106193**   7:23 |
| **00110858**   6:16 |
| **00119209**   8:13 |
| **00119704**   6:20 |
| **00129337**   7:6 |
| **0063**   204:22 |
| **04274**   1:5 340:5 |

| 1 |
|---|
| **1**   1:21 6:22 9:3 |
| 33:17,18 57:9 |
| 71:22,23,24,25 |
| 100:21 128:3 164:3 |
| 164:13,13 165:11 |

166:23 168:5
223:16 224:18
225:6 271:6 291:18
298:3,14,18 302:10
340:23
**1,000**   63:17 65:14
**1,500**   65:14,17 66:9
**1.310**   343:25
**1.40**   170:20
**1.95**   143:24 145:18
**10**   94:17 173:25
183:12 185:19
187:4 210:5 271:9
280:8,10,19 334:3
334:4 335:2
**100**   37:12 74:11
140:22 146:5
171:15,18 172:22
185:20 191:21
287:19 307:2
320:10,11 321:1
**100,000**   24:13 26:9
39:11 40:4 77:18
108:25 109:7
121:19 207:20
**103**   213:9
**105**   8:19 121:12,14
124:18,21 333:22
**108**   194:20
**10848**   229:4
**10849**   152:22
**10:24**   57:10,11
**10:33**   57:12,15
**10th**   226:3 252:22
253:17 254:13
**11**   6:14 128:3,3
143:9,12,12 191:18
220:21 258:18
271:12
**110859**   143:22

**111**   8:7
**1116**   4:5 343:4
**119201**   261:18
**119331**   237:12
**119333**   8:10
**119704**   162:15
**11:45**   95:5 112:21
**11:52**   113:8,9
**12**   6:5,17 128:1
145:11,12,14
169:18 173:25
217:3 273:24 280:8
280:11,20
**12,430**   167:7,16
**12/16/2020**   343:6
**12/17/10**   150:6
152:12
**12/31/22**   341:20
342:20
**120**   117:8 171:11
202:19,23 203:5
204:8,11
**120,000**   176:14,23
**1200**   3:14
**121**   8:19
**124,911**   127:12
**12604**   341:18
342:18
**129335**   54:9
**129337**   52:20 55:3
**129339**   53:22
**12:41**   113:10
**12:42**   113:13
**13**   37:17 169:18
172:25 193:21
277:7 283:13
**13,868**   117:24
**13116**   147:7
**13th**   3:10
**14**   201:21 283:12

**140**   216:12 217:1
**143**   6:14
**145**   6:17
**14th**   33:12 145:16
203:14
**15**   94:17,25 202:23
203:5 204:24 265:6
284:23
**150,000**   109:2
**1500**   68:18
**155,000**   207:19
**156**   7:8
**16**   1:20 9:2 55:11
141:18 261:21
287:5 338:3 340:1
**1600**   341:22 342:22
**162**   6:19
**166**   6:21
**16th**   2:4
**17**   7:4 65:23 117:6
136:7 287:20 289:6
291:15
**1750**   4:21
**17th**   126:23 131:5
152:24 222:11
224:1
**18**   44:16 65:23
71:25 194:19 255:9
292:7,11 293:7,8
295:1
**18,000**   54:25 55:18
**180**   171:13
**189**   7:10
**18th**   51:4
**19**   69:9,10 71:25
220:21 293:15
**190**   7:12
**191**   7:25
**199**   7:23 292:8,18
**1992**   1:9 326:16
340:10

**19th**   286:2
**1:53**   155:25 156:1
**1st**   194:1,14 209:13
   209:15 212:14

**2**

**2**   18:6 23:15 30:12
   30:13,24 34:20
   35:16 43:24,25
   44:22 57:14 100:21
   113:6 225:7 271:6
   289:6 304:20
   305:10
**2,000**   61:13 66:13
   66:15 68:20,22
**2,349,000**   221:14
   223:23
**2.349**   220:4
**20**   27:17 38:18
   94:17,25 98:17
   159:21 202:1,5
   203:4 210:5 292:10
   292:23 293:2,15
**20,000**   48:3,4 56:11
   56:17
**200**   3:20 320:11
**200,000**   72:2 109:6
   109:7 320:10 321:1
   321:3
**20005**   3:10
**2006**   230:13
**2007**   18:2,6,13,16
   18:22 23:6 24:13
   25:21 30:22,23
   31:7,9,20 34:2,6
   35:18 36:1 37:4
   38:7,16,25 41:4
   44:16 57:17 64:4
   121:19 122:13,20
   123:8 124:3 126:23
   127:4 132:23
   137:24 138:2

157:17 170:11,18
   170:22 182:3 183:1
   184:5 191:17 200:5
   206:10 207:6 218:6
   267:1 272:17 277:9
   278:23 292:9,17
   293:1,21 296:22
   298:25 299:4
   306:23,25 307:17
   319:2,15 320:22,25
   321:2,13 333:24
**2007/2008**   229:18
**2008**   18:3,25 19:2,5
   23:6 24:13 25:21
   30:23 34:4 36:1
   57:17 58:3 64:4
   121:19 159:21
   163:16 166:15
   169:3 209:13,15,15
   212:5,15,15 216:22
   216:22 233:22
**2008/2009**   232:24
**2009**   30:13,15
   47:24 48:18 51:4,6
   53:14 55:23 57:20
   58:19 61:8 121:20
   242:11 249:4 250:2
   251:1,18 252:23
   253:17 254:13
   255:9
**201**   7:16
**2010**   53:1 62:12
   65:21 80:17,19
   152:24 174:10
   176:2 219:18,25
   220:20,21 222:12
   224:4 226:7 236:14
   240:5 256:4 258:17
**2011**   37:4 38:8,16
   38:25 41:4 62:13
   105:20 111:4

183:18 184:1
   189:22,22 190:17
   190:18 191:17
   192:4 194:1,2
   226:4 267:1 269:5
   306:8,12 320:23
   321:2
**2012**   105:20,22
   192:4 261:21
**2013**   111:4,5
   265:23
**2014**   107:2 111:9
   111:10,16 121:23
   140:5 143:18 265:3
   265:6,25 266:1
**2015**   140:10 143:22
   145:16 174:8,9
   266:2,9 296:3,8,16
   296:19,25 297:14
**2016**   141:17 266:11
**2017**   44:16 65:23
   72:21 73:2,17
   77:14 117:5 131:5
   141:21 278:1
   297:14 320:15
**2018**   61:2 69:9,10
   70:13,21 71:9,17
   72:21 73:2,17
   114:10,11 115:24
   116:11,23 117:8,23
   118:2 120:15 142:2
   204:12 206:17
   266:19,20
**2019**   46:23 66:2,4,7
   66:15,18,23 68:7,8
   68:13,14 70:13,21
   70:25 71:9,17
   72:21 73:2,18
   77:14 121:22
   122:23 123:8 124:4
   137:24 170:11,18

170:23 182:4 183:2
   183:18 184:1,5
   198:14,15 200:5
   201:17,21,22
   203:16 206:7,14
   207:6 266:17 277:9
   281:8 285:1,2
   287:9 292:9,17
   293:1,21 296:22
   298:25 299:4
   302:17,18 303:14
   306:8,12,23 319:2
   319:15 321:14
   326:19
**202**   3:11
**2020**   1:20 2:4 9:2
   33:12 47:2,3,6,8
   281:11 285:4 338:3
   339:20 340:16
   341:14 342:14
   343:1
**203**   7:14
**208**   7:18
**209-8836**   5:6
**20th**   114:10 116:11
   116:23
**21**   293:16
**217**   7:20
**218**   190:2
**219**   7:22
**21st**   218:6
**22**   1:9 293:16
   322:19 323:2,5
   325:3,8,9,12
   326:16 340:9
**222**   7:24
**225**   8:4
**22nd**   157:17
**23**   6:19 162:8,9,10
   162:11,12 167:18
   298:23 299:11,13

CONFIDENTIAL

**[2300 – 48]**

**2300**   3:15
**233**   8:6
**236**   8:8
**23rd**   189:22 190:17 196:1
**24**   6:21 166:21,21 166:25 300:1,1,19 300:25
**24,000**   30:21
**24,084**   18:13,24 31:7
**240**   194:15,17,25 195:14
**246**   8:11
**249**   7:13
**25**   21:22 22:1 301:5
**250**   47:14 51:7 53:1
**2500**   4:10
**2525**   3:5
**26**   242:11 249:4 256:4 302:7
**26,000**   30:21
**26,580**   212:6
**261**   8:12
**263.5**   196:4
**264**   8:14
**27**   167:10 201:21 302:13
**270**   8:17
**2700**   4:20
**272**   195:1 197:13
**27th**   53:14 203:14
**28**   305:19
**28,999**   55:21
**29**   306:6
**294**   8:18
**29th**   190:17 209:15 212:15
**2:15**   156:2,5
**2s**   17:25 34:18,19 35:21 83:11

**3**

**3**   6:3 60:18,21 64:23 106:24,25 113:12 114:1 128:16 155:24 184:6 271:7 289:20 304:20 305:10
**3,000**   62:18,20 63:9
**3,600**   204:11
**3.328**   223:21
**3.695**   153:3
**3.793**   225:23
**30**   21:22 22:1 38:20 38:24 73:4,4,25 98:19 187:4 204:2 204:10,14 270:15 278:16,21 291:15 299:11 300:19 306:15 312:9,10,16 312:18 340:23 341:2 342:4 343:13 343:24
**30,000**   56:7
**300**   65:17 66:9 68:18 193:21 341:21 342:21
**303**   196:5 197:6
**305**   3:6,22
**30th**   250:1
**31**   306:18
**32**   6:23 37:5 41:4 59:10 195:1,10,21 196:12 197:15 267:1 307:14
**3210**   4:10
**326**   6:6
**33**   307:14
**330**   6:7
**33131**   3:21
**33134**   3:6

**333**   6:8
**336-3042**   341:23 342:23
**338**   6:9
**339**   7:6
**34**   158:13 309:12
**34,211**   164:6,20 167:19
**340**   6:10
**349**   5:5
**35**   158:11,20 202:23 310:2,3 312:14
**36**   310:22 311:3,16 311:23
**36,000**   108:15 167:12
**365**   277:21 278:2 280:19
**36551**   264:21
**36553**   265:6
**36609**   52:23
**37**   6:23 32:4,5,9,11 32:15 43:23 48:8 49:22 60:14,14 106:12 113:20,21 113:22 167:10 311:21,21
**37,681**   165:17
**37,950**   51:25
**371-2700**   3:22
**38**   170:24 171:6 311:23 313:6
**39**   299:17,19 312:22 313:8
**39,000**   299:17
**3900**   4:5 343:3
**3911**   132:13
**3:20**   201:5,6
**3:30**   201:7,10

**3rd**   236:14 251:1 251:18

**4**

**4**   63:14 125:20 128:11 156:4 184:7 201:5
**4,000**   69:1,2,4,11 70:12,21 72:8 108:3,4,12
**4,432**   212:19
**40**   73:4 81:22 171:2 171:4,8 173:11 180:4 193:6,9 194:2,5,15,17 195:16 196:9,11,11 197:10 202:1,4,10 202:17,22 312:14 318:3
**40,000**   56:7
**400**   65:13
**41**   318:3
**42**   318:4
**429**   7:17
**43**   318:12
**44**   212:11,23 318:20
**444,359**   295:8
**45**   160:9 312:10 318:20 333:17
**46**   318:21
**46,000**   56:8
**46,999**   54:10 55:15 56:1,9
**460**   8:20
**463-6000**   4:11
**47**   318:21
**47,000**   56:8 58:25
**47226**   7:9
**48**   7:4 16:3,5,6 17:7 17:10,19 49:23,24 49:25 116:3,4

CONFIDENTIAL

**[48 - 851]**

193:10 194:2,6
295:3 318:22,24
**49** 297:12 321:12
321:16,17
**4900** 3:21
**49561** 51:10,20
53:24 54:2,12 55:6
**496-9700** 3:16
**4:11** 228:5
**4:12** 228:6
**4:19** 1:5 340:5
**4:21** 228:7,10
**4th** 46:23 219:18
219:25 224:3
252:17

**5**

**5** 174:25 189:22
197:7 201:9 271:7
279:14 282:13
302:10
**5,234** 190:5
**5,760** 196:20
199:23
**50** 7:5 38:22,24
52:11,11,16,17
73:21,24 187:4
256:5 267:14
312:10 322:9
**500** 63:14 277:17
**51** 138:22,22
**52** 7:5
**522-4435** 4:6
**526-3700** 4:22
**53** 147:4,5 151:18
154:19 156:23
**55** 7:8 32:23,24
155:7 156:8,10,11
156:13,16 157:16
158:21 312:17,18
**554** 8:16

**56** 155:7 158:24
159:1,3,11,13,17
**569-7720** 3:6
**57,820** 53:2
**570-07** 218:19
**571** 341:21 342:21
**575** 189:25
**575.5** 197:18,21
**5:20** 268:2,3
**5:33** 268:4
**5:34** 268:7
**5th** 114:10 117:8
194:2 265:3

**6**

**6** 170:21 174:25
183:23,24 194:17
220:8,14 221:8
228:9 268:1 270:15
271:7 278:16,21
279:14 282:13,13
291:15 299:11
300:19
**60** 7:10 171:2,3
180:5 189:9,13
197:20 206:6
**61** 7:12 190:10,11
190:12 196:1 206:6
**62** 7:14 203:10,12
206:7
**626-3600** 3:11
**63** 7:16 201:12,14
201:19 204:20
206:7
**6363** 4:15
**64** 7:18 208:18,19
208:20 209:12
213:7 215:17
216:25
**65818** 244:11
**65826** 253:14

**65886** 255:8
**66,453.90** 19:8
**66,553.90.** 19:6
**66004** 239:7
**66051** 256:1
**6:54** 324:20
**6:56** 324:21

**7**

**7** 126:10 174:25
268:6 271:8 324:19
**7.25** 297:16 298:2
298:10
**70** 187:5 203:24
**700** 4:15
**701** 3:10
**705** 207:14,16
**71** 7:20 217:24
218:1,1,3
**713** 3:16 4:6,11,16
4:22
**72** 196:12
**72,000** 108:15
**72,200** 190:4
**725.96** 116:13
**74** 7:22 219:15,17
224:3
**75** 7:24 222:3,5
**750** 3:5
**76** 8:4 225:16,20
**76102** 341:22
342:22
**77** 8:6 172:22 173:5
181:19 233:2,3
**77,434** 190:7
**77002** 3:15
**77007** 5:5
**77027** 4:6 343:4
**77056** 4:21
**77057** 4:16
**77063** 4:11

**78** 8:8 236:12,13,20
331:2,21,25 333:1
**79** 147:15 242:8,9
**79020** 242:10
**799-08** 164:2
**7:00** 324:22
**7:01** 324:25
**7:03** 2:5
**7:17** 336:7
**7:20** 2:5 337:11
**7:30** 324:4
**7th** 55:23

**8**

**8** 108:11,12 174:25
183:12 194:5
233:21 271:8
300:21 324:24
336:6 343:1
**8,000** 108:3,4,6,12
121:5,7
**8.25** 297:15 298:1,9
**80** 8:11 171:10
173:5,12 178:25
181:19 195:1,10
196:13 202:10,17
202:22 203:19
206:11 246:21,22
246:24 253:9
**800-726-7007**
343:10
**81** 8:12 261:14,16
261:18
**815** 7:19
**817** 341:23 342:23
**82** 8:14 264:15,17
264:20 268:9
**832** 5:6
**849** 152:11
**850** 152:11
**851** 152:11

**860**   6:16
**879**   8:5
**882**   207:13,15
**888**   6:18

**9**

**9**   108:11,12 126:10
  173:19,21 174:4,13
  174:17,25 183:12
  271:8 300:21
**9,000**   47:22 48:24
  49:7,19
**90**   8:17 206:11
  270:14,15,18
  298:22
**9059**   341:19 342:19
**913**   7:21
**917-0024**   4:16
**91911**   218:3
**92**   8:18 294:14,17
  294:19
**95**   212:10 213:1
  216:19
**9713**   6:20
**9:11**   9:3
**9th**   143:22 145:17

**a**

**a.m.**   57:11,12 113:9
**aaa**   143:14
**abatement**   99:13
  99:14,15 164:2
  168:5,25 169:8
**abby**   227:19
**abigail**   2:6 341:19
  342:19 343:18
**ability**   176:18
  312:2
**able**   10:19 147:6
  155:3 176:4 180:3
  247:21 253:21
  311:18 321:15

322:3
**abraham**   1:6,19
  2:1 4:3 6:4 9:3
  12:21 33:1 45:18
  57:10,14 60:23
  113:7,12 126:18
  155:24 156:4
  192:16 201:5,9
  218:4 219:20,20
  222:15 228:9 258:4
  258:5,12 268:1,6
  287:21,25 300:2
  305:19 313:9
  324:19,24 336:7
  338:2 339:1,5,12
  340:6,15 343:2,6,7
**abrahim**   258:5
**absolutely**   63:25
  122:6 173:17 177:4
  179:3 207:25
  240:18 242:6
  259:21 269:19
  304:18 321:5
**accept**   15:13
**acceptable**   328:4
**accepted**   187:19,19
  188:2,5
**access**   257:5,5
  280:13,14,19
**accident**   48:14
**accompanied**   274:5
**account**   24:2 74:3,4
  74:5 75:24 107:6
  107:13,16 110:1,2
  110:3,4,5,13 118:5
  119:12 138:22
  140:4 179:5 181:1
  219:18 221:22
  283:22 284:13,16
  312:20

**accountant**   25:17
  25:21,25 26:2
  109:19
**accountants**   79:15
**accounting**   74:7,20
  75:17 78:2,22 79:2
  79:24 109:12
  119:14 191:20
  198:18
**accurate**   240:1
  322:3
**acknowledged**
  143:14 339:16
**acknowledging**
  135:11
**acknowledgment**
  130:24 132:25
**acres**   210:5,5
**action**   341:10,12
**active**   231:4,7
**activities**   71:14
  128:4,5 213:21
**actual**   35:15 38:11
  76:12 83:4 141:23
  167:14 169:8
  182:16 184:5
  195:17 238:4
**adamant**   92:18
**add**   195:23 205:8,9
  225:9
**added**   192:12
  194:12,25 196:7,9
  197:11,16 204:15
**adding**   130:6 195:3
  199:10 213:12
  224:23
**additional**   139:13
  139:18 325:3,5
**address**   50:25
  161:10,11,13
  221:18 222:1,22,25

223:2,5 258:22
  278:24 283:18,21
  283:23,25 322:10
  322:11
**addressed**   254:1
  324:1
**addresses**   294:24
**adds**   202:22 203:4
**adhere**   131:16
  134:22
**administrative**
  157:18 173:10
  177:5,10,19 178:1
  178:4,22 181:15
  214:17 216:1 272:2
**administrator**   1:8
  340:8
**advance**   11:6
**advice**   105:4
**advise**   343:9
**affiliates**   306:21
**affix**   339:2
**afshar**   165:25
  166:11
**agent**   175:22 176:1
  176:2
**agents**   287:22
**aggravated**   261:1
**aggressive**   268:17
**aggressively**
  220:21,22
**ago**   37:17 48:8
  115:23 169:18
  198:3 217:3 278:2
  300:21
**agree**   13:17 14:8
  49:18 51:12 54:20
  118:8 126:4 131:15
  131:19 132:19
  135:13 176:12
  187:21 295:20

319:20
**agreed** 27:20 49:20
  54:2 131:20 271:10
  334:19
**agreeing** 29:23
  295:13 335:3
**agreement** 124:22
  125:14 126:11
  133:25 175:1
  179:17 180:11,16
  180:20 228:17
  241:10 333:23
  342:5
**agreements** 136:21
  334:16
**ahead** 10:4 44:17
  83:2 109:25 132:12
  134:5 151:16
  154:25 168:2
  191:25 192:1
  228:22 239:17
  245:25 249:22
  256:14,15,16,24
  262:19 271:20
  306:17 308:16
  311:21
**air** 168:22 308:8
**airfare** 61:12 62:14
**ajoseph** 222:16
**ajoseph777** 283:24
**aku** 322:21
**al** 343:7
**alar** 104:6
**alcohol** 131:13
**allegation** 81:21,21
  82:10,10
**allegations** 81:11
  81:17 82:22 83:7
  328:18
**allocation** 136:23

**allocations** 313:2
**allow** 15:13,17 40:3
  40:7,15 91:13
  187:16 276:20
**allowance** 54:25
**alongside** 156:19
  156:25 157:5 160:6
  187:16
**altogether** 312:13
**amended** 285:3
**america** 107:4,8,12
  107:19 108:9,22
  109:24 110:2,6,9
  110:11,17 111:19
  114:2,3,7 121:23
  127:21
**american** 231:15
  231:15 262:2
**amount** 43:11,21
  55:20 58:14 65:10
  65:15 66:8,17
  68:21,24 71:18
  107:16,23 116:15
  164:6 170:25 177:8
  295:8 299:5 311:23
  318:25
**amounts** 108:2
  109:5 298:23 299:3
**analyzed** 296:3
**anchored** 235:19
**angel** 62:1,9
**anne** 80:1,2,7,8,24
  81:1 84:17 87:4
  103:14 191:3,11,21
  191:23 192:5,7,11
  192:11,22 194:11
  199:19 202:14,16
  205:2 206:19 208:1
  208:8,9 218:4,12
  273:22

**anne's** 80:6 190:22
  190:23
**annual** 298:25
  311:25 312:3 319:1
  319:13 321:12
**anomaly** 198:12
**answer** 13:13,21
  14:5,6,7,13,14
  17:13,16 22:10
  28:5,15,16 35:13
  35:14 37:22 38:2
  40:9,22 60:12 61:7
  64:22 74:24 75:1
  75:10,12 81:19
  82:3,5 96:21,22
  111:8 112:10 119:5
  134:5,15,17,18,19
  135:5,6,7 137:15
  137:16,17,18,19
  138:3,7,16,16
  139:4,8,23 144:13
  146:20,21 166:8,9
  176:10 185:23,24
  187:9,12,14 192:23
  195:23 198:7,9,20
  199:6,8,17 205:7,8
  205:15,22 206:1,2
  208:9,10,11 216:23
  217:4 234:9 258:17
  274:2,7,11,15
  275:4,6 276:7,9,13
  276:15,16,20,25
  281:5,17,17,19
  289:2,2,3,18
  290:15 291:9 293:7
  298:11,21 299:10
  300:7,9,13,17,18
  300:25 301:1,8,11
  304:23 313:6 319:5
  319:17 320:4
  321:15,19,19

**answered** 26:12
  134:14 293:8 301:2
**answering** 32:18
  61:5 291:17 326:2
**answers** 106:13
**anticipated** 57:1
  192:20
**anybody** 13:23
  39:16 76:25 93:2,3
  93:4 172:5 302:6
  327:12
**anymore** 110:3
**anytime** 235:4
**aol.com.** 222:22
**apart** 84:18 163:22
  172:17 310:20
**apartment** 305:12
  305:16
**apologize** 86:7,9,24
  97:7 331:20
**apologizing** 86:8
**app** 282:22
**apparently** 35:1
**appear** 56:4 190:25
  227:16 325:21
**appearances** 6:3
**appeared** 2:8
  339:12
**appearing** 9:17,20
  252:14
**appears** 53:1 55:9
  55:25 118:2 126:12
  127:11 193:12
  221:17 256:17
  277:16 332:6
**applicable** 125:23
  128:23 134:20
**application** 55:9
**applied** 334:21,25

**applies** 129:14
132:8 133:15,21,22
133:24 134:20
296:2 335:20
**apply** 133:15 134:1
134:12,25 335:1
**applying** 48:9
**appreciate** 63:8
154:15 326:1
**approached** 180:9
**appropriate** 62:5
205:24
**approved** 224:25
**approximate** 171:1
**approximately** 9:2
31:15 46:20,25
48:5 57:15 71:16
113:7,13 156:5
201:9 228:5,9
232:21 268:6
324:25
**approximation**
115:22
**april** 47:9 114:10
116:11,23
**arabella** 68:8,10,12
68:16 69:21 305:13
305:16
**archie** 193:14
**architect** 248:23
**area** 6:14 26:6
67:23 143:13 185:4
230:18 251:13
253:1 254:16
255:13
**areas** 10:13 179:13
210:18
**argentina** 314:24
314:25
**argue** 138:11

**arguing** 134:3
135:2
**argument** 335:17
**argumentative**
134:9 138:4
**arguments** 138:12
**aromus** 279:5
**arrange** 61:20
62:25
**arranged** 273:17
273:18,19
**arrangements**
343:11
**arrow** 202:21
**asap** 245:23
**asbestos** 99:15
164:2,15 168:5,24
169:7
**ashley** 3:19 9:19
60:24 70:4 122:9
304:9,14,16,25
305:3,22
**ashley.stoner** 3:23
**aside** 10:14 92:7
229:13
**asie** 231:13
**asked** 17:13 20:4
21:10 26:11,14
29:2,3 36:5 43:25
49:15,16 62:22
63:19,20 90:11
91:15 96:9,23
115:12 119:23,25
120:9,12 121:6,7
123:19 130:8
134:13 137:22
140:22 141:11
151:9 152:5 160:24
180:1 187:10 192:4
192:11 205:2 219:9
228:11 232:4

234:12 237:21
243:10 258:23
274:18,19 310:23
316:8,9 332:25
333:1,16 335:10,11
**asking** 37:15,16,18
43:18,19 89:11
92:5,10 95:20 96:4
96:8 105:16,17
111:11,14,17 129:7
129:9 135:22
138:15 174:24
176:11 185:22
198:5 240:11,14
246:18 254:2
259:19 261:6,13
262:11,21 268:14
273:15 287:6
300:18,18 316:11
320:3 332:22
335:13,18,20
**asks** 33:18 275:7
302:7,8 310:3
**assertion** 296:1
**assigned** 20:16
**assist** 238:21
318:16
**assistant** 206:23
275:21
**associated** 185:14
245:9
**associates** 247:4
**association** 292:1
**assume** 56:16
132:13 216:19
315:16
**assumed** 92:2
**assuming** 56:9 89:9
224:10 283:13
290:9 321:25

**assumption** 205:10
**at&t** 282:8,18
**atkin's** 85:17
**atkins** 7:8 84:20
85:3,10,18,20 86:5
91:5 93:7,13 95:10
98:23 102:22 155:8
156:8,16 157:12,23
158:19,21 161:17
305:23
**attached** 2:10
17:19 61:3 114:8
237:4 244:15
332:25 334:12
341:3
**attaches** 219:24
**attaching** 237:13
249:11 251:18
**attachment** 127:11
127:17 218:17,25
222:12 334:12
**attempt** 207:23,25
**attendees** 2:8
**attention** 33:16
60:17 107:1 127:20
192:9 209:12 334:3
**attorney** 290:16
291:10,19 326:22
329:14
**attorneys** 45:25
46:3 146:13 214:21
217:6 285:11 288:6
289:25 341:10
**august** 30:13,15
34:4 47:21,24
48:18 51:4 55:23
122:13,20 126:23
131:5 157:17
189:22 194:1,1,14
218:6

authorities 293:22
  297:1
authorized 33:2
auto 292:1
autocad 211:25
  215:5,21
available 118:25
  176:9,19,20 342:6
  343:10
average 73:6
avoid 136:20 241:8
aware 34:9 35:5,6
  41:7 45:7 70:2
  160:2 207:9,19
  229:15 240:19,23
  275:1 279:22 295:4
  295:5 302:9,14,19
  303:12 318:4,7
  327:22 328:10,12
  328:17 329:24
ayers 126:13
azarpour 84:21
  86:10 97:14,17
  98:3,8 99:6,22
  143:15 144:21
  146:22
azarpour's 99:8

**b**

b 61:3 114:8 116:8
  127:17 270:15
  278:16,21 291:15
  299:11 300:19
  334:12
back 21:6 30:24
  35:18 42:4 48:8
  57:13 60:13 71:4,7
  75:7,9 80:18 93:22
  110:5 113:11,18,25
  116:3 138:16
  140:14,16 149:22
  155:20 156:3

