## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **TOSHIBA INTERNATIONAL CORPORATION,** | § § § | |
| **PLAINTIFF,** | § | |
| **v.** | § § § | |
| | § | **No. 4:19-cv-04274** |
| **ABRAHAM JOSEPH, an individual, ONEPOINT, INC., RUDOLPH CULP, as independent administrator of the ESTATE OF PABLO D'AGOSTINO, PD RENTALS, LLC, JANUARY 22 1992, LLC, VINOD VEMPARALA, an individual, and V2V SOLUTIONS, LLC,** | § § § § § § § § § | **JURY TRIAL DEMANDED** |
| | § § § | |
| **DEFENDANTS.** | § | |

## PLAINTIFF TOSHIBA INTERNATIONAL CORPORATION'S
## OPPOSITION TO JOSEPH DEFENDANTS' MOTION TO COMPEL

Abraham Joseph and OnePoint, Inc.'s latest attack on TIC's attorney-client privilege and attorney-work product protection is rooted in a misunderstanding and misrepresentation of the facts, governing case law, and nature of the documents they demand. *See generally* Abraham Joseph and OnePoint, Inc.'s (collectively "Joseph Defendants") Mot. to Compel, ECF No. 356. The Joseph Defendants would have this Court believe that they have a strong and valid statute of limitations defense based on OnePoint ceasing work at TIC in 2011. *Id.* at 3. The Court is likely well

aware by now that OnePoint actually continued to do business at TIC through 2019, and Joseph recently testified that he continued giving Pablo D'Agostino envelopes containing thousands of dollars of cash through 2019.  The unravelling of the statute of limitations defense and the Joseph Defendants' inability to support it through normal discovery is the motivation behind their misguided attempt to force TIC to disclose privileged information regarding a legal and ethical compliance culture assessment that had nothing to do with the fraud or anyone's knowledge of the fraud at issue in this litigation.

The Joseph Defendants mischaracterize the nature and scope of AMI's work to confuse the Court as to its relevance; the assessment covered all personnel of four separate companies, it was not a targeted "investigation into the culture of the Houston facilities department run by D'Agostino."  *Id.* at 14.  The assessment was not a "pre-suit investigation" into the Defendants' scheme (*Id.* at 2), and the privileged reports resulting from the assessment do not contain facts TIC is relying on in asserting its claims or rebuffing any party's defenses.  Further, the records sought by the Joseph Defendants were created with the understanding that they were confidential and privileged, the privilege was maintained, and the minimal relevance of the documents to this litigation does not warrant an abrogation of TIC's attorney-client privilege and work-product protections.  The Joseph Defendants have had, and

continue to have, various opportunities to obtain the facts they believe exist from non-privileged sources of discovery.

## I.     TIC Budget Documents from Outside the Period at Issue Are Not Relevant to Any Party's Claims.

The relevant period in this litigation is 2007–2019.  That period encompasses Pablo D'Agostino's employment at TIC, the bribes paid to D'Agostino by Abraham Joseph and Sudhakar Kalaga, and the coordination of bids and submission of fake bids by Abraham Joseph, Sudhakar Kalaga, and Vinod Vemparala.  Am. Compl. ¶¶ 1, 16, 20, 34, 39, 43, 61, 64, 77, 104, ECF No. 90.  TIC seeks damages for the economic losses it suffered as a result of the conspiracy that operated during that period.  To measure losses and determine what TIC would have paid in the absence of collusive bidding and kickbacks to TIC's facilities manager, TIC's experts have calculated the difference between what TIC actually paid versus the costs incurred by Defendants.  This loss calculation has nothing to do with TIC's budgets.

At Defendants' request, TIC already has produced numerous budget documents in this litigation, including Facilities Department budget submissions, Facilities budget G&A expenditures (which includes maintenance project expenditures), TIC-approved capital budgets, and records of the approved capital expenditure request forms.  Available documents from the period of D'Agostino's employment were produced to Defendants months ago.  TIC has also responded to

interrogatories regarding budgeting issues and confirmed that TIC is not aware of D'Agostino ever exceeding the approved facilities budget.