161:11 164:16,16
  167:18 168:8,10,23
  169:3 176:18
  178:23 192:7,10
  197:4,20 201:8
  220:22 223:13,25
  225:1,6 228:8
  229:18 240:5
  262:15,25 268:5,9
  272:17 280:7,8,10
  298:22 304:8
  311:15 314:24
  317:16 319:9
  320:25 324:23
  331:1
backing 205:11
backup 169:10
  214:14 282:15
backups 169:12
  277:10 279:23
bad 46:13 304:7,7
  315:19
bag 49:4
balance 214:15
ballpark 187:3
bancroft 67:25
  68:1,3 69:21,22,23
  70:13
bank 24:1 26:13
  29:4,10,17 74:2,3,4
  107:3,8,12,19
  108:9,22 109:24
  110:2,5,8,11,17
  111:19 114:2,3,7
  121:23
baptized 258:4
bare 221:7
base 51:25 52:5,5,7
  187:19 323:8
baseball 63:7,9,13

based 33:12 56:3
  61:11 62:16 105:4
  109:10 140:8
  148:17 159:6
  171:25 176:24
  178:23 185:3
  187:19 188:2,3,18
  191:6 194:6 202:8
  208:7 245:8 277:10
  278:4,6 279:23
  286:22 290:9 296:1
  296:14 297:15
  298:1
basic 179:10,10
basically 239:11
  243:22 244:6
basis 21:15 28:21
  298:25 311:25
  312:1,3
bates 6:16,18,20
  7:6,9,11,13,15,17
  7:19,21,23 8:5,7,9
  8:13,15,20 52:18
  124:21 125:10
  128:2,8,9 136:8,17
  136:17 139:2
  143:22 145:22,24
  146:14 148:4,17
  150:7,9 151:4,10
  152:5 162:15
  189:10 212:22
  218:3 237:12
  242:10 247:10,13
  253:9 264:20
bautista 104:8
bcc 244:22 245:5
  245:18 247:21,23
  248:4 249:13,20
  252:12 256:18
  257:18

bcc'd 245:10,15
  249:5,9 250:2,7,10
  251:4,17 252:8,17
  252:24 254:13
  255:11,18 256:3,11
  257:13
bcc'ing 247:3,7
  248:19,22 250:14
  251:1 254:23,25
bear 142:3 253:18
  331:9
beat 315:25
beer 138:19
beg 286:6
began 331:24
begging 132:14
beginning 228:18
begins 233:16
behalf 9:8,9,11,15
  9:20 35:11 156:24
  157:22 198:19
  299:11
believe 19:7,8
  33:14 34:12 36:2
  36:13 69:15,22
  79:6,19 80:17,17
  83:14 84:25 97:5
  100:21 101:25
  103:23 108:10
  139:12 145:17
  153:6,23 158:19
  160:9 180:24 185:7
  199:17 207:12
  213:4 225:14
  226:25 231:25
  243:16 251:21,25
  253:16 264:6
  270:19 272:20
  278:8 283:11
  286:24 287:17
  288:11,11 292:19

CONFIDENTIAL

297:4,6 298:19
299:12,14 303:4
312:21 314:19
315:17 316:23
318:9 319:5 323:8
327:5 329:3 332:4
333:2,4
**believed** 322:12
335:14
**benefit** 13:18 14:10
119:4 129:3 133:10
**benefits** 122:25
128:18 129:17
130:13 137:12
**best** 15:23 23:18
31:5,8 38:6 39:1
48:16 62:17 65:11
69:7 72:25 109:4
111:3 114:22
115:22 130:20
175:23 262:13
286:19 312:16
315:23
**bet** 138:8
**better** 38:1 46:21
47:18 50:4,5 96:14
125:2,3 233:8
**bid** 38:7,7,13,24
39:7 42:5 88:10,17
88:25 89:3,21 90:1
90:6,14,19 91:3
93:9 105:13,18
106:2 123:13,20
127:11,15 143:23
144:7,8,11,17
145:1 146:3,7,18
146:23 147:2 153:3
154:2,3,4,5,6,7,18
156:20,25 157:6,10
159:21 161:5,5
162:7,21 164:8,19

165:6,9,14,14,19
170:3,6 187:24
188:1 189:2 218:5
218:10 219:1,18,24
220:3,16 223:7,17
224:1 226:11
228:12 229:21
239:4,20 259:1
260:23 270:2,2,6
306:12 331:24
332:3,5,6,25 333:2
333:5,6
**bidded** 189:4
**bidder** 91:14
240:22
**bidders** 90:2 92:6
187:15
**bidding** 42:2
105:21 187:22
220:18,20 226:2,19
273:7 310:24
**bids** 7:8 37:13
83:13,15 84:13
85:11,24 86:16,22
87:1,11,13,14,15
87:21,24 88:1,8,20
88:24 89:8,10,14
89:18,23 90:9,25
91:4,6,6,8,10,11,16
91:23 92:6,10 93:6
93:6 95:10 96:1
97:11,23 98:1,8,11
99:17,19 100:1
102:7,9 105:24,25
135:21 136:4,22
137:5,13 143:11
144:2 145:1 147:6
147:10 151:19
154:18 155:8,8
156:8,12,15,19,23
157:8 158:10,13,20

159:4,7,13,16
160:5,6,10,22,24
160:25 161:1,2,16
162:5 163:6,9
187:16 188:7,8,12
188:21 217:12,18
226:17,21 227:21
237:22 240:17
269:21,21 271:13
272:9 301:14,20
306:8 309:13,17,20
318:16 322:16
333:8,8
**big** 106:16 147:25
149:1,2 169:23
183:10 210:5
260:14 264:2
292:12,14
**biggest** 172:16
**bill** 177:14 189:15
193:3 202:9 203:9
203:11 213:20
214:3,7,11 217:1
227:14 317:9,9,11
317:12
**billable** 23:23
**billboards** 163:18
163:21
**billed** 167:8 191:6
193:1 196:13,20
197:23 199:23
204:1 212:23 214:7
214:23 216:12
267:1 317:14,15
**billing** 72:3 102:4
124:7 178:4 208:4
272:8
**billings** 201:25
**bills** 107:4,12,24
108:9,22 109:8
110:8,8,18 114:2,3

114:8 121:22
177:13 191:9
206:15 214:14
217:10 263:21
**bimonthly** 28:20
36:11,13
**biscayne** 3:20
**bit** 10:19 41:19
53:7 117:22 125:1
140:11 164:24
165:1,4 173:13
222:6 233:6 236:22
252:21 262:20,25
263:10,11 286:6
**bite** 263:9
**bits** 45:5
**biweekly** 21:15,16
35:22
**blacked** 55:4
**blamed** 181:9
314:21
**blank** 35:17
**blind** 219:21
**block** 23:17
**blow** 140:11 233:5
**blue** 314:3
**bluehost** 278:8,10
278:12,19
**blurb** 12:18
**board** 231:5,8
257:20
**boat** 92:25
**bolt** 309:5
**bona** 24:24 25:18
**bones** 221:7
**bookkeeper** 79:20
80:3,10
**bookkeeping** 79:17
80:14
**books** 75:25 76:18
79:3

**boss** 273:19
**bosses** 92:19
  140:21
**bottom** 53:8 137:20
  242:16 264:23
  265:5 331:24
**bought** 48:19
  323:16
**boulevard** 3:5,20
  4:20 5:5
**boundaries** 263:14
**box** 35:2 290:18
**boxes** 119:15 288:4
  288:5
**brad** 84:22 100:5,8
  100:15 101:7
  102:10 170:16
  177:13 179:17,24
  180:12 190:16
  193:8,19 196:24
  197:3
**brand** 210:1
  282:10
**break** 56:21 57:11
  72:20 94:19,24
  95:7 112:23 113:3
  113:9 142:17
  154:23,25 155:1,3
  156:1,7 200:11,12
  200:15,17,17,25,25
  201:6 215:21,22
  228:6 267:17,19
  268:3,10 323:24
  324:21 325:2
**breakdown** 118:18
**breaker** 210:19
**breakers** 181:4
  211:1,1 215:11
**breaking** 112:25
**brg** 295:3,7,14

**bribe** 13:8,11,14,18
  14:3,9 15:6,25
  28:21,24 63:24
  64:17,18 70:18,19
**bribery** 40:19 83:9
**bribes** 14:16 15:9
  15:13,18
**brief** 323:24
**briefly** 82:17 314:8
**bring** 67:1 210:23
  277:3
**bringing** 168:22
**broad** 81:20 111:2
  111:3 310:2
**broken** 299:23
**brother** 87:9
  102:17 159:25
  161:10
**brother's** 102:18
**brought** 94:23
  180:18 192:9
  297:10
**brown** 307:21
**bucks** 21:22 63:17
**budget** 77:16,17,20
  188:3,4
**budgetary** 188:21
  188:23 189:6
**budgeted** 221:5
**build** 187:16 210:1
  235:18
**builders** 98:9,12,21
  143:14,23 146:4,7
  146:18,23 147:2,6
  151:19 153:1,24
  156:22,24 226:15
  229:22 240:21
**building** 6:14 67:23
  67:24,25 68:4
  69:15,16 143:13
  157:18 219:24

223:8,10,12 224:6
  234:11 243:9 308:2
  309:1
**building1.doc.**
  222:13
**buildings** 99:16
  243:7 307:25 309:2
**built** 210:1 236:1
**bull** 168:7
**bully** 317:8
**bunch** 135:10
  142:25 213:24
  253:11
**burden** 177:10
  178:4
**business** 20:23
  25:11,14 29:14
  37:5 39:17,20
  40:13 59:5,6 62:3
  63:22 64:1,4,25
  70:20,23 71:3,5,10
  71:16 72:7 74:12
  74:17,17 75:15
  78:23 92:24 103:1
  107:7 115:3 119:18
  120:11,14,22 121:3
  128:3,4 163:14
  172:14 178:8,21
  192:2 199:21 229:5
  229:16 231:24
  262:23 265:8,11
  266:5 268:12
  334:10 335:5,20,21
**buy** 55:1 115:14,17
  138:19
**buyer** 130:5
**buying** 53:16
  129:15 323:18

**c**

**c** 3:1 4:1 5:1 50:9
  50:10 272:15,19
  343:2
**cabinets** 288:5
  290:17
**cad** 211:3
**calculate** 311:8,10
  311:12,15 313:5
**calculated** 207:11
  312:4
**calculation** 191:22
  202:16 312:6
**calculations** 235:9
**calculator** 196:17
**california** 62:14,23
**call** 63:23,23 64:1
  71:4 83:9 93:6
  149:20 191:19
  208:16 209:11
  235:8 257:25 258:5
  258:7,11 260:24
  294:13 304:17
  314:3
**called** 45:13 85:4,5
  85:7 101:19,20,22
  101:25 123:21
  191:11 222:12
  240:3 258:12 273:3
  278:10 293:9
  325:16 326:12,15
**calling** 260:22
**calls** 177:16
**campus** 210:5
**cancelled** 119:9
**canopy** 235:17
**capable** 168:16
**capacities** 136:24
**capacitors** 210:4
**capacity** 10:20 11:2
  270:10

**capitalized** 262:20
**car** 54:15 292:1
    314:4 325:23
**card** 61:1 107:4,6
    107:12,13,16,24
    108:9,22 109:8,23
    110:10,18 114:2,3
    114:7,16,20 115:4
    115:4,10,18,19
    116:3,9,24 118:17
    118:19,20 119:9,13
    119:17,21,23
    120:10 121:22
    229:5 263:21
    339:14
**cards** 111:12,14
    114:4 118:5 121:25
    140:18,19,20,23
    141:3,4,7,9
**care** 87:14 172:4
    245:12
**carefully** 311:14
**carlos** 114:21,22
    115:4,11 116:19,21
    116:24 117:12,19
    117:23 118:3,11,18
    119:13,24
**carried** 166:19
    173:21 180:22
**carry** 88:14,16
    175:2 205:3 206:18
    206:21
**carrying** 116:24
**carving** 132:3,7
**case** 3:9,14,19 10:7
    12:16 98:2 105:1
    157:8 172:15
    199:25 206:8 236:4
    236:6 257:1,8
    263:4 324:5

**cases** 23:24 84:25
    93:10,22,23 186:10
    186:10,11 188:15
    188:16 219:10,11
    257:1 291:25
    307:25 308:2
    309:18
**cash** 26:10 49:1,2,4
    49:7,19 60:25
    64:24 65:3,8,17,20
    65:25 66:4,6,22
    67:1,8,11 68:4,10
    68:15,20,22,24
    69:5,11 70:1,5,8,13
    70:21 72:8,18,23
    73:3,9,13,18,23
    74:1,6,10,14,22
    75:18 76:7,11,13
    76:21 77:2,7,10,22
    78:9,11,16 79:13
    81:2 83:10 106:18
    121:5,7,21 122:25
    137:24 263:21
**castro** 193:6
**catch** 126:8
**caught** 317:15
**cause** 2:4 334:14
**caused** 251:10,12
**cc** 244:22 257:15
    257:18
**cc'd** 244:2
**cease** 124:14
**ceased** 124:12,15
**ceiling** 168:9,9,16
    168:17
**ceilings** 164:14
**cell** 283:16
**center** 3:20 209:22
**certain** 177:22
    179:11

**certainly** 255:21
    291:24
**certificate** 6:10
    53:22 55:10 340:19
**certification**
    340:15
**certified** 12:17
    227:18 228:2 241:6
    336:8,20,24 337:10
    341:13
**certify** 131:7
    340:22 341:8 342:3
**certifying** 211:5
    213:25
**cf** 204:24 205:2
**cfo** 272:19
**chaffin** 247:3
    248:23
**chain** 222:11 233:9
    233:14 236:13,16
    239:6 242:9 244:10
    245:20 248:11
    265:1,5 332:8
**chance** 151:18
    218:2 242:19
**change** 338:5
**changed** 194:2,5
    198:17 306:24
**changes** 6:9 225:10
    338:1 341:3,4
    342:7,9
**changing** 175:21
    175:25 224:22
**channel** 242:23
    243:8
**chapter** 128:3
**charge** 75:17 79:2
    163:12 173:4
    181:23 190:4
    212:18 213:7 317:4
    317:7,17

**charged** 170:20
    171:10 178:6
    195:19 204:8,12
    295:8 317:6 328:3
**charges** 217:7
    328:2
**charging** 216:19
**chart** 311:3
**cheat** 205:13
**check** 11:10 23:10
    23:12,13 24:4 49:1
    50:11 107:18,20,20
    107:22 110:17
    111:19,21 112:1,2
    112:5 207:1
**checked** 283:9
**checking** 211:6
    261:5
**checks** 23:14,23
    24:5,9 36:11
    109:13,22 110:12
    112:19 141:22,23
    141:23 194:17
    206:25
**chetan** 1:11 231:17
    261:21 263:1 264:9
    265:2,7 269:9
    340:11
**china** 168:7
**chips** 309:4
**choice** 258:15,17
**choosing** 253:22
**christmas** 141:11
    141:12
**chronological**
    253:16
**chronologically**
    331:23
**chubb's** 175:24
**churches** 307:22

**circuit** 178:12
210:9 291:23
**circuits** 211:15
215:10
**circumstances**
115:9 208:4
**cite** 291:25
**city** 232:10
**civil** 2:9 8:9,13,15
232:10 235:4
237:12 239:7
242:10 244:11
253:14 255:8 256:1
261:18 262:10
264:21 265:6
343:24,24
**claim** 177:1 180:17
180:19 318:25
**clarification** 25:6
40:23 75:8 138:20
241:3 250:18 255:5
**clarify** 105:15
269:23
**classify** 76:4,7,21
91:9
**clause** 332:15
**clean** 206:9 259:24
**clear** 92:18 104:1
107:4 138:1 139:19
197:6 276:17 314:2
**clearly** 31:3 37:1
188:20 244:4
**clerical** 214:17
216:2
**click** 16:18
**clicks** 16:5
**client** 61:11 62:6
76:25 254:1,3,7
275:1 290:16
291:10,19 329:14

**client's** 64:15,15
**clients** 20:2 27:18
62:4 63:6 77:1
90:11 174:21,22
307:15
**clinics** 307:20
**close** 31:10 37:7,11
37:12 126:25 127:7
176:13 191:20,23
257:12 315:22
**closed** 67:6
**closely** 235:11
283:12
**cloud** 277:10 278:4
278:6 279:23 280:5
288:15
**cna** 175:23
**coaching** 37:24,25
38:1 294:7,9
**cocounsel** 9:17
112:12 294:12
323:25
**codes** 125:24
**collect** 287:22
291:1 297:25 298:9
**collected** 253:11
288:2,3,10,20
289:23 290:6,10,11
291:2 293:17,21
296:25 297:14
298:11,15
**collections** 178:5
**column** 250:4
251:3,9 252:5
**combination**
148:16 211:4
213:21 214:4
**combined** 7:8
**combining** 52:13
**come** 27:25 28:9
40:18 42:8 48:20

74:1 94:16 151:7
168:6 184:25
186:17,20,22 187:7
193:21 195:21
196:5 235:9 243:12
258:2,3 260:23
261:7 272:24 273:4
323:16 343:10
**comes** 194:20
257:10
**comfortable**
112:24
**coming** 48:11 91:5
96:2 192:10 209:22
210:9 235:12
249:23 269:13
273:9,25
**commercial** 128:22
**commission** 339:25
**committed** 329:25
**common** 218:15
219:3
**communicate**
219:5 273:20 282:2
282:23 283:5 284:3
284:6,13
**communicated**
292:20 330:12,15
330:23
**communication**
241:19 246:12
269:10 274:25
283:7 286:13,14
**communications**
12:2 241:21 250:15
272:5 281:16 289:3
329:15
**companies** 40:12
40:16 60:7 62:4
83:16 88:2,24 92:7
92:11 99:6,9,25

136:12 161:14
172:21 185:3
210:17 215:4,23
220:15 226:11,14
227:2 232:5 234:17
262:2 301:15,20
307:12 310:18
**companion** 62:15
**company** 10:12
13:18,22 14:1,3,9
15:12,17,23 20:4
23:16 27:13,16
36:1 40:3,14 50:21
50:25 60:5,6 63:6
74:5 75:25 76:10
77:13,22 85:11,17
86:1,15,17 91:21
92:5 97:10,23
99:13,14 100:12
104:13,21 110:11
110:13 127:17
131:16 133:3,5,6
137:13 145:22
147:1 159:7 160:3
163:3,4,12 170:16
175:19 195:19
209:6 210:9 211:17
212:2 215:3,5,6,7
215:18 229:8,10,12
229:13,15,19 230:1
232:12 234:15
240:20 251:11
278:10 279:10,21
283:14 314:9
325:16 326:12,15
334:5,18
**company's** 74:9
75:25 77:9 97:25
146:7,12 334:8
335:5

compare 223:14
comparison 43:5
compel 138:17,18
compensate 19:16
competing 220:15
220:20
competition 136:9
136:14 137:6
competitive 89:21
187:21
competitors 136:21
complain 27:6,8,15
92:9,13 260:13
complaint 81:17,23
285:1,3 287:8
complaints 41:12
59:17 177:4 300:2
300:4,8,23 301:3
327:24 328:1
complementary
86:16,21 87:11
88:20 89:23 90:2,6
91:4,9,23 92:6 93:6
95:10 96:1 97:11
105:25 137:5
160:24,25 161:2,5
170:6 187:16 188:7
237:22 240:17
269:20 270:2
complete 169:17
205:9,10 224:21
256:5 310:4 312:23
completed 318:5
343:9,13
completely 137:25
193:1 209:24
completing 257:7
completion 257:4
340:25 341:7
complex 71:13
165:11 166:23

172:11
complexity 185:13
compliance 125:21
132:4 133:2 334:5
334:17
complied 19:17
20:9,10 26:23
27:22 29:5 64:6
91:17
comply 29:10 92:3
125:22 128:21
136:12 334:8,20
335:4
complying 29:1
64:15
components 181:5
composite 7:5
52:11 138:22 147:5
149:11 151:18
154:19 155:8 156:8
156:15 158:11,21
159:3,11,13,17
190:15 201:19
246:24
compressors 308:8
comptroller's
298:13
computed 55:20
312:3
computer 93:17,19
165:22 280:2,18
288:12,13,16 291:2
concealed 67:8
concede 10:21
concepts 229:24
concern 178:20
274:23
concerned 92:23
101:14 173:25
178:10,16,21,21
181:8

concerning 131:9
235:20 254:14
concerns 19:19
179:16,24,24
235:19 261:22
concluded 337:11
conclusively
146:16
concrete 242:22
251:20 252:2
condition 40:7
48:16 133:2
conditions 40:5
210:2 225:12 313:1
condolences 305:7
conduct 40:15
127:21,24 128:4
130:12 131:10
132:4,17,22 133:15
133:20 134:12,19
135:12,14,19,20
136:8 137:10 300:3
333:25 334:10,21
335:5,21,21
conference 272:18
272:23
confidential 1:18
10:6 178:16
confidentiality
228:17
confined 131:24
confirm 32:21
330:8 336:9
confront 259:19,20
confronted 192:11
258:23
confused 144:12
182:24 275:3
confusing 182:22
consent 158:7

consider 121:1,2,4
121:8 177:9 179:5
313:15,18
consideration
172:13 312:25
339:18
considered 171:21
269:18 329:21
343:13
considering 31:7
173:6,6
consistency 110:21
consistent 137:25
194:22 328:3
constant 124:10
225:5
constantly 177:15
construction 36:17
42:6 48:15 76:14
78:24 86:18 100:25
162:24 163:2,3,4,7
163:10,19 169:8
185:10 188:9
219:24 224:7
226:20,22,24 227:7
227:21,22 232:18
232:20 235:15
249:21 258:14
261:3 266:22,23
269:13 270:2
308:21 309:14
325:16
construction's
188:13
constructive
318:25
consultant 99:12
162:23
consultation 169:7
consumption 238:7

cont'd 4:1 5:1 7:1
  8:1
contact 35:7 273:1
  343:10
contained 333:24
containing 164:15
containment
  168:23,23
contains 17:25
  127:17 341:4
contend 182:6,19
contents 247:9
  274:25
context 240:5
  252:1
contingencies
  186:19
contingency 172:4
continue 11:16,25
  16:18 19:15 20:8
  20:25 25:15 26:15
  29:14 41:6 70:15
  70:20 72:10,12,14
  121:3 148:24 264:2
  328:9
continued 70:23
  92:3 120:23
continuously
  122:24 123:1
contract 125:16,20
  136:5 175:2,4
  180:2 334:4,20
contractor 125:22
  131:12 132:2
  133:16,17 143:14
  258:15,16 259:7,8
  259:15 309:7,9
  334:7,13 335:3
contractor's
  134:21

contractors 131:21
  132:9 153:18
  178:25 181:22
contractual 128:20
contradicts 293:25
control 147:21
  234:10 259:3 311:6
conversation 25:20
  46:9,21 81:8 82:16
  82:19 85:2 86:14
  97:1,16 101:6,21
  102:1 205:24 208:7
  208:12 275:18,24
  305:21
conversations
  84:23 269:1,6
  305:18 313:10
cooperated 327:13
coordinate 163:9
  210:23 215:9
coordination
  210:20,22
copied 219:21
  238:13,20 243:18
  250:11
copies 244:12
  334:11
copper 129:15
copy 112:2 131:8
  196:23 206:22
  218:12 245:7
  336:21,23 337:6
  340:19
copying 218:4
  233:17 261:20
coral 3:6
core 255:12
corp 104:21,22
corporate 10:16,20
  10:25 11:20 42:10
  128:19 129:4

137:22 233:20
  259:4,6 270:10
  306:19,20,22,24
corporation 1:3
  9:16,21 17:13 22:8
  25:12 26:22,25
  28:11 31:12,16
  33:24 35:9 47:5
  59:5,11 85:25
  92:14 104:21
  125:17 126:12
  130:25 131:9
  162:18 340:3 343:6
corporation's 16:7
  50:7
correct 15:2,5,7
  18:7,8,11,15 19:7,9
  21:25 22:11 30:9
  31:21 33:11,14,14
  33:15 34:5,8 36:14
  45:10 48:25 51:2
  61:13,14 62:18,19
  64:2 65:6,7 67:5,14
  68:2,6 69:12,13,18
  69:20 70:9 75:16
  76:23 77:8,12 79:9
  79:11 80:25 85:19
  87:10 88:7,18 89:1
  91:12 94:2 95:16
  100:2,14 104:20
  107:9,10 108:5
  111:15 112:13
  115:7 122:22 123:6
  124:5 127:6 131:6
  131:13,14 139:22
  144:5 145:4 149:7
  149:13,14,15
  152:21 153:2,4,13
  154:20 156:17
  157:3 160:4 162:6
  164:7 167:20,22

170:19 171:9
  174:22 182:5
  186:13 187:23
  189:17,19,23 190:3
  190:6,20,24 194:16
  194:21,24 195:12
  195:15 196:3,6,15
  197:19 203:3,6,15
  203:25 204:4
  205:19 207:5
  212:20 214:13
  216:8 217:8,20
  219:3 223:20
  229:23 232:15,17
  233:18 234:23
  244:17 245:25
  248:3 255:19
  256:12 262:5,6
  263:22 265:4 272:9
  272:9 273:13
  276:23 277:1
  280:21 283:15
  293:14,19 297:20
  297:22 299:22
  300:15 301:13
  304:15 305:14
  307:5 313:4 325:13
  331:8 334:22 339:3
corrected 158:10
  193:20,20
correction 243:14
correctly 295:20
correlation 37:3
corresponds 195:3
cost 54:15 61:13,15
  62:18,20 63:9,13
  167:24 169:1
  173:10 176:5 184:4
  184:5 186:12,14
costs 169:11 176:23
  177:6 179:5 180:25

181:14 186:7 212:5
311:16
counsel 9:4 11:18
75:3 82:5 105:15
118:23 134:3
138:11 139:1,20
149:10 152:3
154:22 176:7
182:23 205:23
247:11 248:2
274:17,24 277:15
281:16 284:19,21
287:22 289:1,3
293:4 305:20
318:23 325:2
329:13 341:8 342:5
counsel's 105:4
296:1
counsels 275:22
count 277:17
counted 158:20
160:9
country 314:18
county 232:9
257:10 339:10
342:1
couple 10:2 106:20
121:23 142:25
226:9 231:22
249:25 258:23
286:9,20 291:25
304:12 324:9
course 241:12
317:22
court 1:1 9:24
96:19 291:22,24
322:1 336:15 340:1
cover 175:7 271:2
coverage 174:13
covered 142:25
143:2 270:25

293:15,16,16 300:6
318:3,20,20,21,21
covering 201:20
covid 266:16
cpa 79:4,5 109:14
119:15
cracking 235:23
cracks 244:18
251:19
cranes 179:13
crawling 213:22
create 98:1 99:17
99:19 102:9 146:8
147:10 149:20
153:8 156:12
161:13 166:15
created 83:15
85:10,24 97:23
98:9,11 100:1
146:3,17 156:17
158:13 165:22
166:14
creating 160:22
credit 60:25 107:4
107:6,12,13,16,24
108:8,22 109:8,23
110:10,18 111:11
111:13 114:2,3,4,7
114:16,20 115:4,10
115:18,19 116:2,9
116:24 118:5,20
119:9,13,17,21,23
120:9 121:22,24
263:20
crew 213:24
crime 329:24
criminal 314:14
327:17,20
cris 227:9,13
criss 62:1,9

cross 50:16
crossed 194:2
crumbs 263:2
csr 2:6 341:19
342:19 343:18
culp 1:7 340:7
current 44:1 210:2
curve 245:12
249:22
customer 63:8
customers 59:19,21
59:24 136:23 267:6
cut 166:6 221:6
cv 1:5 340:5
cycle 265:8,11
266:5 268:12

**d**

d'agostino 1:9 4:18
9:10 15:25 18:10
18:12,16,20,23
19:1,4,11,20 20:22
21:9 22:6,13,25
23:3,7,21 24:1,24
25:18 26:8 27:1,20
28:2,10,20 29:3,13
29:24 30:8,10 31:6
31:17 33:19 34:2,3
34:7,10,23 35:1
36:5,15 39:4,14,23
41:8,13 44:3,23,24
45:8 46:7 47:11,13
51:17,23 53:4
56:12 57:18,20
58:2 60:9,23,24
61:8 62:8,10,13,15
63:18 64:3,8,24,25
65:3,9,25 66:22
67:20 68:25 69:4
69:10 70:1,5,7,12
71:6 72:8,18,23
73:3,17 74:10,22