Upset that these materials do not support the Joseph Defendants' new and unfounded suspicion that D'Agostino grossly exceeded his budget without consequence, the Joseph Defendants now command the production of "facts" from *before* and *after* D'Agostino's time at TIC. Mot. at 3. This request is nonsensical on its face, because budgets for years D'Agostino did not work at TIC have no bearing on whether D'Agostino "maintained proper spending discipline within TIC's internal budgetary process." *Id*. Asking TIC's finance personnel to track down budget documents as old as 19 years is not proportional to the needs of the case in light of the burden on TIC and the Defendants' access to other available discovery. The Joseph Defendants have taken two days of Rule 30(b)(6) testimony from TIC and have scheduled the deposition of TIC's Chief Financial Officer, Ken Schaeffer. The Joseph Defendants have also subpoenaed D'Agostino's former supervisor, Kyle Kem, who had responsibility for authorizing or rejecting projects proposed by D'Agostino. The Joseph Defendants have ample opportunity to pursue their 2002–07 and 2020 budget detour during those depositions.

The Joseph Defendants' request for out-of-period documents on a tertiary issue such as TIC's budgets is particularly unreasonable in light of their own refusal to produce records of their bribes to D'Agostino *during* the period actually at issue

4

in this case.  *See generally* Joseph Defendants' Mot. to Quash, ECF No. 354.  The Joseph Defendants' strategy of scorching the earth on offensive discovery while attempting to shield themselves from incriminating evidence on the core issues in the case should not be rewarded.  Denying the Motion as to the out-of-date budget documents works no prejudice to the Joseph Defendants' theory that D'Agostino spent TIC resources without oversight.  After the depositions of Messrs. Schaeffer and Kem, the Joseph Defendants will be satisfied that D'Agostino did not have unchecked spending authority.  The Joseph Defendants' clever "tails we win, heads you lose" argument about the TIC Facilities Department's spending (Mot. at 3) ignores the reality that D'Agostino manipulated and subverted the budget process to gain preapproval for the inflated amounts he knew his co-conspirators would charge.

## II.     TIC Properly Objected to Requests for Attorney-Work Product and Attorney-Client Privileged Information.

In 2019, Timothy J. Fraser, Vice President, General Counsel, and Secretary of Toshiba America, Inc. ("TAI"), the separately-incorporated parent of TIC and a non-party in this litigation, retained Affiliated Monitors, Inc. ("AMI") to conduct an ethics and compliance culture assessment ("Assessment") of TAI and its subsidiaries, which included TIC and multiple other companies.  The AMI reports created for and sent to Mr. Fraser are relevant to this litigation, if at all, only as a link in the chain of events that led to Mr. Fraser's discovery of the fraud perpetrated by Abraham Joseph and his co-conspirators against TIC.

5

Mr. Fraser already has testified that, as TAI's General Counsel, he retained AMI to (i) identify and assess potential compliance-related legal risks, and (ii) investigate the TIC compliance culture concerns raised by TIC's General Counsel, Margaret McKay, arising from the company's efforts to pursue an insurance claim for fire-related remediation and repair work. *See* Fraser Dep. Tr. 16:2–17, 99:7–100:12. Mr. Fraser was concerned that there may be unrecognized compliance-related legal risks at TIC and the other group companies, and he decided to take this opportunity to investigate. *See* Declaration of Timothy J. Fraser ¶ 3 (January 29, 2021) ("Fraser Decl."), attached as Exhibit A. At the time AMI was retained, Mr. Fraser had no evidence or suspicions that Pablo D'Agostino, Abraham Joseph, or others were involved in the bribery and bid-rigging scheme at the heart of this litigation. Fraser Decl. ¶ 6.