75:19,21 76:3,7,21
77:11 79:13 81:2
91:19,24 98:13
107:2,4,9 109:20
113:16 114:4
117:15 119:18,22
120:19 121:4 122:1
122:7,12,20,24
123:10 124:12
127:8 137:21
139:14 140:6,7
161:4,18 166:18
218:5,12 219:6
232:2,22 233:10
234:6 237:14
241:23 246:2 247:3
248:19 249:5 250:1
250:12,15,25
251:17 252:9,23
254:14 255:10
256:3,19 258:11
259:13 260:18
270:1,5 271:13
272:25 273:1 281:3
282:23 284:4,14,17
287:8,16 292:10,18
300:3,4 301:7,10
302:15 303:16
305:21 306:6,11
313:9,12,21 323:2
325:11,20 326:11
328:7,11 329:7,20
329:25 335:12,15
340:9
d'agostino's 24:15
24:21 39:19 61:10
61:15 70:24 92:9
107:12,24 108:8,22
109:8,23 110:18
114:2,23,24,25
115:11 116:21

117:20 263:20
d.c. 3:10
damage 178:22
179:1 250:3 251:2
251:10,14 252:4
damages 181:9
dan 5:8 9:14 10:3
13:1 52:19 148:9
148:12 151:16
248:15 267:20
285:20 296:10
301:1 319:16
324:14 326:6 327:2
dang 230:3
daniel 3:4 4:4,7
340:18 343:5
daniels 4:14 9:6,6
10:2,5 11:3,13 12:8
12:12 13:12,20
14:4,12,17,23
15:10 16:9,11,15
16:19,22 22:9 23:4
24:17 25:1,5,13
26:11,20 28:4,13
28:22,25 29:6 30:1
32:20 35:3,10,13
36:18,25 37:14,20
37:22,25 39:6,24
40:11,21 43:10,16
44:18 50:13,17
52:18,21 56:2,13
56:18,22,24,25
57:4,6 59:1,14
60:11 65:12 66:12
66:16 74:23 75:1,2
75:6,10 76:1 78:10
81:14,18,25 82:1,4
82:9,12 90:21 91:1
91:7 94:21 95:4,7
96:18,22 105:15
112:8,9,14,18

113:1,20 118:23
123:18 129:5,9,21
130:15 132:6
133:13,19 134:2,7
134:9,13,18 135:1
135:7,22 137:7,14
138:3,8,18 139:1,9
139:19 140:14
142:14,15,17,21
143:5 145:7,13
146:19 147:11,14
147:20,24 148:2,6
148:9 149:2,8,10
149:14 150:1,7,9
150:14,18,20 151:1
151:3,6,7,14 152:3
152:10,16 154:12
154:22 155:5,9,15
155:17,21 160:15
160:19 161:23
162:9 171:17
175:11,14,15 176:6
176:10,15,17
182:22 187:6
192:24 199:5,15
200:7,9,14,20,24
201:2 205:22 206:2
208:16,24 209:3
234:8 239:25
240:13,25 241:7
245:6 246:17 247:8
247:10,13,17 248:6
248:15,20 250:17
250:20,22 253:4,8
253:18,20,24 254:9
254:24 255:1,4,6
259:12,18,24
263:25 264:14,16
267:4,11,15,20
274:2,7,11,14,16
274:24 275:6 276:7

276:10,13,16,20,23
277:1,5 281:15
284:21 285:12,16
288:25 289:17
290:15 291:9,16
292:2,6 293:3,8,13
294:1,5,8,9 295:14
295:16 296:9,20
297:5,7,21 298:4
299:1 300:6,9,11
300:13,20 301:1
302:23 303:22
304:22 319:7,9,16
319:25 321:9,11,15
321:17,23,24 322:6
323:10,13 324:2,10
324:13,16 329:13
329:17 331:6,10,15
333:13,17 334:23
335:7,16,24 336:2
336:5 337:3,3
343:2
dara 3:18 9:18
dara.jeffries 3:22
data 277:7 284:25
285:6
date 21:6,7 30:19
47:7,20 51:3 53:13
66:1 69:6 105:16
111:20 115:21
116:1,10 117:1
131:5 145:16 150:6
152:4,10,12,12
174:11 223:24
224:1,3 225:25
226:3,6 233:21
255:9 265:17,19
280:25 285:14
286:11 302:21,22
302:25 303:11
338:3 341:2,20

342:20 343:22
dated 55:23 114:10
117:8 143:22
152:24 157:16
209:13 218:6
222:11 236:14
242:11 249:4
251:18 252:22
261:21
dates 30:14 224:14
david 44:8,10
45:13 228:25 229:5
273:22 309:19,19
309:25
day 2:4 11:11,17
61:9 105:16 124:14
138:9 191:19
206:14 263:1
270:25 307:4
339:12,20 341:13
342:14
days 172:25,25
225:3 341:2 342:4
342:5 343:13
dct 168:17
de 3:5
dead 103:8 304:13
deal 92:22 172:1
239:12 246:10
dealership 314:4
dealings 163:14,22
256:19
deals 223:11
dean 175:21 176:1
dear 343:8
death 171:24
debt 178:20
december 1:20 2:4
9:2 46:23 85:1
97:19 101:9 140:5
140:10 141:17,21

2

142:2 143:18
152:24 222:11
224:1 273:25 281:8
285:2,21 286:2
302:17,18 303:14
326:18 338:3
340:16
**decide** 186:15
290:13
**decided** 90:4,5
225:4,8 259:6
**deciding** 75:17
**decision** 13:19
14:11,24 42:10
58:6,8 89:25 259:4
**declare** 33:2,8
**deduct** 312:24
**deduction** 24:19
**defendant** 16:7
32:11 33:3 50:8
327:5,9,14
**defendants** 1:13
4:3,18 5:2 9:10
337:5 340:13
**defense** 27:25 28:8
**definitely** 31:23,24
32:1 35:16 46:24
71:25
**definition** 91:2
**delete** 245:22 246:1
246:15,18 280:22
285:22 287:13
**deleting** 285:10,15
287:2
**deletion** 277:11
**deliver** 39:7 66:22
88:9 95:9,14,18,22
96:10,23 239:9
240:6 241:22
**delivered** 39:4
96:24 161:18

241:25 242:1,2
340:17
**demand** 107:3
240:3
**demanded** 20:10
64:24 70:14 114:25
120:20 328:8
**demands** 107:9
300:4
**denied** 45:7
**deny** 146:11 200:16
**department** 52:14
54:21,22 129:15,19
129:25 130:2
210:22
**depend** 187:8
**depending** 185:12
**depends** 40:5 63:15
63:16 224:19
**depo** 241:9
**deponent** 340:23
340:24 341:6
343:22
**deposed** 102:24
**deposit** 23:25 24:2
24:3 35:2 110:17
**deposition** 1:17 2:1
8:17 11:5 33:23
45:3,6 46:6 105:6
205:23 270:16
278:16,21 291:22
322:4 338:3 339:2
340:15,17,25 341:7
343:6,9,21
**depot** 61:2 114:9
114:20 115:2,3,10
116:9 117:18
118:16,21 119:3,12
120:9,20,21 121:24
141:4,7,9

**depreciation** 48:9
**describe** 111:24
177:9 218:2 309:10
**described** 91:5
98:22 109:15,17
307:15 312:21
**description** 6:13
7:3 8:3 149:17
164:1 216:7 339:14
**design** 235:9,21,23
243:8 245:3 246:14
249:23
**designate** 10:6
**designations** 76:17
**designed** 91:13,15
243:25
**designing** 268:17
**designs** 235:12
**destroy** 287:11
**destroyed** 287:7
**destruction** 277:11
**detailed** 312:6
**details** 10:15 78:22
83:5 87:3 191:22
210:8 238:19,19
**determination**
291:3
**determine** 78:8
146:16 288:23
**developed** 93:13
**development** 61:11
62:3 63:22 64:1,4
78:23
**devices** 283:13
**diagram** 209:14
210:2
**diagrams** 178:12
**died** 171:25 172:3
**differ** 286:6
**difference** 184:17
298:14

**different** 10:12,13
11:17 53:10 54:5
76:17 88:11 119:15
123:1,2 145:16
185:18 196:8 208:8
214:1 215:12 243:9
289:13 302:8 309:8
319:19 335:16
**digits** 51:9
**diminution** 260:7
**direct** 12:23 23:24
24:2,3 37:3 103:22
104:5 106:25 214:3
263:3 334:3
**directed** 101:22
**direction** 48:18
239:23 242:4 243:9
306:7,11
**directions** 179:8
242:6
**directly** 20:16
22:20 23:9 88:22
180:8 204:22
213:17 235:9
239:12,14 269:10
**director** 129:23
**directors** 44:2
128:13,17 129:19
136:20 306:20
**disagree** 82:7 137:8
**disappointed** 97:4
98:5,7
**disclose** 274:25
281:16
**discloses** 329:14
**disclosing** 281:18
289:2 290:16
**disconnects** 181:5
209:22
**discount** 220:8
221:8

discovery 289:21
discrepancy 216:25
discretion 101:4
discuss 12:1 26:24
  42:14 84:18 91:23
  105:5 260:7,19
  261:10 271:12,17
  271:21 291:13
  302:6 305:25
  310:23
discussed 11:18
  46:2 57:17 86:5
  102:15 120:2
  121:18 122:19
  156:22 181:2
  242:22 260:3
  261:12 271:2,6,6,7
  271:8,8,8,20,25
  272:4,10 301:23,23
  302:2,11 322:15
discussion 260:21
discussions 175:5
  261:8
disguise 26:17,17
  26:21
disobeyed 317:18
display 333:7
displayed 247:25
disposal 131:11
distinction 36:22
  100:23 266:4
distributing 119:15
distribution 74:8
  74:11,12 78:5,19
  78:25 209:24
distributions 74:13
  75:14 77:21,24
  78:3,8 319:1,13
district 1:1,1 340:1
  340:1

ditch 256:6
division 1:2 340:2
dock 251:13
document 16:14,25
  17:5 30:5 35:23
  52:19,22,24 53:22
  54:6,8 55:25 56:3
  83:4 93:11,16,23
  111:24,25 114:14
  124:20,22 125:9,14
  126:5 127:11
  130:23 132:21
  135:3 142:8,11
  143:21 146:17
  147:15 148:5,6
  149:6 150:13
  152:20,24 153:8
  157:16 158:4
  160:14 161:7
  162:15 164:19
  165:8,23 166:6,14
  166:15,17 167:5,7
  167:11 179:21
  189:10,12 208:15
  218:23 222:8,12
  223:4 226:23 230:7
  236:8,17 242:8
  247:24 253:10,11
  253:15,21,25 254:4
  254:6 255:8,25
  256:9 264:20
  270:17 288:22
  289:6 291:7 298:6
  316:15,17 317:24
  318:2 331:1,4
  333:22 335:8
  339:15
documentation
  214:14 316:9,11,13
  316:14

documented
  178:24
documents 11:8
  37:15 52:14 93:18
  94:8,11 96:16
  107:7 112:16 126:6
  135:11 139:13
  148:14 189:5 209:9
  211:19 247:22
  253:11 254:2
  256:10 277:14
  284:25 285:7 287:6
  287:6,7,11,23,24
  288:1,2,7,9,10,23
  289:7,14,16,22
  290:5,5,11,13,14
  297:3 322:12
  331:13 334:16
doing 24:12 27:12
  31:11,15 39:20
  42:23,24,25 70:20
  70:23 71:2,16
  78:21,21 92:24
  97:10 110:20 121:3
  123:8 147:16
  153:24 160:3
  168:16,24 183:9
  192:2 210:12 211:6
  213:24 232:7,19
  234:19 235:11
  241:9 245:1 254:5
  259:11 263:13
  282:20 300:22
  307:18
dollar 43:11,21
  65:10 68:21 170:25
  177:8
dollars 43:15 71:19
  107:16 119:7 120:5
  121:21,24 137:23
  178:13

domain 80:23,24
dominguez 193:13
domnitz 4:9
door 67:6,7 218:6
  218:21 275:13
doubling 173:12
  178:5
doug 4:4 9:6 337:3
  343:2
dow 4:19,20,22 6:6
  9:9,9 326:6,8,9
  329:16,19,20,23
  330:2 333:15
  335:10,11 336:4
dowgolub.com
  4:22
dragged 45:15
drainage 232:8
  242:22
draper 175:22
  176:1
draw 127:20
drawing 215:5
drawings 153:18
  178:18 210:2 211:3
  211:17 224:21
  235:10 236:1 257:6
dridman 3:7
drive 4:15 131:23
  256:5
drivers 251:12
drives 181:6
driveway 257:5
dropping 220:13
  314:4
drove 325:23
drug 131:11,12,13
  334:10
dtlawyers.com
  4:17

**due** 107:8 220:6
**duly** 2:3 12:22
**duration** 72:24
**duty** 51:7
**dwindling** 258:18

**e**

**e** 3:1,1 4:1,1 5:1,1
  159:5 289:21
  343:24,25
**earlier** 79:6 214:5
  245:22 246:1
  249:10 251:22
  252:6,11 257:18
  302:3 312:21 330:7
  331:2,22,25
**early** 116:23
**earn** 320:24
**earned** 311:24
  320:7
**earning** 120:4
  321:3
**easy** 258:7
**edrick** 193:13
**education** 80:11
  230:22,23
**effect** 10:13 316:1
**effective** 320:3
**effort** 294:10
**efforts** 35:7
**eight** 10:21 195:3
  196:7 198:24
**eit** 213:16 216:9
**either** 66:24 75:14
  136:17 166:5
  177:16 216:20
  235:22 284:13
  293:7 303:23 310:1
  329:8 330:13,23
**electric** 310:17,17
**electrical** 100:9,11
  100:12,17 172:23

178:24 181:5,22
  189:21,21 190:15
  201:20 209:14,21
  210:8,14 230:25
  308:24
**electrician** 100:22
  182:1 184:20 215:8
  295:9
**electricians** 71:11
  71:15 100:18,20
  102:4 120:3,6,8
  123:17,20 124:7
  170:8,8,13,21,22
  171:12,14,23
  172:12,18,19 174:2
  174:18 177:11
  178:3,9,18 179:6
  180:4,18 181:7,11
  181:16 182:7,20
  183:12,14,19
  184:14 185:6
  187:11 189:18
  210:16 211:14,23
  263:17 302:3
**electricity** 238:8
**electrocuted**
  171:24 172:3,6
**electronic** 96:1,16
  277:7 283:13
  284:25 285:6 287:7
  288:9,10 322:12
  337:6
**electronically**
  287:23
**elevated** 179:13
**elevators** 225:8,9,9
**eliminate** 290:4
**email** 3:7,11,16,22
  4:7,12,17,22 5:6
  7:20,22,24 8:6,8,11
  8:12,14 95:13,22

161:8,10,11,13,20
  161:21 206:19
  218:4,13,24,24
  219:6,9,12,17,19
  220:23 221:1,13,15
  221:18 222:1,11,18
  222:22,25 223:2
  232:25 233:9,16,20
  236:13 237:12,13
  239:8,22 240:4,9
  242:9,11,17,22
  244:2,10,11,12
  245:21,22 246:1,7
  247:2,3,9,23
  248:19 249:4,11
  250:7 251:16,23
  252:2,22 254:12,13
  255:9,18 261:20
  262:7 263:4,6
  264:5,13 265:1,1,5
  265:20,22 266:1
  268:11,16 269:11
  272:5 277:7,9,18
  277:20,24 278:12
  278:23,24 279:16
  280:7,10,14,18
  282:2 283:18,21,25
  286:12 322:11
  330:13 331:17,22
  331:23 332:7,9,10
  332:15,16
**emailed** 206:22
  218:10 219:1 293:2
**emailing** 96:10
**emails** 219:14
  236:25 245:15,16
  245:18 246:15,18
  246:24 248:4
  249:25 250:12
  277:11,15,17
  278:20 279:23

280:20,22,23,24
  281:2,7,10,13,23
  284:16,25 285:10
  285:15,23 287:3,13
  287:15 288:20
  290:10,24,25 291:4
  292:8,10,12,13,15
  292:18,23,24
  293:12
**emergency** 132:13
  174:2 257:5
**emphasizing** 132:1
**employed** 341:9
**employee** 13:18
  14:2,3,9,10,11 15:3
  15:3 19:2,5 21:24
  22:7 24:25 25:3,7
  25:19 33:20 44:4
  58:10 104:5,19
  124:13 129:2
  133:10,10 153:11
  328:14
**employee's** 13:19
  18:9
**employees** 15:13
  15:18,22 23:23
  40:3,8 44:2,11
  59:22 60:6,8
  103:17,22 104:25
  118:5,19 128:14,17
  129:20 130:13
  133:15,22 134:20
  134:24 136:20
  137:11 168:16
  169:19 173:8
  177:24 179:9
  210:21 211:13
  212:1 259:8 273:20
  273:21 301:6,25
  308:22 309:13,16
  315:3 328:10,17

334:7,14,15,22,25
335:4
employer's  18:7
employment  46:17
  46:18 131:10 334:9
ems  100:13 102:12
  170:14,18,20
  171:12 178:5
  180:12,16,20,22
  181:24,25 194:22
  195:19 203:22
  204:2 211:23
  213:13 310:7
enacted  136:13
ended  196:24
ends  57:9 201:4
  336:6
engage  137:13
engaged  171:22
  229:16
engaging  29:24
engineer  210:14
  212:10,23 214:16
  216:1,7,18,19,20
  230:19,20,21,22
  243:21
engineering  165:10
  166:22 169:7
  212:10 213:5
  214:16 215:2,16
  216:7,25 231:1,2
  231:21 232:4,11
  235:5,5,14,22
  242:13 243:12
  244:16 249:6 251:2
  251:19 252:18,25
  254:15 262:10
engineers  211:15
  213:2,17,18,22
  216:9,10,11 230:15
  230:16,17,18 231:4

231:15 235:6
enjoy  62:7
enjoyable  62:11
enjoyed  62:9
ensues  50:16
ensure  173:16
ensuring  128:21
enterprise  86:18
entertainment
  61:13
entire  45:5 66:17
  123:4,7 182:14,18
  183:4 184:4,4
  210:5 236:16
entities  307:24
entitled  14:21
entity  118:12
entrance  256:5
entry  51:15 78:3,4
envelope  67:12,13
  68:4 72:23 73:13
  73:18,22 121:5
envelopes  77:1,7
environmental
  99:12,15 126:1
  162:23 334:11
equal  131:10 334:9
equipment  172:10
  172:14 178:13,22
  179:2,11 181:10
  308:4,6,7
equipments  60:1
  101:2 173:9 179:9
  211:16
erc  6:21 99:10,11
  99:17,20 162:5,8
  165:9,14,19 166:21
  167:2 168:6 169:4
  169:6
erc's  167:6

err  184:21
errata  343:16
essex  4:5 343:3
established  319:10
establishment
  322:24
estate  1:8 34:22
  326:11 340:8
estimate  31:8 39:1
  72:25 109:4 152:25
  312:16
estimates  188:22
  188:24
estimation  62:17
et  343:7
ethically  128:22
ethics  133:18
evacuation  131:24
evaluation  244:18
evening  330:5
everybody  267:20
  326:21
evidence  285:23
  297:16,21 298:17
evidencing  334:16
ex  122:7 227:10
exact  21:7 22:2
  30:14,19 31:13
  37:7 38:9 43:11,21
  44:15 45:16 47:10
  47:20 65:10,15,18
  66:1,8 68:17,21
  69:6 71:18 72:6,19
  72:24 83:22 90:22
  91:2 108:23 111:1
  115:21,25 120:7
  122:16,18 144:12
  170:24,25 174:6,11
  174:16 177:7,8
  183:21 207:17
  265:19 267:5

280:25 299:9
  302:25 303:11
  317:8 325:6
exactly  23:9 30:24
  31:19,24 37:10
  42:25 43:4 47:1
  86:20 90:23 122:14
  122:15 182:13
  191:23 246:13
  251:15 280:9 284:1
  303:11,20
examination  6:5,6
  6:7,8 12:23 326:7
  330:3 333:19
example  20:12
  48:14 120:24
  201:16 213:12
  218:9 219:1 246:9
  246:11 252:16
  255:23
excessive  295:11
exchange  36:15
exchanged  292:18
exchanges  265:2
excited  84:7
excuse  113:4
  142:24
execute  33:2
  334:13,15
executed  339:17
exhaust  191:12
exhibit  6:14,17,19
  6:21,23 7:4,5,8,10
  7:12,14,16,18,20
  7:22,24 8:4,6,8,11
  8:12,14,17,18,19
  16:3,3,5,6 17:7,10
  17:19,22,25 32:4,5
  32:9,11,15 43:23
  49:10,21,22,23,24
  49:25 50:8,10

CONFIDENTIAL

52:11,11,11,12,16
52:17 60:14,14
61:3 106:11,12
113:22 114:8 116:3
116:4,8 121:12,14
124:18,21 138:22
138:22 143:6,9,12
143:12 145:7,11,12
145:14 147:4,5,5
151:18 154:19
155:7,7 156:8,10
156:11,13,16,23
157:16 158:11,21
158:24 159:1,3,11
159:13,17 162:8,11
162:12 166:21,21
166:25 167:18
189:8,9,13 190:10
190:11,12 196:1
197:20 201:12,14
201:19 203:10,12
204:20,22 208:18
208:19,20 209:12
217:24 218:1,1,3
219:15,17 222:3,5
224:3 225:16,20
233:2,3 236:12,13
236:20 242:8,9
246:21,22,24 253:5
261:14,16,18
264:14,17,20 268:9
270:14,15,18
294:14,17,19
298:22 331:2,21,25
333:1,22
**exhibits**  6:12 7:1
8:1 11:6 16:5 17:19
155:8,13 206:6
331:14
**existence**  306:20

**existing**  118:19
251:19
**expansion**  234:11
273:9 311:6
**expansions**  183:9
**expect**  15:22 202:8
203:10
**expedite**  11:4
268:25
**expense**  24:20 63:5
64:13,14 74:12,17
74:17 76:4,8,22
77:10,25 121:5,9
**expenses**  61:1,1
75:15 76:11,15
77:14 78:12 109:16
109:20 119:3 121:2
178:1 313:2,4
**expensive**  89:16
172:10 173:9 204:5
223:16
**experience**  186:12
**experiencing**  265:8
265:11 266:5
**expert**  8:18 192:9
207:9 238:6,20
280:1 293:24
294:10,13,19 295:4
295:17,21,25
296:14 297:10,12
297:12,24 298:20
**expertise**  234:13
235:7 238:8 239:5
243:11,25
**experts**  207:10,13
296:6,18 298:17
**expiration**  341:20
342:20
**expires**  339:25
**explain**  28:1,9
33:18 87:1 105:11

115:9 168:3 193:18
195:22 196:21
197:1 198:2,3
204:14 205:6
213:11 216:24
217:2
**explainable**  208:6
**explanation**  198:21
198:25 199:13
207:22 213:15,16
250:8,9 292:7
293:9,9,11,13
**exposed**  178:3
179:12 184:22
**exposure**  173:8
178:7 184:22
**express**  217:13
**expressed**  339:18
**extend**  10:18 305:7
**extensive**  311:7
**extent**  33:12
281:15 288:25
290:15 291:9
336:16
**extra**  195:21 196:9
196:11,13,20
197:10,15 199:23
202:22 204:2,10,11
204:14 285:8
**extract**  250:19
253:15
**extracts**  248:4
**extremely**  311:6

**f**

**f**  51:7 53:1 165:25
229:5 340:23
**face**  19:17 20:9
64:10 84:3 92:22
313:13
**facial**  86:3

**facilities**  28:3,12
33:19 40:20 233:21
310:4
**facility**  209:21
**fact**  26:25 40:19
41:16 51:22 70:23
84:16 85:21 138:1
138:9 153:16 173:7
198:16 239:3
**factor**  171:18
**factors**  172:16
185:14
**facts**  33:10,12,14
192:19 322:13
**fail**  36:21
**failed**  181:9
**failing**  235:22
**fair**  37:17 48:12
60:4 73:16 82:5
108:13,14 130:11
136:14 181:19,21
181:24 187:18
188:1 189:4 266:21
272:8 317:4,10
321:2 329:16,16
333:10
**faith**  128:21 263:13
**fake**  25:3,7 83:13
84:13 90:24 91:2,6
91:9 97:23 98:1,8
98:11 99:17,19
100:1 102:7,9
105:13,18 135:21
136:4 137:4 144:2
145:1 146:3,18
161:1,13 170:3
187:15 226:21
227:21 240:21
241:1 309:20
**familiar**  183:5
326:12 330:19

**family** 122:5
**far** 35:17,18 99:25
  122:19 140:12
  158:10 172:13
  266:3 280:7
**fargo** 110:12,14
**fast** 147:17
**fastsigns** 94:6,6
**fault** 172:12
**favor** 13:19 14:11
  15:4 262:12
**favors** 262:10,21
**february** 47:6,8
  209:15,15 212:5,14
  212:15 251:1,18
  252:17 265:3
  281:11 285:4
**federal** 2:9 125:25
  217:13 336:10
  343:14,24
**fedex** 161:25 162:1
  217:14,17,19,22
**feeds** 263:10
**feel** 133:25 134:11
  215:24 224:12
  263:10,11 319:11
**feeling** 221:10
  244:25
**fels** 3:4 9:15
**felt** 42:21 263:13
**ferko** 291:25
**ffslawfirm.com** 3:7
**fide** 24:25 25:18
**field** 252:24 254:15
**fifth** 291:23
**figure** 94:14 118:14
  118:15 142:22
  150:15 183:20
  186:7
**figured** 268:24

**figures** 321:13
**file** 146:15 148:5
  169:14,16,16
  220:25
**filed** 287:8 303:21
**files** 125:10 145:21
  146:7,12 147:23
  148:19 279:23
  290:18,20 322:13
**fileshare** 11:5
**filing** 285:1,3 288:5
  290:17
**filings** 24:20
  296:24
**final** 197:2,3
  213:19 221:12
  225:22
**finally** 211:5
**financial** 3:20
  180:19
**financially** 341:11
**find** 25:23,24 58:16
  81:6 112:10,20
  156:14 176:18
  244:14 253:15
  255:25 294:6
**fine** 57:6 95:2
  140:13,13 209:10
**finish** 11:10,15,22
  44:17 83:3 132:12
  198:7 256:15 257:2
  257:4 271:3 324:7
**finished** 44:19,20
  81:24 148:22
  235:25
**fire** 131:23 236:2,2
  257:3,5,10 314:8
**fired** 36:20 41:5
  103:9 303:17 314:5
  328:18,21 329:3

**firm** 4:4 9:14
  341:21 342:21
  343:3
**first** 6:24 7:4 10:3,5
  12:22 16:3,7 20:4
  21:4 30:17 31:6,10
  32:13 33:4 34:6
  41:20,22,24 46:1,1
  46:1,5,11,12 50:7
  60:16 61:7 93:8,10
  116:4,10 117:1
  125:14 127:7
  136:11 140:18,24
  151:25 157:16
  159:20 171:22
  173:23 181:17
  186:7 194:10 196:1
  196:12 198:23
  201:25 209:9,12
  212:21 216:5
  223:24 225:14
  226:6 230:12
  232:22 233:25
  234:22,23 238:24
  238:25 243:10
  247:2 249:3 256:10
  260:4 264:20
  272:17,23,24 279:6
  279:7 281:2 285:14
  285:20 288:1
  295:25 302:14,18
  303:3,6,11,14
  306:25 316:19
  325:20
**fits** 185:15
**five** 51:9 140:18,22
  172:25 183:8 196:8
  196:8 231:9 238:16
  296:2 321:1 324:15
**fix** 251:14

**fixed** 17:1 21:10
  186:3 313:2
**flooding** 316:23
**floor** 164:14 168:11
  235:20
**flooring** 168:17,18
**florida** 3:6,21
  343:14,24
**flow** 155:1
**fluer** 271:18,22
**flying** 314:23
**focus** 215:15 310:2
**focused** 216:5
**focusing** 14:1 132:8
**folder** 169:25
  214:25
**follow** 131:16
  155:9,10 249:17
  286:23 326:10
  332:7 333:15
**followed** 26:21
  93:1,5 137:4
  155:10 241:7
  249:16 290:13
**following** 20:19
  132:15 249:12
  257:17 285:1
**follows** 12:22
**food** 63:15
**fool** 89:20
**ford** 7:5 47:14 51:6
  183:10
**foregoing** 33:10
  339:1,16
**forged** 158:4
  160:13 166:3,5
**forgery** 160:18,20
**forget** 10:8 92:19
**forklift** 250:4 251:8
**form** 13:12,20 14:4
  14:12,17,23 15:10