Mr. Fraser initiated the Assessment to help identify potential compliance weaknesses or failures that could reveal potential legal risks so that he could recommend what steps Toshiba Corporation, TAI and/or its subsidiaries should take to avoid or mitigate those risks. Mr. Fraser recognized that using an outside party with experience surveying employees, such as AMI, was important to elicit open and candid disclosures[1] from company employees – the persons with the greatest

---

[1] Mr. Fraser was asked during his deposition whether he received the raw data from the employee survey. Contrary to the Joseph Defendants' assertion in their Motion, Mr. Fraser responded that he received a report, but would need to review before answering whether it was raw data. Fraser

knowledge about what is going on inside the company – in order to identify hidden problems within the organization that potentially could create civil, regulatory, or criminal exposure for the organization.   For this purpose, AMI disclosed to all interviewees that the interviews were being conducted under the "under the auspices of the Toshiba Group Legal Team" and that "discussion therefore is confidential and privileged."   Fraser Decl. ¶ 5.   Mr. Fraser maintained the confidentiality and privileged nature of the reports and did not disclose them to anyone other than counsel and the senior executive leadership at TAI and its subsidiaries to whom he, or the General Counsel at each respective company, reports on legal matters.  *Id.*

The AMI reports to Mr. Fraser were drafted by Eric Feldman, a Senior Vice President and Managing Director of AMI, who previously served in executive positions with the Offices of Inspector General at the Department of Defense, Defense Intelligence Agency, Central Intelligence Agency, and the National Reconnaissance Office.   The AMI reports reflect Mr. Feldman's observations, opinions, and recommendations based on the interviews, focus groups, employee survey, and his review of numerous documents.

Mr. Fraser further testified how AMI's observations (contained in PRIV0020, just one of AMI's several reports) caused him to hire outside counsel to conduct an

---

Dep. Tr. 134:5–9.  The referenced report is a 340-page document authored by Stephen J. Nemmers, Ph.D., reflecting his analysis of the data.  PRIV0023.

internal investigation.  *See* Fraser Dep. Tr. 16:18–25.  That internal investigation resulted in discovery of the fake-bidding and bribery scheme in September 2019.

Mr. Fraser, as originally intended, also relied upon the AMI reports to make legal recommendations to Toshiba Corporation, TAI, and its subsidiaries unrelated this litigation or the underlying fraud perpetrated by Abraham Joseph and his co-conspirators against TIC.  This included investigating, or causing others to investigate, certain anecdotal reports and concerns received from employees across the TAI Group.  Mr. Fraser also made numerous recommendations regarding actions that his clients should take to avoid or mitigate potential legal risks

While the Joseph Defendants' Motion to Compel is silent on the subject, the record is clear that Mr. Fraser testified about AMI only upon agreement among counsel, including counsel for the Joseph Defendants, that his testimony would not be a blanket waiver of the attorney-client privilege and attorney-work product protections.  *See* Fraser Dep Tr. 7:10–17; *see also* Ex. B. (e-mail among counsel memorializing agreement that "deposition testimony by Toshiba's general counsel, Tim Fraser, will not constitute a broad waiver of privilege or work product protections.").  Notwithstanding that agreement, the Joseph Defendants now invoke the sword-shield doctrine to seek discovery of this privileged material of minimal evidentiary value.  To be clear, TIC is not relying on any of the contents of the AMI reports for any purpose in this litigation.  Fraud was not suspected when Mr. Fraser

8

retained AMI, AMI did not conduct an investigation to detect fraud, and the reports do not contain facts necessary for any party's claims or defenses in this litigation.

Therefore, the work performed by Mr. Feldman and the resulting reports provided to Mr. Fraser for purposes of advising his corporate clients are protected by both the attorney-client privilege and the work-product doctrines. Moreover, the Joseph Defendants cannot overcome the stringent requirements of Rule 26(b)(3)(A)(ii) of the Federal Rules of Civil Procedure to demonstrate the substantial need required to abrogate the protections.

### A. Communications Between TAI's General Counsel and His Agents Gathering Information to Render Legal Advice Are Protected by the Attorney-Client Privilege.