22:9 23:4 24:17
25:1,5,13 26:20
28:22,25 29:6 30:1
36:18 39:6,24
40:11,21 43:10,16
56:2,13,18 59:1,14
60:11 65:12 66:12
74:23 78:10 81:14
81:18 90:21 91:1,7
96:18 123:18 129:5
129:21 130:15
132:6 133:13,19
134:2 135:1 137:7
137:14 146:19
160:15,19 161:23
171:17 187:6
192:24 199:5
225:17 234:8
240:13,24,25 241:5
246:17 247:8,23
248:13,20 254:24
255:6 259:12
263:25 267:4 296:9
296:20 334:23
335:8 342:8
**formal** 80:11
**formalized** 179:20
180:1
**formally** 331:13
**format** 135:15
**former** 44:1
**fort** 341:22 342:22
**forth** 225:2,6
**fortunately** 181:13
**forward** 128:1
205:3 247:18
249:24 255:7 277:5
291:14 292:6 296:3
296:16
**forwarded** 219:17
343:16,16

**forwarding** 221:21
**found** 39:19 41:10
111:18,21 192:8,18
238:6 269:12 304:4
304:11,14 325:10
**four** 99:25 195:3
196:8 226:2 231:9
260:17
**frame** 129:10 144:8
232:24 265:13
**framing** 309:4,5
**francisco** 62:14
**frankly** 119:11
172:2
**fraser** 5:10 9:21
**frcp** 340:22
**fredrico** 104:10
105:2,7
**free** 131:11,12
136:13 224:12
334:10
**frequency** 181:6
**fridman** 3:4,4 6:5,8
9:13,14,15 10:4
11:3,18 12:4,6,9,14
12:20,24 13:17,24
14:8,15,19,25
15:12 16:4,10,13
16:20 17:1,4,9
22:12 23:6,11
24:19 25:3,10,17
26:16,24 28:7,19
28:24 29:3,8 30:3
32:3,6,22 35:4,5,12
35:25 36:21 37:4
37:20,23 38:2
39:10 40:2,14,24
43:14,18,22 44:7
44:21 50:14,18,21
52:20,22,24 56:4
56:16,20,23 57:1,5

57:7,16 59:4,18
60:13 65:16 66:14
66:19 74:25 75:4
75:13 76:2 78:13
81:16,24 82:2,7,11
82:15 90:24 91:4
91:10 94:18 95:2,6
95:8 96:21,25
105:17,18 112:7,11
112:17,24 113:2,14
113:21,22 118:24
118:25 121:13,17
123:22 129:7,11,12
130:1,16 132:10
133:17,24 134:5,11
134:15,23 135:6,9
135:24 136:1,19
137:9,16 138:6,14
138:21 139:4,11,12
140:2,16,24 142:15
142:20,23,24 143:7
143:10 145:10,14
146:22 147:13,18
147:22 148:1,11,13
148:16 149:13,15
149:19 150:12
151:5,17 152:8,13
152:19 154:15
155:2,11,18,22
156:6,15 160:17,21
161:25 162:10,12
167:2 171:20
175:13,16 176:8,11
176:21 183:3
187:10 189:15
190:14 193:4 199:9
199:20 200:8,12,16
200:24 201:11,16
203:14 205:25
206:1,4 208:17,20
209:1,5 217:25

219:16 222:7
225:22 227:23
228:11 233:7
234:21 236:23
240:1,16 241:12,14
245:14 246:22
247:12,15,19 248:2
248:9,10,18,25
250:17,21,23,24
253:6,13,19,23
254:6,11,12 255:7
255:24 256:2
259:16,22,25 260:2
261:15 264:4,15,18
264:19 267:8,14,19
268:8 270:20
271:23 272:2 274:5
274:10,14,21 275:5
275:10 276:8,11,14
276:19,24 277:2,6
281:21 284:23
285:12,25 286:3
289:5,20 290:20
291:12,20 292:5,7
293:6,11,15 294:3
294:7,12,16,18
295:19 296:11,23
297:6,11,23,25
298:8 299:2 300:7
300:11,15,24 301:4
303:2,25 304:23,25
308:12,14,16
319:12,22 320:6,18
320:24 321:8,12,18
321:21,22 322:5,8
322:9 323:14,23
324:8,11,15,17
325:1,25 326:4,18
327:2 331:12,16
333:14,20 335:2,11
335:22 336:12

340:18
**friend** 313:17,18
**friendly** 304:16
**friends** 122:5 258:9
258:10
**front** 40:1 72:5
106:6
**fulfill** 128:20
**full** 22:7 26:13 80:6
172:25 173:4
180:18 189:5 193:1
308:1
**fully** 128:21
**function** 80:10
240:20
**functions** 169:19
**funds** 23:8 75:24
76:1,2
**furnitures** 168:10
168:10,20
**further** 64:21
105:5 117:22
131:15 133:6 239:6
326:7 330:2,3
333:19 335:24
336:4 340:22
341:11
**furtherance** 318:24
**fyi** 237:18 238:3

**g**

**gables** 3:6
**gabriel** 104:14
105:12
**game** 63:13
**games** 63:7,9
**gap** 32:1
**gas** 238:7,14
**gc** 164:16 168:13
257:7
**general** 132:8
265:12,16 266:3,6

266:8,9 275:21
309:7,9 313:1
**generally** 89:17
170:20 171:2
246:25 307:16
333:3
**generators** 210:4
238:15 308:8
**genuine** 332:5,6
333:2,5
**geotechnical**
255:12
**geotest** 231:21
**getting** 14:20 21:12
21:14 42:3,17,21
82:21 88:19 89:19
177:15 182:24
183:10 192:14
260:14 261:1,2,6
261:11 263:15
264:1 268:15
**gift** 60:24,24
140:23 141:3,4
**gifts** 139:13,18
301:7
**gilbreath** 4:20
**give** 13:5 15:25
22:17 24:1,5,9 25:8
37:2 38:6,9 46:21
49:18 57:22 65:11
67:1,13 68:4,10,15
69:4,7,25 70:4,12
72:6,17,22,25 73:2
73:11 74:22 75:4
75:19,20,22 93:12
95:22 103:24,25
107:14 108:24
111:1,3 113:19
121:8,25 122:4
123:12 145:7 173:2
178:11,12 188:17

189:6,6 191:12
197:18 218:1 225:3
225:4 237:11
242:16 255:1
257:19 275:7,8
290:1 305:1 318:2
320:2,2 324:11,15
**given** 66:17,24
106:19 140:19
172:21 179:9 217:6
289:21 339:19
342:10
**giving** 13:18 14:10
26:9 42:20 60:25
65:24 67:11 68:25
123:10 153:17
181:25 188:6
224:21 239:23
242:4,6 246:9
263:21 274:15
**glasses** 164:22
233:4
**gmail** 283:22
284:13,22
**gmail.com.** 283:24
**go** 10:4 17:18,22
18:25 21:6 30:5
35:18 42:4 44:17
50:8 57:7 60:13
61:23 62:22,24,25
71:8 83:2 92:21
94:3,25 95:4
100:13 106:10,21
107:18 109:25
110:17 113:2 114:6
115:14,17 116:3,8
128:1 132:12 134:5
138:16 139:16
140:14,16 141:16
147:15 149:22
151:16 154:23,24

154:25 155:11,18
157:21 158:24
165:8 167:18 168:2
168:7 176:18
183:17 184:20
186:18 191:16,25
192:1 195:25
197:20 203:1
204:18 213:5
220:22 223:25
224:19 225:6,6
227:25 228:3,22
236:15,21 239:6,17
244:10 245:25
247:18,18,18
255:22 256:14,15
256:16,24 257:21
260:24 271:20
274:18 280:2,7,8
282:18 283:12
287:5,20 302:13
304:21 308:16
311:15,21,21 314:5
314:10,23 320:25
324:3,5,6
**goal** 11:10
**goes** 10:22 11:9
16:4 92:18 147:7
210:18,19
**going** 10:5 16:2,10
16:13 17:18,18
18:1 21:21 25:8
32:3,6 37:2,14
38:10 39:22 42:13
43:23 45:15 49:9
49:21,22,24 50:8
52:10 56:21,23
62:24 80:18 81:21
82:9,13,20 85:9
87:23 90:23 94:18
94:20,22 95:3 97:6

101:14,24 103:17
103:18 105:8,20
106:11 113:25
116:3,9 117:3
121:13 124:19
126:6,8 127:10,20
128:1 130:22 135:6
135:7 138:10,11,21
139:16,20 142:3,11
143:3,12 147:4,17
149:9,16,18,24,24
150:3,4,8,22,25,25
154:22 157:15
162:7,8 166:20
172:6 173:3,4
177:18 178:23
181:18 183:8 185:3
186:15 189:8,9
190:10 192:3,21
198:8 200:11,19,22
201:11 205:20
206:1,11 208:14,18
209:4,5,8 213:22
213:23 217:25
218:16 219:16
222:3,7,8 224:14
225:16 227:1 228:4
228:23 230:6
232:25 235:18
236:12,15,22 238:6
238:18 245:1
246:22,23 248:11
248:25 249:1
252:21 255:20
257:9,11 261:1,15
264:24,25 265:10
267:18,21 268:9
270:8,13,14,20
271:5 274:17,18,21
274:24 277:13
279:14 280:10

286:5 289:1 291:14
292:2 297:11 298:5
298:6 300:21
306:16,16 317:17
319:9,17 320:4
324:3,4 327:9,14
327:17 329:17
333:21
**golfs** 62:5
**golub** 4:20
**good** 12:25 13:1
47:15 59:16 94:24
101:10 128:20
155:3 187:20
200:15 206:11
209:4 241:11,16,19
241:20,24 257:9,13
263:13 266:4
319:11 330:5
333:13
**gotten** 139:6
**grade** 168:17
**grand** 66:18
**granted** 138:19
**grass** 308:1 309:1
**great** 198:24 239:8
260:23
**greater** 73:21
**greatest** 210:6
**grips** 168:9
**ground** 307:25
309:1,2
**group** 85:18 91:5
93:7,14 95:10
98:23 127:21
136:12 156:17
157:12 158:19,21
230:17,18 231:4,19
235:6
**group's** 156:8

**guarantee** 20:18
**guaranteed** 20:17
36:19
**guerra** 2:6 341:19
342:19 343:18
**guess** 21:20 30:12
41:11 63:16 83:5
84:8 93:19 105:2
105:20 154:12
208:9 227:17 280:5
282:13 284:1
**guessing** 154:11
**gun** 227:14,15
**guy** 211:25 235:11
240:9 279:3,20
292:14 323:12
332:10
**guys** 94:22 178:12
215:9,22 336:11
**gyrations** 225:1

## h

**h** 18:10,12 26:5
51:17 79:10 165:25
230:4
**hand** 88:9,14,16
95:9,14,18,22
96:10,23,24 161:18
166:19 206:18,21
239:9,20 240:6
241:22,25 263:9
339:19
**handed** 49:5 152:4
**handle** 119:15
**handled** 285:17
**handrails** 316:25
**hands** 263:10,11
264:10
**handwriting** 53:19
53:20 158:2 190:21
190:22,23,25
202:13

**handwritten** 193:9
204:16
**handyman** 114:23
115:11,16,17,20
116:21
**hang** 147:11
**hanging** 191:15
**happen** 25:9 178:8
181:12 198:13
206:8
**happened** 41:11
45:12 111:10
181:13 202:12
208:2 217:2 234:5
259:2 290:22
303:10
**happening** 205:12
252:3 261:4
**happy** 39:8 85:21
85:23 97:21 139:7
142:20 158:9
223:13 239:18
313:14 320:19
**hard** 218:12 262:9
311:8
**hardin** 306:4
**harm** 315:15
**harris** 4:14 9:7
112:18 151:9 152:5
**he'll** 25:14 193:20
**head** 72:5 192:6
320:5,21
**headaches** 178:22
**headrick** 44:8,10
44:24 45:4,7 46:6
273:22 309:19
**health** 126:1
**healthy** 220:7
**hear** 84:11 274:22
300:12

CONFIDENTIAL

**heard** 40:15 71:7
90:16,17,18 92:5,7
138:8 227:3,4,6,8
229:9 230:1 263:9
305:6 308:14
325:15 328:20
**hearing** 16:21
154:24 155:4,12,20
**heavily** 310:8,10
**heavy** 308:4
**heb** 153:6
**heights** 5:5
**held** 4:14 257:3
**help** 142:19,20
146:2 211:14
238:18 239:18
262:16,17 265:9
268:14
**helped** 279:19
**helping** 216:11
279:12
**hereto** 2:10
**hesitant** 19:12,22
19:23 27:15,17,19
**hev** 219:18,24
222:13 223:8,9,11
224:6 225:7,14,18
235:24
**hey** 22:16 45:13
148:11 192:5,14
221:6 240:3
**high** 56:6 168:21
172:9 173:8 179:12
**higher** 27:16 87:15
88:24 89:2,19
91:11,16 92:11
94:14 157:9 183:7
184:21 186:25
187:17 188:12,15
188:16,19 215:7

**highest** 183:13
**highly** 179:11
**hire** 310:1
**hired** 248:24
**hiring** 177:24
309:14,24
**history** 220:6
**hit** 311:23
**hittner** 292:4
**hmm** 104:15
**hold** 150:4 268:17
307:6
**home** 61:2 67:21,22
114:9,20 115:1,1,3
115:10 116:9
117:18 118:16,21
119:3,12 120:9,20
120:20,21 121:24
141:4,7,9 304:5
**honed** 132:15
**honest** 199:25
208:3 302:6
**honor** 173:1
**hopefully** 264:2
**hoping** 25:9
**hospitals** 307:19
**host** 289:22
**hosted** 279:16
**hotel** 61:12 62:14
**hotmail.com** 161:8
**hour** 21:22 22:1
56:21 94:19 170:20
170:21 171:11,11
171:13 173:5
178:25 180:4
195:11 196:13
200:11 204:8,11
212:10 213:1,9
217:1 267:18
326:10

**hourly** 21:23
216:12
**hours** 10:19,21
189:25 190:2
191:24 192:15
193:6 194:3,12,15
194:19 195:10,10
195:14,21,24 196:4
196:5,7,9,11,11,12
196:13 197:7,10,13
197:15,18,21 199:3
199:10 202:1,1,5,5
202:10,23 203:4,19
203:24 204:2,10,14
204:24 205:8,9
207:11,13,14,15,16
207:17 212:11,23
213:7,12 214:15,23
215:17,20 216:25
300:21 302:3
**house** 79:21,22,25
85:6,22,22 115:13
115:15 168:16,19
169:19 262:16
308:22 316:6,10,18
316:19,24,25
**houses** 114:24
**houston** 1:2 3:15
4:6,11,16,21 5:5
26:6 230:18 231:2
231:3 340:2 343:4
**how's** 233:7
**huge** 10:11
**huh** 103:15 104:9
104:11 125:11
263:7
**human** 305:7
**hundred** 121:24
**hundreds** 10:12
71:19 120:4 137:23
225:1

**hurricane** 235:20
265:14 316:20
**hurry** 174:3
**husband** 87:8
**huston** 5:4,4 6:7
9:11,11 11:14,15
11:23 12:5 136:16
155:6 240:24 241:4
241:4,13 248:1,13
248:21 253:13
255:24 330:4,6
331:8,11,17 333:11
336:1,22,22 337:1
337:2
**hvac** 310:14
**hybrid** 317:20
**hydraulic** 232:10
**hydroelectric**
183:11

---

**i**

**icloud** 282:15
**idea** 61:10 63:3
87:19,20 95:19
103:16 108:1
118:15 181:25
227:12 237:10,25
238:1,25 240:14
242:1 248:22 251:4
254:25 257:16
289:11 291:6 312:7
312:8 316:12
330:21 332:24
**identification**
51:10 301:5 309:12
322:10
**identified** 18:9 44:8
50:22 51:6 84:24
113:17 150:12
151:21 156:23
226:18 311:3

**identify** 9:4 43:25
60:22 74:21 109:22
139:16 147:7
149:19 156:11
211:1 215:11 235:3
289:7,13,15
**identity** 277:9
310:3 339:14
**ignored** 296:6,18
296:21 298:2
**ike** 265:14 316:21
**illegal** 26:18 329:21
335:13
**image** 112:5 288:12
**imaged** 288:13,16
288:19
**imagine** 179:23
**immediate** 92:19
133:4 273:19
**immediately** 45:17
45:23 177:22 286:7
**implicate** 254:3,7
**important** 72:7
257:1
**impression** 192:6
216:6 334:24
**improper** 269:18
**improvement**
115:1 120:21
**improvements**
256:6
**inc.'s** 32:12 33:3,8
114:20
**include** 12:2
246:13
**includes** 60:24
117:23 121:18
197:10,15 319:2
**including** 44:1
113:16 125:24
136:22 198:13

277:9 284:25
287:22 289:14
292:9 300:4 305:21
306:19 313:9 334:9
335:5
**income** 24:20
**increase** 188:6
**increased** 195:9
302:4
**increasing** 258:19
**incur** 173:11
**indefinitely** 173:1
**indemnity** 180:11
**independent** 1:8
340:8
**index** 6:1
**india** 231:1
**indian** 325:9
**individual** 1:7,10
1:12 10:20 11:1
13:23 270:10 340:7
340:10,12
**individually** 10:17
**indo** 231:15 262:2
**indulgence** 324:5
**industrial** 99:16
172:11 330:19,24
**industry** 163:19
328:4
**infiltration** 243:6,7
**inflated** 301:22
**inflating** 199:3
**influence** 13:19
14:10
**inform** 129:1
301:19
**information** 24:2
93:11 176:5,9,18
178:15 199:2 257:9
279:15 289:1
299:24 305:1 315:2

315:5 316:5 319:4
319:20 320:1
321:25 322:3,16
**informed** 33:13
45:23 301:6,11,15
325:2
**initial** 19:24 183:6
183:7,8 226:1
**initially** 27:19
191:11
**initials** 100:13
**initiated** 101:21
263:6
**inside** 275:25
**inspection** 257:11
**install** 218:21
**installation** 218:6
**instance** 2:2 47:12
60:22
**instances** 177:21
219:7 235:13
**instruct** 191:3
193:23 195:23
198:4 205:8 244:24
276:24 289:1
319:17 329:17
**instructed** 82:4
191:8 205:9 208:1
**instructing** 74:25
138:6 240:16 276:8
276:14,18 281:16
300:24
**instruction** 87:17
93:2 191:7 193:2
242:4 249:16
257:17 275:8 286:4
286:5,23 289:17
306:7,10 317:19
**instructions** 12:19
26:22 95:15 191:8
192:22 246:10

249:12 257:19
274:15 289:21
290:1
**instrument** 339:16
**insurance** 173:17
173:19,22 174:12
175:3,6,19,21,23
176:1,2,5,22,22
180:23 314:9
**intend** 11:15
**intent** 200:1 205:12
**intention** 189:1,1
318:1
**interest** 11:24
15:23 307:10
**interested** 60:2
341:12
**interior** 308:2
309:4
**internal** 89:10,25
329:24
**internally** 84:4
**international** 1:3
9:16,21 16:6 17:12
22:8 25:12 26:25
28:11 31:11,16
33:24 35:8 47:5
50:7 59:5,11 85:25
92:14 125:16
126:12 130:25
131:9 162:18 340:3
343:6
**interpret** 130:17
**interrogatories**
6:25 7:4 16:7 32:13
33:4 50:7 60:16
61:4 114:9 116:5
**interrogatory**
32:17 33:17,17
43:23,25 44:21
60:18,21 64:23

106:13,24,25
112:15 113:17,18
113:25 120:18
**interrupt** 136:16
200:23 227:19
**interrupting** 200:9
**interruption** 178:8
178:21
**intertec** 325:16
**intervals** 123:1,2
**interview** 46:22,24
274:1,19 275:19
276:22 281:7 285:2
285:22 286:2
**interviewed** 275:15
**introduce** 262:1
**introduced** 232:6
232:22 233:25
272:17 325:12
331:13
**introducing** 232:1
**intrusive** 285:13
**invade** 291:18
**investigation** 45:14
82:20 85:9 101:8
252:25 314:15
327:17,20
**investigations**
254:15 255:12
**investigator** 85:6
**invite** 153:19
**invoice** 7:10,12,14
7:16,18 190:14
193:8 194:1,14,23
196:12,12 197:3,4
199:10 204:3,12
209:13 212:5,9,22
215:20 256:4
**invoiced** 295:11
298:23 299:3

**invoices** 177:14
182:17 190:15
191:4 198:17
201:19 206:17
207:10
**invoicing** 80:12
184:5,6
**involved** 45:15
168:5 210:12 211:4
211:10 215:10,13
235:24,25 245:2
246:14 322:2
**involvement**
254:19,22
**involves** 100:25
169:23 235:4
**involving** 250:15
**iphone** 282:9,11,15
282:17
**iphone's** 282:22
**iphones** 282:12,13
**irritated** 261:6
**issue** 36:11 115:17
115:19 179:1
262:12 278:15
292:3
**issued** 17:25
115:21 287:25
310:5 311:24
**issues** 99:16 206:10
234:11 243:5
249:17 314:9
316:23
**item** 170:2 215:16
**items** 114:21
215:25 323:4

---

**j**

**j** 3:9 26:5,5 79:10
**jacket** 154:23
**jackhammers**
308:9

**jackson** 4:4 84:22
100:5,8,16 101:7
102:10 177:13
179:17,24 180:12
190:16 193:8 343:3
**jackson's** 170:16
**jacksonlaw** 4:7
343:5
**january** 1:9 140:4
140:9 141:16,21
142:2 143:22
145:16,17 233:21
242:11 249:4 250:1
265:6 296:25
297:14 326:16
340:9 343:1
**jay** 26:3 79:8 84:20
85:3 102:21,22
157:22
**jeffries** 3:18 9:18
**jerk** 46:13
**jewelry** 323:11,15
325:9
**job** 42:9 89:4 185:1
187:8 189:1,2
211:24 213:25,25
215:18 216:11
220:12,17,18
221:11 224:23
239:4 245:1,4,10
257:2,7 259:15
273:3 311:9 313:15
**jobs** 42:2,21 123:13
123:14 189:3,3
215:10 220:22
234:14 258:18,19
260:12 263:3 266:3
266:3 290:22,23
311:11
**jobsite** 42:12 263:1
273:23

**join** 29:4 63:20,21
**joints** 210:1
**joseph** 1:6,19 2:2
4:3 6:4 9:3,8 10:14
11:19 12:11,21,25
13:3,8 16:21 17:6
32:4,7 33:1 36:22
38:2 57:10,14,16
60:23 61:8 62:13
64:24 65:1 74:20
75:13 82:2,16 95:8
102:19 103:4
104:12,24 107:5,21
113:7,12,14,23
126:19 134:6,12
149:12 151:17
155:7,24 156:4,6
158:12,14 198:10
200:17 201:5,9,11
209:11 215:15
218:4 219:20,20
222:15 228:9,11
230:10 248:10
253:23 254:12
255:10 256:3,17
258:5 264:19 268:2
268:6,8 270:8
275:10 277:13
285:2,4,14 286:3
287:21,25 292:8
294:18 296:11
300:2,16 305:19
313:9 319:13 320:6
320:20 324:19,24
325:1,25 326:9
330:5 335:14 336:7
337:5 338:2 339:1
339:5,12 340:6,15
343:2,6,7
**joseph's** 61:12
62:17 114:22

CONFIDENTIAL

**[journeyman - know]**                                                     Page 372

**journeyman**
184:16,19 214:17
216:2 263:24
**journeymen** 71:11
71:15 100:18,19,22
102:4 120:3,6,8
123:16,20 124:7
170:7,8,13,21,22
171:12,14,23
172:18,19 174:18
179:6 182:7,20
183:19 184:14
185:6 187:11
189:18,25 206:16
210:16 211:13
263:16 295:9 302:3
**judge** 86:3 277:4
292:4
**julio** 193:13
**july** 53:14 114:10
117:8 189:22
190:17,17 196:1
204:12 256:4
**jump** 139:7
**june** 107:2 111:9
111:10,16 201:21
201:21 203:14,14
**justification** 40:18
**justifies** 178:5
**justify** 40:19
**justifying** 318:18

**k**

**k** 143:15
**kalaga** 41:9,15,21
41:25 42:18,24
43:1,2,4,9,15
230:11,12 231:7
232:1,6,7,23
233:10,17 234:1,6
235:1 236:13
237:13,18 238:2

239:8,23 240:8,11
240:17 241:15,22
242:4,11 244:3,11
244:21 245:5,14,17
246:9 249:4,14,16
250:1,11,14,25
251:17 252:8,23
254:14,23 255:10
256:2,18 257:25
258:20 259:10,19
259:20 260:4,4,8
260:13,16 261:20
264:5 265:2 268:11
269:1,6 283:5
284:7,14,17 302:15
303:16 305:15,22
305:25 306:1,11
323:7 332:9,17,18
332:18,22
**kalaga's** 306:3,7
**kambiz** 103:2
**karat** 322:19 323:2
323:2,5 325:3,8,9
325:12
**kay** 5:9 9:22 275:18
275:20 276:4
**kbr** 307:21
**keep** 27:24 39:14
92:16 94:19 95:3
115:2 119:18
120:11,14,22 149:9
149:16,17,24,24
150:3,8,22,24,25
169:20,21,25 170:1
200:19,22 208:2
209:4,5 236:22
242:18 250:11
252:8 255:20
260:22 263:23
264:24,25 298:14
298:18 300:21

306:16
**keeping** 256:18
257:8 319:8
**keeps** 175:21,25
**kellogg** 307:21
**kelly** 4:9 9:7 274:6
326:23
**ken** 272:20 273:12
329:3
**kept** 36:20 59:4
105:21 123:10
191:23 198:5
**keystone** 310:18
**keywords** 289:14
291:8
**kicked** 227:19
263:15
**kill** 315:21
**killed** 304:10
313:21
**kind** 94:23 180:17
229:19 234:14
282:7 308:7 331:23
**kinds** 169:6 172:4
183:9 232:10
**king** 193:13
**kinsella** 325:18
**kit** 8:9,13,15 188:9
188:12 232:16,17
232:18 234:16,18
237:12 239:2,7
242:10 244:11
253:14 255:8 256:1
258:14 261:18
264:21 265:6
266:22 270:2
**kit's** 188:15,16
259:8 262:1,4,9,21
262:22
**kits** 232:13,14

**knew** 27:4 39:18
45:11 88:3,19,21
88:23 163:19 172:2
172:8 179:19 191:5
207:20 238:14,15
238:15 262:2
303:17 304:2
314:25 315:1
317:22
**knocked** 251:8
**know** 10:15,16,22
10:25 11:1,9 13:8
14:5,14 19:21
20:13 22:2,10,17
23:20 28:16,16
30:14,19 31:18,24
34:24,25 37:10,22
38:23 39:21,25
41:13,16,22 42:25
43:4,6,7,11,21
44:15 45:14,16,18
45:23,25 46:2,15
47:1,9,20 48:6
53:18 54:16 56:7
56:14,19 58:4 59:2
60:12 63:2 65:15
65:18 66:8,17
68:17 69:6 71:18
71:20,20 72:19,24
73:24,25 75:12
77:13,15,18,19
78:20 79:12 80:22
81:1,3,4 83:18,19
84:4 86:20 88:1,21
89:24 90:12,14,22
91:2,8 95:24 96:3
96:11 97:6 98:18
98:20 102:22,22
103:18 106:1,7
108:23 109:3,14,17
111:1,17 112:11,14

112:16 115:21
117:1,18,21,21
118:17,18,22 119:5
119:8,11 120:7,18
121:7 122:14,15,16
122:18 124:16
127:3 132:18
133:22 135:9,16,20
135:25 137:15,16
137:18,18 139:1,8
144:3,12,16,21
146:20,21 148:22
153:5,7,14,16
154:1,13,14 155:2
155:19 158:8
160:17,20 161:12
161:24 163:13
166:3,4,8,9,13
167:13,13 170:24
170:25 171:5
174:11,16,16,24
176:8 177:7,8
180:22 182:11,13
183:21 184:9 185:5
185:8,9 186:11
188:4 191:16 194:5
194:9 195:22
196:23 197:1 198:9
198:19 199:1,7,19
199:21,22 205:2,6
205:9 207:17 208:2
208:3,5,11 211:24
211:25 212:1
216:17,21,22
218:14 219:22
220:17,19,19
221:25 222:1
223:10 226:13
227:7,9,11,13,15
228:25 229:7,8,19
229:20,24,25 230:3