Questions of privilege that arise in the course of the adjudication of federal rights are "governed by the 'common law — as interpreted by United States courts in light of reason and experience.'" *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020) (citing Fed. R. Evid. 501). The elements of the federal attorney-client privilege are: 1) a confidential communication, 2) made to a lawyer or his subordinate, 3) for the primary purpose of securing either a legal opinion, legal services, or assistance in a legal proceeding. *M-I L.L.C. v. Q'Max Sols., Inc.*, No. H-18-1099, 2020 U.S. Dist. LEXIS 140419, at *30 (S.D. Tex. Aug. 6, 2020) (citation omitted). Application of the privilege "is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *Hodges,*

*Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985) (citation omitted).  The burden of demonstrating the applicability of the privilege rests on the proponent.  *See id.*

The privilege "protects both 'the giving of professional advice to those who can act on it' and 'the giving of information to the lawyer to enable him to give sound and informed advice.'" *Adams*, 973 F.3d at 349 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).  The Supreme Court has determined that the attorney-client privilege applies to corporations, justified by "the vast and complicated array of regulatory legislation confronting the modern corporation," which requires corporations to "constantly go to lawyers to find out how to obey the law . . . particularly since compliance with the law in this area is hardly an instinctive matter." *Upjohn Co.*, 449 U.S. at 392.

As a case cited by Joseph Defendants makes clear, "communications made by and to non-attorneys serving as agents of attorneys in internal investigations are routinely protected by the attorney-client privilege." *Heckman v. TransCanada USA Servs.*, No. 3:18-CV-00375, 2020 U.S. Dist. LEXIS 7293, at *8 (S.D. Tex. Jan. 13, 2020) (citing *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758 (D.C. Cir. 2014)).  In *Heckman*, this Court cited *In re Kellogg Brown & Root, Inc.*, a prominent decision from the D.C. Circuit on federal common law attorney-client privilege.  *See generally* 756 F.3d 754.  In *Kellogg*, the D.C. Circuit vacated a district court's order

denying the protection of the privilege on communications made during a business's internal investigation led by company lawyers. *Id.* at 756. There, an individual accused of defrauding the U.S. government by "inflating costs and accepting kickbacks while administering military contracts" sought documents from his previous employer, a defense contractor, related to the employer's internal investigation into the alleged fraud. *Id.* The Court held that "[i]n the context of an organization's internal investigation, if one of the significant purposes of the internal investigation was to obtain or provide legal advice, the privilege will apply," and that in the scenario at hand, "there [could] be no serious dispute" as to the purpose of the investigation, which was to facilitate legal advice. *Id.* at 760.

The work performed by AMI was done at the request of counsel to identify compliance-related legal risks that were important to Mr. Fraser's ability to advise his clients, Toshiba Corporation, TAI, and its subsidiaries. Mr. Fraser was not seeking general business advice or gathering information to advise the company on any non-legal matters. Fraser Decl. at ¶ 4. Mr. Feldman, working as Mr. Fraser's agent, conducted his work and reported to Mr. Fraser for purposes of identifying legal risks. Mr. Feldman's reports reveal his mental processes through the observations and recommendations on how the TAI Group companies could strengthen its compliance culture and minimize and avoid legal exposure. Mr. Feldman's communications with Mr. Fraser reflect his understanding that the

communications were being made for purposes of the rendering of legal advice. *See, e.g.,* PRIV0020 ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████

Case law cited by the Joseph Defendants only bolsters this proposition. *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 474 (N.D. Tex. 2004). Looking beyond the selectively-quoted language that the Joseph Defendants rely on regarding communications made in a non-legal capacity (Mot. at 12 (citing *Navigant*, 220 F.R.D. at 474)), the Court in *Navigant* was clear that the privilege applies to communications "made for the purpose of facilitating the rendition of professional legal services to the client." 220 F.R.D. at 473–76. The Joseph Defendants have failed to cite a single case in which a court ordered disclosure of a corporate general counsel's communications with an agent retained for the purpose of assisting in the provision of legal advice. An order compelling disclosure of these AMI reports would cause a chilling effect on companies' proactive efforts to look self-critically at themselves and diligently probe the potential ethical and compliance failures that result in public harm, regulatory violations, and legal exposure.