231:8,11,17,21,22
232:19 236:9 237:5
237:6,9,24 238:9
239:3,19 240:4,7
241:1,1,25 245:11
245:19 246:3,8
248:23 249:9 250:9
253:20 254:4
256:10,21 257:8
258:6,8 259:18
261:5 264:14
265:13,14,14,19,24
266:12,20 267:5,10
267:12,13,16,17
273:8,18 275:20
276:3,5 278:14,24
279:17 280:1,4,9
280:25,25 281:5
282:16 284:1,19,20
286:8 287:1,18
288:2,4,9,15,17,19
288:20,21 289:9,18
289:19,21 290:3,4
291:3,8,11 292:11
292:14,24,25 293:4
293:5 296:21
298:16,21,21 299:5
299:8 302:21,25
303:10,20,20,25
304:1,7 305:2,15
305:17 307:16,17
309:22,23 311:4,5
312:15 316:3,14,15
318:1 319:14 320:4
320:7,16,17,20,21
322:2,23,23 323:4
323:6 325:9,18
327:1,20 328:13,20
328:22 332:17,20
**knowing** 11:25

**knowledge** 23:19
33:13 44:1 45:8
85:13 86:1,22 97:9
302:10 330:22
**knowledgeable**
238:17
**known** 137:10
232:16 322:10
339:12
**knows** 102:23
105:7 135:23
304:23
**kommy** 84:21 86:9
86:10 97:13 102:23
102:25 153:20
**kommy's** 153:21
**komy** 143:14
**kstephens** 4:12
**kurian** 80:7,8,24
81:1 84:17,21
86:12,14,24 87:4,5
87:9 97:1,9 159:22
160:2,23 161:8
**kurian's** 86:17,22
160:13 229:10,15
**kv8** 238:16

**l**

**l** 4:19 159:5,5
**label** 162:15 211:18
212:22
**labeled** 139:2 218:3
**labeling** 209:25
211:2,18 215:8,22
**labels** 212:2
**labor** 101:1,3,3,11
**laborers** 76:13
78:15
**lady** 276:3,3
**land** 239:19 264:2
**lane** 4:5 343:3

**language** 245:8
246:20 249:18
**lapeyrouse** 5:8
**lapsed** 31:25
**lara** 104:10
**large** 186:25 267:2
**largest** 68:24
**las** 61:9,16,19
83:10
**lasted** 311:7
**late** 241:8 272:6
303:25 326:10
**latest** 210:6 222:13
**launched** 38:12
311:13
**lauren** 4:14,17 9:7
112:18
**law** 4:4 9:14 15:8
19:20 87:9 125:21
136:9 160:18,20
241:19 298:12
343:3
**law's** 159:25
161:10
**laws** 33:9 55:4
125:23 126:1,1
128:23 136:12
**lawsuit** 41:10 45:12
81:12 82:23 84:18
90:17 97:2,14,18
101:18 102:15
103:12,14 230:2
290:14 302:19,21
302:22,24 303:6,10
303:10,12,15,21
304:11 305:9,20
306:1 327:6,14
328:19 329:12
**lawsuits** 302:14
328:13

**lawyer** 274:6 306:3
**lawyers** 35:10,14
  84:19 102:15
  281:18 287:3
  289:13 290:21,25
**layout** 210:7
  238:11,17 239:19
**lead** 22:18
**leads** 22:25 25:8
**leak** 178:15
**learn** 288:25
  302:23 303:23
**learned** 44:24
  205:17 281:3
  302:25 303:3,6
**leave** 191:15 193:1
  285:9 314:17
  320:19 324:6
**leaves** 267:20 336:9
**leaving** 75:25
  191:18
**lectured** 292:2
**left** 113:15 191:14
  191:19,25 198:25
  263:2 305:10
  318:11 333:18
  336:2
**leg** 317:3
**legal** 227:17 341:20
  342:20
**legitimate** 144:8,11
  145:1 163:4
**lemer** 8:18 294:15
  294:20
**leon** 3:5
**lesser** 187:1
**letter** 6:17 50:22
  250:3 343:9,13
**letterhead** 93:21,22
  93:25 94:1,13,15
  97:24,25 99:2,3,4

**letters** 221:21
**liability** 173:21
  174:12,13 175:6,20
  176:22 178:2
  179:18
**license** 230:21
**licensing** 308:24
**lie** 259:5
**life** 172:14
**lifts** 210:17 215:6
**lights** 168:9
**liked** 49:16
**limit** 29:15
**limitation** 125:25
  296:2 334:9
**limited** 129:18,20
  245:16 283:7
**limits** 10:10
**line** 129:22 137:20
  142:3,3 181:23
  191:10 193:9
  200:10,22,23
  209:14 210:2
  215:16,25 216:5
  235:8 243:21 248:4
  335:16,17 338:5
**lines** 210:25
**list** 23:22 103:24,24
  104:1 141:15
  151:12 271:1
  310:21,22,25
**listen** 45:3 192:14
**listened** 45:17
  64:11
**lists** 308:18
**literally** 267:11,15
  301:2
**litigation** 17:13
  43:19
**little** 10:14,19,23
  16:17,20 22:18

41:19 42:1 53:7
  64:21 117:22 125:1
  140:11 164:24
  210:8 221:21 222:6
  233:6 236:22
  252:21 256:5,20
  262:19,25 286:6
**lived** 68:1
**livelong** 138:9
**llc** 1:9,10,11 190:16
  326:13,16 340:9,10
  340:11
**llp** 3:9,14,19
**load** 11:8 126:9
  143:4 147:4 264:13
**loaded** 264:18
**loading** 251:13
**lobby** 67:23 68:3
  68:10,12 69:16,17
  69:21 70:13
**local** 230:17 293:22
  297:1
**locate** 36:3
**location** 210:3
  238:14,15,16
  322:10
**locations** 2:8 173:9
  215:7 238:16
**lock** 131:22
**logical** 112:22
  200:10
**long** 31:15 38:15
  57:2,4 80:16 113:3
  117:1 277:24
  278:12,19 279:12
  282:12 283:25
  324:13
**longer** 39:20
  267:21
**look** 30:12 35:22
  45:20 59:7 78:7

86:20 93:9 138:14
  157:16 162:8
  163:25 167:11,14
  175:22 193:4
  195:13 198:15
  202:12 212:21
  218:1 223:16
  225:25 237:11
  253:14 277:5
  284:23 331:1,21
**looked** 19:16 35:15
  74:20 76:5 77:9
  145:15 159:10
  226:6 296:15
  307:14 331:2
**looking** 12:14
  23:15 43:7 53:10
  55:6 106:24 139:15
  148:22 194:7
  196:22 206:10
  208:24 249:25
  267:21 292:6
  294:15 305:19
  311:13 319:9
  331:25
**looks** 10:23 194:4
  194:11,25 196:25
  199:3
**loop** 238:14 249:21
  256:18 257:8,11
**lopez** 144:18,19
  154:11
**lose** 90:1,7 107:6
  133:11 188:11
**loss** 172:13,14,14
**lost** 188:8 260:12
**lot** 42:2,21 48:9
  169:18 171:19
  173:11 210:20
  212:1 213:18
  225:11 238:7 271:1

CONFIDENTIAL

**[lot - meeting]**

292:13,15 309:4
321:3
**love** 188:25
**low** 182:1
**lower** 47:15 188:15
**lowest** 91:14
**lucrative** 36:16
**luis** 144:18,19
153:9,11,14,16,19
154:10,14
**lukewarm** 262:13
**lumped** 118:6
215:20
**lunch** 94:23 112:23
**lunchtime** 94:21
**lying** 46:6,8

**m**

**m** 143:15 159:5,5
279:5
**machine** 2:7
**machinery** 308:5
**machines** 308:9
**mad** 98:6 261:4
**madam** 343:8
**madame** 96:19
336:15
**magee** 316:5
**mail** 24:5,7 88:13
88:15 96:16 162:2
207:4 217:16,18
218:12,14
**mailed** 206:25
218:13
**main** 210:15
**maintaining**
136:13
**maintenance** 36:17
71:13 309:15
**major** 20:4 39:23
**making** 14:24
89:25 138:15

150:17 151:3 172:5
185:5,7 213:19
263:20 295:19
301:7 342:10
**malicious** 200:1
205:12
**management** 89:8
89:20 129:25 130:2
273:10 300:3
**manager** 28:3,12
33:19 40:20 44:13
144:20 153:10
179:14 233:21
**manlifts** 179:13
**manual** 131:12
**march** 159:21
209:13 252:22
253:17 254:13
255:9 297:14
**margaret** 5:9 9:21
272:20 273:12
276:2 314:22 315:6
315:13 316:10,18
317:4,16 327:1
**margin** 171:15
182:7 184:11,23,25
185:11 186:4
187:17 311:9
312:13
**margins** 301:22,24
310:24 311:2,10,19
312:2
**mark** 167:23
325:18
**marked** 16:5 17:7
32:5 52:17 121:12
143:9 145:12
156:13 162:11
166:25 189:13
190:12 193:6
201:14 203:12

208:19 217:24
219:15 222:5
225:20 233:3
236:20 246:21
261:14 264:17
270:18 294:17
**market** 47:15 48:1
49:12 57:21,24
58:1 59:25 60:3,4
121:20 178:23
181:18,18,20,21,24
187:18 188:1 189:4
317:4,6,7,10,21
**marketing** 62:4
63:5 64:12,14
74:17 76:4,7,11,14
76:21 77:9,14,25
109:15,18 121:2,5
121:9
**markets** 136:23
**marshal** 257:3,10
**marshal's** 236:2,2
**martinez** 193:13
**mary** 104:6 105:7
**mason** 310:10,11
**matches** 52:6 216:6
**material** 327:24
**materialize** 90:4
**materials** 101:1
115:13,15 129:24
130:2 164:15
**math** 21:20 24:12
72:4
**matter** 178:17
**matters** 12:7 235:5
**mckay** 5:9 9:22
272:20 273:12
276:2 314:22 315:6
315:13 317:4,16,25
327:1

**mckay's** 316:5,10
316:18
**mean** 39:18 78:13
87:11 91:18 94:24
112:5 120:16
123:23 129:6,13
138:14 182:14
193:16 206:9
217:14 220:11
231:14 239:10
253:8 260:11 269:9
289:11 291:20
313:16 315:14
319:25 321:24
**meaning** 90:22
**means** 90:14,23
130:12 205:3,4
301:18
**meant** 193:17
**mechanical** 100:9
100:11 190:16
201:20 230:25
310:10,11
**medacki** 101:20,21
177:16
**medical** 307:20
**medium** 185:3
**meet** 67:22 68:3,9,9
221:3 230:12,14
231:19 272:22
273:10
**meeting** 68:16 85:1
101:9 153:19
231:19 233:19,19
233:20 234:3,5,18
245:8 272:18
273:11,15,17,19
275:11,22 286:7,9
302:17 326:19
327:13

CONFIDENTIAL

**[meetings - n]**                                                                                    Page 376

**meetings** 97:18
  230:15 231:10
  272:16
**meineke** 4:9
**melissa** 60:23 122:7
**memory** 81:22
  82:14 221:2 236:11
**mentally** 245:3
**mention** 83:7,8
**mentioned** 46:16
  82:24 83:5 84:21
  95:9 97:13 102:17
  153:20 211:7 214:5
  215:19 260:15
  314:8 315:6
**mep** 212:10 213:5
  214:15 215:2,16
  216:7,25
**mercy** 179:15
**mess** 240:10 332:10
  332:21
**message** 304:6
**messages** 277:12
  282:1,22,24 283:10
  285:23
**messaging** 277:8
**messed** 240:12
  332:23
**met** 68:11 230:15
  231:22 243:19
  244:5 245:22
  246:19 249:18
  260:16 272:13
  302:16 303:4,5,13
  304:19,20 305:12
  325:20 326:18
  330:9
**meters** 238:14
**method** 98:22
  330:13

**methodology**
  288:23 289:7,12
**miami** 3:21
**mic** 285:18
**michael** 126:12
**microsoft** 277:21
  277:24 278:1
  280:19
**mike** 165:25 166:11
**miles** 55:11
**millenium** 86:18,18
  86:19 88:17 91:6
  93:7,14 95:10
  98:22 102:21 155:8
  159:4,4,8,16,21
  160:5,9,22 161:7
  161:17 226:20,21
  226:24 227:20,22
  228:12,19 229:5,10
  240:21 305:22
**million** 37:5 41:4
  59:10 71:22,23,24
  71:25 143:24
  145:18 153:3
  173:19,21 174:4,11
  174:17,25 183:23
  183:24 184:7 220:4
  223:16,21 224:18
  225:6,7,23 267:1
  299:17,19 312:22
**millions** 43:15
  178:13
**mind** 46:11 97:6
  130:4 188:3 245:10
  310:19
**minds** 224:22
**minimum** 257:19
**minor** 168:17
**minus** 158:11
**minute** 45:22 126:8
  189:11 200:22

**228:1,3 243:6**
  323:24
**minutes** 57:3,5
  94:25 154:23 201:1
  305:10 324:9,15
**miscellaneous**
  192:16
**mischaracterizes**
  294:2
**mischaracterizing**
  135:3 294:10 298:6
**mislead** 294:11
  298:5
**missed** 136:17
**missing** 50:23
**mistake** 172:11
  200:1,3 208:3
  262:11 302:6
**mistaken** 101:19
**mm** 104:15
**mm007pd** 222:22
**moayedi** 103:2
  144:23 146:22
**mod** 164:3,13
**module** 6:21
  164:13 165:11
  166:23 168:4,5
**modules** 168:21
**moment** 113:19
  143:4,8 189:9
  229:13 331:9
**moment's** 177:25
**moments** 142:25
**money** 26:18 41:25
  58:14 65:2 74:16
  75:20,21 76:10
  77:10 78:1,22 79:1
  182:9,10,11,19
  185:6,7 186:15
  205:20 238:7 320:7
  329:5

**monies** 191:14,18
  193:1 198:25
  328:11
**month** 21:13 47:10
  110:20,22 111:17
**monthly** 296:23
**months** 30:20
  31:19,22,23,24,25
  47:21 48:8,10
  110:22,22 122:12
  122:17,18 224:16
  224:17 226:2,9
  260:25 286:9,20
**morning** 12:25
  13:1 147:23 162:4
**motion** 138:17,18
**motor** 50:10 51:16
  52:13 210:23,24
**mouer** 5:4
**mouerhuston.com**
  5:6
**move** 12:3 134:4,10
  135:3,8 138:5
  270:13 273:24
  277:2 300:1,10,14
  300:23
**moved** 35:19,19,20
**moving** 168:20
**multiple** 66:19,21
  89:8 135:15 237:22
**multiplied** 195:10
  195:16
**multiplies** 202:17
  202:23 203:5
**multiply** 196:16
  207:18
**mundane** 10:15

| **n** |
| :---: |

**n** 3:1 4:1 5:1 159:5
  230:4

**n.w.**  3:10
**name**  18:7,9 25:22
  26:3 40:16 45:21
  46:15 47:22 48:23
  51:16 80:6 85:11
  85:17,25 86:15,17
  87:2 97:10 98:9,12
  99:17,19 102:18
  104:7,23 114:20
  115:10 126:18
  144:10,12 146:3,18
  149:25 154:10,13
  156:16 158:6 159:7
  160:3,22 161:16
  162:5 163:6 165:25
  211:24,25 212:2
  227:16 231:11
  232:12 243:22,23
  257:21 258:4 259:7
  279:5,6,6,7,8,20
  326:9,25 330:5
  338:2 339:15
**named**  230:3
  325:18
**names**  83:16 88:2
  88:24 92:11 103:25
  156:16 211:21
  234:15 235:16
  301:15,20 329:2
**narrative**  82:14
**national**  292:1
**native**  139:3,10
  247:23
**necessarily**  188:14
**neck**  235:8 243:21
**need**  10:23 12:3
  16:16 50:2,13 57:4
  78:7 115:15 133:18
  134:21 147:15
  148:9 154:23
  191:20 200:21,25

210:13,14 236:18
  254:4 257:11 265:8
  317:9 336:9,18
**needed**  11:19 25:11
  177:20 291:23
**negative**  308:8
**neighborhood**  41:3
**neither**  179:14
  341:8
**net**  53:1 55:20,20
**nevada**  61:9
**never**  42:2,6 45:18
  45:24 46:16 67:18
  71:7 79:15 136:1
  177:3,3 180:1
  208:1 227:4,6,8
  229:9 230:1 231:24
  237:8 260:10 264:8
  269:9 318:5,8
**new**  51:17 55:10
  143:5 150:20 210:1
  224:6 282:19
**news**  304:7 305:6
**nickname**  257:23
  257:24 258:3
**non**  283:18
**nonelectronic**
  322:13
**nonresponsive**
  290:5
**noon**  112:22
**norm**  92:2 328:4
**normal**  10:18 40:13
**nos**  6:16,18,20 7:6
  7:9,11,13,15,17,19
  7:21,23 8:5,7,9,13
  8:15,20
**notary**  339:24
  341:1
**notations**  193:5

**note**  138:15 139:24
  150:6,17 151:10
  152:4 204:24
  297:12
**noted**  297:13 339:3
**notes**  151:3 204:17
  319:10
**notice**  8:17 177:25
  258:14,19 270:15
  285:20
**noticed**  111:8
  258:18 277:13
**notified**  342:3,6
**november**  34:2,6
  219:18,25 224:3
  226:3,7 236:14
  304:2,2
**number**  22:2 37:7
  38:9 51:10 52:18
  53:23 54:1,12 55:6
  59:12 65:18 72:6
  72:19 77:15,19
  87:15 98:14 102:6
  107:14 108:23,24
  120:7 122:18
  125:10 128:2,9
  132:13 136:17,18
  145:8,22,24 146:14
  148:17 150:7,10,24
  151:4,10 152:5
  170:24 172:7,8
  173:9 174:2,16
  177:7,17,17 182:8
  183:21 184:25
  185:15 186:3 189:7
  193:22 195:1
  204:25 237:12
  248:8 264:14,20
  294:13 299:9 304:6
  317:21 322:11

**numbered**  2:4
**numbering**  247:13
**numbers**  37:15,17
  37:18 48:12 72:5
  80:12 107:25
  188:19 197:2 221:6
  253:9

**o**

**o**  26:5 79:10 143:15
  279:5 343:2
**oak**  4:20
**oakanella**  218:21
**oath**  13:2 339:13
**object**  14:17 15:10
  23:4 25:1,13 26:20
  28:4,13,22,25 29:6
  30:1 36:25 37:14
  43:10 56:2,13,18
  59:1,14 60:11
  65:12 66:12 74:23
  78:10 81:14,18
  129:5,21 132:6
  133:13,19 134:2,2
  135:1 137:7,14
  146:19 160:15,19
  161:23 171:17
  187:6 192:24 199:5
  234:8 240:24 254:3
  255:6 263:25 267:4
  291:17 296:9,20
  308:12 334:23,23
  335:7,7
**objected**  96:20
  241:5 297:8
**objecting**  37:19
**objection**  13:12,20
  14:4,12,23 22:9
  24:17 26:11 36:18
  39:6,24 40:11,21
  43:16,16 60:15
  66:16 90:21 91:1,7

96:18 123:18
130:15 139:20
175:11 239:25
240:13,25 241:8,10
241:10 245:6
246:17 247:8
248:13,20,21
254:24 255:2
259:12 274:23
291:17,22 308:15
318:23
**objections**  32:12
33:3 319:6
**obligations**  128:20
**obtain**  237:21
**obtaining**  88:23
115:10
**obviously**  84:7
97:20 102:21,23
173:17 187:1 188:2
188:25 291:13
**occasion**  316:20,20
318:12
**occasions**  67:3
304:20 316:19
**occupational**
125:25
**occurred**  45:4
**occurring**  206:6
**october**  33:12
261:21 285:1 287:9
**odd**  27:17
**odometer**  55:11
**offer**  329:11,11
**offering**  220:8
221:7
**office**  35:20 67:4
80:3 103:16,21
236:2 246:7 288:6
314:2 339:19
343:10,10

**officer**  91:21
129:24 342:6
**officers**  44:2
306:20 334:25
**official**  54:20,23
231:11 258:4
**offline**  12:1 176:7
319:1 320:19
321:23
**oh**  21:14 35:6 46:14
50:18 63:25 130:3
133:24 141:4
148:25 149:4
150:11 174:9,15,15
176:16 177:20
195:5 225:2 229:20
247:19 248:16
259:3,10 295:15
**ohio**  240:9 332:10
**ojha**  26:3,6 79:8,12
79:17,23 80:24
**okanella**  218:5
**okay**  11:13,23 14:8
17:4 18:25 19:7
21:2 23:20 24:24
26:16 29:21,22
32:8 36:9 39:2 40:7
46:4 47:11,17
50:18 52:10,21
53:13 54:2,8 62:11
63:23 64:12 66:11
66:14 68:9,24
71:22 72:7 75:10
80:4 82:18 85:2
86:12,21 88:5
102:20 103:11
104:3,17,23,25
105:10 106:5,8,9
106:18,23 108:21
109:19 110:24
112:7,11,24 113:1

114:16 115:19
116:2 118:24
120:14 125:3,9
126:7 127:21,25
128:13,15 130:6,21
134:8,15 136:6
138:14 139:11,25
140:13 141:5,5,13
141:22,24,24,25
142:5,9,13,23
144:10,16,21 145:5
145:23 148:18,21
149:4,4,5,9,16,17
149:21,22 150:4,4
150:19,24,25
151:12,21,24 152:2
152:7,13,19 153:7
153:14 154:3,10,13
154:21 155:15,23
158:9,24 159:3
163:21 164:18
165:6 166:5,11,17
167:15 168:1,3,14
171:7,20,22 173:14
174:5,8 175:9
176:21 181:12,14
182:11 183:18
184:3,8,18,23
185:5,8,16 186:6
186:21 187:2,10,15
188:23 189:9
190:25 192:20
193:4 194:8,11
195:5,6,25 196:19
197:5 198:10 200:6
200:13 201:2,3,4
201:11,16,18
204:20,21,25 205:4
205:5,14,17,25
206:3 209:10,10,18
209:20 210:11

212:4 216:5 218:17
218:22,24,24 219:5
220:5,10,17,25
221:1,9,18 222:3,7
222:10,14 223:13
223:18 224:2,17
225:16 226:20,25
227:23 228:4,18,21
228:22,24 229:4,14
229:21 230:6,10,24
233:15 234:21
235:3 236:3,8,10
236:22,22,23 237:3
237:20 238:4 239:6
240:8 241:15,24
242:18 243:4,23
244:8 246:6 247:18
248:1,6,10,11,12
248:17 249:14,24
252:8,13 255:4
259:16 260:1,6,21
261:18 264:12,18
264:24,25 265:1
266:9,18 269:1
270:22 271:4
279:25 285:19,25
286:18 287:2,13
290:7 291:20
292:23 295:1,3,18
295:22,24,25
296:17 299:15
300:1,15 303:13,19
303:25 304:1,1,4
308:19 310:2,15,22
315:17 318:3 320:6
321:11,21 324:2,16
325:15 326:15,24
327:4,8,16,20,23
328:2,6,14,22
329:1,4,19 330:22
331:8,12,20 332:3

332:21 336:24
337:3,9
**old** 209:20
**once** 22:15 44:24
50:6 60:14 68:11
177:12 183:15
186:14 252:17
261:12 262:11
269:8 280:23 283:3
309:3 328:6 343:16
**one's** 252:16
**onepoint** 1:7 4:3
9:8 10:11,13 15:12
15:17 16:8 18:1,7
18:13,16,22 19:1,4
21:12 22:13 23:3,8
24:12,15,19,25
25:18 31:6 32:11
32:19 33:3,8,18
34:2,19 36:16 37:5
37:12 38:24 39:4
40:25 41:2 44:2,3
44:23 45:8,19 47:4
48:6,17 50:8,22
52:7,15,23,23,25
55:25 59:10,18
60:22 61:10 62:15
65:1,2 71:16 75:18
78:8 79:18 91:13
101:24,25 104:5
107:3,5,6,7,11,21
107:22 109:9
114:19,25 115:2,3
115:10 116:5,15,18
116:24 117:11,19
118:12 119:4,10
120:10,20,22
122:12 124:20
125:16 126:16
137:12 138:23
145:22 148:19

156:20,25 157:5,10
160:6 162:22 164:8
164:19 166:22
167:24 170:14
171:10 174:19
177:10 181:1
187:16,17 189:16
197:24 199:24
201:20 204:3
206:16 207:11
209:13 212:18
214:19 220:7
226:12 243:20
244:6 245:9,23
246:19 249:19
251:10,14 258:15
260:7 265:10,18
270:11,16 273:20
277:8,18,20 279:12
279:18,22 284:24
285:3,5 287:7,21
287:25 288:3
289:23 292:8
293:17,20 295:8,10
295:11 296:7,15,19
297:14,25 298:8,24
299:4,11 300:2,5
301:6,7,11,14,15
302:14 305:18
306:7,22 307:1,7
307:10,12,17,18
308:4,7,20 309:7
309:13,16 310:4,5
310:7 311:24 318:5
318:7,8 319:1,14
320:7 321:4,13
327:25 328:2 329:5
329:8 337:5 340:7
**onepoint's** 6:23
18:20 19:11,20
22:7,13 23:7 34:4

60:14 74:4 79:2
88:10 91:11 109:12
110:7 127:8 165:14
167:21 267:2
271:12 277:11
301:11,22,24
306:18 310:23
**onepoint000387**
8:20 124:21
**onepoint000387-1**
8:21
**onepoint000387-...**
8:22
**onepoint000810**
7:19
**onepoint016246**
7:11
**onepoint016248**
7:13
**onepoint021427**
7:15
**onepoint021428**
7:17
**onepoint021887**
6:18 145:24
**onepoint16246**
189:10
**onepoint36609** 7:7
**onepoint387-23**
128:9
**onepoint409** 128:8
**onepoint410**
128:17
**onepoint415** 136:8
**onepoint811**
212:23
**onepointinc.com**
222:16
**ones** 53:11 89:16
90:5 113:16 151:24
157:5 192:12

215:19 216:15
248:8 249:1 271:2
**ongoing** 85:8
**open** 11:19 67:7,11
290:17 327:17
**operation** 10:13
**operations** 165:25
**opinion** 294:24
**opportunity** 138:12
156:7 242:17
334:10
**oral** 1:17 2:1
**orally** 330:16,23
**order** 10:7 20:22
115:2 120:21
183:10 210:25
238:9 247:21
253:17 254:4
291:21 310:5
311:24 336:13
**ordered** 336:16
**ordering** 240:2
343:16,16
**orders** 239:23
244:7 336:9
**organization**
231:11,12
**origin** 53:23
**original** 51:3
343:15
**ought** 10:19
**outcome** 341:12
**outlet** 210:10
**outlets** 215:12
**outlook** 247:25
277:22,23
**outset** 10:25
**outside** 258:10
275:24 276:1,2
282:2 302:9 304:22
305:20 335:9

**outsourced**  168:19
168:20 309:3
**overall**  306:18
312:10
**overbill**  207:23,25
**overbilled**  207:14
207:15,16
**overbilling**  205:18
207:11
**overheads**  313:1
**overnight**  319:23
**oversee**  179:14
**oversight**  164:2
**overstepped**
263:14
**overtime**  22:4
170:22 171:3,11,13
180:5 190:2 194:19
194:20 202:1,5,10
202:23 203:4,24
204:2,5,10,15,24
207:16
**owned**  117:16
305:15
**owner**  51:17 52:7
100:9 307:3 323:15
**owner's**  325:6
**owners**  305:22
**ownership**  307:10

**p**

**p**  3:1,1 4:1,1 5:1,1
**p.m.**  2:5,5 113:10
156:1,2 201:6,7
228:6,7 268:3,4
324:21,22 337:11
**pablo**  1:8 15:25
18:10,12,16,19,22
19:1,4,11,20 20:21
20:22 21:5,8 22:6
22:12,25 23:3,7,21
24:1,13,15,20,24

25:18 27:1,5,20
28:2,10,20 29:13
29:24 30:8,10 31:6
31:17 33:19 34:2,7
34:10,23 36:5,15
39:4,11,14,18,23
40:1 41:8,13,20,25
42:8,17,23,24 43:3
43:3,5,9,15 44:3
45:8 46:7,13 47:11
47:13 48:21 49:6
49:12,15 51:17,23
53:4,25 56:12
57:18,20 58:2,17
58:21,22 59:4 60:9
60:23 62:8,10
63:18 64:3,5,8
65:25 66:22 67:2
67:20 68:25 69:4
69:10 70:1,5,7,12
70:24 71:2,6 72:8
72:18,23 73:3,8,13
73:17 74:10,15,22
75:19,21,23,23
76:3,7,21,24 77:4,6
77:11,22 78:9
79:13 81:2 83:21
83:23 84:14 87:12
87:17 88:1,17,19
89:19,22 90:2
91:19,20,24 92:9
92:10,17,24 95:11
96:9,15,17 98:13
101:12,18 103:7
106:19 107:11
109:8,20,23 113:16
114:1,4 115:12
116:21 117:15,20
119:18,22 120:9
121:4,10,19,20,21
122:1,12,20,24