### B.     Records Created at the Request of TAI's General Counsel to Evaluate Litigation Threats are Protected Attorney-Work Product.

The work-product doctrine protects "the mental processes of an attorney from inquiry by an opposing party." *Smith v. Diamond Offshore Drilling, Inc.*, 168 F.R.D. 582, 583 (S.D. Tex. 1996) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)). Categories protected by the work-product doctrine include such materials as "a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries." *Adams*, 973 F.3d at 349–50 (citation omitted).

The Fifth Circuit recognizes that to apply the attorney work-product doctrine, "[l]itigation need not necessarily be imminent . . . as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981) (citations omitted). "[F]actors relevant to determining the primary motivation for creating a document are the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." *Heckman*, 2020 U.S. Dist. LEXIS 7293, at *5 (quotation marks and citation omitted).

Indeed, the facts of *Heckman*, a case cited in the Joseph Defendants' own Motion (Mot. at 11, 15), are particularly instructive where this Court found the work-

product doctrine applied to investigatory documents created by a party's internal legal counsel resulting from an employee complaint. *See Heckman*, 2020 U.S. Dist. LEXIS 7293, at *6–7. There, an employee of the company made a discrimination complaint, which ordinarily would have been addressed by the company's human resources department. *See id.* at *13. Instead, the company deviated from this routine practice, and the internal counsel's office investigated the complaint directly out of the concern there could be potential litigation stemming from the complaint. *See id.* It was precisely "[b]ecause [the party's] counsel-directed investigation was neither routine nor ordinary" that this Court found "the documents at issue were prepared in anticipation of litigation and are entitled to work product protection." *Id.* at *7.

Just like in *Heckman*, Mr. Fraser does not investigate matters at TAI's subsidiaries except in exceptional circumstances – generally limited to matters where the subsidiary's General Counsel has a conflict. Additionally, Mr. Fraser does not typically investigate matters by retaining outside consultants to conduct a wide-ranging assessment of the legal and compliance risks. Mr. Fraser joined TAI in 2011, and the Assessment performed by AMI in 2019 was the first time this extraordinary step was taken. *See* Fraser Decl. ¶¶ 1, 3.

Furthermore, given the broad scope in terms of companies, locations, and employees, and that the interviews, focus groups, and survey were intended to elicit

open and candid feedback from employees regarding potential misconduct, Mr. Fraser anticipated that the Assessment potentially would uncover a compliance failure that could lead to civil litigation, or, potentially, even criminal or regulatory action.  Fraser Decl. at ¶¶ 3, 5.  During his deposition, Mr. Fraser truthfully testified that he was not anticipating this litigation or any other specific litigation when he retained AMI.  The decision to retain AMI was directly and inextricably linked to the threat of legal exposure to TIC and the other TAI Group companies, and the resulting Assessment was performed "against a background of circumstances that highlight the risk of litigation," and therefore, the investigatory materials generated by AMI are protected by the work-product doctrine.  *See Heckman*, 2020 U.S. Dist. LEXIS 7293, at *7.

It is well-recognized that the attorney-work product doctrine extends to investigators and consultants retained by a party and working at the direction of that party's counsel.  *See, e.g.*, *SEC v. Brady*, 238 F.R.D. 429, 442 (N.D. Tex. 2006) ("Examples of opinion work product include notes and memoranda created by an attorney or his agent, regarding witness interviews, because they contain mental impressions." (citing *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991))); *Smith*, 168 F.R.D. at 584 (holding that transcripts of recorded interviews with defendant's employees who witnessed plaintiff's accident recorded by investigator for defendant company "were taken in anticipation of litigation and

thus fall within the scope of the work product doctrine."). Mr. Feldman's selection of the information to gather and report to his client, Mr. Fraser, is protected opinion work to product.