123:10 124:12
127:8 132:8 137:21
139:14,15,18 140:6
140:7,19 141:15,19
141:20,25 142:5
153:17 161:2,4,18
166:18 170:5
174:24 175:5
177:16 188:17
191:10 192:5,13,14
193:13 208:7,12
209:25 218:5,10,16
219:2,6,17,21
221:13,20,25
222:20,22,25 232:2
232:4,7,22 233:17
234:1,6,12,18
235:8 237:14 238:5
239:21 241:23
242:1 243:10,16
244:12 246:2 247:3
248:19 249:5 250:1
250:12,15,25
251:17 252:9,23
254:14 255:10
256:3,19 258:11
259:14 260:3,18
263:20 269:23
270:1,5 271:13,15
272:25 273:1,17,18
281:3 282:2,23
284:4,14,17 287:8
287:16 292:10,12
292:18,21 293:2,11
300:3,4 301:7,10
302:15 303:7,7,16
303:17 304:7,21
305:21 306:6,11
313:9,12,13,21
317:8,16,16,22,24
318:13,16 322:17

323:2,4,19,19
325:7,9,11,20
329:7 335:15 340:9
**pablo's**  27:6 45:20
46:15 48:18 110:8
119:3 121:22
206:23 227:10
258:15,16 317:18
335:20
**pace**  227:5,7
**pace's**  227:14
**package**  6:15 101:2
132:1 143:13
228:12
**padding**  302:5
**page**  6:13 7:3 8:3
32:20,22,24 81:22
117:7 126:10 128:1
128:3,3,16 130:23
136:7 139:16,16
140:3,5,7,9,24
141:22 143:21
157:21 159:20
164:18 166:2
190:21 191:1 196:1
202:13 209:12
253:4,6,9 295:1
338:5 341:4
**pages**  147:14,15
255:25
**paid**  24:12 39:9,11
40:8 42:18 43:3,4,9
43:15 48:6,24 49:6
54:17 56:1,9 59:17
70:21 74:9 78:9,11
78:16 106:19
107:23 108:19,21
109:8 114:21
117:19 119:3
121:19 177:15
178:24 181:20,21

CONFIDENTIAL

[paid - percent]

197:3 216:17 296:6
296:7,19,22 298:2
298:10,12,24 299:3
318:5
**paige** 206:21,23
271:17,22 272:4
292:20
**paint** 115:12
**panel** 251:20
**panels** 209:21,24
210:19 211:18
213:23
**paper** 49:4 53:19
107:14 152:4 207:1
**paperworks** 227:17
**paragraph** 107:1
114:6 130:10,11
295:3 297:12
311:16 334:3,4,17
335:2
**parent** 306:21
**parents** 258:6
**park** 131:22
**parking** 63:15
**parsons** 227:2,3,9
227:13
**part** 31:3,9 61:7
62:3 63:5,21 64:14
64:14 121:8 125:14
128:10,13 131:25
132:8 136:19
150:21 172:11
173:13,18 175:1
183:14 193:24,25
194:1 198:16
206:20 215:18
225:14 228:12
**participated**
326:19
**particular** 35:23
40:16 184:11

185:23 251:6
252:12 256:21
257:1,14 306:9,13
333:7
**parties** 9:5 340:20
341:9 343:16
**partner** 103:1
**parts** 54:5 191:7
**party** 340:24 341:7
343:16
**pass** 324:1 326:4,5
333:11
**passing** 90:18
**password** 280:17
**paste** 166:6
**pat** 101:20,21,22
177:16
**patel** 322:21
**patience** 326:1
**pattern** 110:23
302:2
**paving** 256:6
**pay** 14:16 15:3,9,18
18:22 19:4 20:23
21:8,11 23:3 24:15
25:11 27:20 28:3
29:23 31:16,17
36:6,7 58:14,16
61:15 62:13 63:4
63:18 74:10 76:13
77:22 107:3,15,19
108:8 110:18
111:11 114:3 115:1
120:20 134:24
329:5
**paycheck** 23:24
**paychex** 23:10,15
23:20 34:14,16
35:7,15 36:11
45:20 46:16

**paychex's** 35:21
**paying** 14:3,20,22
22:1,4 26:19 43:2
79:12 81:1 83:10
107:11 108:2
109:20 110:7,8,10
111:13 121:22
196:24 216:18
**payment** 14:9 21:4
23:8,20 28:20
60:25 61:1 66:20
107:17 114:1
122:16 294:24
296:3,15,25 300:5
328:15 329:9
**payments** 21:12
35:8 39:14,23 40:3
40:25 41:2,8,14,21
65:3 66:19 72:13
72:14 83:20,22,23
84:14 107:5,8
109:11,15 112:16
113:15 119:13
122:11 124:12
133:10 206:24
261:7 263:20 272:6
301:6 318:7 319:3
322:17 328:7,8
**payroll** 18:17,20,23
19:2,11,20,25 21:1
21:5,14,23 22:7,14
23:7 24:23 25:4,16
26:8,14 27:1,21
28:12 29:20,20
30:8,11,18 31:6,17
32:1 33:19 34:3,4,7
34:11 35:24 36:8
37:2 44:3,23,25
45:9 46:7 47:12
57:18 58:3,10,11
58:13,15 59:22

60:10 64:3,9,12
83:11 104:12
121:19 122:21
127:8 137:23
301:11
**pd** 1:9 326:13
340:9
**pe** 230:21
**penalty** 33:9
**pending** 303:15
304:11 305:9
327:21
**penn** 5:4 9:11
11:15 241:4 324:4
330:5 331:7 335:25
336:22
**penny** 191:24
**penthouse** 305:12
**people** 10:12 61:23
84:23 103:19,21
172:8 174:1 177:17
177:17,18,20 196:8
210:12 211:4 214:4
215:13 258:5,8
272:22 302:11
305:25 307:9 327:1
327:3
**people's** 178:20
**pep** 125:4
**perceived** 265:18
**percent** 73:21,24
73:25 74:11 94:17
94:17 146:5 171:15
171:18 185:19,20
187:4,4,5 191:21
206:11 220:8,14
221:8 256:5 267:8
267:14 287:19
297:15,16 298:1,2
298:3,9,10,14,18
307:2 312:10,14,17

**[percent - policies]**                                                    Page 382

312:18
**percentage** 94:17
  186:20,21 187:7
  267:5
**percentages** 186:23
**percolation** 252:2
**perez** 104:14
**perform** 308:23
**performance** 86:19
  88:17 125:22 133:3
  133:6 159:8,16,21
  160:5,10,22 161:7
  229:10 240:21
  334:6
**performed** 59:16
  114:23 124:23
  125:15 309:6
  327:25 333:23
**performing** 309:14
  334:15
**period** 37:13 38:15
  59:9 65:19 71:9
  110:24 111:1 120:2
  123:4,7 124:6
  154:24 183:4,24,25
  196:1 201:21 202:9
  203:11 212:14
  260:17 263:19
  292:9 297:13
  299:21 320:22
**periodic** 263:20
**periods** 182:24
  183:4,13
**perjury** 33:9
**permit** 257:2
**person** 14:24 22:20
  24:9 27:4 77:6
  79:22,25 107:18
  112:9 158:6 171:24
  177:22 208:10
  210:15 215:21

230:3 269:8 273:14
  292:14 304:8
  322:11 325:18
  326:5 339:15
**personal** 33:13
  61:1 74:3 78:1,25
  93:19 107:20
  128:18 129:3,17
  130:13 186:11
  219:6,9,12,14
  221:13,15,18 222:1
  222:25 223:5
  262:12 283:14
  284:13,22
**personally** 22:23
  23:18 24:6 35:10
  35:14 78:19 110:17
  161:18 231:23
  319:13 339:12
**persons** 44:1 173:2
  328:22
**pertaining** 249:10
**peterson** 5:9 9:22
  275:19,20 276:4
**petition** 81:23
**phase** 223:10,11
**phases** 214:1
  223:10
**phone** 3:6,11,16,22
  4:6,11,16,22 5:6
  86:3 101:22 177:15
  282:6,7,8,19 283:9
  283:16 285:17
  341:23 342:23
**phonetic** 101:20
  104:10 330:20
**phrase** 241:19
  263:9
**phuston** 5:6
**physical** 23:12,13
  112:2 277:10

279:23 284:25
  285:6 287:6,11,23
  288:7 290:11 315:8
**physically** 315:15
**pi** 85:21
**pick** 227:24
**picked** 24:8 288:6
  290:18
**picking** 24:4
**piece** 107:14 126:5
  152:4
**pieces** 45:5
**pinpoint** 111:16
  144:14 286:11
**piping** 231:1
**place** 19:20 30:17
  31:17 93:24 94:3
  336:13
**placed** 33:18 34:10
  127:8 137:22
**placing** 27:1 29:20
  301:10
**plaintiff** 1:4 2:3 3:3
  9:15 33:23 336:14
  340:4
**plaintiff's** 6:24
  32:13 33:4 60:15
**plaintiffs** 9:14
**plan** 11:21 168:4
  210:7 317:20
**planning** 314:17
**plans** 210:6
**plant** 183:11
  189:21,22 210:23
  210:24 234:10
  311:6
**plants** 215:11
**played** 20:10 27:23
**please** 9:4,24 12:1
  28:1,6,9 37:23 38:3
  41:1 50:3 72:25

73:14 82:3 112:11
  125:1 134:15
  138:25 140:1,11
  149:5,23 151:9
  168:3 175:18
  180:14 198:2
  209:18 218:12
  233:6 244:14
  253:24 254:5
  256:15,24 269:3
  296:13 325:3
  336:16 343:10
**plenty** 291:24
**pllc** 3:4 4:9,20
**plumbing** 234:12
  262:15 308:24
  316:25
**plus** 81:22 190:5
  196:12 199:23
  204:12
**po** 191:13,14,15,16
  191:19,21,25 193:2
  193:19 198:7 205:9
  205:10
**point** 7:4 10:10,24
  35:17 46:5 101:13
  112:22,25 118:3
  171:5,6 173:25
  176:13 200:11
  209:22 223:15
  225:7 258:13 289:5
  307:10 321:24
  327:4
**pointed** 157:4
  206:5
**pointing** 54:3,5
  202:21 261:3
**policies** 8:19
  127:17 130:24
  131:9,16 133:2,4
  334:5,8,11,12,24

**[policies - problem]** Page 383

335:5,6,12,15
**policy** 39:25 40:2
129:2 130:16,17,19
130:20 131:13
137:3,6,11,13,22
137:25 138:1 175:9
175:20 177:2
329:24
**politician** 13:24
**ponce** 3:5
**pond** 234:20
**ponds** 232:9
**pops** 280:18
**populating** 147:12
**portion** 75:9 78:9
169:23 181:15
267:2 294:24
334:15
**portions** 81:15,16
**pos** 191:12,12
192:25 272:6
**position** 44:12
137:20 169:4,11
173:15 178:2 215:2
242:3 276:19 307:8
**positions** 307:6
**possession** 34:20
169:13
**possibility** 105:5
**possible** 11:25
54:14 66:3,4,6
68:23 108:7 109:1
127:2 161:22 284:9
284:12,15
**possibly** 111:6
144:24 280:12
**post** 4:20
**potential** 137:5
**potentially** 58:25
287:24

**power** 209:23
210:9,24
**powerpoint** 318:13
318:15
**practice** 40:13
137:4 257:13
**practices** 128:22
**precast** 251:19
**predominant** 236:3
236:14
**preliminary** 12:7
**premarked** 11:6
**premier** 98:2,9,12
98:21 106:2 143:23
144:7 145:3 146:3
146:7,18,23 147:2
147:6 151:19 153:1
153:24 156:22,24
157:8 158:10,13
226:15 229:22
240:20
**premises** 124:23
125:15 133:3,5
172:3 174:1 258:21
333:24
**premium** 176:23
**premiums** 174:12
174:15,16 176:5,14
**prepare** 93:5,9
105:24 151:22
154:4 155:14
158:12 159:14
163:6 278:15,20
299:10 309:20
313:5 318:12,15
**prepared** 88:12
92:6 105:19 143:11
144:2 149:11 154:3
154:19 157:9
158:20 159:17
160:7 165:19,20,21

226:17 245:4
247:17 289:10
291:13 293:7 299:6
310:23
**preparing** 88:4,21
97:11 105:14
309:13,17
**presence** 305:20
**present** 5:8 89:7
275:22 307:4
**presentations**
318:13,16
**preserve** 281:13,22
284:24 285:6,8
**president** 27:8
92:13,20 126:21
231:6 272:11,13,19
273:12 307:8
**pressure** 308:9
**pressured** 34:2
**pretty** 46:13 182:3
263:15 291:17
315:22
**prevailing** 185:2
**prevent** 281:14
**previously** 151:8
**price** 47:15,16 48:1
49:12 51:25 52:2,4
52:5,7 53:1 54:9
55:14 57:21,23,25
88:24 89:2 91:11
91:16 94:14 154:5
154:6,7 157:9
167:6 168:12
172:21 178:5,23
180:7 181:20,21,23
181:24 182:1,2,3
186:6 187:18,20
188:2,3,5,6 189:4
220:3,13 221:12
223:16,21 224:17

224:19 225:3,5,22
270:5 306:9,13
317:5,6,7,10
**prices** 89:19 92:11
**pricing** 136:22
220:9 225:10
310:24
**primarily** 170:14
308:20 309:18
**primary** 71:10
**principal** 214:16
215:17 216:25
**print** 93:24 94:1,12
99:3 247:23,24
**printed** 99:2,4
126:18 178:12
**printing** 93:24 94:3
**printout** 53:13
**printouts** 53:6
138:23 139:17
**prior** 30:20 107:2
111:9 206:6 286:1
291:22
**privacy** 55:4
**private** 85:5
**privilege** 290:16
291:10,19
**pro** 13:16 15:1
20:12,14,15 59:13
64:19 70:16 117:23
118:5 120:24
**probably** 22:3 31:4
35:22 37:12 48:3
56:17 89:13 96:14
112:5 169:24
208:10 266:10
292:20 304:2
331:12
**problem** 206:5
241:8 245:13

**problems** 177:3
206:12 234:10
257:14
**procedure** 2:9
131:11 155:10,11
343:24,25
**proceed** 12:10
248:7 254:8
**proceeding** 341:10
**proceedings** 337:11
**proceeds** 319:3
**process** 89:21,25
93:5 177:14 187:22
191:3 272:22
290:12
**processing** 89:10
231:2
**procurement**
128:10,11,19 129:4
129:23 130:3,4
**produce** 107:7
112:15,19 139:2
**produced** 2:2 52:23
112:7 124:20
135:10 138:24
139:10,13,21
142:22 247:14,22
248:5 277:16 292:8
297:3,8,9
**production** 52:25
112:20 136:23,24
287:25 288:24
289:8 291:5 331:7
**professional**
209:14 216:10
230:18,20 244:15
262:1,22
**professionals** 214:7
232:16,17,18
246:12 262:4,9

**profit** 171:15,18,19
182:6 184:8,10,11
184:23,25 185:11
186:4 187:17
199:24 295:12
301:22,24 310:24
311:2,8,10,19,23
312:2,13,23 319:1
319:11 321:13
**profitability** 312:4
**profits** 74:9 182:16
182:23 312:25
322:17
**program** 63:22
146:8 282:5 283:2
**programs** 282:4
283:6
**prohibited** 135:21
**prohibition** 133:5
**project** 20:16 22:16
22:23 37:3 44:13
89:8,15 93:8,12
100:21,24,25
105:16 125:5,7
143:24 144:9,11,20
145:18 149:24,25
150:5 153:5,6,10
153:20 157:9 164:1
164:2,10 167:3,9
167:23 168:4 169:1
169:11,14,15,16,20
169:21,22,23,24,25
170:2,4 173:18
179:14 184:15
185:13,13,14,17
186:4,5,6,14,18,24
186:24 187:1
209:18 211:11
214:16 216:1,18,19
223:8 224:9,11
225:7,13,15 226:12

229:6 235:4,24
237:22 242:21
243:2,4,10,15,17
245:2 251:6 256:21
257:4,12 259:1
260:23 265:3,9
268:23,25 270:6
273:9 290:23
306:12 311:7 312:1
312:1
**projects** 36:16
38:10,12,13,24
39:7 42:3,4,5 59:7
76:12,12 78:15,24
89:15 100:20
105:21 144:13
153:25 184:17
217:21 232:8
234:25 235:3,14,16
260:14 261:2 264:3
269:14 272:15
273:7 306:8 309:15
310:22,25,25 311:3
311:12,16,19
312:14
**pronounce** 258:7
**proof** 42:22 49:6
294:6
**proper** 209:25
**properly** 33:2
**properties** 43:12
117:15
**property** 66:25
67:1 178:9 262:12
**proposal** 6:14,21
143:13 166:21
167:14,21 188:20
217:22 236:15
237:3,15,19 238:1
238:3,5,23,24,25
239:2,7 241:23

242:12 244:5,15
249:6,11 252:24
254:14,20,21
**proposals** 225:11
**proposed** 220:3
221:12 224:18
**protect** 128:23
**protective** 10:7
93:3 291:21
**protocol** 329:24
**proud** 60:9
**prove** 41:17 42:22
**proved** 339:13
**provide** 65:1,2,8
72:11 79:17 100:19
115:3 119:21
120:12 133:9
169:10 176:4 180:3
181:10 217:7
244:15 278:12
283:9 298:17 316:4
318:25 319:4 322:4
**provided** 32:18
47:13 65:17,20
90:2 102:5 118:20
119:17 120:10,12
131:8 139:14,17
170:8 171:12
175:19 181:11
290:21 297:16,21
298:20 336:17
**provider** 277:20,25
278:6,20,23
**providers** 137:12
277:10
**providing** 88:1
90:9 120:3,6 121:4
121:21 122:11,24
124:7 171:23
177:10 182:20
262:3

**provisions** 2:10
**public** 339:24
  341:1
**pull** 16:12 145:8
**pulled** 288:4
**pulling** 145:8
  193:22
**purchase** 6:19 8:4
  52:2,4 162:17
  225:17 310:5
  311:24 323:1
  336:21
**purchased** 47:21
  48:17 323:4
**purchases** 61:2
  115:1 117:15,19
  120:21
**purchasing** 129:15
  129:19,24 130:1
**pure** 199:24
**purely** 64:5
**purge** 280:23 281:7
  281:10 287:15
  331:13
**purged** 280:24
  281:2,14
**purging** 285:22
**purports** 152:25
  157:22 165:9
**purpose** 26:18
  74:14 136:13
  139:21 324:2
**purposes** 339:17
**pursuant** 2:9 10:6
  340:22
**put** 12:18 16:2
  19:14,25 21:1
  25:16 26:8,14
  27:15 28:12 30:23
  30:24 31:6 32:6
  34:3,6 36:7,8 37:1

49:9,21,24 52:12
59:21 64:8 93:11
93:11 94:15 106:11
113:18 136:17
143:3,12 145:5
153:12,14 155:3
156:10 158:24
164:16 168:22,23
172:4 182:8 188:20
197:4 208:14
211:18 223:13
225:8,9 230:6
243:23 246:25
254:21 262:23
265:21 266:1 268:9
270:14,20 272:21
290:18 291:14
294:4 295:13
336:11
**putting** 18:19
  19:10 47:11 168:8
  168:10,11 229:13
  254:19 298:22

**q**

**qualified** 79:23
  225:11 254:21
**quality** 39:8 187:20
  313:15 327:24
**quantify** 181:14,17
**question** 11:14
  28:6 29:18 35:3
  38:3,4 41:1,23,24
  44:5 61:5 73:1,14
  75:6,10,12 82:3,5,6
  96:20 103:11
  112:10 134:10,16
  138:4,7,19 139:5
  139:23,25 149:10
  151:13,15,16
  175:12 176:15,17
  180:13 192:21,21

198:6 199:13
212:21 214:9
217:16 227:20
240:15 248:18
256:17 269:3,24
271:19,20 272:3
274:22 275:6
278:17 280:16
281:20 284:10
285:13 289:4,6,15
290:8,12 296:10,12
296:14 298:7,8
299:1,7 302:20
303:18,22,23 310:6
319:12 322:22
327:10 333:15
334:19
**questioning** 101:23
  200:10,23 335:17
**questions** 17:12,16
  32:18 38:1 138:9
  138:17 253:25
  254:2 273:16
  276:21 323:25
  326:2,10 330:2
  335:23
**quick** 72:4 333:14
**quickbooks** 80:15
  80:16,18,21,23
**quickly** 209:2
**quickreport** 138:23
  140:4
**quid** 13:16 15:1
  20:12,14,15 59:13
  64:19 70:16 120:24
**quiet** 319:8
**quit** 42:19
**quo** 13:16 15:1
  20:12,14,15 59:13
  64:19 70:16 120:24

**quotations** 136:22
**quotes** 186:9
**quoting** 295:14,15
  295:16

**r**

**r** 3:1 4:1 5:1 165:25
  279:5
**racing** 292:1
**raise** 274:23
**ramp** 174:1
**ramped** 174:4
**ramping** 177:16
**randall** 8:18
  294:20
**random** 94:16
**range** 22:3 65:18
  66:9 108:1 109:5
  111:2,3 172:22,22
  185:16,17,19
  265:17,19 312:9
**ranges** 172:21
**rate** 181:18,19,24
  195:11,16,19 204:8
  216:13 297:15
  298:1,9
**rates** 175:23 185:2
  191:5,6 216:17
**ravi** 231:21
**raw** 312:25
**reach** 101:17
  210:18
**react** 98:3
**reaction** 83:24,25
  84:1,4 86:3
**read** 33:1,7 34:1
  43:12 44:22 60:21
  61:8 62:12 64:23
  75:6,9 107:2 111:9
  114:8,19 120:19
  125:21 128:2,17
  129:22 130:24

131:7,8,15 132:10
132:17 133:1 136:1
136:3,11,20 137:9
143:13 153:21,22
154:1 164:1 207:20
215:16 218:2,5,19
219:20 220:6,23,25
221:1 222:9 224:6
224:12 228:22
236:18 237:18
238:4 239:8 240:9
241:15 242:12,17
242:19 244:14,22
245:22 247:9
248:11 249:6 250:3
255:11 256:4 262:8
262:20 263:8
264:23 265:7
268:18 284:24
287:20 295:7,20
296:1 297:13 301:5
301:10,14 302:8
305:18 306:6,18
309:12 318:24
328:12 331:23
332:9 334:5 337:4
339:1 343:11
**reading** 41:11
111:18 132:18
133:20 159:6
264:25 343:20
**reads** 128:3 318:24
**ready** 152:7 183:10
**real** 24:24 91:6
226:21 227:22
241:1
**really** 22:15 54:14
56:10,19 71:20
72:5 77:19 78:20
89:24 90:15 96:11
97:3 98:20 109:17

115:25 130:17
132:14,15 146:9
154:14 173:25
178:16 195:22
198:8,19 199:1,18
199:22 205:7,7,15
208:1,3,11 216:21
217:3 218:14
220:19 222:1
229:20 239:1 246:3
265:24 267:10
289:18 312:15
319:10 326:1
**reask** 274:18 298:7
**reason** 26:17 75:22
146:6 194:6 198:5
243:18 314:10
332:4 333:1,4
338:5
**reasonable** 56:16
343:13
**reasons** 341:4
342:9
**recall** 23:9,10 24:3
24:4,7 25:20,22
37:16 44:5 46:9
55:2 61:5 69:23
83:25 84:1 86:8
90:3 94:4 98:10,11
98:14 99:5 100:4
107:25 108:2,7
114:16 115:25
118:22 122:2 125:7
132:18 136:3,4
146:9 161:21 162:1
162:3 164:10 166:8
166:16 167:8 169:3
171:6 174:6,24
212:3 216:23 217:3
225:13 234:3,4
235:17 246:4

250:13 251:5,6
255:16,17 260:15
260:16 264:7
273:25 275:18
279:20 281:6,9,12
284:5,8 314:13
315:23 331:25
**receipt** 114:21
116:10 117:7 118:9
130:24 135:12
341:2 343:13
**receipts** 61:3,11
62:16 114:9,17
116:3,9
**receive** 49:3 72:12
72:14 129:3,16
137:11,23 206:24
207:1 262:13
306:10
**received** 18:12 31:7
34:22 37:5 41:8,22
52:15,25 59:10
87:17 132:19,22
135:14,16,17 138:2
191:7 277:14
328:11 343:16
**receives** 319:13
**receiving** 41:14,14
41:21,25 115:2
120:22 128:18
130:13 133:11
318:7
**reciting** 342:9
**recognize** 32:15
**recollection** 37:19
38:6 61:12 62:17
65:11 69:7 109:10
114:22 140:8
153:23 176:24
286:19,22

**recommendations**
234:15
**recommended**
162:22
**reconvene** 11:16
155:12 201:1
**record** 2:10 9:1
10:3 54:21,23 57:8
57:10,14 74:6
75:14 109:11 113:3
113:5,7,11 139:20
155:19,24 156:4
158:9 201:5,8
227:25 228:3,5,8
268:1,2,5 324:19
324:24 336:7,11
**recorded** 77:24
78:18 109:14
**records** 34:9,13
35:8 54:17,19
62:16 74:7,20
75:25 80:18 280:7
280:10
**recurring** 206:13
**recycling** 131:10
**reducing** 177:17
224:24
**refer** 22:19,20
**referenced** 343:9
**referral** 262:21
**referred** 127:23
**referring** 33:23
246:2,3 262:14
266:6,8 332:17,19
**reflected** 61:2
204:2 220:9
**reflecting** 107:7
112:16 137:21
296:25
**refrain** 128:18
130:13

**refresh** 37:19 221:1
**refreshes** 236:9
**regard** 128:19
129:3 343:14
**regarding** 85:7
265:3 305:20
322:13
**reggie** 102:19
103:4
**regina** 104:12,24
**registration** 51:3
51:16 341:21
342:21
**regroup** 323:24
**regular** 170:21
171:4,11 180:4
184:17 185:10
189:25 193:6
194:12 195:10
196:4,5,9 197:23
202:1,4,10 203:19
207:14,15 218:14
337:6
**regulations** 125:24
128:23 136:13
**relate** 125:4
**related** 76:14 78:11
78:24 79:24 87:4,7
105:1 177:2 227:9
262:10 271:25
283:12 341:9
**relates** 319:12
**relating** 136:21
284:17
**relationship** 100:15
220:7 313:8,11,16
**relevance** 142:11
**relevant** 289:14,16
290:13,14,21
322:16

**relied** 310:8,9
**rely** 308:20
**remediation** 6:21
165:10 166:22
**remels** 4:20
**remember** 21:7,19
23:11 24:11,22
46:7 54:2 65:24
66:1 68:16,21,25
82:15,18 83:12
97:2 105:14 112:13
144:10 163:16
164:12 167:15
173:18 216:16
219:23 220:1,2
232:21 235:16
236:3,5,7 243:2
251:7,8,15,15
275:23 286:4,5,8
286:10 303:2,11
304:4 320:25 325:4
325:5,23,24 334:1
334:2
**remembered**
275:15 325:2
**remembers** 320:22
**remit** 293:20
295:10
**remitted** 294:6
297:16
**remodel** 8:19 308:3
**removal** 133:5
**remove** 30:10
245:22 249:19
**removed** 34:3
**removing** 168:9
249:11
**rendered** 13:15
72:15
**renovation** 225:18

**rent** 211:16
**rentals** 1:9 326:13
340:9
**rep** 10:16,20 245:9
**rep's** 243:23
**repair** 71:12,13
**repairs** 192:16
235:12 243:11,13
**repeat** 12:16 28:6
38:4 41:1 73:14
139:25 175:18
214:9 269:3 278:17
281:20 289:4 290:7
296:12 308:17,17
**repeated** 200:3
**rephrase** 175:13,15
180:14 271:19,20
284:10 327:10
**replace** 177:23,24
258:14
**replacing** 177:20
**report** 8:18 50:10
51:16 207:9,21
242:13 249:6 250:3
251:2,19 252:18,25
254:15 293:24
294:2,5,10,13,15
294:19 295:21
297:12
**reported** 2:7
**reporter** 9:24 25:6
40:23 75:8 96:19
138:20 241:3 255:5
336:15
**reporter's** 6:10
340:15
**reports** 35:15,18,22
38:11 43:7 45:20
46:16
**represent** 9:5
284:21 326:11