        **C.**     **The Joseph Defendants Fail to Demonstrate Any Substantial Need Required by Fed. R. Civ. P. 26(b)(3)(A)(ii) to Invade TIC's Privilege.**

In order to overcome the protections of the work-product doctrine, Rule 26 of the Federal Rules of Civil Procedure requires that "(i) [the materials] are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii); *see also King v. Odeco Inc.*, No. 95-31171, 1997 U.S. App. LEXIS 43057, at *5 (5th Cir. Jan. 8, 1997). The Joseph Defendants have not asserted any need for the documents subject to the Motion to Compel, much less a "substantial need" as required by Rule 26(b)(3)(A)(ii).

Moreover, the Joseph Defendants have no need for the AMI communications where they have the ability to depose TIC personnel about the exact questions covered in the AMI report (i.e., the "red flag indicators of fraud" regarding the fire claim), and in fact, have already deposed five TIC witnesses on this subject, with (at least) four more occurring imminently, including the deposition of Margaret McKay, TIC's general counsel, and Robert Darden, the fire insurance claim investigator. The

Joseph Defendants also have stated that they intend to depose at least five former employees of TIC – including Mr. D'Agostino's assistant and the three persons with greatest responsibility for managing him during this tenure.   If the Joseph Defendants truly believe evidence of TIC's culture will help them escape liability for their participation in a bribery and bid-rigging conspiracy, they can explore that discovery through these other (non-privileged) avenues.  The two employees closest to D'Agostino, his supervisor, Kyle Kem, and assistant, Paige St. Fleur, are both scheduled to be deposed in the coming weeks.  The Joseph Defendants have already deposed Patrick Widacki and Cesar Diaz, two Facilities Department employees who worked under D'Agostino for years.  While TIC continues to believe evidence of TIC's culture is not relevant to the matters genuinely at issue in this litigation, it has not impeded the Joseph Defendants' discovery efforts as to non-privileged communications.

As the Court can verify through *in camera* review of the AMI reports and correspondence, none of the materials are limited to D'Agostino or contain discussions of the Defendants' fraud, which, as Mr. Fraser has testified, was not uncovered until *after* AMI concluded its work and TIC retained outside counsel.  In the reports, AMI presents its compilation of observations based on anecdotal reports and discussions with hundreds of employees.  The AMI reports contain extensive information gathered from other non-parties Toshiba subsidiaries that have zero

involvement in this litigation.  As such, there is no significant need for the reports that justifies abrogating TAI's work-product protections and attorney-client privileges.  As the Court will see in reviewing the reports, there are no findings of illegal behavior, no mentions of bribes being paid by Abraham Joseph or others, and no mentions of bid-rigging.

### D. TIC Has Not Waived Its Privileges in the AMI Communications with TAI's General Counsel.

Despite the Joseph Defendants' vigorous and woefully misguided assertions that TIC is using the AMI communications as both a sword and a shield, TIC has never relied on the privileged communications from AMI to Mr. Fraser for any purpose in this litigation.  The only instance in which TIC has ever discussed AMI's Assessment was during Mr. Fraser's deposition in response to questions from the Joseph Defendants' counsel to explain in detail how the May 2018 fire at TIC eventually led to the discovery of the Defendants' fraud in September 2019.  *See* Mot. at 18–19 (citing Defendants' Ex. B (Fraser Dep. Tr. 13:14–17:3, 99:21–24, 134:5–15, 132:3–133:9)).  TIC has never relied upon the AMI Assessment in opposing a statute of limitations defense raised by any party in this case, nor has it ever been cited in TIC's briefing.