330:6
**representation**
248:7
**representative** 11:1
28:18 243:20
246:19 270:10
**representatives**
244:5 249:19
**reps** 11:20
**request** 27:18,19
27:22 34:16 58:7
64:15 288:24 289:8
291:5 329:4 331:6
**requested** 62:13
75:9 87:12,12
89:22 170:5 206:22
218:16 297:5,7
340:24 341:6
**requesting** 200:20
262:22
**requests** 287:24
**require** 174:22
334:18
**required** 27:13
28:2 89:14 161:2
**requirement** 20:19
28:11 92:21 121:9
217:21,22
**requirements**
19:18 20:20 26:23
27:23,24 64:16
91:17 92:4 125:23
131:25 132:14
134:22 298:13
334:17
**requires** 308:24
**requisition** 6:19
8:4 162:17 225:17
226:3
**research** 52:13
278:15,19 299:10

| | | | |
|---|---|---|---|
| 299:13,16 | **result** 23:1 65:2 | 34:4 35:25 36:5,6,9 | 123:5,8,11,15,17 |
| **resend** 245:21 | 328:18 | 36:12,17 37:6,9,13 | 124:1,8,10,13,18 |
| **reserve** 277:3 | **results** 299:15 | 37:23 38:25 39:5 | 126:10,19,22,23 |
| **residence** 66:25 | **retain** 72:15 | 39:11,15,20 40:10 | 127:1,5,8,9,10,24 |
| 69:16,17 | **retention** 232:9 | 40:20,25 41:4 | 128:2,14 129:12 |
| **residing** 280:5 | 234:20 262:12 | 43:22 44:8 46:11 | 130:7,16 131:5 |
| **resisting** 244:18 | **return** 205:20 | 46:19 47:25 48:10 | 132:5,19,23,24 |
| **resource** 99:12 | **returned** 341:1,3 | 49:9,21 50:6,12,24 | 133:11,12 134:1 |
| 162:23 | 342:11 | 51:1,5,7,8,11,20,21 | 135:9 136:2,14,15 |
| **respect** 266:6 | **returns** 15:3 36:1,3 | 51:23 52:6,8,9 | 137:13 138:2 140:3 |
| **respective** 2:8 | **revealing** 291:10 | 53:15,21,25 54:12 | 140:8,17 141:16 |
| **respond** 234:12 | **revenue** 183:13,20 | 54:13,21 56:1,5,9 | 142:7,10 143:3 |
| 239:7 241:15,20 | 267:2,8 321:13 | 56:20 57:2,5,7,16 | 144:25 145:3,14 |
| 244:21 | **revenues** 182:23 | 57:18,21,25 58:23 | 146:10,12 147:4 |
| **responds** 240:8 | 183:7 | 58:25 59:5,8,11,13 | 149:8 150:4,23,24 |
| **response** 33:17 | **review** 151:18 | 60:13 64:9,13,21 | 151:2,5,19,20 |
| 34:1 44:7,17,21 | 155:7 156:7 287:23 | 65:17 67:2 68:5,7 | 152:23 153:1 |
| 106:25 112:15 | 288:22 289:6 291:7 | 70:25 71:1,3,6,20 | 154:15,19 155:4,6 |
| 142:22 262:13 | 342:7 343:10,11,12 | 72:9,12 73:20 74:1 | 155:22 156:6,10,20 |
| 264:4 331:10 | **reviewed** 33:7 | 74:18 75:4,15 | 157:1,6,10,13,23 |
| **responses** 6:24 | 106:21 120:19 | 76:16,18,19,22 | 157:24 158:4,7,15 |
| 32:12,17 33:4,8,11 | **reviewing** 156:11 | 77:11,22,25 78:6,9 | 158:16,22,23 159:5 |
| 60:15 113:17,18 | **revised** 252:18 | 78:17,19 82:2,23 | 159:8,9,10,11,18 |
| 120:18 | **revisit** 319:24 | 83:12 84:6 85:15 | 160:11,12 161:1 |
| **responsibilities** | **rhyme** 194:5 | 85:18 88:6 89:5,5,6 | 162:4,5,7,21 |
| 177:19 245:10 | **rice** 3:13 9:18 | 89:8,21 90:5 91:11 | 163:25 164:6,8,9 |
| **responsibility** | **rid** 49:13 | 91:14 95:2,6,8,11 | 165:8,15,17,18 |
| 180:19,19 244:3 | **rigging** 90:14,19 | 96:25 97:14,15 | 166:7,12,14,20 |
| 291:21 | 137:13 215:6,22 | 100:1,6 102:14,25 | 167:8,16,19 169:1 |
| **responsible** 18:19 | **right** 9:13 12:6,9 | 103:4,11,20 104:5 | 169:12 170:7,9,11 |
| 168:8 232:1 243:24 | 12:25 13:6 14:1,15 | 104:19 105:13,22 | 170:14,16,18,23 |
| 257:7 309:13,16,24 | 15:1,4,16,21 16:2 | 106:22,22 107:25 | 171:2,8,12,14,16 |
| 309:25 | 17:9,14,25 18:10 | 108:15 109:9 | 174:17 177:5 180:5 |
| **responsive** 287:24 | 18:14,20 19:10 | 110:13,16 111:7,22 | 180:6,25 182:4 |
| 288:24 289:7,8 | 20:21,24 21:2,8 | 112:17 113:14,25 | 183:23 185:10 |
| 291:4,5 | 22:8 24:12 25:4,12 | 114:6,19 116:4,8 | 186:12 187:7,12,22 |
| **rest** 132:25 236:25 | 25:22 27:21 29:12 | 116:11,12,13,14,24 | 188:9,13,17 189:2 |
| **restrictions** 136:24 | 29:15,18 30:5,22 | 117:12,16 118:3,7 | 189:8,15,18,22,25 |
| **restroom** 8:19 | 30:25 31:3,20 32:3 | 118:10,13 119:2,19 | 190:1,7 193:7,14 |
| **restrooms** 125:4 | 32:11,13,14 33:5,6 | 120:5,11,22 121:11 | 193:18 194:13,17 |
| 157:17 | 33:20,21,24,25 | 122:13,21,25 123:3 | 194:18,22 195:11 |

195:18,19,20 196:5
196:6,10,14 197:8
197:9,12,14,17,18
197:22 199:9,20,24
200:21 202:11,17
202:18,19,20,25
203:8,13,20,21,22
203:23 204:6,7,12
204:13,17,21 205:1
206:4,7 207:1,4,7,8
207:11 208:10,13
208:14,23 209:11
211:8,9 212:3,13
212:21,24,25 213:6
213:8,20,20 214:2
214:6,12,13 216:20
217:10 219:4
220:24,25 221:14
221:23,24 222:16
222:17 223:2,3,5,6
223:19,22,23,25
224:18 225:13
226:3,5,7,8,10,12
227:24 228:24
229:8,24 230:6
232:21 236:8,21,24
241:14,24 242:3,5
242:9,16,21,24,25
244:12,20 246:16
247:19 248:9
249:16 250:23
251:16 253:13
254:3,11 255:8,18
255:25 256:11,19
256:25 257:6 262:4
263:17,21,24
266:14 267:19
268:8,13,21 270:8
270:11,20,25 273:8
273:24 274:1,6,10
275:5,11,13,13,16

277:2,3,6 279:1
280:20 286:3 287:5
287:20 288:8
289:20 292:5 293:6
293:18,25 294:3,16
294:18 295:4,6,12
295:19,21,23,24
296:8,16,19 297:11
298:7,22 299:5,25
300:8 301:8,12,16
302:7,13 303:9,16
304:5 305:18
306:25 308:16
309:20 310:20
311:19 312:12
313:8 314:11
316:16 318:3,22
321:8,19 322:5,9
323:21 324:10,11
324:17,18 325:25
333:21 335:6,22,24
336:5
**ripped** 168:11
**risk** 173:6,16,16
181:15 184:21
185:14 244:9
**road** 173:24
**roadside** 256:6
**rob** 29:9
**robbing** 29:4,17
**roberto** 114:20
115:11 116:18,21
117:12,19,23
119:13
**rock** 92:25
**rodriguez** 279:9
**room** 9:7 272:18,23
275:25,25 276:1,2
327:3
**root** 307:21

**rough** 103:16 312:7
312:8 336:17,21
337:7
**roughed** 336:23
**roughly** 44:16 48:8
**round** 192:1,1,5,23
198:6
**rounded** 192:2
**rounding** 192:2,7
193:16,24 199:21
**route** 243:8
**routes** 131:24
**roy** 257:21,25
258:2,7,8,11
**rudolph** 1:7 340:7
**rule** 89:17 142:18
340:23 343:24,25
**rules** 2:9 20:11,11
64:6 343:14
**ruling** 291:24
**running** 267:24
**rushed** 336:23
**rusty** 306:4

**s**

**s** 3:1,20 4:1 5:1
104:21,22 165:25
279:5
**safe** 35:1 173:20
**safeco** 175:24
**safety** 125:25
131:12,22 134:21
334:11
**salary** 21:18 24:21
319:1
**sale** 121:20
**sales** 54:9 55:14
136:23 293:16,17
293:20 294:25
295:9,10 296:7,16
296:18,22,23,25
297:15,25 298:9,11

298:14
**sam** 9:18 84:20
86:12,14,17,22,24
87:4,9 97:1,9
159:22 160:23
161:8 218:4 336:13
**samples** 255:12
**samsung** 282:9
**samuel** 3:9
**samuel.sharp** 3:11
**san** 62:14
**sandy** 324:3,6
336:2
**sanford** 4:19 9:9
326:9
**satisfy** 125:23
**save** 52:12 135:13
138:13 238:7
**savvy** 282:20
**saw** 42:20 45:5
70:3 73:8,10
181:18 204:17
213:12 223:17
236:4,5 256:10
257:18 263:1 302:2
**saying** 27:24 69:19
82:13 195:5 208:2
208:6 244:6 246:8
261:4 268:16
271:23 314:22
**says** 18:6,12 32:23
51:3,25 54:22,24
55:14 116:15,18
117:11,12,23,24
125:21 128:13,17
129:19,22 130:23
131:7,15 132:20
133:1 135:2 136:9
136:11,19 140:4
141:4 143:12,14,18
145:16 152:25

158:12 159:20
161:8 164:1 193:10
204:21,24 218:17
218:19 219:19
220:6 221:16,20,20
221:25 222:15,16
222:20 224:6
228:19 240:9
242:12 244:4,5,14
249:5 262:7 268:18
268:20 295:3,7
297:13 298:4 304:6
332:9,16,21 334:5
334:6,13
**scaffoldings** 210:17
308:9
**schedule** 337:7
**scheme** 312:10
**schools** 307:19
**scope** 93:9 94:12
188:17 224:13,20
224:24 245:3,11
**screen** 16:2,14
17:23 30:25 32:7
47:17 49:10,22,23
49:24 50:20 52:16
54:3,4,6 106:11
113:19 124:19
136:18 140:3 143:4
143:12 145:5
147:25 149:1,2
156:11 157:15
158:25 159:1
162:13 196:17
201:13 208:15,21
228:13 246:23
253:19 268:9,19
270:14,21 294:4
298:23 331:4,4,18
**screwed** 172:15

**scroll** 18:1 51:15
53:7,21 55:3 64:21
126:6 127:10
130:22 147:8
148:24 204:16
222:8 227:1 228:23
233:13 236:16
248:14 252:21
253:14 264:23,24
271:5
**scrolled** 54:8
133:21 255:7
**scrolling** 135:18
147:21 148:24
149:1 151:11
164:18 167:5 209:2
242:18 253:10
255:20 294:23
**sdmattorneys.com**
4:12
**se** 66:18 312:24
335:1
**seal** 339:19
**search** 284:22
287:22
**searched** 284:16
**searches** 284:18,19
**seated** 275:13
**seats** 63:16,16
**second** 9:19 16:9
16:11 117:7 128:9
140:9 164:18
193:25 196:12
202:4 203:1 228:22
237:19,25 238:3,23
239:7 269:9,10
316:24 332:15
**seconds** 333:18
**secret** 39:14 92:16
92:17

**secretive** 172:9
**section** 125:20
128:10,11 135:18
**see** 10:22 11:9
12:15,15 16:6,14
16:15,16 17:2,6,23
18:2,4 30:2,3,4
31:1,2 32:9 36:21
42:5,11 45:1,2,20
47:18 49:25 50:11
50:14,15,19,21
51:16,18 52:6,16
53:13,22 54:3,3,4,5
54:11 55:7,12,16
60:19 61:19,25
65:4,5 70:4 73:11
73:12,17,19,22
79:8 84:3 86:2
102:2 106:2,14,15
110:7 111:23
113:22 114:12
115:5 116:6,13,15
117:9,22,25 118:1
122:23 125:12,18
125:20 126:2,14
127:13,18 128:6,11
128:24 130:1,3
131:1,17 133:7
136:9 137:1,2
141:1 143:16,19,25
145:19,20,25 146:1
147:10 149:17,23
150:5 152:19
157:19 159:1,20
161:8 162:12,19,21
162:25 164:4,19,21
164:24 165:2,3,4,9
165:12 166:24
177:18 189:12
190:11,19 193:5,11
193:12,25 195:1,2

195:5,7,8 196:2,3
196:16,18 197:25
198:1,13 201:13,23
201:25 202:2,6,16
202:24,25 203:7,17
203:18 204:21
205:4 206:5 208:20
209:16 212:7,8,9
212:12,13,16,17,23
213:7 216:3,4
218:7,8,17 219:4
220:4,5 221:18,20
222:4,15,20,23
225:19,21,24,25
226:11,13,15,24
228:11,14,15,17,19
229:21 233:2,5,8
233:11,12,13,16,23
233:24 236:16,25
237:2,12,16,17,17
242:14,15 244:13
244:19,20 245:2
247:5,6,21 249:7,8
249:22 250:5,6,20
250:22 252:19,20
253:2,3,21 254:4
254:17,18 255:14
255:15 256:7,8
258:21 259:8,16
261:2,16,23 263:3
268:10,19,21
270:23 273:4
291:16 294:21
295:1,3 296:4,17
297:8,18,19 310:25
313:21 317:18
321:9 323:25
325:11 332:12
**seeing** 112:13
194:10 199:10
228:18 331:3,4,17

**seek** 291:21
**seeking** 88:22
  177:18
**seen** 17:9 46:15
  58:24 163:18,21
  214:22 227:16
  231:9 243:17
  270:17 272:14
  333:6
**select** 290:24
**selected** 261:11
**self** 308:23 309:6
**sell** 47:14 49:17,18
  59:24 60:3
**selling** 60:5
**send** 23:20 25:11
  25:14 59:6 88:5,8
  107:17 146:23
  147:1,23 161:20,25
  166:17 177:14
  193:3,20 206:16,22
  217:22 219:14
  263:4 269:14,15
**sending** 11:5 59:4
  64:25 71:5 119:18
  161:21 162:1 172:5
  206:15 238:2
**sends** 218:13
**senior** 153:10
**sense** 10:14 46:22
  119:2,6 184:3,4
  187:2
**sensitive** 172:9
**sent** 32:18 96:16
  146:13 148:15
  190:15 207:3
  221:13,15 223:4
  237:14 240:9 246:7
  265:20 289:25
  332:10,16 333:9

**sentence** 292:15,22
**separate** 74:13
  78:2,4
**september** 70:25
  124:4
**series** 321:25
**serious** 172:13
  316:2
**served** 231:5,8
  340:19
**service** 13:15 72:11
  262:9 277:10
  278:20
**services** 72:15
  79:17 114:23
  124:22 125:15
  165:10 166:22
  172:24 209:14
  244:16 262:3 277:8
  278:13 333:23
**set** 16:7 32:13 33:4
  50:7 60:16 116:4
  189:5 210:6 224:21
  234:17 282:17
**settle** 329:11
**setup** 250:18
**seven** 10:18 30:20
  57:5 172:25 189:24
  198:24 201:1
  215:12 327:2
**shaffer** 272:20
  273:12 329:3,4
**share** 11:7 16:13
  30:25 47:17 49:23
  124:19 157:15
  230:8,9 307:2
**shareholder** 319:14
**shareholders**
  306:19 307:1 319:2
**sharp** 3:9 9:18
  121:16 294:14

336:15
**shawn** 193:13
**she'll** 193:19
**shifted** 266:22
**shipping** 252:25
  254:16 255:13
**shit** 316:1
**shocked** 84:9 325:8
**shop** 168:7
**shopping** 53:5
**short** 198:17
**shorthand** 2:7
**shot** 305:8
**show** 32:3 34:10
  37:16 52:10 54:17
  60:25 61:19,25
  62:1,9 82:25 83:4
  106:8 116:2 124:18
  135:12 138:21
  139:13 162:7
  166:20 189:8,9
  190:10 199:21
  201:12 202:9 203:9
  217:25 219:16
  222:3 225:16
  232:25 236:8,12,25
  242:8 246:22,23
  247:1 248:4 253:22
  261:15 316:13
  333:21
**showed** 34:19 85:6
  85:22 151:8 243:10
  243:15 314:2
**showing** 17:5 37:18
  203:10 210:1
  238:21 249:3
  251:16 264:19
  294:19 298:18
**shown** 198:16
  243:16 340:20

**shows** 35:23 51:22
  54:9 210:3
**shutting** 215:10
**sic** 11:19 33:9
  140:23 143:15
  231:16 255:24
  295:9
**side** 132:2 184:21
  279:11 326:25
**sidebar** 28:4,14
  36:25
**sign** 23:14 127:15
  131:25 166:11
  337:4 342:9 343:11
  343:11
**signarama** 94:6
**signature** 6:9 23:17
  23:17 32:21,24
  86:16 126:11,16
  131:3 153:10
  157:22,25 159:23
  159:24,25 160:13
  165:6,7,24 166:1,6
  338:1 339:2 340:23
  341:1,4,18 342:11
  342:18 343:22
**signed** 86:16 126:5
  126:21 132:3 133:1
  133:25 135:11
  158:5,6 159:21
  166:16 334:4,20
**significant** 310:19
**significantly** 171:7
**signing** 23:18
  343:21
**similar** 135:10,15
  145:15 240:20
  321:12
**simultaneous** 50:16
**simultaneously**
  145:9

**sincerely** 343:17
**single** 66:20
**sir** 113:4,24 124:2
  159:2 162:14,16
  163:5 164:23
  170:12,15,17,19
  343:8
**sirmag** 330:19,23
**sister** 80:5,8 82:16
  82:19 84:17 87:4
**sit** 216:24
**site** 11:7 177:12
  178:4 183:15
**sits** 129:11
**sitting** 168:21
  320:5
**situation** 235:20
**six** 30:19 47:21
  48:8,10 140:18,22
  183:8 198:23
  215:12 327:2
**size** 153:25 185:12
  185:15
**sized** 185:3
**skip** 249:1 306:16
**skipped** 248:15
  249:24
**skipping** 262:19
**sleep** 199:18
**slight** 186:25
**slightly** 58:1 91:16
  186:25 187:1 302:8
**slope** 256:6
**slow** 183:15 265:8
  265:11,12,15,15,18
  265:20,21,23,25
  266:1,2,5,9,13,14
  266:21 268:12,24
**slower** 147:16
**small** 180:24
  186:24 268:22

**smith** 3:14
**snapshot** 196:23
**soc** 127:23 128:3
**society** 230:15,16
  231:15
**software** 80:14
**soil** 255:12
**sold** 57:22,24 58:22
  60:1,4,7,7
**sole** 74:14 319:14
**solicit** 186:9
**solutions** 1:11 5:2
  9:12 100:10,11
  190:16 201:20
  229:6 237:9 238:23
  240:19 330:6,17
  331:24 332:3 333:5
  340:11 341:20
  342:20
**somebody** 129:14
  129:23 130:4 168:6
  172:1 189:5 206:21
  211:16 246:7
  291:14
**someone's** 196:23
**son** 323:11,14
  325:6
**soon** 11:25 45:12
**sorry** 30:21 41:23
  49:23 85:18 96:19
  97:20 136:16
  142:15,19 148:25
  150:11 154:13
  176:16 207:14
  217:11 227:18
  247:12 255:3
  274:14 300:11
  308:13
**sort** 209:25 328:3
**soto** 3:4 9:15

**sound** 128:22
  158:15,22 160:11
**sounds** 37:9 158:23
  160:12
**sources** 162:22
**southeast** 3:20
**southern** 1:1 340:1
**space** 131:24
**spanning** 123:4
  292:9
**speak** 84:5 198:19
  256:20 333:8
**speaking** 171:2
  259:13
**speaks** 335:8
**special** 308:23
**specialized** 179:11
**specializes** 210:17
**specializing** 232:8
**specialty** 239:13
**specific** 37:15,18
  81:20 187:8 328:20
**specifically** 75:20
  75:23 84:15 104:13
  131:21
**specifics** 314:16
  321:10
**specified** 196:25
**specify** 219:13
**speculate** 21:20,21
  43:1,20 239:3
  246:6 299:8 328:24
**speculating** 142:18
  312:15
**speculation** 43:17
  96:6
**speed** 131:23
**spell** 26:4
**spelled** 159:4
**spend** 11:8 117:23
  118:2

**spending** 62:7,10
  65:2
**spent** 77:13
**spike** 183:16
**spoke** 84:21,25
  97:13 100:5 103:4
  234:16 237:8 264:8
  264:9 276:2
**spoken** 237:7 269:9
  286:17 330:9
**sporadically** 107:3
**spot** 162:23 163:2,6
  163:9
**st** 271:17,22
**stable** 182:3
**stack** 42:11
**staff** 103:16 211:13
**stairwell** 251:20
**stamping** 213:19
**standard** 127:24
  133:14,20 134:19
  135:14 241:18,18
  334:21
**standards** 125:24
  127:21 128:4
  130:12 131:10
  132:4,17,22 134:11
  134:23 135:12,19
  135:20 136:8
  137:10 333:24
**starbucks** 140:19
  140:23 141:1,2
**start** 18:6 128:2
  183:5,6,19 184:16
  192:12 237:3 242:9
  242:16 245:12
  260:4 265:16 273:7
**started** 31:11,15,23
  42:12,20 101:23
  102:1 122:11,14,15
  126:25 127:4

258:14 260:25
261:3 279:18
**starting** 31:25,25
122:12 306:25
307:17
**starts** 107:1 147:7
242:10
**state** 2:6 125:25
178:3 293:21
296:24 297:1,17
298:2,10 339:9,24
342:1
**stated** 2:10 33:10
**statement** 36:23
129:1,8,13 293:25
297:23 342:9
**statements** 115:4
118:21
**states** 1:1 33:10
60:21 295:7 340:1
**statute** 296:2
343:14
**stay** 20:7,25 25:15
26:15 39:17 41:6
72:10 120:23 264:2
**staying** 70:17 121:3
**steel** 129:16
**stenographer**
12:17 227:18 228:2
241:6 336:8,20,24
337:10
**stephanie** 3:13 9:18
**stephanie.rice** 3:16
**stephens** 4:9,9 9:7
274:6 285:17,19
286:1,21 326:23
**steps** 11:4 281:13
281:22,24 284:24
285:5,8 287:21
290:4

**stick** 43:22 134:21
235:8 243:20
**stipulations** 336:11
**stock** 292:1
**stoner** 3:19 9:19
**stop** 37:23 47:17
64:25 71:4 92:24
149:16 191:16
236:18,21 250:14
285:13,15,22 287:3
294:9
**stopped** 71:2,5
111:11,13,14,17
261:13 285:10
287:2,4
**stopping** 112:22
**storage** 277:7
**store** 227:14,15
282:18 323:12,15
325:10
**stored** 287:23
**straight** 17:22
292:15,22
**strange** 27:19
90:10 304:6
**strategy** 62:4
**street** 3:10,14
341:21 342:21
**strictly** 94:11
**strike** 76:5 217:11
**strive** 229:24
**strong** 235:19
244:25 310:17
**structural** 235:5,6
235:22 242:12
243:21 244:15
246:14 249:6 252:7
252:24 254:15
309:3
**structure** 306:19
306:23,24

**study** 236:3,14
238:6
**stuff** 43:13 213:23
234:20 272:8
274:18 309:5 313:1
323:17,19
**styled** 2:3
**sub** 172:1 308:24
**subcontracted**
170:14 177:11
**subcontractor**
167:2
**subcontractors**
172:20,23 175:7
186:9 211:8,10,22
308:21 309:14,24
310:1,3,7,15
334:14
**subheading** 128:16
**subject** 133:4 218:5
233:19,20 250:2
255:11 256:4 261:7
261:21 334:7 335:4
335:14,15
**submission** 301:20
**submissions** 301:14
**submit** 92:10
146:24 147:2 161:5
170:3 177:1 187:15
217:10,12 240:17
269:20 270:1 306:8
306:12
**submitted** 90:6
98:12 156:19,24,25
157:5 160:6 162:5
188:23 211:19
270:3 333:5
**submitting** 135:21
137:4 160:17
**subpoenaed** 105:2

**subscribed** 339:16
342:13
**subsidiaries** 306:21
**substance** 342:8
**substantiate** 217:7
**subtracting** 192:12
**sudhakar** 41:8,21
41:25 230:11,12
234:6,16,18 237:13
243:16,18 249:4
250:1 252:23
255:10 256:2 263:5
264:11 265:2,6
269:10 284:7,14,17
302:15 303:16
305:21 306:7,11
323:7,16 325:8,12
**sudhakar's** 42:11
**sued** 47:5 81:7
82:21 84:12,16,24
101:12,12,15 103:9
105:9 172:6 178:19
281:10,23
**suggest** 22:21
**suggested** 162:22
343:12
**suggesting** 322:6
**suitcase** 26:9,13
49:4
**suite** 3:5,15,21 4:5
4:10,15,21 272:15
341:22 342:22
343:4
**suites** 272:19
**sum** 127:12 329:5
**super** 51:7
**superimposed**
16:24 17:1
**supervised** 173:7
**supervisor** 27:6
39:19 92:10

**supplemental** 6:23
32:12 33:3,8,11
52:25 60:15
**supplied** 101:11
172:17 180:7 181:7
**supplier** 129:3
**suppliers** 128:19
128:20,23 130:14
134:24
**supply** 100:18
**supplying** 100:25
101:1,1,2,3 180:6
**support** 199:11
212:4,9 214:6,15
214:23 250:4 251:2
252:4
**supports** 251:9
**supposed** 129:16
164:16 178:15
**sure** 10:4 11:11
25:7 30:16,23
35:21 36:2,15
38:23 46:8,12 47:3
53:17 78:4 80:21
86:2 89:10 91:15
105:7 111:3 118:4
119:1 139:22
142:10 144:3,4,6,9
144:24,25 145:2
146:5 151:9,17
152:16,17 154:14
161:11 166:3
167:11 169:15,18
172:5 176:3,24
186:1 188:10 193:2
213:19 218:11,13
238:13 253:22
258:16 259:25
263:8 279:17 282:5
286:25 287:2,18,19
287:19 295:19

301:18 302:5 312:9
318:10 321:24
327:11 328:24
**surgery** 317:3
**surprised** 84:9
90:13
**surrounding** 115:9
**susan** 104:6 105:7
**susan's** 104:7
**suspect** 41:18,20
42:17,23 43:2
**suspected** 41:24
**suspecting** 42:12
**suspicion** 42:1
**suspicions** 42:14
**sway** 235:6
**swear** 9:24
**switch** 164:22
**swore** 178:14
**sworn** 2:3 10:1
12:11,16,17,18,22
13:2 32:17 342:13
**synced** 336:18
337:8
**system** 109:12
277:18 278:5,7
279:16 280:3
282:15 288:15
**systems** 277:7,8
289:15

**t**

**tag** 131:22
**tail** 236:1
**take** 24:19 40:3
43:23 56:21 57:2
58:2,4 60:17 62:4,5
63:6 75:22 77:21
78:22 93:21 94:19
126:8 142:4,24
157:15 162:8
163:25 164:14

168:23 172:4,13
173:13 178:18,18
179:4 180:18 181:1
192:22 199:7
200:15,17,25,25
202:12 211:20
218:1 243:22 244:9
267:17,19 281:13
281:22,24 292:4
304:24 323:23
324:13
**taken** 2:3 11:4
44:23 57:11 76:10
113:9 156:1 201:6
228:6 268:3 284:24
285:6,8 287:21
290:4 324:21
341:11
**takes** 203:4 323:21
**talk** 10:9,23 50:16
72:20 84:20 93:2
101:17 102:3,7
103:1,7,9,12
131:22 170:7 176:6
227:25 230:10
260:2 263:5 264:11
273:14 277:6
285:21 298:23
306:3,22 319:18
321:9,23
**talked** 84:20
102:22,25 103:14
114:1 172:20,23
252:11 260:3 269:8
274:16 275:2 303:7
305:24 306:2
**talking** 23:5 50:12
51:13 53:24 55:5
86:4 92:19,20 93:4
101:24 106:18
113:15 129:12