TIC also does not rely on facts from AMI's Assessment in its pleadings, a fact that distinguishes TIC from the parties found to have waived work-product protections in the cases presented by the Joseph Defendants.  They cite to the

"instructive" decision in *Doe v. Baylor University*, 335 F.R.D. 476 (W.D. Tex. 2020), where the party resisting discovery, in stark contrast to TIC, relied extensively on helpful elements of its counsel's work in defending the litigation. Baylor's reliance upon a law firm's investigatory work to defend itself was central to its defense, as it repeatedly referenced the investigation in answers to the plaintiffs' complaints and opposing a motion to dismiss, "repeatedly invoked [the investigation] to limit questioning in depositions," and even published a 755-page external report about the investigation and recommendations. *See id.* at 482, 485–86, 488–490 (noting that referring to work product in pleadings can be interpreted as "relying on" work product). Indeed, Baylor's "repeated" citations to this report to support its defenses even led the judge to warn that it would "risk waiving work product protection if it directly invoked [the investigation] as part of a substantive defense to Plaintiffs' claims in the future." *Id.* at 490. These facts are entirely inapposite to the facts in this matter, where the parties interested in the AMI reports are the Joseph Defendants, not TIC.

Further, "[m]ere relevance is not sufficient to place work product at issue." *Id.* at 488 (citation omitted). Rather, waiver becomes an issue only where "a party has asserted a claim or defense that explicitly relies on the existence or absence of the very communications for which he claims a privilege." *Mir v. L-3 Communs. Integrated Sys., L.P.*, 315 F.R.D. 460, 471 (N.D. Tex. 2016) (citing *In re Burlington*

*N., Inc.*, 822 F.2d 518, 533 (5th Cir. 1987)).  That is simply not the situation with the privileged AMI communications, as TIC's discovery of the fraud does not (explicitly or otherwise) rely upon them or any of their contents.  Mr. Fraser's testimony about "red flag indicators of fraud" involves the contents of just one of the several AMI reports.  AMI did not uncover any fraud, let alone the fraudulent scheme that prompted this litigation.  Furthermore, AMI explicitly states in the reports that it was not tasked with conducting a fraud examination.  *See* PRIV0020

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████).  The AMI report mentioning potential fraud indicators was simply a link in a chain of TIC's discovery of the fraud.  The Joseph Defendants cannot now in good faith claim that TIC's privileges and protections have been waived where they themselves expressly agreed as a condition of Mr. Fraser's testimony that the "deposition testimony by [Mr. Fraser] will not constitute a broad waiver of privilege or work product protections."  Ex. B.

## CONCLUSION

TIC respectfully requests that the Court deny the Motion to Compel.

Respectfully submitted,

Dated:  January 29, 2021                          WHITE & CASE LLP

By: _/s/ Michael Rodgers_____
Michael Rodgers
Texas State Bar No. 24095114
S.D. Tex. Bar No. 2638667
michael.rodgers@whitecase.com
609 Main Street, Suite 2900
Houston, TX 77002
tel.: (713) 496-9700
fax: (713) 496-9701
*Attorney-in-Charge for Toshiba*
*International Corporation*

OF COUNSEL
Christopher M. Curran (*pro hac vice*)
ccurran@whitecase.com
Samuel J. Sharp (*pro hac vice*)
samuel.sharp@whitecase.com
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
tel.: (202) 626-3600
fax: (202) 639-9355

Daniel Fridman (*pro hac vice*)
dfridman@ffslawfirm.com
Fridman Fels & Soto, PLLC
2525 Ponce de Leon Boulevard
Suite 750
Coral Gables, FL 33134
tel.: (305) 569-7720
fax: (786) 627-4145

*Counsel to Toshiba International*
*Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2021, I caused to be electronically filed Plaintiff's Opposition to OnePoint, Inc.'s and Abraham Joseph's Motion to Compel with the Clerk of the Court using the CM/ECF system, which will send notifications of filings to all counsel of record.

Respectfully submitted,

**WHITE & CASE** LLP

By*:  /s/ Michael Rodgers*
Michael Rodgers
michael.rodgers@whitecase.com
609 Main Street, Suite 2900
Houston, TX 77002
tel.: (713) 496-9700
fax: (713) 496-9701