143:11 179:10
182:16,17,19,25
183:1,3 184:6
187:3,3,4 215:24
223:7 251:21 252:6
252:10 259:14
268:10 275:24
282:24 302:21
313:3
**talks** 128:11
**tanglewilde** 4:10
**target** 184:11,24
185:11,23 221:3,5
327:5
**tax** 24:20 36:1,3
190:5 199:23
204:12 293:20
295:9 296:24
297:15 298:1,9,11
298:15
**taxable** 55:20
**taxes** 24:15 293:16
293:17 294:25
295:10,11 296:3,7
296:16,18,22,25
**team** 121:14 139:7
210:21 211:2,2
247:15 273:10
**tear** 164:14 168:7
**technical** 238:19
**technology** 136:25
**telephone** 322:10
**telios** 211:5,7 212:9
212:18,22,24 214:3
214:11 215:3 216:7
216:15 217:1
**tell** 13:10 14:2
25:17 30:24 37:1
38:11 39:10,13,16
41:20 46:10 47:12
47:19 48:20 49:11

**[tell - thought]**

55:5 61:18 62:20
65:8,19 81:10,13
83:13,22 84:15
85:2,10,12,14,20
86:14 87:23 90:23
93:5 97:16,19,22
98:8 99:22 101:6
101:19 102:6 104:4
105:3 107:11,23
108:21 109:19
137:3 139:15 147:9
148:17 154:5,6,7,9
155:13 166:10
171:20 184:17
209:2,18 219:11
220:13 221:4,6
230:24 235:10
236:18 241:17
243:4 245:21
250:14,16 252:12
253:6 258:25 259:2
259:7,10,15 260:9
260:11,12,21
262:24 265:17
270:5 275:7 276:6
276:11 279:25
282:1 285:5 287:10
288:22 299:2,15
305:5 306:23 311:2
311:18 312:2,8
313:11 314:1,1,7
314:11,14,17,20
315:11,24 316:8,17
317:9 320:21 325:3
327:8,12,16 328:6
**telling** 39:22 76:20
98:3,10 112:19
130:9 141:6 176:22
191:20,23 239:11
243:22 246:12,15
260:16 268:11

286:21 293:1
**template** 93:13
98:25 99:1
**ten** 38:13,17 57:3
73:6 98:15 272:22
**term** 74:16 90:14
90:16 310:10
**terminated** 71:2,6
124:13,15 281:3
313:24
**termination** 70:24
314:12
**terms** 117:18
**territories** 136:24
**testified** 12:22 41:3
162:4
**testify** 13:2 81:22
82:13 289:10 299:6
**testifying** 37:21
**testimony** 10:21
13:5 20:21 153:21
153:22,24 330:7
**texas** 1:1 2:6 3:15
4:6,11,16,21 5:5
54:21,22 55:4
293:22 296:24
297:1,17 298:2,10
298:12 340:1
341:19,22 342:1,19
342:22 343:4
**text** 247:24 248:4
250:19 253:15
277:8,12 282:1,4
282:24 283:10
285:23 304:5,17
330:13
**texted** 282:3,6
283:1,8 304:8
**texting** 282:5 305:1
**thank** 9:23 12:5
46:4 52:21 67:17

67:19 136:18
142:11 145:13
150:8 241:6,13
262:21 294:16
301:4 326:2,3,6,6
331:20 333:11
336:1 337:2,10
**thanks** 201:3
264:16
**theft** 29:24
**theirs** 148:6,7
**thing** 10:9 15:16,21
16:17 43:12 45:17
46:11,12 63:14
83:9,11 97:21
103:18 123:22
157:12 193:12
196:2 203:2 206:13
208:25 210:4,13
211:4,19 215:13
223:9 239:13
241:18 244:1
249:15 333:15
**things** 10:2 12:2
15:23 106:20 132:2
143:1 148:14
171:19 181:8
183:15 186:12,18
193:21 232:10
238:22 281:18
308:23 312:11
**think** 10:19 20:15
21:7,21 30:15,16
32:23 34:15 35:20
39:22 40:9 45:11
48:1,12 50:13 52:3
53:17 56:10 66:14
69:1 72:3 79:23
86:25 88:3 89:17
90:8 94:24 95:21
95:25 96:9,12,13

96:14 103:6,8,9
108:21 118:23
120:25 124:15
131:25 139:9,10
140:12 141:7
152:20 158:17
167:10 171:5
176:13 181:22
182:22 183:11
185:17 192:4,20
199:4 206:20
207:20 214:22
230:13 234:2,16
244:2 247:20
250:18 251:23
257:9,12 261:12
264:9 273:10
276:17 278:4
279:24 280:8 286:6
286:7,20 287:4
289:24 292:17,23
303:13,24 304:1,2
305:24 310:20
311:21 312:13
316:2 318:11,20,22
319:23 320:2 322:2
329:13 330:7
333:17 336:2,12
**thinking** 75:2
89:20 101:16
129:23 130:4
199:18
**third** 157:21
**thought** 19:24
27:12 29:22 56:6
57:2 62:5 89:12
90:10,12 96:4,5,6,7
96:8 127:2 137:21
189:4 259:13 286:8
303:7 305:6 308:14
335:20

**thousand** 121:24
**thousands** 10:12
  71:19 119:6 120:4
  121:21 137:23
**threatened** 64:25
**threats** 315:8
**three** 49:14 73:4
  88:12 99:21 103:21
  110:22 118:19
  154:23 167:23
  183:14 196:8 226:2
  226:14 232:4
  234:15,17 235:13
  238:10 260:16
  311:7 323:24
**threw** 264:10
**throckmorton**
  341:21 342:21
**throw** 186:19
**throwing** 205:3
**tic** 6:16,20 7:6,9,21
  7:23,25 8:5,7 33:22
  36:16,20,20 37:6
  38:7 39:11,13,17
  39:17,20,22 40:1
  41:5,6 52:20 53:22
  54:9 55:3 64:5,8,25
  66:24 67:2 77:5
  85:1 91:20,24 92:3
  92:7,24 100:20
  101:4 115:2 119:18
  120:4,16,17 121:9
  122:13 123:8 124:7
  143:22 147:7
  148:19 149:6 152:9
  152:22 160:6 161:3
  162:15 170:9
  171:10 191:9
  217:12,18 218:3
  220:7 221:7,21
  229:4 243:23 269:2

269:7,12 270:3,6
271:13 275:11
281:4,8 287:8
293:17,21 295:8
297:1,15 298:1,9
298:11,24 299:3
300:3 301:5,12,16
301:19,24,25 302:4
302:9 309:15 310:8
311:24,25 312:4,5
312:14 313:24
315:2,9 318:5,8
319:3 328:9,10
329:23
**tic's** 27:23,24 33:18
  40:24 41:2 67:1
  90:12 107:6 114:9
  116:4 120:22
  148:19 285:1,2,3
  287:24 288:24
  289:8 295:4 302:14
  305:20 310:4
  318:24
**tickets** 60:25 62:25
**tilt** 309:3 310:18
**time** 9:2 10:10 11:8
  20:4 22:6,7 23:5
  27:4 29:22 30:7
  31:10,13,14 37:13
  41:14 42:4 45:19
  49:14 51:1 52:1,2
  52:12 56:15 57:14
  59:3,10 62:7,10,11
  65:13,14,15,19,24
  68:16 69:2,11
  70:10,11 71:9 73:8
  73:10,19,22 75:5
  88:12 89:12 95:5
  96:8 101:16 103:8
  110:16,24 112:25
  113:12 120:2 123:4

123:7,12 124:6,16
126:25 127:7
129:10 135:13
141:11 142:4 144:8
144:14 154:25
155:3 156:4 170:21
171:11 172:25
173:3,4 178:17
180:4 181:20
182:18 183:11
185:3 189:2,25
194:10 195:10,25
196:4,5,9 197:23
200:15 201:9,21
202:9 205:24
207:14,15 216:17
218:9 226:13 228:5
228:9 229:17 232:6
232:24 233:25
255:1,22 263:19
265:13,15,20 267:6
267:23,24 268:6
269:5,5,9 275:7
280:24 282:19
291:25 292:9
299:21 302:18
303:3,6,14 312:16
316:24 320:22
324:24 326:1,4
327:4 333:18,22
336:19 337:7,8
**times** 38:7 72:17,19
  73:4,6 88:11
  108:11,12 135:15
  135:16 138:15
  167:24 177:23
  178:11 183:7,16
  188:8,10 194:17
  195:1,4 202:22
  225:1 231:9,10,22
  245:18 258:23

260:17 282:3 283:8
293:2 334:6
**timothy** 5:10 9:21
**title** 47:22 51:24
  55:10 219:18
**titled** 124:22
  236:14
**tmpe** 6:14 143:13
  143:23 145:18
**today** 9:2,17 11:10
  11:15,22 13:3,5
  25:25 26:2 28:1,9
  37:21 121:18
  122:19 137:20
  216:24 274:19
  278:16,21 302:3,11
  311:18 322:16
  326:1 330:8 331:2
  331:22 332:1
**tokyo** 224:25
**told** 20:3 35:16
  36:7 42:6 45:13,18
  45:22,24,24 46:17
  48:22 61:19,20
  62:23 64:7,8 79:15
  81:11,15 82:12,20
  82:22 83:15,20
  85:8 86:15 87:21
  89:22 93:1 97:4,18
  97:23 100:1 101:8
  101:9,11 104:25
  105:6,8 108:10
  115:13 117:17
  120:1 171:25
  188:18 192:5,5,13
  192:14,23,25 198:6
  199:15 219:14
  234:13,17 239:11
  239:20 240:5,6,6
  243:10,18 249:12
  249:19,20 263:2

273:3,4 281:18
285:11,14,22 287:3
290:10 304:10
305:8 314:4 317:11
317:17 323:8,9,10
323:14 325:6,7
**tomorrow**  11:16,19
12:1 319:24 331:15
**tonight**  324:7
**tools**  179:10
**top**  16:17 162:21
210:13 220:23
228:19 242:10
245:20 320:4,21
**topic**  82:13 271:6,6
271:7,12 273:24
275:2 277:3,7
283:12 284:23
287:5,6,20 291:15
292:7,11 293:9,15
299:11 300:19
302:13 304:22
305:19 306:6,15,18
309:12 310:6 313:6
313:8 318:3,4,12
322:9
**topics**  271:1,5
291:13 302:7,10
322:13,14 323:22
**tops**  277:17
**toshiba**  1:3 9:15,20
10:11,11 16:6
17:12 19:15,17,17
20:7,8,9,23 21:1
22:8 24:10 25:12
25:15,16 26:15,22
26:25 27:4,9 28:2
28:11,18 29:14,25
31:11,16 33:23
35:8 38:25 42:4
47:5 50:6 58:10

59:5,10 64:10
70:15,17,20,24
71:3,4,5,7,10,17
72:10,13,16 82:21
85:7,25 89:8,20
92:14,22 97:11
102:4 105:9,21
121:3 124:13
125:16 126:11
127:1,4,21 129:2,2
130:5,12,17,25
131:9 132:4 133:12
133:22 134:20,24
136:11 137:11,21
137:25 138:1
140:19,21 146:24
147:2 162:17
165:10 166:23
167:9 171:24
172:10 173:7
174:23 175:2,7
177:2,11,15 178:9
178:14 179:1,6,9
180:8,10,18 181:7
181:11,16 182:17
182:21 183:9 185:2
187:18 188:1,2,17
189:1,16 190:4,17
196:13,20 197:2,4
197:23 198:17
199:24 201:22
203:9 204:1,6,11
205:13,21 206:15
206:17,24 207:3,24
208:1 209:13,20
211:20 214:8,23
223:2 224:20
225:17 233:21
235:1,18 238:10,12
246:10 248:24
250:4 251:12

256:19 260:14
262:1 263:12,24
264:2 265:3,16
266:3,7,22,25
267:2,6,9 268:15
269:21 272:10,13
272:18,23,24 273:2
273:4,21,25 276:12
281:11,23 290:23
290:23 296:7,19
303:15,17 307:17
313:13 314:5,6
327:8,12,16,23
328:3,14,17 329:8
329:11 333:24
334:4,20,25 340:3
343:6
**toshiba's**  11:20
19:18 20:11 40:19
129:14 132:22
135:12,14 137:6,9
148:7 195:11
199:10 202:9 207:9
275:21 291:5
326:20,25 334:21
334:22
**total**  24:13,14
66:18 68:17 108:16
116:13 118:2 120:7
127:12 164:6
182:14,16,17 184:5
184:5,6 189:24
190:4,7 207:18
212:5,18 277:17
295:8 298:23 299:2
299:5,19,20 318:25
**totally**  335:16
**town**  163:18
**trace**  210:25
**tracing**  211:15
215:9

**track**  11:11 169:20
169:21 170:1
**tracking**  170:1
**trade**  54:24 55:1,18
**trades**  169:17
213:18
**trail**  96:1,16
**training**  213:17
216:10,15,20
**transactions**  74:21
128:21
**transcript**  10:6
12:15 336:17,18,21
336:23 340:17
341:2 342:6 343:7
343:11,13,15,21
**transfer**  23:8,12
48:20,22 49:11
51:24 52:1,3 58:20
282:20
**transferred**  47:22
48:2 51:23 53:4
56:11,15
**transferring**  74:14
**transformer**
209:23,23 210:3
238:16
**transformers**  181:6
**transition**  143:10
**transpired**  276:21
**transportation**
54:21,22
**traveled**  61:9
**treatment**  75:18
**tredennick**  4:14
**tried**  36:3 262:8
**trio**  310:17
**trip**  61:9,10,11,15
61:18,21 62:2,6,14
62:16,18,20,22
63:4,18,20,21

304:21,24
**triple** 224:19
**trips** 83:10 106:19
121:25
**trouble** 16:20
**truck** 7:5 47:14,19
47:20 48:2,7,13,14
48:15,17,21,22
49:7,11,13,16
50:11 51:6,12,20
51:22 52:5 53:3,4
53:16,23,24 54:18
55:1,5,10 56:1,10
56:10 57:20 58:19
58:22,24 59:2
83:11 121:20
**trucks** 49:14 53:6
53:10 59:25 257:5
308:11
**true** 33:11,14 36:19
36:24 81:13,15,17
119:20 171:9 182:6
207:6 256:20 307:4
339:3
**trust** 318:25
**trusted** 262:4
**truthful** 13:6
**try** 11:4,22 112:20
142:22 184:20
186:6 188:5 259:23
270:13 271:3
311:15 313:5 331:8
**trying** 16:12 72:3
74:19 103:6 141:7
149:23 150:5,14
164:22 185:24
187:2 188:24 191:5
220:12,13 221:3,4
221:4,5,7 225:25
243:8 269:2,6
285:21 314:13

**tucker** 60:24 70:4
122:9 304:9,14,16
304:25 305:3,22
**tune** 121:23
**turn** 33:16 171:10
210:24,25 215:11
285:18 322:1
**turned** 32:22
**turnkey** 100:24
168:12
**twice** 68:11 252:14
261:12 283:4
**two** 17:25 49:14
61:9 72:4 76:17
87:13,15,21 89:14
89:23 91:16 99:21
103:17 110:22
114:9 116:8 118:19
128:10,13 136:19
144:13 172:8,15
173:2 177:21 178:7
183:14 190:15
191:9 193:3 196:7
201:19 217:21
223:10 224:16,17
225:3 235:13
246:12 316:19
**tx.com** 4:7 343:5
**type** 71:13 99:2
229:11 232:7,11
280:17 292:21
307:18,23 329:9
**types** 135:11
**typical** 186:21,23
186:24 224:21,22
224:23,23
**typically** 168:6
184:19 186:2,23
206:16 210:11

**u**

**u** 159:5 279:5
**u.s.** 162:2 207:3
218:14
**uh** 103:15 104:9,11
125:11 263:7
**ultimately** 320:1
**unclear** 118:9
**uncomfortable**
19:10 27:14 58:9
90:9 160:21
**underlying** 322:14
**undermined**
137:25
**understand** 15:8
27:25 28:8,19
29:23 33:22 34:18
46:19 74:19 90:24
101:5 130:18,19
131:8 133:1,14
146:2 147:18
180:13 185:25
199:4,12 200:24
215:14 247:20
253:22 254:1 270:9
293:24 311:25
330:7 335:18,19
**understanding**
13:10 14:2 31:5
43:8,14 89:11,13
90:19 95:17,19,20
117:14 123:23
129:8 130:8,9,20
138:10 217:16
297:9 302:20
332:14,22
**understandings**
136:21
**understands** 43:19
**understood** 11:3
12:4,20 89:7,18

133:9 303:15
325:11
**unfinished** 318:11
**unhappy** 84:11,13
84:16
**united** 1:1 33:10
340:1
**universities** 307:22
**university** 231:2
**unreasonable**
40:10,12 56:4
295:12
**unrelated** 246:25
**upgrades** 157:17
**upload** 121:14
**uploaded** 11:7
**upped** 173:19
**upset** 84:2 85:24
86:2 315:20 317:23
**upwards** 183:12
**use** 78:22 80:14
93:17 97:25 98:21
100:19 119:22
155:3 185:15,23
211:14 219:9,12
236:3,14 245:8
277:22 282:4,15,22
283:2,14,14,16,19
284:3,6 289:13
296:24 310:9
317:10,24
**uses** 101:4

**v**

**v** 1:5 230:4 340:5
**v2v** 1:10 5:2 9:12
237:9 238:23
240:19 241:2,23
330:6,16 331:24
332:3 333:5,6
340:11

vacations  60:25
vaguely  125:8
  163:16 164:11
valuable  58:25
value  47:13 57:21
  57:25 58:1,20 59:2
  59:25 60:3,4
  121:20,25 122:4
  317:5,6,21
variable  181:6
variables  185:1
  187:13
varies  186:4
various  246:24
vary  185:12
vegas  61:9,16,20
  83:10
vehicle  50:10 51:9
  51:16
vehicles  52:14
vein  321:12
vemparala  1:10 5:2
  9:12 237:5,14
  330:6,10 340:10
vendor  39:23 40:8
  228:17 289:24,24
  290:2,3
vendors  40:4
  289:22,25
verbal  175:5
  286:13,15,16
verbally  175:4
verification  32:23
verified  6:23
veritext  341:20
  342:20
versed  238:11
versus  292:1
vetting  272:21
victor  193:5

video  9:3 57:9,14
  113:6,12 155:24
  156:4 201:5,9
  228:9 268:1,6
  324:19,24 336:6,18
  336:25 337:7
videoconference
  2:5 3:4 4:4
videographer  5:8
  9:1,23 57:9,13
  113:4,11 155:23
  156:3 201:4,8
  228:4,8 267:23,25
  268:5 324:18,23
  336:6,25 337:9
videotape  227:24
videotaped  1:17
  2:1
view  146:17 241:23
viewed  19:16 26:22
  28:17,17 40:1
vin  53:23 54:1,1,12
  55:6
vinh  230:3
vinod  1:10 5:2 9:12
  237:5 330:6,10
  340:10
violating  329:23
violation  133:4
  137:6
violence  315:8
virtually  9:18
visit  67:20,22 305:3
visits  177:12
volume  1:21 136:22
  288:1
voluntarily  274:10
  275:11
vp  165:24
vs  343:6

vyas  1:11 231:17
  261:21 263:1 265:2
  268:12 269:2,6,8
  340:11

|   w   |
|---|

w  17:25 18:6 23:15
  30:12,13,24 34:18
  34:19,20 35:16,21
  83:11
wages  18:13 24:16
  26:17,18 30:22
wait  243:6 254:5
waiting  11:8 143:5
  264:13
waive  343:11,20
waiver  343:20
walk  93:8
wall  235:22 309:3
  310:18
want  10:7 19:15,24
  20:25 21:19 25:15
  25:16 33:16 40:24
  41:2 45:14 46:2,15
  50:11 58:11,13,15
  60:17 61:25 62:24
  72:4 79:7 81:20
  83:3 92:25 94:19
  94:22,25 103:24
  106:25 108:1 111:2
  113:18 137:17
  143:10 147:9
  154:24,25 155:1
  171:1 176:8 185:24
  186:23 200:18,18
  200:22,23 209:5
  220:23 223:15
  224:12 225:2 230:8
  230:10 235:7
  243:20,23,24 245:3
  245:5,9 246:6
  247:1 252:14

253:20 256:25
258:6 260:2 268:16
271:1 275:3 285:14
299:8 306:22
307:16 308:17
310:2 315:25,25
317:24 319:23
320:19 324:14
330:8 331:1 332:14
334:3 336:11,13,25
337:7
wanted  10:10,24
  20:7 26:14 39:14
  39:17 41:5,5 49:13
  49:17 61:19 64:5
  70:14 72:10,11,12
  72:14 95:14,18,21
  139:23,24 140:20
  140:20 143:1
  148:10 171:25
  174:1 189:3 191:9
  209:3,25 210:6
  219:11 225:8,9
  238:19 245:1,2
  276:12 315:15,21
  316:15 328:8 332:7
wants  200:17
  315:12 324:6
warehouse  218:6
  250:4
warehouse.doc.
  218:21
washington  3:10
waste  131:11
water  234:11 243:5
  243:6,7,9 252:2
  262:12,15 316:23
way  19:14 27:21
  30:2,3,4 32:20
  46:10,14 53:8
  58:20 63:7 67:9

CONFIDENTIAL

70:17 76:6 96:15
109:16 112:21
121:21 122:23
124:3 133:14 139:5
140:15 146:16
147:20 148:3 155:2
163:17 173:19
174:9 183:1 199:7
200:5 206:9,10,13
209:22 210:8,19
220:21 224:25
226:25 227:1
247:24 250:18
253:8 262:1 263:3
263:23 268:25
269:14,15 271:3
286:11 292:3
296:22 302:8 308:1
308:1 317:25
319:19 320:2
329:14 337:4
**ways**  58:16 289:13
**we've**  11:6,18
56:20 57:17,17
58:24 80:17 94:18
102:25 120:2
122:19 142:22
143:2 147:25 151:7
158:19 160:9
200:11 214:22
225:4 227:23
246:25 247:21,21
253:9,9 260:22
267:18 270:25
271:6,6,7,7,8,8
275:1,2 293:15,16
293:16 302:11
305:24 306:15
307:19 311:21,23
318:3,20,20,21,21
319:10 324:1 335:8

**wealthy**  325:21
**website**  307:14
**websites**  53:11
**week**  21:13 45:4
72:13 172:25,25
173:2 202:1,4
203:1
**weeks**  72:4 191:9
193:3 304:12
**wells**  110:11,13
**went**  61:22 73:12
73:17,19,22 92:23
93:24 170:2 197:2
224:18 305:7
**west**  256:5
**whatsapp**  283:2,3
**white**  3:9,14,19
**whitecase.com**
3:11,16,22,23
**wife**  84:22 102:16
104:12 122:7
227:10
**wife's**  104:23
**williams**  228:25
229:5
**willing**  10:18,21
29:12 244:9 319:19
319:22 320:1,20
322:1
**win**  188:24
**winning**  225:13
**wire**  23:12
**wish**  199:17
**withdraw**  74:2,16
75:21
**withdrawal**  74:6
**withdrawing**  74:22
**withdrawn**  75:23
**withdrew**  75:18,20
**witness**  2:2 9:25
10:1 12:13 16:16

16:24 17:3 37:24
38:1 50:19 69:25
134:8,17 147:17,19
148:4,7,10,12,14
148:25 149:4,9,16
149:22 150:2,8,11
150:16,19,21 151:2
152:2,17 155:16
176:16 200:16,18
201:3 206:3 248:16
255:3 271:23 275:9
291:12 294:7,11
295:15,18 298:5
319:6,8 323:11
326:3 333:12
335:19 337:4 338:2
340:20 342:3,4,7,8
342:10,11
**won**  36:16 37:12
38:7,14,25 164:8
**wonderful**  11:24
**woodway**  4:15
**word**  93:11,16,23
94:7,11 98:25 99:1
99:3 146:8 165:22
249:20 317:10
**words**  45:16 130:6
246:19 249:12
315:19 317:8
**work**  19:15 22:12
22:19,21,23 23:1
31:11,16 39:8,9,9
44:14 59:16,16,17
70:15 78:11 79:24
93:9 94:12 100:17
101:11 122:13
123:8,10,13 124:22
125:15,22 133:3,6
133:12 155:16
168:14,17 169:5,6
169:8,9 174:18,20

179:6 185:11
187:20 188:18,24
188:25 189:20,21
189:24 190:16
201:22 210:11,21
213:12 219:18
222:18 224:13,20
224:24 229:11,19
232:7,11 235:10
239:13 244:3
245:11 258:10
259:11 260:7
263:16,24 266:22
267:9 268:15 269:2
269:7,12,15 283:18
291:19 295:9
298:24 299:3
301:24 307:15,16
307:18,20,23 308:3
308:21 309:15
310:4,8,14,24
312:5,22 313:14,14
316:5,10,18,25
317:5,11,12,14,15
318:4,8,11,18
319:20 327:24
328:9 333:23 334:7
334:15
**worked**  169:17
184:12 189:25
227:13 234:25
235:13
**workers**  273:23
**working**  20:8
101:24 103:19
104:2,4 122:15
123:9 127:1,4
172:9,19,24 175:7
178:9 179:8 196:23
213:2,17 220:7
234:19 266:25

279:18
**workplace**  131:11
   131:12,12 334:10
**works**  71:12,13
   79:20 155:15
**worried**  101:10
**worry**  192:16,17
**worse**  140:14
**worth**  37:5 47:23
   56:11,14,17 109:7
   178:13 280:20
   312:22 341:22
   342:22
**would've**  77:10
**wound**  53:16
**write**  61:7 107:2,13
   107:18 109:13
   111:9 114:19 150:9
   150:24 152:5
   245:21 261:25
   262:8,19 263:8
   265:6 266:5 292:14
   293:12 296:1
**writes**  237:18
   244:11
**writing**  110:11
   296:15 330:12,16
   330:23
**written**  111:19
   179:20 330:13
**wrong**  14:15 19:8
   48:13 186:18 248:3
**wrongly**  295:11
**wrote**  23:10 33:1,7
   34:1 44:22 109:23
   112:3 114:8 120:19
   157:25 175:9 264:5

**x**

**x**  37:2 107:15
**xmas**  141:3,4

**xtra**  117:23

**y**

**y**  26:5 37:2 143:15
**y'all**  83:9 263:2
**yeah**  11:23 16:11
   16:22 17:3,22
   21:17 31:2,4 36:13
   45:2 46:1 50:15
   53:10 54:11 68:14
   82:1 89:13 96:22
   104:6 112:4,14
   123:25,25 125:3
   129:11 132:20
   134:18 137:2 139:4
   139:7 147:17,19,24
   148:2,24 149:17,24
   150:2,2,3,23,23
   154:17 155:17,21
   164:22 165:3,4,5
   171:1,3 174:9
   176:1 177:19
   186:17 194:18
   195:8 197:5 198:11
   202:25 204:9,19
   208:17 212:13
   216:4 217:20 218:8
   220:23,25 221:4
   224:10 227:17
   228:2,2 232:24
   233:1 237:2 248:14
   248:16 249:8
   250:21 257:24
   258:8 259:14,17
   263:18 268:21,21
   269:25 282:14
   285:16 286:18
   297:19 316:1 319:7
   319:16,25 322:8
   324:8 331:11
**year**  31:7,18,20
   71:16 72:17 73:6

110:4 115:23 117:3
   122:17 173:23
   174:5,6 176:23
   200:4 226:1 256:9
   266:18 278:1,2
   296:2 299:23 320:7
   320:8,13 321:3
**yearly**  35:17
**years**  37:17 41:7
   44:14,15 72:22
   73:5 135:15 169:18
   173:1,24 183:8
   191:18 193:21
   198:13,24 217:3
   238:10 261:11
   266:25 267:3
   279:14 280:8,11,20
   282:13 284:1,2
   306:25 310:8 311:7
   321:1
**yep**  147:13,18
   193:11 196:3
**yesterday**  274:17
   301:23
**york**  256:5

**z**

**z**  37:2
**zero**  191:14 269:16
**zoom**  2:7 16:23
   50:2,13 116:9
   124:24,24 138:25
   164:24 165:1,4
   222:6 294:23
**zoomed**  17:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.